1

| 1 | IN THE UNITED STATES DISTRICT COURT |
| | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
 3   UNITED STATES OF AMERICA,        )
                                      )
 4              Plaintiff,            )
                                      )
 5              v.                    )   No. 19 CR 00486
                                      )
 6   ROBERT ANTHONY HAAS,            )   Chicago, Illinois
                                      )   July 23, 2020
 7              Defendant.            )   1:00 p.m.
```

8              TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS

9                BEFORE THE HONORABLE EDMOND E. CHANG

10   APPEARANCES VIA VIDEOCONFERENCE:

```
11   For the Plaintiff:        HON. JOHN R. LAUSCH, JR.
                               United States Attorney
12                             BY:  MS. ERIN E. KELLY
                                    MR. BARRY JONAS
13                             Assistant United States Attorneys
                               219 South Dearborn Street, Suite 500
14                             Chicago, Illinois 60604
                               (312) 353-5300
15
     For the Defendant:        MR. ROBERT ANTHONY HAAS,
16                             Pro se;

17   For the Defendant as      BEDI & SINGER, LLP
     standby counsel:          BY:  MS. DENA M. SINGER
18                             53 West Jackson Boulevard
                               Suite 1505
19                             Chicago, Illinois 60604
                               (312) 525-2017
20

21   Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
                               Official Court Reporter
22                             219 South Dearborn Street, Room 2118
                               Chicago, Illinois 60604
23                             (312) 702-8865
                               judith_walsh@ilnd.uscourts.gov
24

25
```

1          (Proceedings heard via videoconference:)

2          THE CLERK:  The United States District Court for the

3    Northern District of Illinois is now in session.

4          19 CR 486, USA versus Robert Anthony Haas.

5          THE COURT:  Okay.  Good afternoon.  Let me prompt for

6    appearances.  First from the government?

7          MS. KELLY:  Erin Kelly for the -- (inaudible).

8          MR. JONAS:  Good afternoon, your Honor.  Barry Jonas

9    for the United States.

10          THE COURT:  Yes, we can barely hear you.

11          MR. JONAS:  If you give us one moment, we're going to

12    switch laptops -- (inaudible) for a moment.

13          THE COURT:  Okay.  Go ahead.

14      (Pause.)

15          MS. KELLY:  Can everyone see and hear us?

16          THE COURT:  Yes.  That's much better.  All right.

17    Great.  Okay.  Once again, appearances for the government.

18          MS. KELLY:  Erin Kelly for the United States.

19          MR. JONAS:  Barry Jonas for the United States.

20          THE COURT:  Okay.  And then, Mr. Haas, can you just

21    state your first and last name?

22          THE DEFENDANT:  Robert Haas.

23          THE COURT:  Okay.  And standby counsel?

24          MS. SINGER:  Good afternoon.  Dena Singer.

25          THE COURT:  Okay.  Good afternoon, everyone.  Okay.

1  We're here for a pretrial conference via video. Let me first

2  make sure and double-check that, Mr. Haas, you received the

3  order that I entered earlier this week -- well, actually,

4  there's been three of them now. One primarily dealt with the

5  government's uncharged statements that they wanted to

6  introduce, and then there was two other much shorter orders.

7  Did you get all three of those?

8          THE DEFENDANT: Yes. I got them this morning.

9          THE COURT: Okay. So you should have gotten the two

10  shorter ones this morning and then the other one, you should

11  have received yesterday. Is that right?

12          THE DEFENDANT: Something like that (inaudible).

13          THE COURT: Okay. So what I'd like to do is, let's

14  go through some of the open questions that were in that order

15  that is docket entry 201, the longer one. And it says 201 on

16  the top. And so, yes, the first issue is on Page (inaudible).

17  It has to do with limiting instructions.

18          So Mr. Haas, if you're not familiar with this concept

19  of limiting instructions, sometimes evidence should only come

20  in for a certain purpose. And in those instances, sometimes

21  the parties want some kind of limiting instruction so that the

22  jury is told, here is what you can consider the evidence for,

23  here is what you cannot consider the evidence for.

24          So I proposed, I really just floated and I wanted to

25  get comments on two limiting instructions. One has to do --

1    they're both on Page 6.  One has to do with those uncharged

2    statements, and then the other has to do with the beliefs that

3    were expressed in some of the statements and what the jury can

4    and cannot consider those for.

5         So first let me solicit from the government if you

6    have any comments on either instruction at this point.

7         MS. KELLY:  No, your Honor.  We don't have any

8    further comments on those limiting instructions.

9         THE COURT:  Okay.  Mr. Haas, do you have any thoughts

10   on those?

11        THE DEFENDANT:  Yes.  I don't fully understand what

12   they were talking about or what you have decided in those, and

13   I haven't had an opportunity to speak to my standby counsel

14   because I just got this information this morning.  I haven't

15   been allowed on the law computer.

16        And this meeting is a violation of my rights.

17   According to Rule 43, defendant's presence, I am supposed to

18   be in that courtroom for the initial appearance, the initial

19   arraignment and the plea, every trial stage including jury

20   impanelment and the return of the verdict and sentencing.  My

21   rights are being violated.

22        I haven't been allowed to have a haircut in four

23   months, and you have me in front of these people looking like

24   this.  I haven't been able to maintain myself, to present

25   myself in court.  I am not presentable.  How am I supposed to

1    call my lawyer?  There's no -- if I have a question with you

2    people sitting here watching this.

3         This is a violation of my rights.  I'm not waiving my

4    right to object to this.  I'm only allowing it because you

5    guys threatened me with quarantine because I don't come to

6    court.  That's a violation of my rights, too.  This whole

7    thing is a violation -- I don't even understand how we're

8    going to get to trial without putting me in quarantine.

9    You're going to lock me up and quarantine me for 15 days for

10   my due process, for my constitutionally guaranteed jury trial?

11        THE COURT:  Okay.  Let me make a couple things clear

12   on the record.  First, with respect to your presence here in

13   court, there was a motion filed by your standby counsel after

14   conferring with you that you preferred to appear by video as

15   opposed to being in person with the -- because you wanted to

16   avoid the quarantine.  So you preserved your objection with

17   regard to the lack of in-person appearance for the pretrial

18   conference.

19        I'll note that the CARES Act did authorize

20   videoconferencing without the defendant's consent -- although

21   you did consent to it, without the defendant's consent for

22   everything other than felony pleas or sentencings.  So I think

23   both statutorily and then on constitutional grounds, we're on

24   firm ground in proceeding this way in light of the pandemic

25   and the need for the quarantine upon return to pretrial

1    detention.

2          So because there was that quarantine, you've made

3    this choice, and you've preserved your objection to the fact

4    that there was a quarantine.  It's not a threat in any way

5    that was leveled by this court.  It is simply a reasonable

6    precaution that the pretrial detention facilities have

7    implemented in light of the pandemic.  So that's number one.

8          Number two, if you have the need to speak with your

9    standby counsel during this conference by telephone, then you

10   and Ms. Singer simply need to mute yourselves, and we won't be

11   able to listen in.  So you can have private conferences during

12   this pretrial conference.  You just get my attention that you

13   need a private conference, you can go ahead and do that and

14   just mute yourselves.  And then you can unmute yourselves when

15   you want to come back in.

16         Next, with respect to, I think you mentioned your

17   haircut and so on.  I guess for that, I would encourage you to

18   speak with Ms. Singer.  If you have some concerns about the

19   jail conditions, whether it's on the back end with like a

20   haircut and your appearance or going forward in terms of

21   what's going to happen with the -- with your return during

22   trial each evening, do that, and she can present a list of

23   concerns to me.  She'll email the other side as long as it's

24   not disclosing any kind of confidential information.  And then

25   I will work with the MCC to see what I can do.  So this is the

1   first I've heard of that potential concern.  So I can work on

2   those things.

3           And yes, with respect to the jury trial itself, I've

4   just received like almost final guidance on the different

5   safety precautions that we're going to try to take to bring

6   you to trial in terms of what the lawyers have to do and the

7   witnesses and the jurors and so on.  I'm going to send that

8   around to everyone, and I'll have that delivered to you as

9   well by the MCC attorney advisor so that you'll have a sense

10  of all the precautions.  So there's going to be distancing,

11  the wearing of masks, and so on.  So we're going to do our

12  very best.

13          I just received that guidance late yesterday, so I

14  will try to push it out today.  Some of it is -- has to do

15  with just internal court operations, so I have to pull out the

16  relevant excerpts for the parties.  And I will do that

17  tonight.

18          Okay.  So with that understanding, your objection is

19  preserved.  Let's -- we'll move forward.  On those limiting

20  instructions, okay, yes, do talk to Ms. Singer about them.

21  And if you have any objections or concerns, you can certainly

22  put them in writing or we can talk about them on that very

23  first day of trial because we don't necessarily need to have

24  the limiting instructions in place before we actually pick the

25  jury.  So we may very well have a chance to talk about that in

1    court on that first day.  Okay.  That's the limiting
2    instruction.
3            All right.  Next, this order at docket entry 201, for
4    Mr. Haas, the government had filed that motion to admit
5    uncharged statements.  I had set a response deadline that was
6    later than some of the other deadlines, and I did not receive
7    a response from you, which is fine.  That's up to you.  In
8    reviewing them, if you've had a chance to read -- and this is
9    the one that was delivered yesterday.
10           In reviewing those uncharged statements, even without
11   a response from you, I felt that some of the statements should
12   be excluded.  And so again, you can talk to Ms. Singer about
13   those if you need some more time.
14           THE DEFENDANT:  You said that you haven't got a reply
15   from me.  You got it yesterday.  You sent it to me yesterday.
16   How am I supposed to respond to you in one day?
17           THE COURT:  No, I don't mean --
18           THE DEFENDANT:  That's impossible.
19           THE COURT:  Okay.  So what I said was that the
20   government filed a motion, and you did not respond to the
21   motion.  So I'm not asking you to respond to the decisions on
22   the uncharged statements that I made because I made those
23   without a response from you because you did not file anything
24   by the deadline or anything at all on that particular motion.
25   And what I'm telling you is that I decided to exclude some of

1    the statements based on the rules of evidence even without a

2    response from you.  So yes, I'm not asking you to respond to

3    the order at all.

4          Next in this order in terms of open questions --

5    okay.  So again, there was no response on this particular

6    point, Mr. Haas, but the government had filed a motion to keep

7    out allegations that you've made against the FBI in the civil

8    case that you've got pending.  And the decision at Page 26

9    discusses why for the most part with two possible

10   exceptions --

11         THE DEFENDANT:  Your Honor?

12         THE COURT:  -- the --

13         THE DEFENDANT:  That is the whole reason all of this

14   happened.  If those FBI officers never came and terrorized me

15   and threatened me, pointing guns in my face without a warrant

16   or charges, none of this would have happened.  I would have

17   never had to defend my First Amendment right and protect

18   myself from these terrorist people, government bureaucrats

19   terrorizing me.  That's the whole reason that all this

20   happened.  I refuse to have that taken from me, my right to

21   defend myself.  That is the whole reason this happened.

22         THE COURT:  All right.  Mr. Haas, before you

23   interrupted, there are two main exceptions to the decision.

24   The first is that if you do have some sort of entrapment

25   defense -- and we can talk about that -- I think it would make

1   sense to talk about that when we get to your exhibits.  If you

2   do have some sort of entrapment defense which I think you were

3   trying to describe in some way, then that would be one

4   exception.

5        The other exception has to do with your allegation

6   that someone in the FBI, someone in the FBI allegedly told one

7   of your neighbors that you had been arrested on a sex offense

8   charge, right.  Now, that particular allegation, I think the

9   question I have for you on that is, do you know which agent

10  allegedly said that?

11       I'm sorry.  Can you unmute?

12       THE DEFENDANT:  Officer Kostuchowski said it to the

13  neighbor to my right.

14       THE COURT:  Okay.  All right.  So as the order

15  explains, I do think then that that is an allegation that

16  Mr. Haas would be able to ask on cross-examination of Agent

17  Kostuchowski because it could go to show bias.  And since he

18  claims to have personal knowledge of that, then he can ask the

19  question.

20       What you can't do is say that you sued the government

21  over it because I think that will inject a whole another piece

22  of litigation that the jury does not need to understand for

23  this case, but you can ask him.  And if you testify, you can

24  testify to that.

25       THE DEFENDANT:  Can I speak, your Honor?

1      THE COURT:  Yes.

2      THE DEFENDANT:  Half of those comments, some of which

3  the government is not allowing you to see, they have produced

4  those messages because I did send the messages, said, "You're

5  going to pay for this, and I'm going to sue you.  You're going

6  to pay me for this."

7      And they haven't showed you those messages.  That is

8  part of what I was saying, was that they are going to pay

9  money to me for damages for terrorizing me and violating my

10  First Amendment.  They were warned about this long ago

11  multiple times, and the government is not allowing this

12  information.  I don't understand what they're trying to keep

13  you in the dark about.  Obviously, they are also guilty of

14  treason or misprision of treason.

15      THE COURT:  Okay.  When we get to the exhibits, if

16  you propose in the exhibits, we can talk about that.  With

17  respect to the questioning, though, of Mr. Kostuchowski, you

18  can ask questions on this point because it goes to bias.  If

19  he denies it, though, and there's no other admissible

20  evidence, then you're going to be stuck about that.  But if

21  you have admissible evidence of it, whether it's your own

22  testimony or something else, then you'll be able to prove that

23  up.

24      Okay.  So does the government understand this,

25  because it goes to bias, in fact, the agent, if the jury were

1    to believe that the agent said these things to the neighbors,

2    it would go to bias.  Do you understand?

3           MS. KELLY:  We understand the ruling, your Honor.  We

4    would ask that Mr. Haas identify the name of the neighbor.

5           THE COURT:  Okay.  Mr. Haas, do you want to do that?

6           THE DEFENDANT:  I object, your Honor.  They have

7    tampered with witnesses.  They've gone and harassed other

8    officers in my neighborhood because somehow they got

9    information that I wanted these officers called as witnesses.

10   And they contacted, Ms. Kelly and Mr. Kelley from the

11   Department of State, contacted my local police and started

12   questioning them about these things which is witness

13   tampering.

14          They caught wind that I wanted these questions asked

15   and called them and briefed them on it.  They've already

16   been -- my witnesses are tainted already.  It's pointless to

17   call them.  They don't even know my witness until my witness

18   is in court.

19          THE COURT:  Okay.  Yes, it's not witness tampering

20   generally speaking to attempt to interview witnesses.  There

21   has to be an attempt to impede or obstruct justice.  So that's

22   not a basis to not disclose your witnesses, especially since I

23   set a witness list deadline many months ago, and you would

24   need to arrange for them to appear as well.  And during these

25   pandemic times, it is important to know, have a sense of the

1    proposed witnesses.

2         So it's -- it's up to you whether you want to

3    identify who that person is if you're not going to propose

4    that the neighbor testify, but just bear in mind, though, that

5    if you testify about it on cross-examination, they will get to

6    ask you, of course, who the identity of the neighbor is.  Do

7    you understand that?

8         THE DEFENDANT:  Absolutely.

9         THE COURT:  Okay.  Now, why don't we just take a

10   pause here and talk about witnesses since you brought that up.

11   So do you have any witnesses under subpoena or who you believe

12   will be here voluntarily to testify?

13        THE DEFENDANT:  I do not.

14        THE COURT:  Okay.  So again, let me warn you that the

15   witness list deadline was some months ago.  If you are

16   planning to either subpoena witnesses or present witnesses

17   other than yourself, you will have to identify them and also

18   explain why you should be allowed to have them testify this

19   late in the game in terms of identifying them.  Okay.  So

20   yeah, the request to have that person named since apparently

21   they're not going to testify, that's rejected, but you can ask

22   about it on cross-examination.

23        All right.  Let's talk next -- as I said, we'll talk

24   about the entrapment in the concept of the exhibits which will

25   make the issue much more concrete.  Okay.  Let's see.  I think

1    those were the open issues on that -- in that particular order

2    other than exhibits.  The other issue had to do with the

3    motion to dismiss on multiplicity grounds.  So that was the

4    order that was entered today -- actually, it was entered late

5    last night, but Mr. Haas received that today.  I did have a

6    question on that for the government.

7         Okay.  Generally speaking, Mr. Haas, there are two

8    forms of multiplicity problems.  One's statutory.  One's

9    constitutional.  Neither one applies to the charges in this

10   case with one possible exception.  And the possible exception

11   has to do with Counts 10 and 11 which are two of the

12   interstate commerce charges.  They charge vk.com posts on

13   February 14 of 2019.

14        And so the question I have for the government is,

15   what is the circumstances that you say justify having charged

16   those in two separate counts given that they were on the same

17   day?

18        MS. KELLY:  Count 10 which is identified as Exhibit

19   64, the version that we included in our exhibit list didn't

20   have a timestamp, but the FBI operations specialist has pulled

21   another copy that identifies the time of that post is at 1:32

22   in the morning on February 14th.

23        Count 11 is identified in Exhibit 65.  That is a

24   comment to a different post that was posted that same day at

25   2:30 a.m.  My understanding is that comments to the post do

1  not necessarily have timestamps attached and -- those two

2  documents, but they are separated by time, and one is a

3  comment to a completely different post.  So we feel it was

4  appropriate to charge them in two different counts.

5          THE COURT:  What was the time of the Count 11 post?

6          MS. KELLY:  2:30 a.m.  That was the post.  And then

7  the comment followed, so it was sometime after 2:30 a.m.  And

8  the comment is what is charged in Count 11.

9          THE COURT:  Okay.  And then the post was a separate

10  post from the Count 10, 1:32 a.m.?

11          MS. KELLY:  Yes.

12          THE COURT:  Okay.  Mr. Haas, do you want to comment

13  on this?  The question about these two particular counts is

14  whether they're truly separate threats or not just as, for

15  example, if a letter, an old-fashioned letter had two

16  sentences in it that are charged as threats, that would be one

17  threatening communication.  But if there's some separation in

18  terms of either date, time, or just the format itself, then

19  they could be charged separately.

20          So do you have any comment on what the government

21  just said?

22          THE DEFENDANT:  I'm not sure which count they're

23  talking about.  This whole case is absolutely ridiculous, so I

24  don't even care.  Go ahead.  Put it on.  Let's have another

25  count.  I want a jury of my peers.

1    THE COURT:  Okay.  Yes, you certainly will have a

2  jury trial.  The distinction in terms of the time and then the

3  difference in postings themselves, so it's not as if it was

4  the same post and then a comment, I think that is sufficient

5  contextual differences so that they are two separate threats

6  in line with the decision on all the other counts.  Okay.  So

7  that part is denied as well, and those counts will stand.

8  Okay.

9    MS. KELLY:  Your Honor, if there's not a desire -- if

10  Mr. Haas desires us to do so, we can attempt to display the

11  different posts and try to share the screen if that is what he

12  would wish us to do.

13    THE COURT:  Do you want to --

14    THE DEFENDANT:  It makes no difference.  It's all

15  ridiculous.

16    THE COURT:  Okay.  All right.  Now, let's talk then

17  about the exhibits themselves.  And let's first talk about the

18  government exhibits.  So the government had filed some time

19  ago a proposed exhibit list.  I think you filed this amended

20  one last week.  What is different about this amended list from

21  the --

22    MS. KELLY:  There are a few additional exhibits, and

23  we also had deleted some exhibits and filled in to eliminate

24  the gaps in numbering.

25    THE COURT:  Okay.  In terms of the additional

1     exhibits, were -- what do they comprise?  Are these more

2     records, or you said communications?

3            MR. JONAS:  Your Honor, for the record, it's Barry

4     Jonas.  Can you hear me okay through the mask?

5            THE COURT:  Yes.  If you could just speak as loudly

6     as you can, though.

7            MR. JONAS:  Sure.  There is one additional ten-second

8     clip on the June 11th FBI interview.  That ten-second clip is

9     an exchange between the defendant and FBI Agent Chris Potts

10    where they briefly discuss vk.com being the Russian social

11    media.  So the point of that clip is just to let the jury know

12    that the defendant acknowledges that vk.com is based in

13    Russia.  That goes to the interstate commerce nexus.

14            There are also -- if I could have one moment.

15            THE COURT:  All right.  Before you move on from that,

16    was that one of the clips that was in part of your motion to

17    admit uncharged statements?

18            MR. JONAS:  No, your Honor.  We identified that clip

19    after we filed the motion.

20            THE COURT:  Okay.  And have you provided the amended

21    exhibit list?  How did you get that to Mr. Haas?

22            MS. KELLY:  We sent it to him on a disk.

23            THE COURT:  Okay.  You got the -- you're saying the

24    exhibit list on a disk, the amended exhibit list, or the clip

25    itself or both?

1    MS. KELLY:  We sent the actual exhibits, and then we

2 filed and served an amended exhibit list.

3    THE COURT:  Okay.  So Mr. Haas, did you get that

4 additional exhibit?

5    THE DEFENDANT:  I did.

6    THE COURT:  Okay.  What I'm going to ask the

7 government to do is email or provide this additional clip.

8 What exhibit number is it?

9    MR. JONAS:  Your Honor, this is Exhibit 31.

10    THE COURT:  Provide it to the MCC attorney advisor.

11 She can provide you -- provide it, you know, same day to

12 Mr. Haas as long as you get it to her within business hours.

13 So is it small enough to email -- well, no.  Then she'd have

14 to burn the DVD.  So you're going to have to get it to her as

15 quickly as you can.

16    And let me suggest that you set up some kind of a

17 system where you deliver things to Mr. Haas through the MCC

18 attorney advisor.  She's been very helpful with facilitating

19 the delivery of court orders to Mr. Haas so that he can get

20 them promptly.  So you ought to do the same at this point.

21    MR. JONAS:  Yes, your Honor.  And we have sent it, so

22 the defendant has it, but we can't send another copy.  Your

23 Honor, there's also an additional exhibit.  I'll let Ms. Kelly

24 address it.  It's a vk.com exhibit.

25    MS. KELLY:  Your Honor, we identified one vk.com

1    exhibit that was not specifically identified in the motion to

2    admit additional statements.  That's Exhibit 66.  It's a --

3    it's a post under the name Robert Haas and reposted by Fox

4    News on February 15, 2019.  Again, that's Government Exhibit

5    66.  It's been provided to the defendant, but it was not

6    identified in the motion to admit additional statements.

7         THE COURT:  Okay.  When you say it was provided, you

8    mean recently?

9         MS. KELLY:  Yes.  On the -- so last week, we provided

10   a disk of all of our proposed exhibits to the defendant

11   including this one.

12        THE COURT:  Okay.  So you provided it how?  You

13   mailed it?

14        MS. KELLY:  It was hand delivered.

15        THE COURT:  Hand delivered --

16        MS. KELLY:  (Inaudible).

17        THE COURT:  I'm sorry.  We lost you there.

18        MS. KELLY:  Sorry.  A disk of all the exhibits was

19   hand delivered to MCC Chicago.

20        THE COURT:  Okay.  So but not through the attorney

21   advisor?

22        MS. KELLY:  No.  It went through legal mail.

23        THE COURT:  So did you, Mr. Haas, get this -- a disk

24   with all of the amended exhibits and exhibit list?

25        THE DEFENDANT:  I've gotten a bunch of disks

1  recently, your Honor, but I'm not allowed to go to the law

2  library to see them because we are on lockdown and have

3  restricted movement.  So I am being denied my due process

4  again.

5         THE COURT:  Okay.  Well, again, thank you for

6  bringing that to my attention.  I will discuss with the MCC if

7  there is a way that you can either go to the law library or

8  access one of the discovery computers.  What floor are you

9  housed on?

10        THE DEFENDANT:  I'm on the 21st floor.  And I have a

11  memorandum from MCC's attorney to use the law computer, but

12  it's on Mondays and Fridays when lawyer calls are happening.

13  So every time I do go in there, two minutes later they come in

14  and say, "There's a lawyer call.  You need to leave the room."

15        THE COURT:  Okay.  Again, this is something that, now

16  that it has been brought to my attention, I can try to help

17  you with.  Okay.  So if you keep the lines of communication

18  open with me, then I can try to work around this, whether it's

19  different days at the law library or letting you have access

20  if there's a discovery computer on the 21st floor so you don't

21  have to go to the law library.  And that will help facilitate

22  attorney calls.

23        And I can also -- so let me ask, Ms. Singer, are you

24  right now limited to attorney calls on Mondays and Fridays, or

25  are you able to set up attorney-client calls other days of the

1    week?

2            MS. SINGER: Your Honor, the process that I have

3    right now is I just basically can email the MCC saying I need

4    a call sometime this week so that I leave it as broad as

5    possible so that Mr. Haas, along with my other clients, and I

6    can just make myself available, and then MCC, I get an email

7    back saying this is the day we can do it.

8            I can't -- I don't -- I think I've been getting calls

9    on other days besides Mondays and Fridays, but whatever MCC

10   gives me, I take.

11          THE COURT: Okay. Got it. Thank you. Okay. I'll

12   see what I can do about this particular case. I take it, when

13   you email them, Ms. Singer, you -- obviously, you list the

14   defendant and the case number. So I will strive to see if we

15   can have -- get faster and more frequent response time.

16          And I do have to remind you, Mr. Haas, that -- and

17   I'm not trying to persuade you, dissuade you either way. I

18   did give you warnings about what it is like to litigate pro

19   se. Ms. Singer is a standby counsel. And so you are

20   representing yourself. I will do what I can to facilitate

21   much more frequent attorney calls and as well as the discovery

22   review. That's one of the difficulties in pro se

23   representation, but I'll do whatever I can.

24          THE DEFENDANT: Your Honor, whether I represent

25   myself or not, I still need to see my discovery and have

1    access to it.  I am being denied my due process.  I have a

2    right to see it.  I have a right, a constitutional right to

3    that law computer, and I'm not allowed on it.

4             THE COURT:  Okay.  And as I said, now that I know

5    that it is an issue, I will try to address it.  Okay.

6             THE DEFENDANT:  I'd like to address an issue, your

7    Honor.

8             THE COURT:  Yes, one moment.  Let's just finish up on

9    the government exhibits.

10            Okay.  What other additions were there?

11            MS. KELLY:  We had two additional vk.com -- they're

12   identified as Exhibits 109 and 110.  109, we're going to

13   withdraw in light of your Honor's rulings on the motions in

14   limine and focus on the State Department so --

15            THE COURT:  One second.  We're getting feedback

16   somewhere.  Whoever is -- everyone else should be muted except

17   for the government.

18            Okay.  Go ahead.  So 110, you're withdrawing.

19            MS. KELLY:  109, your Honor, we're withdrawing

20   because it relates to the State Department in light of your

21   Honor's ruling on the motion in limine.  110 is a post on VK

22   that would go to the identification of Mr. Haas as a user of

23   VK.  It's the attachment to a link that Mr. Haas had texted

24   someone.  I think later in this call, we may be getting to

25   whether there's any stipulations on the use of VK.  And if

1   there are, then we would not need this exhibit either.

2          THE COURT:  Okay.  Let's talk about that right now if

3   we're ready to talk about stipulations because I think that

4   would probably remove the need for some of these exhibits.  So

5   actually, have you had any conversations with Mr. Haas either

6   in writing or otherwise on stipulations?

7          MS. KELLY:  We wrote -- wrote him a couple of times

8   proposing stipulations.  We did so in advance of the May 18th

9   deadline.  And we filed the amended pretrial statement with

10  updated stipulations, but we have not received a response.

11         THE COURT:  Okay.  So, yes, Mr. Haas, the

12  stipulations that the government proposed earlier, have you

13  had a chance to review those?

14         THE DEFENDANT:  I'm not denying those accounts.

15  Either of them are mine or any of the statements.  And I want

16  my passport back.

17         THE COURT:  Okay.  On the passport issue, as I wrote,

18  there is a regulation that appears to deem that the passport

19  is government property.  So that request has already been made

20  and denied.

21         So on the question of -- so which stipulations would

22  be -- would these be?  So I'm asking the government which ones

23  in particular.

24         MS. KELLY:  Your Honor, in particular, we have

25  Paragraphs 31, 32, and 33 --

1          THE COURT:  Okay.  Mr. Haas --

2          MS. KELLY:  -- on -- sorry.

3          THE COURT:  Yes.  So Mr. Haas, I'm going to read

4    these out loud.  All right.  You tell me if you have any

5    trouble, any problems with any of these.  And if you object,

6    that's fine, then there's no stipulation.  It might streamline

7    the trial if some of these stipulations are agreed on, but

8    it's completely up to you.

9          31 says, "Robert Haas has maintained an account on

10   the social media website vk.com under the name," B-o-b, "Bob

11   was here."  Do you stipulate to that?

12         THE DEFENDANT:  I don't object.

13         THE COURT:  Okay.  I think -- yes.  Ms. Singer, did

14   you want to weigh in on something?

15         MS. SINGER:  Your Honor, could you -- I guess I'm a

16   little -- could you repeat, your Honor, how right now on this

17   system I could speak with Mr. Haas?  I understood earlier you

18   said just to mute ourselves but --

19         THE COURT:  No, no.  There's a phone -- right.  So

20   you should have been provided a -- you should have been

21   provided a phone number for the MCC.  That phone's in

22   Mr. Haas' room.

23         MS. SINGER:  Right.  No -- right.  So I provide --

24   okay.  Thank you.  Sorry.  I thought --

25         THE COURT:  Okay.  Now do you -- so let me -- all

1  right.  Let me call my courtroom deputy and see what that

2  phone number is.

3        Actually, if, Mr. Haas, can you look at the phone and

4  see if the number is listed there on the phone itself?

5        MS. SINGER:  Your Honor, I don't think that -- that

6  phone --

7        THE DEFENDANT:  It is not.

8        MS. SINGER:  -- from my experience just calls the --

9  like the guard.  I don't think that phone -- in my experience,

10 that phone has not been able to call out if that's the same

11 room that I've held client interviews in.  But I don't have a

12 phone number to contact him.

13       I provided my phone number to MCC before this to try

14 and facilitate that.  But I just want to ensure that -- and if

15 Mr. Haas doesn't need to speak with me, then we don't need to

16 address this, but if he does, I want to make sure he has the

17 ability to do so.

18       THE COURT:  Yes.  Okay.  Yes, we specifically

19 requested it, so we should have that ability.  So hold on one

20 minute.

21    (Pause.)

22       THE COURT:  Okay.  So Mr. Haas, is there a guard

23 right outside the room?

24       THE DEFENDANT:  He's down the hall.  It's a visiting

25 room.

1          THE COURT:  Okay.  So the procedure is supposed to be

2    that the guard is able to make the phone call out.  And I'm

3    not sure if it's on that phone or another one.  So can you go

4    ahead and -- unless you want to just keep going until you feel

5    the need to talk to Ms. Singer, or we can just take a quick

6    break.

7          THE DEFENDANT:  The guard asked me if I had her phone

8    number when I came down here, and I do not.

9          THE COURT:  Okay.  So -- all right.  Ms. -- if you

10   feel the need to speak with Ms. Singer in private, okay, then

11   let me know, get the guard, and then Ms. Singer will provide

12   the phone number to the guard.  Okay?

13         MS. SINGER:  That's fine for me, your Honor.  Again,

14   like I said, if he doesn't -- if he doesn't need to speak with

15   me, that's fine.  I just want to make sure that he can if he

16   wishes to.

17         THE COURT:  Okay.  All right.  So Mr. Haas, do you

18   understand?

19         THE DEFENDANT:  I understand.

20         THE COURT:  Okay.  So that stipulation No. 31, you

21   have no problem with, Mr. Haas?

22         THE DEFENDANT:  I do not.

23         THE COURT:  Okay.  Now 32 and 33 say the following.

24   32 says, "Robert Haas has posted messages on vk.com under the

25   display name 'Robert Haas.'"  And 33 says, "Robert Haas has

1     posted messages on vk.com under the display name 'Fox News.'"

2               So do you have any objection to either of those?

3               THE DEFENDANT:  I'm not the only person that posts on

4     the Fox News page, but I'm not objecting.

5               THE COURT:  Okay.  I think the stipulation says,

6     "posted messages on vk.com under the display name 'Fox News,'"

7     not a Fox News page.  So do you have any problem stipulating

8     to that?

9               THE DEFENDANT:  I'm sorry.  You were breaking up.

10              THE COURT:  Yes.  I just wanted to be clear that the

11    stipulation does not address a Fox News page but rather the

12    display name.  So specifically, "that Robert Haas has posted

13    messages on vk.com under the display name 'Fox News.'"  Do you

14    stipulate to that?

15              THE DEFENDANT:  I'm saying, I'm not objecting that I

16    have, but other people can do it, also.  Anybody who's in that

17    group that has administrative powers can post using that

18    title.

19              THE COURT:  Okay.  Right.  And again, you can object.

20    But the stipulation is that you have posted.  It doesn't

21    exclude others from having posted under, you know, that

22    display name or any display name.  So are you all right with

23    that stipulation or not?

24              THE DEFENDANT:  I have posted under that name.

25              MR. JONAS:  Your Honor, may I interject real quick?

1          THE COURT:  Yes.

2          MR. JONAS:  I think the question could be a little

3    more narrow.  And the defendant has the government's exhibits

4    that are on the vk.com Fox News posting.  I guess the question

5    is, is he denying that he made those particular postings.

6          MS. SINGER:  Your Honor?

7          THE COURT:  Yes.

8          MS. SINGER:  Thank you.  Your Honor, can we just

9    confirm with Mr. Haas that he understands what the Court means

10   when it's -- when the government is asking him to stipulate?

11         THE COURT:  Sure.

12         MS. SINGER:  Thank you.

13         THE COURT:  Yes.  So stipulation, Mr. Haas, is an

14   agreement between the parties that certain facts are true.

15   And parties will sometimes enter into a stipulation to

16   streamline the trial so that either side does not have to

17   prove up that particular fact because it's just not in

18   controversy.  No one is debating it.

19         So do you understand what a stipulation is?

20         THE DEFENDANT:  I do understand.  And the posts that

21   I have received from them are posts that I have posted.

22         THE COURT:  Okay.

23         MR. JONAS:  Your Honor, again, it's Barry Jonas.  I

24   think what we can do is draft a stipulation that's more

25   tailored to the posts that the government anticipates

1    admitting into evidence.

2          THE COURT:  Okay.  Go ahead and do that.  That makes

3    a lot more sense.  And then have it delivered to Mr. Haas,

4    again, through the attorney advisor so that he gets it much

5    faster.  Do it by the end of the day tomorrow.

6          MR. JONAS:  Yes, Judge.  And, your Honor, there's at

7    least one other stipulation we'd like to address.

8          THE COURT:  Okay.

9          MR. JONAS:  More than one more.  But if we can move

10   on to the next stipulation.

11         THE COURT:  Okay.  What is it?

12         MR. JONAS:  This is the stipulation 29 which pertains

13   to the translation of the vk.com records.

14         THE COURT:  Okay.  Yeah, I am not sure how Mr. Haas

15   can stipulate to that.

16         So Mr. Haas, this one says, "Government Exhibit 105

17   is a true and accurate English translation of the vk.com

18   records that Russia provided to the United States' request

19   made pursuant to a mutual legal assistance treaty."

20         THE DEFENDANT:  I'm not -- I do not speak Russian.

21         THE COURT:  Yes, I am not sure how he could agree to

22   that.  So you're not going to get a stipulation on that one.

23         MR. JONAS:  We will present a linguist.  We noticed

24   up an -- we submitted an expert notice regarding a Russian

25   linguist that will just testify that that exhibit is a true

1  and accurate translation of the original material provided by

2  the Russian government.

3        THE COURT:  Why so late?

4        MR. JONAS:  Well, your Honor, we had already done the

5  notice, so it's not as if -- I don't remember when it was

6  done, but it has been done.  And the reason why it's so late

7  is because we didn't get these records from the Russian

8  government until --

9        MS. KELLY:  Mid-June.

10        MR. JONAS:  -- mid-June.

11        So as soon as we got them, we submitted it to the FBI

12  for translation.  And then as soon as the translator was

13  identified, we sent -- we filed the extra witness notice for

14  the defendant.

15        THE COURT:  The receipt of the Russian language

16  records was when?

17        MS. KELLY:  About June 10th, on or about June 10th.

18        THE COURT:  Okay.  The way we'll handle this is as

19  follows.  You're going to have to file a motion to --

20  specifically to introduce basically expert testimony and

21  explain why there is good cause to have missed the deadline.

22        MR. JONAS:  Your Honor, can -- can we have one moment

23  for me to confer with Ms. Kelly?

24        THE COURT:  All right.  You can just turn it on mute.

25     (Pause.)

1      MR. JONAS:  Thank you, your Honor.  I think we'd like

2  to address a couple of the other stipulations.

3      THE COURT:  Okay.  What else?

4      MR. JONAS:  One -- some of the stipulations are,

5  given the Court's ruling, not necessary anymore.

6      MS. KELLY:  We have a stipulation -- let me just find

7  it -- that the vk.com is a Russian company, at least I thought

8  we did.  Yes.  It's No. 13.

9      THE COURT:  Okay.  So this one reads, "vk.com is a

10  Russian online social media and social networking service

11  based in St. Petersburg, Russia."

12      Okay.  Mr. Haas, do you stipulate to that?

13      THE DEFENDANT:  Oh, my gosh.  A scary Russian

14  corporation.  No, I do not.

15      THE COURT:  Okay.

16      MS. KELLY:  Your Honor, I think that covers -- there

17  is one other stipulation that might be relevant to address

18  here.  The -- we have a copy of Mr. Haas' passport application

19  in our exhibit list.  And we would propose that if he wanted

20  to stipulate that that passport application is his passport

21  application.  It identifies an email address that was used to

22  register with vk.com.

23      MS. SINGER:  Your Honor, could I ask for the exhibit

24  number that the government is referring to?

25      MS. KELLY:  Yes.  It's stipulation 12 and Government

1    Exhibit 42.

2              MS. SINGER:  Thank you.

3              THE COURT:  Okay.  Mr. Haas, up to you.  Are you

4    willing to stipulate to Exhibit 42 is a true and accurate copy

5    of your passport application?

6              THE DEFENDANT:  I'm sure it is.

7              THE COURT:  Okay.  And then 42 was in the discovery

8    all along; is that correct?

9              MS. KELLY:  Yes.

10             THE COURT:  One -- I'm sorry.  Go ahead.

11             MS. KELLY:  It was produced in discovery, your Honor.

12   We can display it if that would be best.

13             THE COURT:  Do you need it displayed, Mr. Haas?

14             THE DEFENDANT:  No.  I seriously doubt they altered

15   my application.

16             THE COURT:  All right.  So you have a stipulation on

17   12.

18             THE DEFENDANT:  Your Honor, I'd like to object.  I

19   believe they're trying to prejudice the jury using Russians as

20   evidence that I'm some kind of threat to the States when, in

21   fact, the government is the threat to the community.  And I

22   have a very serious problem with this.  And that is what all

23   of this is based on.  And that is why I want all of the

24   remainder of related writings added so they cannot take my

25   statements out of context.  I am defending myself against the

1    biggest terrorist organization on the planet, and the jury is

2    going to hear about it.

3         THE COURT:  Okay.  I think the introduction of Russia

4    as the location of vk.com is just for -- and if you want a

5    limiting instruction on this, I'd be happy to give something

6    like that -- for the purpose of establishing the interstate

7    commerce requirement for the Section 875 counts.

8         If you're concerned about some kind of prejudice, you

9    know, again, we can talk about a potential limiting

10   instruction.  It's not necessarily a wise thing -- and again,

11   you can talk to Ms. Singer about this -- to flag issues that

12   maybe the jury won't even think of because then it kind of

13   implants into their mind.  So you might want to talk to

14   Ms. Singer about whether that's an issue.

15        I, of course, would not let the government argue or

16   imply in any way that the mere fact that vk.com is based in

17   Russia has any other role other than that it's based in Russia

18   for the interstate commerce element.

19        THE DEFENDANT:  Your Honor, I'd like to know why they

20   are making it a point to say in these statements, "Robert Haas

21   has traveled to Russia."  It's obviously to alienate the jury

22   like the Russians are some kind of threat.  These prosecutors

23   are pathetic, your Honor.  This whole thing is a joke.

24        MR. JONAS:  Your Honor, we can address that real

25   quickly if you'd like.

1          THE COURT:  Go ahead.

2          MR. JONAS:  Your Honor, the point -- we don't need --

3    with Mr. Haas' stipulation regarding the postings to the

4    vk.com, we don't need to establish that he traveled to Russia.

5    A lot of these points other than that vk.com is located in

6    Russia, as your Honor correctly pointed out, for interstate

7    commerce purposes.  Some of these other points go to establish

8    that these accounts and these postings were, in fact, by the

9    defendant.

10          There was one posting, I believe, where he -- where

11   the poster acknowledges having traveled to Russia.  That's why

12   we put that in the stipulation, but it doesn't sound like we

13   need that particular stipulation anymore.  We will not have to

14   present that fact.

15          THE COURT:  Yeah.  So again, Mr. Haas, what the

16   government is arguing -- and this has been some of the -- and

17   that motion to admit uncharged statements that you did not

18   respond to did argue that some of these posts have to do with

19   identity and just identifying that you are the ones who made

20   those -- you're the person who made the posts.  And there were

21   a couple of instances where I still kept some things out

22   because I didn't think they needed it and it was prejudicial.

23          But on this, the issue to travel to Russia, it's only

24   because the posts refer to travel to Russia.  If it was

25   Canada, then they would be Canada.  All right.  So that's the

1   only reason it can be allowed in.  And if you -- if you

2   stipulate, then there's not going to be a need to have this

3   identity evidence put in.  Again, it's up --

4        THE DEFENDANT:  It would be foolish for me to deny

5   that I made those posts.

6        THE COURT:  Okay.  It may be the -- you know,

7   whatever strategy you want to adopt on that is up to you.

8        MR. JONAS:  Your Honor, again, with that explanation,

9   can we revisit government's proposed stipulation 13 regarding

10  the location of vk.com and see if the defendant wishes to

11  reconsider, understanding the purpose of that stipulation?

12       THE COURT:  Yes, that's the -- that's on the

13  interstate commerce element.  So I don't know -- so it's up to

14  Mr. Haas if he wants to stipulate to that.  You can send it to

15  him in your -- you know, your next volley of much more narrow

16  stipulations, but he's already given an answer at this hearing

17  at least.

18       Okay.  Let's see.  If we're done with the sort of

19  most important stipulations -- and, you know, you're just

20  going to have to pick out the ones you really think you want

21  for Mr. Haas to streamline the trial and deliver those to

22  him -- let's talk about the government exhibits themselves.

23  We'll go back to that.

24       We discussed, I think, four exhibits so far that the

25  government had added to its prior exhibit list which was filed

1    way back in the middle of May.  Were there any other

2    additional exhibits that you added besides those four?

3          MR. JONAS:  Judge, other than the ones we discussed

4    including the vk.com records we received from Russia about the

5    (inaudible), I don't think there are any additional exhibits.

6    We do have -- we would like to discuss at the appropriate time

7    the admissibility of a couple of the exhibits and how we --

8    the best way to go forward.  I don't know if this is the time

9    you want to do it or if you want to wait for a few moments.

10         THE COURT:  Yeah.  So we're actually going to march

11   through the exhibit list and see if Mr. Haas has any

12   objections.  Okay.  So the first set of exhibits, let me just

13   confirm this with the government, Exhibits 1 through -- okay.

14   1 through 35, okay, just start with that, are all of those

15   exhibits either the charged statements or the uncharged

16   statements that were the subject of your motion?

17         MR. JONAS:  Yes.  And your Honor has already ruled on

18   some of them, but yes.

19         THE COURT:  Well, so but if -- well, basically, I'm

20   asking if whether in the prior order I have already ruled on

21   everything in 1 through 35.  There's going to be more, but

22   just 1 through 35 to start.

23         MR. JONAS:  Yes, you have, your Honor.

24         THE COURT:  Okay.  All right.  And so if you don't

25   have that exhibit list in front of you, Mr. Haas, these

1   exhibits are various interview clips, transport clips when

2   you're talking to the Illinois State trooper, at least the

3   government alleges, and parts of the FBI interview.  And there

4   was this -- these were covered by the order on the motion to

5   admit uncharged statements.  So the relevancy and

6   admissibility have already been ruled on.

7           The question I have for you is -- and we can talk

8   about this issue that you had raised early in this hearing.

9   So your proposal is to have the jury have access to all of

10  like the entirety of these -- the interview clips and -- yes,

11  all the interview clips and the transport clips.

12          All right.  I think you are frozen up, Mr. Haas, if

13  you can still hear us.  Try to -- oops.  He dropped off.

14  Let's give him a second.

15          Okay.  All right.  Mr. Haas, can you hear me now?

16          THE DEFENDANT:  I can hear you.

17          THE COURT:  Okay.  All right.  So tell me your

18  position on the jury having access to all of the other parts

19  of the interview clips and the clips of the conversation that

20  you allegedly had with the State trooper.  What's your

21  position?

22          THE DEFENDANT:  Can you see my face right now, your

23  Honor?

24          THE COURT:  Yes.

25          Okay.  I can't see what you're holding up, Mr. Haas.

1    THE DEFENDANT:  Rule 106, Federal Rules of Evidence:

2  "Pursuant thereto, when a writing or recorded statement or

3  part thereof is introduced by a party, an adverse party may

4  require the introduction at that time of any other part of the

5  writing or recorded statement."

6    THE COURT:  Yes.  As I ruled on before, this was in

7  an actually much earlier order because you made this motion

8  sometime ago, and so it's probably been a couple months now.

9  You do have to identify the additional statements you want

10  introduced because there are -- there's two requirements that

11  Rule 106 demands to introduce the rest of the writing.  The

12  rest of the writing that is to be introduced does have to be

13  admissible on its own.  Just because it's part of a writing or

14  an audio clip doesn't mean that it's necessarily admissible on

15  its own.

16    And then second, the question would be, would it be

17  unfair, if it is admissible, to not introduce it at the same

18  time as what the government is proposing.  So there's two

19  separate requirements.

20    THE DEFENDANT:  Your Honor, I can take a little clip

21  of a paragraph that you say and make you sound like Satan

22  yourself if I wanted to.  That's what they're trying to do.

23  They're taking a little clip and taking my sentences out of

24  context and adding their own context to it making it say what

25  they want it to say which it absolutely does not.  If they

1     play the whole entire video, the jury will understand what it

2     is about, not what the prosecution wants you to believe.

3            THE COURT:  Well, here's -- let me try this.  Does

4     the government have an objection, and I -- you know, I'm not

5     even sure this helpful to Mr. Haas really just strategically

6     because there might be all sorts of other prejudicial

7     information that he'd rather not go before the jury, but he's

8     asking for it, right, at this point.

9            So let me ask the government this:  Do you have an

10     objection to entering into evidence the entirety of these --

11     of these interviews, the transportation conversation and so

12     on?  Not that you have to play the entirety of it.  There's

13     obviously still admissibility issues and Rule 403 issues, but

14     then Mr. Haas would have the ability to specify -- again, he's

15     not going to be able to play all of it either, but if he wants

16     to play pieces of it before or after or, you know, somewhere

17     else within those clips that he thinks sheds light on, you

18     know, those statements and his state of mind, so it would

19     overcome a hearsay problem if it goes to his state of mind,

20     then he can do that in his case.  And so I would -- again,

21     that would put a limit on specifically identifying it.  We're

22     not just going to press "play" and let the -- just have the

23     whole thing played.

24            So do you have an objection to entering into evidence

25     the entirety of those clips -- not clips, of those

1      conversations?

2              MS. KELLY:  We do, your Honor.  If there are --

3              THE COURT:  Okay.  Go ahead.

4              MS. KELLY:  If there are specific expansions or

5      specific clips, we would need to review them, and we'd have to

6      consider, if he wanted to talk about the State Department if

7      that were admissible, then we would want to revisit some of

8      the Court's rulings on the State Department texts and the

9      State Department interviews.

10             THE COURT:  Yes.  So, you know, Mr. Haas --

11             THE DEFENDANT:  Your Honor, can I speak real quick?

12             THE COURT:  Go ahead.

13             THE DEFENDANT:  There is no State Department

14     interview related to the investigation.  The State Department

15     interview was after I was arrested for some other charge in

16     another state, and they came back to harass me.  The State

17     Department interview took place in my living room in my house

18     and was not recorded.

19             MR. JONAS:  Your Honor, just based upon the

20     government -- the Court's ruling, we are not seeking to admit

21     anything pertaining to the State Department interviews of

22     January 25th and January 26th, 2018.  We're not going to be

23     calling State Department Agent Dave Noordeloos or Matt Kelley

24     either to admit any of the text messages sent to State

25     Department Agent Robert Rochowiak, so that's out.

1    I think to expand on Ms. Kelly's point, if there's

2   portions of the State trooper video, there's a car ride up to

3   the -- during the arrest that touch upon the State Department

4   interviews back in January 2018, then the government may ask

5   the Court to allow us to get into those interviews to expand

6   and explain to the jury what happened at that time.

7        MS. KELLY:  And to the extent Mr. Haas wishes to play

8   other portions, we'd like to know what they are so we can

9   formulate our position on those portions.

10       THE DEFENDANT:  I want to play the whole video so the

11   jury can hear the entire context in its entirety what I wanted

12   them to hear, what I wanted the State trooper to hear:  The

13   truth, what you're trying to hide.

14       THE COURT:  Okay.  Yeah, Mr. Haas, I did warn that --

15   and again, this was a couple of months ago, I believe, in the

16   order that you would have to identify the specific parts

17   because the -- you just can't ask for blanket admissibility of

18   the interview because there are going to be obstacles, whether

19   it's hearsay or relevance and also Rule 403 which requires

20   that I exclude evidence if its probative value is

21   substantially outweighed by waste of time and confusion.

22       So that's why it's exceptionally rare to ever just

23   hit "play" and let the jury listen to the entirety of any kind

24   of post-arrest interview or this kind of recorded conversation

25   where they say that some threats were made.

1       You can -- you might very well be able to get into

2  evidence specific pieces of these interviews as well as not

3  just -- we've been talking about the verbal interviews but

4  also the writings, you know, whether they're the texts or the

5  posts.  You might very well be able to get some of those in to

6  provide context and to shed light on your state of mind but to

7  just, you know, blanket offer every single piece of writing

8  that they have -- the government has collected in its

9  investigation and turned over to you in discovery and then the

10  entirety of these interviews is improper.

11       So you've got to focus and identify them.  And it

12  might make sense to try to work with Ms. Singer on this as

13  well so that, you know, she can help you put together some of

14  these exhibits or identify some of these statements.

15       THE DEFENDANT:  Your Honor, I made a specific list of

16  everything I want admitted and sent it in to the Court and to

17  Ms. Singer.  It's on the docket, a specific list of everything

18  that I want used.

19       THE COURT:  Okay.  And we can go through your exhibit

20  list, all right, and which much of which was indeed more

21  confined.  I think I figured out the exhibits.  I'm not 100

22  percent sure, but we can go through that.  That's different

23  from offering the entirety of all the text communications

24  you've had with the agents with the federal government and

25  that has been produced in discovery and which was, you know,

1    the scope of the request different from just playing, you

2    know, the entirety of these interviews.

3         Okay.  So let me just make sure -- Ms. Singer, you

4    don't have to agree with me or not agree with me.  Okay.  But

5    do you at least -- do you understand the concern so at least

6    you can give some guidance to Mr. Haas?

7         MS. SINGER:  I understand the Court's ruling.  I

8    understand what Mr. Haas' request is.  I have also seen the

9    exhibit list that he sent in to the Court that I docketed for

10   him as well.  So your Honor, it's up to Mr. Haas whether or

11   not he wants me to be involved with that.  And if he does, I

12   will, and if he doesn't, I don't feel like I can take a

13   position on it.  But I'm obviously here to answer any

14   questions for him.  And maybe when we get to his exhibit list,

15   it might make more sense of what clip he's actually asking

16   for.

17        THE COURT:  Right.  Okay.  No, I just wanted to make

18   sure you understood the parameters and the framework so that

19   you can help guide him through this if he asks you for that

20   help.

21        MS. SINGER:  I do, your Honor.

22        THE COURT:  Okay.  All right.  Let's do this.  Since

23   we've been going for about an hour and 15 minutes, let's take

24   a -- let's take a ten-minute break.  Mr. Haas, during this

25   break, if you go out and speak with the guard, you can just

44

1   make sure -- actually, yes, you can make sure that if you

2   supply him with a phone number that he'll be able to call

3   Ms. Singer for you.  Hopefully, that's the reason why he asked

4   you for the phone number in the first place.

5           Okay.  Let's take ten minutes.  And we'll resume at

6   2:25.

7        (Recess from 2:15 p.m. to 2:26 p.m.)

8           THE COURT:  Okay.  Let's go back on the record.

9           Okay.  We're back on the record.  We have the same

10  appearances.  And the next exhibit is 36, Government Exhibit

11  36.  Can you display that for Mr. Haas?  I'm going to ask the

12  government to display that.

13          MR. JONAS:  Your Honor, we're not going to use --

14  based upon the Court's ruling, we're not going to be using

15  that exhibit.

16          THE COURT:  Okay.  So 36 is out.

17          MR. JONAS:  Your Honor, 36 through 41 are out.

18          THE COURT:  Okay.

19          MR. JONAS:  42 is the passport application that we

20  discussed.

21          THE COURT:  Okay.  Do you want to just show it to

22  Mr. Haas if you can?

23          MS. KELLY:  Sure.  42?

24          Okay.  Here is what we have.  I'm showing the screen.

25  Okay.

1          (Pause.)

2                    MS. KELLY:  Can anyone see this?

3                    THE COURT:  No.

4                    MS. KELLY:  Here.  I'm going to give it to you.

5                    MR. JONAS:  Can everyone see that?

6                    THE COURT:  Yes.  Mr. Haas, are you able to see that?

7                    Mr. Haas?  Mr. Haas, can you hear me?

8                    Mr. Haas, if you can hear me, go ahead and hit

9     "refresh" on your browser.

10                   Mr. Haas, can you hear me?

11                   Can the government hear me?

12                   MR. JONAS:  Yes, your Honor.  We can hear you.

13                   THE COURT:  Ms. Singer, can you hear me?

14                   MS. SINGER:  Yes, your Honor.

15                   THE COURT:  Okay.  And Mr. Haas, can you hear me?

16         (Pause.)

17                   THE COURT:  Let's see if -- you know what, take that

18    off of "share screen."  Maybe that's what is the obstacle.

19                   Okay.  Mr. Haas, are you able to hear me?

20                   THE DEFENDANT:  I can hear you.

21                   THE COURT:  Okay.  Were you able to see that passport

22    application?

23                   THE DEFENDANT:  Yes.

24                   THE COURT:  Okay.  Do you have any objection to that

25    exhibit?

1      THE DEFENDANT:  No.

2      THE COURT:  Okay.  42 is in.

3      Okay.  43 through -- 43 through 6- -- let's see.  43

4  through 65.  Okay.  So let me ask the government again, are

5  these -- were all of these part of the motion to admit

6  statements or charged?

7      MS. KELLY:  Your Honor, the answer is yes.  There's

8  one comment I'd like to make about Government Exhibit 64.

9  That is a vk.com post with comments posted by Robert Haas

10  underneath.  In light of your ruling on the State Department,

11  we expect that we will redact all of those comments because

12  they do mention the State Department and instead only seek to

13  introduce the post itself.

14      THE COURT:  Okay.  Which exhibit was this?

15      MS. KELLY:  64.  We can display it, too, if you'd

16  like.

17      THE COURT:  Okay.  Mr. Haas, do you want them to

18  display it?

19      THE DEFENDANT:  No.

20      THE COURT:  Okay.  Let me ask the government to do

21  the following because the exhibit list doesn't have the

22  numbering system that you had in the motion to admit

23  statements.  Okay.  So go through again -- don't change the

24  exhibit number, okay, because Mr. Haas has that.  I have that.

25      Is everything okay, Mr. Haas?

1          THE DEFENDANT:  Yes.

2          THE COURT:  All right.  Okay.  So yes, don't change

3   the exhibit numbers but insert the numbering system that was

4   in the motion to admit statements so that Mr. Haas can follow

5   along and I can follow along as to what the decision was in

6   the order because that refers to post numbers.  All right.  Do

7   you understand?

8          MS. KELLY:  Yes, your Honor.

9          THE COURT:  Okay.  And do that for the text messages

10  as well.  I think the clips, you do have the numbering down,

11  but just do that for all the other uncharged statements.  All

12  right.  And try to get that on file and delivered to Mr. Haas

13  this Monday the 27th.  So that was through 65.

14          Now let's see.  So 6- -- okay.  Now 66 was a new one.

15  So Mr. Haas had not seen this until recently.  And actually,

16  he says that he -- he has a disk but he hasn't actually seen

17  them.  So can you display 66, please?

18      (Pause.)

19          THE COURT:  Can everyone see that?

20          MS. SINGER:  Yes.

21          THE COURT:  Can you expand it?  Okay.  Is that

22  better?  Yes, that's much better.

23          THE DEFENDANT:  Your Honor, I object.  I'd like to

24  know why -- I'd like to know why half of the words are taken

25  out and the photos are taken out.  I want those put back in.

1     THE COURT:  What were the photos or the other parts

2  of this post?

3     MS. KELLY:  Your Honor, earlier today -- hopefully

4  Mr. Haas did receive it -- we had sent to the attorney advisor

5  unredacted versions of all of our proposed exhibits.

6     THE COURT:  I think he was holding it up.

7     MS. KELLY:  Oh, okay.  I can't see that.

8     THE COURT:  Yes.  He had it up.  So do you --

9     MS. KELLY:  Got it.

10     THE COURT:  Yes.  Do you object to --

11     THE DEFENDANT:  Your Honor, I'd like to know why

12  they're trying to hide the complete truth from the jury.  Why

13  are they trying to hide the facts?

14     THE COURT:  Yes, they can explain the redaction.

15     So go ahead.

16     MS. KELLY:  The redaction purports to be a

17  translation of a Jewish religious text, Sanhedrin.  There's no

18  foundation for the accuracy of that translation, and it's also

19  irrelevant.  And then there's anti-Jewish sentiment at the

20  bottom --

21     THE DEFENDANT:  It's not irrelevant.

22     MS. KELLY:  -- with the two photographs --

23     THE DEFENDANT:  -- if it's part of a related writing,

24  the remainder of the related writing.

25     THE COURT:  Okay.  Mr. Haas, please don't interrupt,

1  all right, or else it will make the record impossible to be

2  clear.

3      MS. KELLY:  I was finishing up, your Honor.  Our view

4  is that there's -- they're irrelevant.  It's unduly

5  prejudicial.  There's also an additional foundational problem

6  with that Sanhedrin quotation.  And they don't go to the

7  elements of the offense which is whether Mr. Haas had made

8  this threat in interstate commerce or a threat in interstate

9  commerce.

10      THE COURT:  Okay.  Mr. Haas, go ahead and explain.

11      THE DEFENDANT:  "Self-defense makes some evidence

12  admissible that would not otherwise be allowed.  For example,

13  a witness cannot ordinarily testify to force, but a defendant

14  who claims self-defense can testify to any implication that

15  led the defendant to reasonably believe that the use of force

16  was necessary.  If one factor in that belief was a rumor that

17  the victim was violent, the defendant can properly testify to

18  the rumor.  Defendants can support a self-defense claim with

19  evidence that a supposed victim was prone to violence.  It is

20  open to the prosecution to produce evidence that the supposed

21  victim was not prone to violence."

22      THE COURT:  Okay.  Reply from the government?

23      MR. JONAS:  Your Honor, this is not a case about

24  someone being physically attacked where self-defense may be an

25  issue.  This is a case about threats made on the internet or

1   threats made to agents.  The defendant -- as your Honor

2   pointed out in the order, to not admit evidence that -- he

3   cannot seek to admit evidence that Jewish people committed the

4   attacks on 9/11.  So this is not a self-defense issue.

5           THE COURT:  Yeah.  So Mr. Haas, here is the

6   distinction.  To the --

7           THE DEFENDANT:  Your Honor, this man is not the jury.

8   That is for the jury to decide.  My intent, he does not tell

9   me what my intent was.

10          THE COURT:  Okay.  Thank you.  Right.  So on the one

11  hand, it is typically a very low bar for the defense to

12  introduce evidence.  Obviously, relevancy has a very low

13  threshold, and what the defense theory is especially expansive

14  in allowing evidence in.  Having said that, there are limits

15  to what the defendant can introduce in support of legal

16  theories that as a matter of law, even the very minimal burden

17  of production has not been met.

18          And so so far as I can tell, there is nothing that

19  would justify introducing evidence of self-defense which

20  requires that there be imminent fear of physical injury from

21  another.  And so the imminence requirement in particular,

22  there's no basis --

23          THE DEFENDANT:  Your Honor --

24          THE COURT:  -- to have a self-defense --

25  self-defense.  So that's as to the self-defense.  On the issue

1   of defendant's intent --

2          THE DEFENDANT:  You cannot tell me that I did not

3   fear for my safety from federal officers pointing guns at me.

4          THE COURT:  So Mr. Haas, that's different from this

5   particular exhibit which I'm trying to lay out the legal

6   framework for a decision on this particular exhibit.  If you

7   are going to testify that agents pointed guns at you and did

8   other -- took other steps that would be -- would put you in

9   imminent fear of injury, then that would be allowed because

10  you're testifying to that kind of imminent action.  That's

11  different from the parameters for --

12         THE DEFENDANT:  Can I speak, your Honor?

13         THE COURT:  -- some of the other exhibits.

14         Go ahead.

15         THE DEFENDANT:  If a piece of evidence constitutes a

16  link in the chain of events, it is relevant.  The main

17  limitation of the relevance rule is that the connection must

18  be based on reason and logic rather than bias and emotion.  It

19  is a fact.  The Department of State and the FBI came around

20  pointing guns at me saying, "Get on the ground or we're going

21  to shoot you" because they wanted to have a discussion about

22  my First Amendment guaranteed protected speech, is a threat.

23  They threatened my life.  They pointed guns at me.

24         I am scared for my life of these people.  All they do

25  is terrorize me.  Self-defense, defense of habitation.  They

1  went and told my landlord she needs to evict me because they

2  disagree with what I say online.  This is what started all of

3  this.  This is self-defense.  That's what my claim is:  I am

4  defending myself.

5       Nobody can tell me that I was not afraid for my

6  safety from these maggot terrorist federal officers supporting

7  people who blew up the World Trade Center.  And I have

8  evidence here to prove it, and the jury needs to see it.

9       MR. JONAS:  Judge, if I can quickly respond, you've

10  already ruled that the State Department interactions with the

11  defendant which occurred in January of 2018 are -- is

12  something that we cannot admit.  And that's what the defendant

13  is talking about, what happened with the State Department.

14       There's no indication at all -- and I can flesh out

15  what happened with the State Department if your Honor wishes,

16  but that aside, there's no indication at all that Joe -- I can

17  never pronounce it --

18       MS. KELLY:  Kostuchowski.

19       MR. JONAS:  -- Kostuchowski ever drew his gun on the

20  defendant.  And that's who his threats in Counts 1 through 5

21  were directed at.

22       THE COURT:  Okay.  So let me just be --

23       THE DEFENDANT:  Can I speak, your Honor?

24       THE COURT:  Just one minute, Mr. Haas, because we

25  need to move on from the actual exhibits.

1          So let me be very clear that if the defendant

2   testifies as to something that would be within his personal

3   knowledge such as an allegation that agents pointed firearms

4   at him and told him to get on the ground, then that could be

5   the basis for some sort of self-defense or possibly an

6   entrapment defense which is why he then went on to make

7   threats.  That would open the door, the interactions.

8   Obviously, then you could then in rebuttal introduce the

9   testimony of State Department agents and so on.  But, you

10  know, far from making a factual finding on whether or not that

11  happened, it's quite the opposite where it's a minimal burden

12  of production.

13          So all I'm saying is that based on the record

14  evidence so far which does not yet include the defendant's

15  testimony, there has not been enough evidence to support

16  self-defense because of the lack of imminence.  Now, if

17  Mr. Haas testifies, as he might very well do, on the

18  interaction with the State Department agents as a basis for

19  either a self-defense defense or an entrapment defense, then

20  you'll be able to rebut that in the rebuttal case.

21          Now, even if he does that, though, on this particular

22  exhibit, I'm getting back to the exhibits, there is -- yes.

23  There's an insufficient link to what's redacted here to even

24  what Mr. Haas says he's going to testify to.  So I don't

25  have -- so the redactions, I believe, are proper because this

1  is not otherwise admissible.

2  Now, having said that, I do want to add that, for

3  Mr. Haas' benefit, that intent is an element of both 115 and

4  875.  And there may very well be statements or images that you

5  posted and so on that would shed light on the intent of the

6  other -- the charged statements and particularly --

7  THE DEFENDANT:  Judge, if I can speak.

8  THE COURT:  Yes.  Just let me finish, all right, so

9  that you can understand where I'm going with this and

10  understand the framework.

11  So it is possible for you to identify statements both

12  verbal and written that you would be able to introduce on

13  intent.  The intent is very specific.  It has to do with

14  intent to impede or retaliate for the 115 charges.  And the

15  115 charges, the government also has to prove that there's a

16  serious expression of an intent to harm someone else.

17  All right.  So some of your statements may very well

18  go to that.  And in the 875, it's an intent to communicate a

19  threat or that you knew that what the -- that a reasonable

20  person would perceive it as a threat.  So there may very well

21  be statements.  These don't fit within that.

22  All right.  Go ahead.

23  THE DEFENDANT:  Because intent was formed in the mind

24  in secrecy and silence, a determination of whether a

25  deliberate intent was formed must be drawn from all the

1  circumstances of the case.  Circumstantial evidence of this

2  subjective fact is, therefore, indispensable.  *United States*

3  *versus Pope*, Seventh Circuit 1984.

4          Nobody can tell me how I felt and what I'm defending

5  myself against.  Federal officers, FBI and State Department,

6  had been harassing me, coming to my home, coming to my job

7  site, calling me since October of 2016.  The same officer, Joe

8  Kostuchowski, is on that same first report from October 2016.

9  In my discovery on Disk 1, you'll find it.  It's in the

10  evidence that I want admitted into this case, Kostuchowski

11  saying he was at the first meeting in October 2016.  Take a

12  look at it.  He's been harassing me for five years.  This is

13  self-defense.

14          THE COURT:  Okay.  Thank you for that.  We will

15  certainly address that when we get to your exhibits.

16          All right.  Next on the government's list -- let's

17  see.  Moving on from 66, all right, so 67 through --

18          THE DEFENDANT:  Your Honor, I can't hear you when

19  you're talking.

20          THE COURT:  Okay.  Well, I've been pausing, so just

21  one second.  So Government Exhibit 67 --

22          THE DEFENDANT:  I can't hear anything but you can

23  hear me, I can see.

24          THE COURT:  All right.  Are you able to hear me now?

25          All right.  So Ms. Singer, can you say something and

1    we'll see if Mr. Haas can hear you.

2           MS. SINGER:  Robert, can you hear me?

3           THE COURT:  Okay.  He might have lost audio again.

4    That might have been what happened before.

5           All right.  Mr. Haas?

6           Okay.  Mr. Haas, can you hear me?

7           THE DEFENDANT:  I can't hear anybody saying anything

8    since the last time I said something.

9           THE COURT:  Okay.  Can you hear me now?

10          Mr. Haas, can you hear us now?

11          All right.  Let me see if I can get the MCC to

12   refresh it for him because -- one second.  Yes, if they could

13   just refresh his screen, that might help.  Oh, they do have

14   the number.

15          Okay.  Mr. Haas, can you hear us now?

16          THE DEFENDANT:  They have the screen locked somehow.

17          THE COURT:  Okay.  So you're not able to refresh your

18   screen, Mr. Haas?

19          Okay.  Let me try to contact the MCC.  I'm going to

20   go mute for a second.

21       (Pause.)

22          MS. SINGER:  Mr. Haas, can you hear me?

23          THE DEFENDANT:  This is why I objected to the

24   constitutionality of this meeting.

25       (Pause.)

1              THE COURT:  Okay.  The marshal service is calling

2     over to the MCC to see if they can help him with the audio.

3          (Pause.)

4              THE COURT:  The marshal service says that the MCC is

5     sending someone to assist him now.

6          (Pause.)

7              THE COURT:  Okay.  Can you hear us?

8          (Pause.)

9              THE COURT:  You're coming in broken up.  We can see

10    you now.  Can you hear us?  Hello?

11             THE DEFENDANT:  Can you hear me?

12             THE COURT:  Yes.  I can hear you.  Are you able to

13    hear us, Mr. Haas?

14             THE DEFENDANT:  I can now.

15             THE COURT:  Okay.  And we can see you.  Are you able

16    to see us as well, Mr. Haas?

17             Mr. Haas?

18             THE DEFENDANT:  For now.

19             THE COURT:  Okay.  All right.  Back on the record.

20    We were talking about the next set of government exhibits --

21             THE DEFENDANT:  I can see you.

22             THE COURT:  Excuse me, Mr. Haas?  What did you say?

23             THE DEFENDANT:  I told the guard that it was working,

24    that they could leave the room.

25             THE COURT:  Okay.  All right.  Thanks for their

1    assistance.

2         All right.  On Government Exhibits 67 through 80, so

3    again, for the government, are these all covered by the motion

4    to admit statements?

5         MS. KELLY:  They are, your Honor.  I would just point

6    out that Exhibit 70 is a charged statement.  That's the

7    statement charged in --

8         THE COURT:  Right.

9         MS. KELLY:  That's the statement --

10        THE COURT:  Yes.  So in other words, covered either

11   as a charged statement or by the motion to admit statement.

12        MS. KELLY:  Yes, your Honor, they are.

13        THE COURT:  Okay.  So again, go through the exhibit

14   list, match up the numbering within the description column.

15   And also why don't you put in the -- you can leave the column

16   entitled "Objection," but put the ruling, whether allowed or

17   excluded, leave it on that list so that again Mr. Haas and I

18   can follow along.

19        And when you file that, can you also email to

20   Ms. Singer and to myself an MS Word version of it?  And that

21   way if Mr. Haas asks her to do anything with the exhibit list,

22   she'll have it in MS Word format as well.  Okay?

23        MS. KELLY:  Okay.

24        THE COURT:  All right.  Next is Exhibit 81.  Again,

25   this appeared probably with a different exhibit but on the

1   prior exhibit list.  This is a call log from Kostuchowski.

2   And it's the calls placed to and from the defendant to

3   Kostuchowski's phone.

4            MS. KELLY:  Your Honor --

5            THE COURT:  I'm sorry.  Go ahead.

6            MS. KELLY:  I didn't mean to interrupt.  I was going

7   to add that these are new exhibits.  They are screen --

8   they've been provided to defendant, but they're screenshots of

9   Officer Kostuchowski's phone.  One is a call log and the other

10  is a -- 82 is a screenshot of the voicemail left on his phone.

11  So they have the date and time of the calls that came in in

12  both 81 and 82.  So they're phone, screenshots from his phone.

13           THE COURT:  Okay.  So these did not appear on the

14  prior exhibit list?

15           MS. KELLY:  They did not.

16           THE COURT:  Okay.  I thought we had gone through the

17  four exhibits that were --

18           MS. KELLY:  We apologize, your Honor.  We overlooked

19  some, and as we're going through by number, we have a few more

20  to identify.

21           THE DEFENDANT:  Excuse me, your Honor.

22           THE COURT:  Yes.

23           THE DEFENDANT:  I'd like to point out that in some of

24  the exhibits that I entered for evidence, Kostuchowski said

25  that I had made 194 calls to his phone when the toll record

1 shows it was 25 calls.  I'd like to know where the other --

2 where the other 175, roughly, calls came from that he invented.

3    THE COURT:  Yeah, I don't think that's so much an

4 exhibit question, Mr. Haas, so we can move on from that.

5    THE DEFENDANT:  Well, it's actually on my discovery

6 disk, and I'd like it shown to the jury that this man is not

7 honest, that he's lying.

8    THE COURT:  Yes.  And I meant the government

9 exhibits.  So we will get to your exhibits as soon as we can

10 finish with the government list.

11    So yeah, can you show 81 to Mr. Haas, please?

12    MS. KELLY:  It's a multipage document, so if you'd

13 like us to move the page.

14    THE COURT:  Yes, you can scroll.

15    MS. KELLY:  Just let us know.  Keep going?  Okay.

16    MS. SINGER:  If it's on the screen -- I'm sorry to

17 interrupt -- I can't see it.

18    THE COURT:  I'm able to see it.  Mr. Haas, can you

19 see it?

20    THE DEFENDANT:  Your Honor, I can't hear you again.

21 And also I'd like to point out that he supposedly blocked my

22 calls on May 11th but there's a May 14th call on there.  I'd

23 like to know how that ended up in that call log.

24    THE COURT:  Okay.  I think it does say "auto-rejected

25 call" on there, but let's just make sure.  Can you hear me

1     now?

2             All right.  One second.  Let me try to get the MCC

3     again.  We might just have the guard stay in there.  Okay.  I

4     might just ask them to stay in there, so they might want to

5     bring a chair or something.  Okay.  Thanks.

6             Okay.  The MCC is going to --

7             THE DEFENDANT:  Every time you have them post a photo

8     like this, we lose -- I can't hear you anymore.

9             THE COURT:  Yeah.  That might be the cause.  You

10    probably still can't hear me, but we'll get you back on, and

11    then we'll go from there.

12            Let me ask the government to take down the exhibit

13    and stop the share screen.  All right.  Thank you.

14            Mr. Haas, can you hear us now?  You'll probably have

15    to refresh it.  All right.

16            THE DEFENDANT:  I can hear you again.

17            THE COURT:  All right.  Here's what we're going to

18    do, Mr. Haas.  We're going to avoid that screen share.  And it

19    is most important to get to your exhibits, so I'm going to

20    move a little bit faster through these government ones and

21    reserve more for trial, which is actually the general thing as

22    we very often reserve evidentiary rulings for trial.

23            I just have a personal preference to try to vet as

24    many exhibits as possible to make the trial go smoother and

25    allow the parties to adjust their cases in reaction to

1  evidentiary rulings.  So 81 and 82, I'm going to reserve that

2  for trial.  So please take a look as it as you prepare,

3  Mr. Haas.  And then if during trial when the government offers

4  it and you object, then you can make an objection at that

5  time.  All right.  Do you understand that, Mr. Haas?

6         THE DEFENDANT:  I do.

7         THE COURT:  All right.  Next, 83 through 87.  And

8  I'll ask the government again, either these are charged

9  statements or covered by the motion to admit uncharged

10  statements?

11         MS. KELLY:  Yes, your Honor.

12         THE COURT:  All right.  So once again, adjust the

13  exhibit chart so we can follow along.

14         Okay.  88 through 92, T-Mobile records and

15  certification, were these the subject of the 902(11)

16  certification?

17         MS. KELLY:  Yes, they were.

18         THE COURT:  Okay.  And so Mr. Haas, there's a -- in

19  one of the rulings that you have now a copy of, there is a

20  rule of evidence 902(11) which allows a party to introduce

21  business records if they can get a certification that these

22  are business records without them producing the custodian of

23  records.  So the government has properly already obtained

24  those 902(11) certifications and provided them to you.

25         Do you have any other -- any further objection based

1   on the --

2          THE DEFENDANT:  I do not, no.

3          THE COURT:  Okay.  All right.  So 88 through 92 are

4   in.

5          And was Kostuchowski's phone the T-Mobile?

6          MS. KELLY:  No, your Honor.  That's State Department

7   Agent Rochowiak.

8          THE DEFENDANT:  My phone is T-Mobile.

9          MS. KELLY:  Those are Mr. Haas' toll records.  The

10  time period of the T-Mobile toll records pertain to calls with

11  Mr. Rochowiak.  Now, in light of your Honor's order, we would

12  not be presenting those in our case in chief.

13         THE COURT:  Okay.  So 88 through 92 dealt with

14  Rochowiak and so, therefore, under that motion in limine

15  ruling, then they're actually out then.

16         MS. KELLY:  That's correct.

17         THE COURT:  Okay.  Now, Mr. Haas, if you have some

18  argument based on your phone records, okay, then -- and if

19  they're not already on your list of 46 exhibits, which I don't

20  think they were, please work with Ms. Singer to figure out

21  what phone records you want to introduce.  All right?

22         THE DEFENDANT:  I don't need any phone records.

23  Thank you, your Honor.

24         THE COURT:  Okay.  So 93 is -- for the government is

25  also subject to the Rochowiak motion in limine ruling?

 1              MS. KELLY:  Yes, Judge.

 2              THE COURT:  Okay.  What about 94 through 97, the

 3   Sprint records?

 4              MS. KELLY:  Those we would seek to admit to show the

 5   contacts between Mr. Haas and Joe -- and TFO Joe Kostuchowski.

 6              THE COURT:  Okay.  Now --

 7              MS. KELLY:  The --

 8          (Overlapping speakers.)

 9              THE DEFENDANT:  Your Honor, I'd like to see the -- I

10   would like to see those records.  I'd like to see those 94

11   calls that I supposedly made to Kostuchowski.

12              MS. KELLY:  We produced them multiple times, the

13   Sprint records.

14              THE COURT:  Okay.  So and that's Exhibit 97?

15              MS. KELLY:  Exhibit 97 is the toll records

16   themselves, your Honor.

17              THE COURT:  Right.  So you're saying you produced

18   those already?

19              MS. KELLY:  Yes.

20              THE COURT:  Okay.  All right.  And so --

21              THE DEFENDANT:  And I would like to see them.  I was

22   looking forward to a jury seeing them.  I'm not objecting to

23   that.

24              THE COURT:  Okay.  So any -- so Mr. Haas, just to be

25   clear for the record, any objection to the record

1    certifications which are 94 and 95 from the records custodian

2    and 96 and 97, which are the Sprint subscriber records and the

3    Sprint toll records?  Any objection?

4         THE DEFENDANT:  No, I don't object.  I understand

5    he's not going to be there either.  That's fine.

6         THE COURT:  Okay.  Those are in.

7         Okay.  Next is a summary spreadsheet of Mr. Haas'

8    contacts with Kostuchowski and then a spreadsheet -- can you

9    just describe 98, 99, and 100?

10        MS. KELLY:  Mr. Haas had asked in discovery for TFO

11   Kostuchowski's toll records, which we provided.  That is the

12   spreadsheet identified as Exhibit 98.  An FBI operations

13   specialist then looked through those records.  He identified

14   some records that were duplicative and created a spreadsheet

15   identified as 99.

16        THE COURT:  Okay.  I see.  So 98 has what the

17   government says are -- has some duplicative contacts in there.

18   99 is the subset that minuses out the duplicatives?

19        MS. KELLY:  Your Honor, I got confused myself by the

20   description.  98 is a summary of 97.  97 identifies the

21   contact from the Haas phone to Joe Kostuchowski's phone.  The

22   full set of his toll records no matter who he called is

23   Exhibit 97.  What the FBI did is in Exhibit 98 identified just

24   the contacts between the Haas phone and Joe Kostuchowski based

25   on the Sprint records.

1          THE COURT:  Okay.  I see.

2          MS. KELLY:  99 then is the records that TFO

3    Kostuchowski obtained himself.  These are his phone toll

4    records.  And then in 100, the FBI operations specialist,

5    there were some duplicate entries, and he then created that

6    summary marked as 100.

7          THE COURT:  Okay.  And so have 98, 99, and 100 been

8    previously produced to Mr. Haas?

9          MS. KELLY:  They have.  At this time, we anticipate

10   seeking to introduce 98.  We have 99 and 100 for

11   identification on our exhibit list, but we may not introduce

12   them into evidence, so we're not seeking to introduce them

13   right now.

14         THE DEFENDANT:  Can I ask a question, your Honor?

15         THE COURT:  Go ahead.

16         THE DEFENDANT:  Is what she's talking about on Disk

17   24 or Disk 20?

18         MR. JONAS:  Your Honor, if we could have a moment to

19   confirm that.

20         THE COURT:  Sure.

21         MS. KELLY:  We produced these on -- more than once.

22   So we produced -- Mr. Haas, are you talking about the full set

23   of toll records or these spreadsheets, the summaries?

24         THE DEFENDANT:  The spreadsheets, the little bar

25   graph that they made.

1          MS. KELLY:  Oh, that's a later exhibit.

2          THE COURT:  Okay.  So that's on the disk that has all

3   of the exhibits that were delivered last week to the MCC,

4   correct?

5          MS. KELLY:  I'm sorry.  Could you repeat the

6   question?

7          THE COURT:  Yes.  So these summaries, 98, 99 and 100,

8   they were on the disk with all the trial exhibits?

9          MS. KELLY:  Yes, your Honor, absolutely.

10          THE COURT:  Okay.  So the -- yes.  So Mr. Haas, if

11  you just want to look on that disk because there's a lot less

12  information on that disk if you want to look and see exactly

13  what that is.  All right?

14          THE DEFENDANT:  Yes.  If I can get to the law

15  computer, I will.

16          THE COURT:  Okay.

17          THE DEFENDANT:  I was able to glance at it.

18          THE COURT:  Okay.  I'm going to reserve ruling on

19  these then for trial.

20          And during the break, I emailed the MCC attorney

21  advisor to see if you could have more frequent access to the

22  law library, to see if Ms. Singer can have enhanced access and

23  more responsiveness to phone call requests and perhaps even

24  setting up a daily phone call at a specific time from here on

25  out to the trial; of course, subject to adjustment by

1    Ms. Singer if it doesn't work with her schedule.

2         And I asked about the haircut.  I asked whether

3    you're going to quarantine during trial and if you are going

4    to be quarantined, if you can still have access, though, to a

5    computer so you can continue to review exhibits.  And yes, I

6    believe those are the four questions that I posed.  So I'm

7    waiting to hear back from them, from the MCC on that.

8         Okay.  101, again, that's on the trial exhibit disk?

9         MS. KELLY:  Correct.  Those are summary graphs.

10        THE COURT:  Okay.  Although this is Rochowiak, right?

11        MS. KELLY:  Correct.  So that one is out.

12        THE COURT:  Okay.

13        MS. KELLY:  101 would be out.

14        THE COURT:  All right.  And then 102 is another

15   summary graph of contacts?

16        MS. KELLY:  Correct.

17        THE COURT:  All right.  I'm going to reserve that one

18   as well.

19        Okay.  103 is a screenshot of the sign in the

20   Illinois State patrol vehicle that was used to transport the

21   defendant on June 11th, 2019.  And don't screen share it since

22   we're going to lose our audio, but this -- so this purports to

23   be a notification that the defendant was audio and video

24   recorded?

25        MS. KELLY:  Correct, your Honor.  We're not certain

1    we're going to use it.  We may be able to just use the video

2    clip, which is clip 5, clip 1 in the -- clip 1 of the ISP

3    recording.

4              THE COURT:  Okay.

5              MS. KELLY:  But we have it here just in case.

6              THE COURT:  All right.  Mr. Haas, do you have any

7    objection to a screenshot of that sign?

8              THE DEFENDANT:  I do not.  As long as most of that

9    video gets played for the jury, that's okay.

10             THE COURT:  Well, I'm not going to condition it on

11   that.  So if you have an objection, you can preserve it for

12   trial, and we can talk about it then if the government decides

13   to introduce it.

14             Okay.  104 is going to be the subject of a government

15   motion to allow this evidence given that -- and 105.  This is

16   the vk.com records, Mr. Haas, that has been produced only

17   recently.  So the government is going to have to affirmatively

18   move to allow that in.

19             106.  Okay.  Now, was this covered in the motion to

20   admit statement?

21             MS. KELLY:  Your Honor, it wasn't.  And I'm not sure

22   we're going to need to utilize it.  This is an email from the

23   defendant's MCC Chicago email account talking about his vk.com

24   account and mentioning his user name "Bob was here."  In light

25   of the agreed stipulation, I don't anticipate that we will

1   need to admit this document.

2          THE COURT:  All right.  Well, I'll reserve it in case

3   it ends up being an issue.  Okay.  The same thing with --

4          THE DEFENDANT:  Your Honor, I would like Exhibit 106

5   to stay on the evidence list.

6          THE COURT:  Okay.  Does the government have any

7   objection?

8          MS. KELLY:  We don't, although we point out, we

9   had -- in our version of Exhibit 106, we had redacted portions

10  of it so that there -- we would avoid any indication that it

11  was sent from the jail account.

12         THE COURT:  Yes.  So let's just talk about that

13  because we had to talk about it anyway.  Mr. Haas, is it your

14  intention to arrange for some kind of civilian clothing so

15  that you're not in an orange jumpsuit and, therefore, it is --

16  the jury would not know that you're in pretrial detention, or

17  does it not matter to you?

18         THE DEFENDANT:  I spoke with my mother, and she's

19  supposed to bring some clothes.  She can contact Ms. Singer

20  about that, where she needs to drop them off but personally, I

21  don't care.

22         THE COURT:  Okay.  Well, I mean, it matters in the

23  sense of both the logistics of changing into the clothes.  And

24  apparently from this particular exhibit -- let me ask you

25  this.  What would you offer this exhibit for, this email to

1    your friend?

2           THE DEFENDANT:  Proof of self-defense.

3           MS. KELLY:  Your Honor, if I may, I think -- I think

4    we would have redacted everything but for the reference to the

5    vk.com account.  I think what Mr. Haas wishes to do is

6    introduce the other language in here which talks about the

7    World Trade Center, Israelis, the Talmud, and other topics.

8           THE COURT:  Okay.  Let's not get into the defense

9    exhibits by going through this exhibit.  So let me just

10   reserve this for trial, and we can actually get to the defense

11   exhibits as soon as we can.

12          THE DEFENDANT:  Hold on.  Your Honor, I have a

13   question.  So they were going to put just a sentence out of

14   this whole page on to their evidence and hide the facts, the

15   underlying facts behind the whole message?

16          THE COURT:  Again, they were only going to offer it

17   to show your use of the vk.com site.  All right.  So like I

18   said, let me just reserve this for trial so that we can get to

19   the exhibits that you had already affirmatively identified,

20   and we're almost there.  So let's try to get there.

21          The -- so 107, 108, 109, 110.  So 109 was withdrawn

22   by the government earlier and --

23       (Background talking.)

24          THE COURT:  Does someone --

25          THE DEFENDANT:  They're speaking Spanish.

1          THE COURT:  All right.  Just make sure you're on mute

2     when you're not speaking.  All right.  So 107, 108, 110,

3     again, we'll reserve if you -- you might not need it if you

4     get an identity stip to the vk.com.

5          Okay.  So then 201 through 236, again, align -- well,

6     actually these are numbered, so that's all right.  What might

7     help is if you put in the relevance column what exhibit number

8     it corresponds with in terms of the video or audio.  Okay?

9          MR. JONAS:  Yes, Judge.

10          THE COURT:  All right.  Okay.  I think that's it for

11     the government exhibits.  So now let's get to the defense

12     exhibits.

13          THE DEFENDANT:  Your Honor, I'd like to --

14          MS. KELLY:  Your Honor --

15          THE DEFENDANT:  I want the reminder of the related

16     writings and photographs that are attached to all of these

17     government exhibits to also be produced in their normal size

18     so people can see what I was really saying in these posts.

19          THE COURT:  Okay.  Again, the -- it is up to you to

20     identify the specifics as opposed to just a blanket request on

21     all exhibits.  And we are now getting to your exhibits, the

22     ones that you have already identified.  And if you need to

23     identify more beyond that, then you do need to do it as soon

24     as possible so that again, we can make this trial go as

25     smoothly as possible.

1          So on the exhibit list that the defendant submitted,

2    and it was -- it was filed as docket entries 171 and 172.  The

3    first four, I don't think I was able to locate.  5 through 46,

4    I think I have an idea.  For the first four -- well, the first

5    one, grand jury Exhibit 9, so what I'm going to ask the

6    government to do is -- so don't screen share, all right, but

7    if you can tell me what discovery disk I might find this on, I

8    might be able to then pull it up.

9          MR. JONAS:  Judge, it's --

10          THE COURT:  Yes.  Go ahead.

11          MS. KELLY:  We have to look through our box of

12    things, if you'd give us a moment.

13          THE COURT:  Well, here.  Let me ask you this.  Is

14    that true for grand jury Exhibits 9, 12, 14, and 8?

15          MR. JONAS:  Yes.

16          MS. KELLY:  Yes.

17          THE COURT:  Okay.  Let me ask Mr. Haas to describe --

18    because you do have written descriptions here, so maybe you'll

19    remember -- what is grand jury Exhibit No. 9.  It has the

20    Talmud, three photos, black nobility, committee of 300, BBC

21    photos, all photos.  What is that comprised of, do you know?

22          Can you unmute?

23          THE DEFENDANT:  All the photos that were produced

24    with that post, I want produced for the jury to see,

25    everything that I -- that I posted.  I don't want it posted

1   little pieces taking everything out of context.  I want the

2   jury to see my full meaning of what I'm posting online, not

3   what these people want them to see, what these people are

4   inventing in their little heads.

5           THE COURT:  Okay.  So let me ask the government if

6   you remember, grand jury Exhibit 9, how -- you know, what's

7   the volume of that?  Is it one post?

8           MR. JONAS:  Judge --

9           THE COURT:  Yes.  Go ahead.

10          MR. JONAS:  The --

11          THE DEFENDANT:  They are -- your Honor.

12          MR. JONAS:  I'm sorry, Judge.  I didn't hear the

13  defendant.

14          THE COURT:  I think he said, "It's all photographs."

15          MR. JONAS:  Judge, so there is a posting written by

16  the defendant.  Then there is this, what purports to be this

17  translation of a passage from the Talmud.  There is a

18  screen -- a picture of something from the Talmud as well as --

19  it's hard to read.  And then there are pictures of individuals

20  that don't appear -- the government objects, to start off, to

21  all of this.  In the very bottom of the exhibit, there is a

22  comment by the defendant where he writes, "Your time is up,

23  clowns."

24          THE COURT:  So what is the time period of this

25  posting?

1    MR. JONAS:  It's dated February 12th, 2019.  It's on

2  the vk.com Fox News site.  What the defendant wrote in the

3  beginning that, his words is, "These savage, hashtag, feds

4  thought they could push me to stop telling the facts.  They

5  didn't know I think they're a joke.  I push death, son, not

6  intimidation.  I won't make threats.  I'll just come kill you

7  who represent Jews and try to obstruct my First Amendment

8  rights."

9    THE DEFENDANT:  And they're trying to obstruct the

10 First Amendment right now by not showing the jury the full

11 context of what I'm saying.

12   THE COURT:  So is this post part of the government's

13 evidence and it's redacted and...

14   MR. JONAS:  One moment, your Honor.

15   MS. KELLY:  Yes, that's one of the charged

16 statements.  And we have redacted after the first paragraph.

17 We redacted the Sanhedrin, and we redacted the photographs

18 underneath.

19   THE DEFENDANT:  Your Honor, I don't object to them

20 using this stuff, but I want all of it to be seen by the jury,

21 full context.  It's five photographs and half a paragraph.

22 They can produce it.  It's not too voluminous, as they say.

23 They're lying.

24   THE COURT:  No, no, no.  It's not -- I was asking to

25 see if I can get an understanding of whether this pertains to

1    one particular statement that's charged -- and it sounds like

2    it is -- as opposed to many other statements which I have more

3    concern of.

4          All right.  So let's go through it.  File on the

5    docket, all right, so that I can see -- and we can make a

6    record, file the -- if you think you need to file them under

7    seal, I don't think you really do at this point even though

8    they're grand jury exhibits -- 9, 12, 14, and 8.

9          MR. JONAS:  Your Honor, is that -- you just asked for

10    the government to file or the defendant?

11          THE COURT:  The government.

12          MR. JONAS:  Okay.

13          MS. KELLY:  And your Honor, you asked about the

14    disks.  They were enclosed in a letter dated June 11, 2020, to

15    defendant with all the grand jury material, the second

16    superseding indictment, as well as copies of these particular

17    posts.

18          THE COURT:  Okay.  So upload those and then that way,

19    I can actually look and see if there may be some admissible

20    statements in there.  Try to do that by the end of tomorrow,

21    please.  And I'm asking the government to do it, obviously,

22    because it will be done -- as opposed to by Mr. Haas given his

23    pro se status.

24          Okay.  No. 5, defense Exhibit 5.  Okay.  Mr. Haas,

25    what is the purpose of No. 5?  This is the one that you

1    describe as Nikki Haley, Bates No. 2362.

2           THE DEFENDANT:  I don't have it in front of me, but

3    I'm pretty sure it's about her being beholden to a foreign

4    government, which is one of the photos that I posted that

5    brought part of this investigation.  Supposedly the reason the

6    Department of State originally came out, but they were coming

7    out before that anyways.

8           THE COURT:  And it has a date of January 26, 2018.

9    Does that sound about right, Mr. Haas?

10          THE DEFENDANT:  Yes.  A couple days before the

11   Department of State came out, which is the reason that I

12   returned for the fifth time.

13          THE COURT:  Okay.  What's the government's position?

14          MS. KELLY:  Your Honor, this is a text to Agent

15   Rochowiak which I believe you ruled on at least as far as the

16   government's motion was concerned.  This particular message --

17   sentiment is not directly relevant to the charged statements

18   in the case.  And it goes down the line of the side trial over

19   the legitimacy of government policy and the government's

20   relationship with Israel.  And it's a whole separate trial

21   within a trial on an irrelevant point.

22          THE COURT:  Mr. Haas, the truth or falsity of your

23   beliefs are not at issue at this trial.  Okay.  And the jury

24   is not going to be allowed, for example, to convict you based

25   on agreement or disagreement with your beliefs.

1        THE DEFENDANT:  Your Honor --

2        THE COURT:  Your belief may go to your state of mind,

3   but there has to be some relevancy to the belief connecting it

4   to some element in the case or some defense to the element in

5   the case, and I'm not sure that this does that.

6        Go ahead.

7        THE DEFENDANT:  Your Honor, as I said before, I am

8   defending myself against the biggest terrorist organization in

9   the world.  The First Amendment guarantees me my right to

10  defend myself against these people, and I'm allowed to -- to

11  point it out to people who work for the federal government.

12  Therefore, they are guilty of misprision of treason, not doing

13  anything about it and continuing a bad faith investigation

14  against me because they don't believe what I have to say.

15       Instead of investigating it, they attack me and

16  harass me and point guns at me and -- me and tell me I need to

17  change my tone online.  That's not acceptable, and the jury

18  needs to see this.

19       THE COURT:  Okay.  So I'm just going to try to parse

20  through one more time, some testimony that you just noted

21  might very well be admissible.  For example, if you testify

22  that agents pointed guns at you and that there may be -- can

23  you mute yourself, please?

24       Okay.  There may be -- given the very low threshold

25  that it takes to present evidence on self-defense and on

1  entrapment, there may be some testimony that you can offer on

2  the agents pointing guns at you or using excessive force

3  against you.  This doesn't fit into that kind of category.  It

4  doesn't fit into the entrapment defense either.  Entrapment is

5  made up of inducement and lack of predisposition, and so

6  it's --

7       THE DEFENDANT:  Your Honor, that is my response --

8  that is my response the day after they pointed guns at my head

9  and said, "We'll kill you if you don't get on the ground.  We

10  need to have a chat about what you say online."

11       THE COURT:  Yeah, that wasn't -- you said this was

12  before the encounter with the agents.  So it wasn't --

13       THE DEFENDANT:  I thought it was a post -- I thought

14  it was a post they took offline.  I didn't realize it was a

15  phone call.  I didn't have his phone number until he came and

16  pointed a gun at my head.  That's when I got his business

17  card.

18       MR. JONAS:  Your Honor, if I may, this particular

19  item we're talking about is dated January 26th, 2018, which

20  was the day after the State Department -- I believe it was the

21  day after the State Department first interviewed the

22  defendant.

23       In this particular post, he references State

24  Department agent, not by name, but Bob Rochowiak leaving his

25  card at the defendant's home but this -- your Honor, the

1  defendant, as you point out, has been charged with threats

2  made almost a year and a half later against another agent.  To

3  argue self-defense in May of 2019 for an encounter with the

4  State Department -- does not comport with the law.

5        THE DEFENDANT:  Your Honor, can I speak for a second?

6  The prosecution is claiming that the FBI, that I threatened

7  this FBI officer, and they're also claiming that I supposedly

8  threatened this other guy, and that's the whole reason

9  Kostuchowski came to see me.

10        When Kostuchowski came to see me, I said, "What are

11  you here about?  Do you have a specific topic you want to talk

12  about?  What do you have?  Do you have charges or a warrant?"

13        He says, "Let's just be friends."  He came to my job

14  site to harass me and waste my time to be friends and not

15  address what he's there to address about:  Terrorizing me

16  about my First Amendment right to talk to this other police

17  officer who left his card at my house.  Kostuchowski was

18  supposedly investigating comments that I made to the State

19  Department.  That's why -- that's why they claim that the FBI

20  was at my house that day.

21        MR. JONAS:  Actually, your Honor, those two agents

22  that went to interview the defendant in May of 2019, it was a

23  State Department agent named Matt Kelley.  Matt Kelley was

24  there because of the text messages the defendant was sending

25  to State Department Agent Rochowiak.  Joe Kostuchowski was

1    there because of complaints made to the FBI by the Simon

2    Wiesenthal Center regarding the defendant's postings on

3    vk.com.  So both agents were there for separate purposes.

4            THE COURT:  Yes.  So that is --

5            THE DEFENDANT:  I would like to see proof that I made

6    threats, legitimate threats.  And why would he not say, "You

7    made threats, and these people reported it"?  He said, "Let's

8    just be friends."

9            And he's there with the other man who is there to

10   talk to me supposedly about statements that I made to this

11   other officer.  It's been an ongoing investigation, violating

12   my rights since October of 2016.  Kostuchowski was there that

13   day, also.  This whole time, he has been harassing me about my

14   First Amendment guaranteed freedom of speech.  No arrests, no

15   charges, harassing me, pointing guns at me, threatening my

16   life because they don't like what I have to say about their

17   scumbag allies.  These are facts.

18           THE COURT:  Mr. Haas, if you use that kind of

19   language and tone in front of the jury, it's not going to help

20   you.  We're here at a bench conference, so I will allow the

21   hearing to continue.  But this isn't the place to try your

22   case.  You can try to explain what your theory of the defense

23   is.  I'm trying to be patient and listen to it, and I'm trying

24   to parse through what might be admissible and what's not.  So

25   going off on this -- on a diatribe is not helping you explain

1    your relevancy theory.  So let me try to connect this up here.

2         This January 26, 2018, text is -- so this is a day

3    after the Rochowiak visit.  Is that correct, Mr. Jonas?

4         MR. JONAS:  Yes, your Honor.

5         THE COURT:  All right.  And you agree with that,

6    right, Mr. Haas?

7         THE DEFENDANT:  Yes, your Honor.  All these things

8    they gave to me, it's evidence that they are trying to use

9    against me.  I want all of it used in full, not little clips.

10   I want the photographs added to the context of what I said.

11        THE COURT:  Okay.  Just to focus again, Mr. Haas,

12   because this is a one -- I think this is just a one-page

13   exhibit, just one text message, all right, that -- in which

14   you assert that the ambassador was beholden to a foreign

15   government.  All right.  So do you remember this exhibit now?

16        THE DEFENDANT:  Yes.  That was the whole reason that

17   they supposedly came out because of supposed comments that I

18   made to Nikki Haley which they just came out and terrorized me

19   for and had no charges -- (inaudible).

20        THE COURT:  So the text you sent on January

21   (inaudible) -- what you're saying is that you were basically

22   reposting something that you had posted before January 25?

23        THE DEFENDANT:  No.  I sent it to him showing him

24   that I'm defending myself against a terrorist organization --

25   the State of Israel sitting in front of an Israeli flag.

1      MR. JONAS:  Your Honor, not -- the defendant's

2  statement that he just made does not go to self-defense, does

3  not go to entrapment.  I would characterize it as harassment

4  of this agent when you consider all the other text messages he

5  sent to the agent which your Honor has reviewed and has ruled

6  on already.

7      The defendant is going to open the door for us to

8  bring in everything that he did with regard to both Agent

9  Noordeloos and Agent Rochowiak, and none of it -- I mean, your

10  Honor, a lot of it is threatening against him.

11      THE COURT:  So look, again, I can't make a factual

12  finding.  It's quite the other way around, that if a rational

13  jury could find either self-defense or entrapment, then I have

14  to apply that.  The --

15      THE DEFENDANT:  Your Honor --

16      THE COURT:  The prior decision that I made obviously

17  warns the defendant that he may very well open the door.  All

18  right.  And so what he is proffering is that he was held at

19  gunpoint.  So all right.

20      Mr. Haas, let me just make sure I understand your

21  proffer.  Okay.  Let's go back in time chronologically.

22  October 2016 you say is the first encounter you had with

23  federal agents in relation to all this.  Is that correct?

24      THE DEFENDANT:  I'm sorry.  The guards came in here

25  and started talking to me and told me to put a mask on and

1  walked away and left the door open.

2        SPEAKER:  There's no one down here.  You need a mask

3  on.

4        THE DEFENDANT:  I don't care what you have to say.

5        SPEAKER:  I don't why you're (inaudible) --

6        THE COURT:  Okay.  Do keep the mask on.  It's a

7  reasonable request because it's a small room and others are

8  going to use it, I'm sure.  So keep the mask on.

9        What I was asking you was, October 2016 you say is

10  the first encounter with federal agents in relation to --

11        THE DEFENDANT:  They were out there October 2016.

12        THE COURT:  Okay.  So October 2016.  Now, let me ask

13  the government because I think they might have the information

14  more at hand, so who are the agents in that first encounter?

15        MS. KELLY:  An agent by the name of Tim Robertson.

16        THE DEFENDANT:  And Joseph Kostuchowski according to

17  his police report in my discovery disk.  I don't -- I don't

18  have it right in front of me, but I'll bring it to court.  He

19  said he was there, too.  He was there.

20        MS. KELLY:  Your Honor, what the -- there was an

21  encounter earlier before, before that time where FBI TFO Tim

22  Robertson and FBI TFO Joe Kostuchowski interviewed a Robert

23  Haas.  A conclusion was made it was not this Robert Haas.

24  This Robert Haas was then interviewed later by TFO Robertson,

25  and Kostuchowski --

1    THE DEFENDANT:  Tim Robertson did interview me in

2  October 2016.  Kostuchowski claims he was there.  That's a

3  fact.  This lady is lying now or -- or Kostuchowski is lying.

4  I have the document.  And I met Tim Robertson in McDonald's.

5  Who's the liar here?

6    THE COURT:  Okay.  Mr. Haas, did Mr. Robertson --

7  because you've alleged that at least some agents --

8    THE DEFENDANT:  He was a very nice man.  He's a black

9  gentleman from the Illinois State Police.  And I spoke to him

10  for two hours at McDonald's.

11    THE COURT:  Okay.  And so did he threaten to harm you

12  in any way as some kind of premise for a self-defense defense?

13    THE DEFENDANT:  No.  He was a very nice man.  I never

14  had a problem with him.  It wasn't until the State Department

15  came, Robert Rochowiak and Noordeloos pointing guns at me

16  saying, "We're going to kill you if you don't have a meeting

17  with us."

18    THE COURT:  All right.  So now, January 25th, 2018,

19  would then be the starting point for your proffer that

20  Rochowiak and -- so who was the other one on January 25th?

21    THE DEFENDANT:  Rochowiak --

22    MR. JONAS:  Judge --

23    THE DEFENDANT:  -- Noordeloos, Kostuchowski.

24    MR. JONAS:  Your Honor, Joe Kostuchowski was not

25  there on January 25th.  It was Noordeloos, Rochowiak.  There

1    was a couple of, I believe, State police or local Ottawa

2    police.  There may have been one other, two other agents.  I'm

3    not sure.  But those are the two primary agents that

4    interviewed the defendant.  And your Honor, that meeting was

5    recorded.  The defendant has a copy of that recording.

6            THE DEFENDANT:  Your Honor, that -- that meeting

7    absolutely was not recorded.  That meeting took place in my

8    living room for an hour and a half.  The recording happened in

9    the local police station two days later when I was arrested

10   for a different charge.  This man is lying again.

11           MS. KELLY:  Your Honor, we provided a recording to

12   Mr. Haas multiple times.  It's not video recording.

13           THE DEFENDANT:  And it's --

14           MS. KELLY:  It's audio recording.

15           THE DEFENDANT:  That circumvents the truth.  She is a

16   liar.  The --

17           THE COURT:  Okay.  Mr. --

18           THE DEFENDANT:  Kostuchowski --

19           THE COURT:  Let's back up.  All right.  So Mr. Haas,

20   again, so I just want to understand what your proffer is,

21   right.  A proffer is just like your offer of proof of what

22   might support either self-defense or entrapment.  So your --

23   you plan on testifying that or trying to introduce evidence

24   that at the January 25th, 2018, meeting that Rochowiak and

25   Kostuchowski were there.  Is that correct?

1          THE DEFENDANT:  There was about 20 officers there.

2    I'm not sure who was there, but I don't understand why he

3    would be at the October 26th meeting and not that next one and

4    then at the one after that.  Anyway, it's federal officers

5    that I don't like, not just specifically him, all of them that

6    are trying to take my First Amendment right away.

7          "It is well established that speech involving

8    government impropriety occupies the highest rung of First

9    Amendment protection.  *Swineford versus Snyder County,* Third

10   Circuit 1994.  Moreover -- emphasized that the public has a

11   significant interest in encouraging legitimate whistleblowing

12   so that it may receive and evaluate information concerning the

13   alleged abuses of public officials.  *O'Donnell*, 875, 1602.

14   The public's interest in exposing potential wrongdoing by

15   public employees is especially powerful."

16         THE COURT:  All right.  So I understand your proffer.

17   You allege agents on January 25th, 2018, pointed their guns at

18   you and ordered you on the ground.

19         THE DEFENDANT:  It's in the reports.  It's in my

20   discovery disk, their reports.

21         THE COURT:  I'm -- right.  I'm just asking if that is

22   your proffer.

23         THE DEFENDANT:  Yes.

24         THE COURT:  Okay.  I understand your proffer.  That

25   will help me figure out -- and we can do, I think Exhibit 5.

1    Let me take it under advisement.  You do understand, you know,

2    Mr. Haas, that this does open the door wide open to many of

3    the uncharged statements that I excluded in the order that you

4    received yesterday as to alleged threats against other

5    officers.

6            THE DEFENDANT:  Absolutely.  But if we're going to

7    add other -- other statements, I want the photographs and full

8    statements, the remainder of related writings added to it, not

9    just little, one sentence of two paragraphs.  If it was two

10   paragraphs, show the jury the two paragraphs.  Tell the truth.

11   Quit trying to keep them in the dark from the facts.

12           THE COURT:  All right.  Again, this is what we're

13   doing in terms of reviewing exhibits to determine the merit of

14   your position on that.

15           All right.  Let me look at No. 6.  This one, you

16   described, Mr. Haas, as statements towards Zionists.  Okay.

17   So why are you offering this one, Mr. Haas?

18           THE DEFENDANT:  I don't have the list in front of me.

19   It's downstairs in my cell.  Everything that I entered as an

20   exhibit that I want added as an exhibit, I got from them.

21   They're trying to use it against me in a certain way.  I want

22   it added.

23           THE COURT:  Just because they produce something in

24   discovery does not mean that they're offering it at trial.

25   Okay.  I think I understand your proffer.  Anything else other

1 than the January 25, 2018, in terms of a physical encounter?

2 Okay. Anything else of a physical nature, Mr. Haas?

3 THE DEFENDANT: Are you asking me if there was?

4 THE COURT: Yeah.

5 THE DEFENDANT: Yes. They threatened me when they

6 came to my job site also, Kostuchowski and Matthew Kelley.

7 THE COURT: Okay. And when was the job site visit?

8 THE DEFENDANT: I don't have the date in front of me,

9 but they came to my job site, and I recorded video of me

10 talking to them in the middle of the street and --

11 THE COURT: All right. Let me ask Mr. Jonas.

12 MR. JONAS: Your Honor, that was May 8th, 2019. The

13 defendant did record the encounter. He posted it on to

14 vk.com. And it's one of our exhibits, that recording.

15 THE DEFENDANT: I also motioned to have both of those

16 exhibits added.

17 THE COURT: So Mr. Haas, let me just make sure I

18 understand. May 8th, 2019, and the job site visit which

19 included Kostuchowski, what did he say that made you feel

20 threatened?

21 THE DEFENDANT: He told me if I talk about his

22 father, he'll beat my ass. It was a long story. They got --

23 they were being very unprofessional trying to talk about other

24 things other than what they were there for, and I didn't want

25 to hear it. And it led to him telling me he'll beat my ass if

1   I talk about his father.  I'll be happy to talk to the jury

2   about it.

3         THE COURT:  All right.  So that's May 8, 2019.

4   Anything else, Mr. Haas, in terms of in a physical nature?

5         THE DEFENDANT:  No.

6         THE COURT:  All right.  So since you don't have your

7   list in front of you --

8         MR. JONAS:  Your Honor --

9         THE DEFENDANT:  I just need my memory refreshed of

10   what I wrote, and I'll tell you what it is.

11         THE COURT:  Oh, all right.  I had said that Exhibit

12   6, you had described as prior statements toward Zionists.

13         THE DEFENDANT:  And it says a list of what they do

14   and how they terrorize the world.

15         MR. JONAS:  Your Honor, I think what we're going to

16   see throughout his exhibits are these screenshots of

17   anti-Semitic postings that the defendant is trying to use to

18   justify his beliefs.  It has nothing to do --

19         THE DEFENDANT:  Your Honor, this man --

20         MR. JONAS:  -- inappropriate --

21         THE DEFENDANT:  -- is --

22         THE COURT:  Mr. Haas.  Mr. Haas.  Stop speaking for a

23   moment, please.  Let Mr. Jonas speak, and then you'll

24   certainly be able to reply.

25         All right.  Go ahead.

1    MR. JONAS:  Throughout the defendant's purported

2  exhibits and the government has redacted out in the postings

3  that the government wishes to show are screenshots of

4  anti-Semitic statements, anti-Semitic pictures that the

5  defendant is trying to introduce solely to support his belief

6  that Jewish people are terrorists and run the U.S. government.

7  That is inappropriate.  So we have a running objection to

8  admission of anything like that.

9    THE COURT:  That is -- but that's the theory of

10  admissibility for many of your exhibits, for many of the

11  uncharged statements --

12    MR. JONAS:  There's a difference.  What we're trying

13  to admit is the defendant's own statements.  We're not trying

14  to limit screenshots that he posted of either Talmud or

15  screenshots of anti-Semitic pictures from other places.  These

16  are the --

17    THE DEFENDANT:  Your Honor, can I speak for a second?

18    MR. JONAS:  -- the defendant has posted --

19    THE DEFENDANT:  This man keeps saying "anti-Semitic."

20  I'm pro-Semites.  Arabic is Semitic.  Yiddish is not.  I'm

21  pro-Palestinian.  I'm actually very atheist, but I'm

22  pro-Palestine, and they're Muslims.  I am pro-Semites.  They

23  speak a Semitic language.  Jews do not.  They speak Yiddish, a

24  Judeo-Germanic language.  Biblical Hebrew was Phoenician.

25  Modern Hebrew --

1         THE COURT:  Mr. Haas --

2         THE DEFENDANT:  -- is Yiddish.

3         THE COURT:  -- you need to terminate your

4 presentation on that point --

5         THE DEFENDANT:  Stop lying.

6         THE COURT:  -- because that line of argument is not

7 particularly relevant to what is under discussion right now.

8         THE DEFENDANT:  Your Honor, everything they're

9 claiming is that I made anti-Semitic conspiracy theory

10 comments.  Let's show them to the jury and decide if that's a

11 crime that should be investigated.  It's not.  It's a First

12 Amendment right.

13         All through these police reports -- read my

14 discovery, every other police report.  The JBL said he made

15 anti-Semitic conspiracy theory comments.  Welcome to the

16 United States, clown.  That's the basis for their

17 investigation, I made anti-Semitic?  Oh, I denied the

18 Holo-hoax, the fairy tale.  Guess what?  Jews killed 60

19 million Orthodox Russian Christians in Russia and invented the

20 Holocaust and blamed Hitler for their own behavior.  I lived

21 there --

22         THE COURT:  Mr. Haas, I'm terminating your

23 presentation along these lines, or I am going to deem that you

24 have waived your right to participate in this pretrial

25 conference.

1          THE DEFENDANT:  I'm sorry, your Honor.  This is

2     aggravating, the subterfuge to circumvent the facts.  I don't

3     like liars.  I am pro-Palestine.  I like Palestinians.  I have

4     many Arab friends.

5          THE COURT:  Mr. Haas --

6          THE DEFENDANT:  I'm an atheist.  I'm a white guy.

7          THE COURT:  Okay.  I did warn you to stop argument

8     along those lines because it's not pertinent to the particular

9     issue that we're trying to focus on.

10          THE DEFENDANT:  Your Honor, it is.  He just said that

11     it's anti-Semitic comments that I'm making, and they're not.

12     They're anti --

13          THE COURT:  If you would just let me get a word in

14     edgewise.

15          THE DEFENDANT:  I'm sorry.

16          THE COURT:  The label is not important.  I'm trying

17     to understand if it goes to your state of mind.  Go ahead and

18     mute yourself, please.  We're getting the feedback.

19          The fact that the statements were republished by the

20     defendant means that, in effect, he's adopting those

21     statements.  So there isn't this kind of bright line between

22     his own statements and statements of others that he then

23     republishes.  So I don't think as a basis for distinguishing

24     in terms of motive evidence that that is a -- that that does

25     not -- that is not a bright line there, Mr. Jonas.

1          What I really have to decide is how much of the

2     defendant's own motive evidence that you believe is

3     inculpatory and he believes he's offering as some kind of

4     exculpatory or in service of some kind of defense, I have to

5     decide what are those parameters.  And having heard his

6     proffer on what he believes happened in those two encounters,

7     I'm going to deliberate over that, take it under advisement,

8     and then apply it to each of the proposed exhibits that he

9     has.

10          As I did explain earlier in the order that was

11    delivered to Mr. Haas two days ago, proving up, for example,

12    the conspiracy theories, that is out of bounds both on

13    relevance and certainly on 403 grounds.  Like, again, the

14    truth or falsity of those beliefs are not anything that the

15    jury needs to decide.  So there are going to be relevancy and

16    Rule 403 problems with many of these exhibits.  However, there

17    may be again certain statements that, now that I understand

18    his proffer, might be admissible.  So --

19              THE DEFENDANT:  Your Honor, can I --

20              THE COURT:  Go ahead.

21              THE DEFENDANT:  I just want to read you something

22    that they're excluding from every single one of these posts

23    that I've made.  And it's from the Israeli Jewish Talmud.

24    Okay.  "A Jew" --

25              THE COURT:  No, I don't think --

1      THE DEFENDANT:  -- an --

2      THE COURT:  Let's -- Mr. Haas, I have, I believe,

3  identified because you did provide Bates numbers for most of

4  these, and I was able to match up --

5      THE DEFENDANT:  I want to --

6      THE COURT:  -- the disks -- there's no --

7      THE DEFENDANT:  I am being threatened by this.

8      THE COURT:  There's no need for you to read what is

9  already in the proffered exhibits because I have access to the

10  exhibits.  Let me just ask a few more specific questions on

11  particular exhibits.

12      All right.  Let's go to what is the 21st item on the

13  list which is labeled Disk 1, Page 2 of 3.  And yes, so I'm

14  calling this Defense Exhibit 21.  And maybe I don't have --

15  all right.  And it's -- all right.  Let me read this off, the

16  description and, Mr. Haas, you tell me what this exhibit's

17  comprised of.  It says, witness tampering Kelley, K-e-l-l-e-y,

18  dash, Kelly, K-e-l-l-y.  What was that?

19      THE DEFENDANT:  That is the Kelly here, the

20  prosecutor, and Officer Kelley from the State Department

21  calling my local police and coaching them what to say about my

22  civil suit because they are my witnesses.

23      THE COURT:  Okay.  I don't think I have the right

24  exhibit then.  So --

25      THE DEFENDANT:  But you have the right exhibit.

1      THE COURT:  No, no.  All I do is read your

2  description.  And I thought I had identified the exhibit.

3      So does the government have an idea of where this is

4  in the discovery?

5      THE DEFENDANT:  It's a report of -- from the

6  prosecutor's office of admitting that they got together and

7  set up and called my local police station to coach them on

8  what to say during the meeting.

9      THE COURT:  All right.  So it's labeled Disk 1, Page

10  2 of 3.  So now that he's described it as a report of

11  interview, do you have a sense of where that is?

12      MS. KELLY:  Your Honor, there were interviews

13  conducted of the Ottawa police officer.  It's not on Disk 1.

14  I conducted that interview with FBI Special Agent Caitlin

15  Thomas.  Mr. Kelley or Agent Kelley was not present, so I do

16  not know what the defendant is referring to by his

17  description.

18      THE COURT:  So when you labeled it Disk 1, Mr. Haas,

19  what were you referring to?

20      THE DEFENDANT:  Discovery Disk No. 1 and then

21  whatever page that would be.  I might have got the pages mixed

22  up.  I'd have to go back on the computer and look.  But it's

23  specifically the report from Officer Kelley of the Department

24  of State saying he met up with this Mrs. Kelly and they called

25  the local police and talked to them.

1    MS. KELLY:  Your Honor, I -- that didn't happen.  So

2  I would need to know what document Mr. Haas is referring to to

3  address it further.  As I mentioned --

4    THE COURT:  Okay.

5    MS. KELLY:  -- Special Agent Caitlin Thomas from the

6  FBI and I did an interview that was produced to Mr. Haas, but

7  I did not speak to the Ottawa police along with Agent Kelley.

8  So I'll need to see it to really address it much further than

9  that.

10    THE COURT:  Okay.  Mr. --

11    THE DEFENDANT:  I may have read it -- I may have read

12  it wrong.  Maybe she spoke to them with this other agent, but

13  she called the Ottawa police.  After she found out that I was

14  using the comments that were read in front of them in my civil

15  suit, she called the Ottawa police to tamper with my

16  witnesses.  She's not involved in that.

17    THE COURT:  All right.  So Mr. Haas, the -- what you

18  ought to do is go back, check the page.  All right.  And then

19  in what I hope to be a daily phone call with Ms. Singer, you

20  can tell her, okay, what page number Exhibit 21 refers to.

21  All right.  And then she'll be able to alert the Court and the

22  government.

23    All right.  One moment here.  And I think I

24  understand what you're arguing is the theory of relevance

25  here.

1          MR. JONAS:  Your Honor, from the government's

2   perspective, it's inadmissible.

3          THE COURT:  I understand -- I understand the

4   argument.  It was basically captured by the motion in limine

5   to exclude the entirety of the civil suit as well, as well as

6   prosecutorial misconduct arguments and so on.  I understand

7   the argument.

8          So all right.  There are two videos that you marked

9   here as -- again, it was marked as Disk 1.  On the list, I

10  have it designated Exhibit 22.  And I'll send to Ms. Singer

11  and the government what I have labeled as 1 through 46.  So

12  you wanted to offer -- again, I think I understand what you

13  had already argued.

14         You say there are two videos from the job site in

15  Ottawa, Illinois.  That's from the agent visits?

16         THE DEFENDANT:  Yes.  That was the date Kostuchowski

17  and Kelley came to my job site to harass me.

18         THE COURT:  Okay.  And the government, let me ask

19  them, are there two videos from that day?

20         MS. KELLY:  Yes, your Honor.  And they're on our

21  exhibit list as well.

22         THE COURT:  Okay.  But do you have the entirety of

23  the videos or just clips from them?

24         MS. KELLY:  They're videos that Mr. Haas took of

25  portions of the interview and uploaded to vk.com.

1      THE COURT:  Okay.  So you actually don't object to

2  these two videos?

3      MS. KELLY:  No.

4      THE COURT:  All right.  And do you happen to know

5  offhand which government exhibits they are?

6      MS. KELLY:  Judge --

7      THE COURT:  I'm sorry.  Go ahead.

8      MS. KELLY:  Sorry.  76 and 78.

9      THE COURT:  All right.  So Mr. Haas, at trial, the

10  government may very well introduce those so you don't have to

11  introduce them again on your own.  Okay?

12      THE DEFENDANT:  Thank you, your Honor.  I just wanted

13  to make sure that they -- that the jury sees them.

14      THE COURT:  It makes sense to cross-designate

15  exhibits.  That's fine.  But yeah, you won't have to

16  reintroduce them in your case.

17      Okay.  So 23, what I've designated as 23 is described

18  as Disk 1, Page 222 to, I think, 245.  And then Mr. Haas wrote

19  on the exhibit list, Kostuchowski, quote, "not talking to no

20  FBI faggots," quote.  And --

21      THE DEFENDANT:  Your Honor, I'd like that comment to

22  be shown to the jury and then the video of the interview so

23  they can see that that was never said.  I recorded from the

24  minute he got out of his truck until he walked up to me.  That

25  was never said.  He's a liar, and I have video proof.

1          THE COURT:  All right.  So let me just clarify for

2    the record.  It's actually, I think it's Bates 222 and 245.

3          THE DEFENDANT:  Yes.  He says that in his official

4    police reports from that day that I said that to him, and I

5    have video proof that that was never said to him.  He's a

6    liar.

7          THE COURT:  Okay.  Is there any objection from the

8    government on cross-examination on that point?

9          MR. JONAS:  Not to cross-examine the witnesses on

10   that point.  Our objection is the admissibility of the report.

11         THE COURT:  I understand.  Let me explain to

12   Mr. Haas.

13         So Mr. Haas, it may very well be that you can go

14   ahead and cross-examine Kostuchowski on whether you made that

15   statement, all right, and that he then wrote in the report

16   that you made that statement.  And then you can -- it's

17   what -- and then you can ask him whether, in fact, you made

18   that statement.

19         And if he says -- if he concedes you did not, then

20   you have what we call perfected the impeachment.  It's over.

21   If you -- if he denies it and he still insists that you said

22   it, you can prove it up with the video.  All right.  But

23   actually just introducing again like wholesale an entire

24   report as opposed to a portion of it if he refuses to

25   acknowledge that he wrote the report, you'll be able to show

1   it to him, for example, and see if he'll acknowledge it.

2          So you may make use of this.  It may not be to

3   introduce the document itself.  All right.  Do you understand?

4          THE DEFENDANT:  I do.  Thank you, your Honor.

5          THE COURT:  Okay.  The next one is 24.  And this was

6   described as Disk 1, Page 245 again because it's got a Bates

7   label of -- I'm sorry.  The handwriting is a little off.  It's

8   Haas 246 is the Bates label.  I think it's another report by

9   Kostuchowski.  And what Mr. Haas has quoted here is blocked

10  text, May 9, 2019.  So --

11         THE DEFENDANT:  Yes, Judge.

12         THE COURT:  Go ahead.  What's the purpose?

13         THE DEFENDANT:  I mentioned that a little while ago.

14  He told me he blocked the texts on May 9th but then in the

15  screenshot that she just showed us a little bit ago, it showed

16  that a phone call from May 14th.  If he blocked my phone

17  calls, how could he get a phone call on May 14th?  Another lie

18  from this guy.  He's just a liar and I want the jury --

19         THE COURT:  Again, what you're doing, Mr. Haas,

20  you're calling -- (inaudible) arguing.  I understand you're

21  not an attorney, but there are rules of decorum as well.  And

22  it does not advance the ball to call government counsel liars.

23  So you're --

24         THE DEFENDANT:  No, I'm not saying them.  I'm saying

25  Kostuchowski.  I'm pointing out that Kostuchowski is lying all

1   these reports and about the interviews and everything.

2          THE COURT:  Okay.  So what's the government's

3   response on this?  Go ahead.

4          MR. JONAS:  Your Honor, it's the same response as

5   prior.  He can certainly question the witness about the

6   encounter and then possibly use the document to impeach him,

7   but wholesale admission of the document is improper.

8          THE COURT:  Okay.  Yes, it's the same procedure,

9   Mr. Haas, is you can ask him questions about this.  And if he

10  tries to deny that he wrote it, for example, you can show it

11  to him.  If he still refuses to acknowledge it, then you may

12  very well be able to get it into evidence itself, but you've

13  just got to follow those steps.  Do you understand?

14         THE DEFENDANT:  Yes, your Honor.

15         THE COURT:  All right.  So the next series, I'm just

16  going to kind of group them all together and try to get an

17  understanding of Mr. Haas' theory of admissibility.  25

18  through 31, Mr. Haas has them coming out of Disk 1 and various

19  pages of Disk 1.  And it's all labeled "Russell Palarea" -- I

20  might be mispronouncing that -- who I think I can tell from

21  these excerpts are -- is some kind of mental health consultant

22  of the government.  And then there are various quotes.

23         So let me ask Mr. Haas, what's your theory of

24  relevancy on these?  If you could unmute yourself, please.

25         THE DEFENDANT:  I'm sorry.  Let me read for you the

1    comments that I want the jury to see.  "Palarea stated it

2    would be helpful to know what the prosecutor needs Haas to do

3    in order to cross the threshold and be charged."  In

4    another -- in another email, he said, "The Court needs to

5    demonstrate that his behavior is unacceptable and needs to

6    change."

7            In another comment, he said, "Based on my past

8    behavior, there's a likelihood that I'm going to enter a

9    synagogue with my vehicle running over Jews."  In another

10   comment, he said, "A management strategy needs to be in

11   place."

12           This is who the FBI is getting their instruction

13   from, some psychologist of what the law is and that I should

14   be railroaded and entrapped because they don't like what I say

15   online?  I think all these comments need to be heard by the

16   jury.

17           THE COURT:  Okay.  The government's response?

18           MS. KELLY:  Your Honor, a similar response.  The

19   reports themselves are not admissible.  He also shouldn't be

20   permitted to read from the report because the author is not

21   expected to be called as a witness.  There may be -- depending

22   on which particular statement, there may be an ability to

23   inquire generally.  But the way Mr. Haas's has presented the

24   argument in terms of -- wholesale and getting that into

25   evidence in that fashion, we object to that.

1    We also had commented on this report or these

2  position statements in the motion in limine that we filed.

3  It's motion in limine No. 9.

4    THE COURT:  Okay.  Yes.  So Mr. Haas, what you might

5  be able to do is since you don't have a sponsoring witness for

6  these particular communications unless one of the government

7  witnesses is going to be your sponsoring witness or has some

8  relevant knowledge of these communications, so you are going

9  to have to try to take the first step and establish that the

10  witnesses on the stand were aware or recipients of these

11  communications.

12    THE DEFENDANT:  Your Honor, that was Rochowiak,

13  Noordeloos, and -- I can't think of their names, but it was an

14  email that was sent to multiple officers that are involved.

15    THE COURT:  Yeah, but not all of them were sent to

16  all of the officers, is what I'm saying.  When you go back and

17  look at these pages that you've designated, there are some

18  that are not -- some are not even emails.  Some are emails,

19  but they don't go to all of those individuals.

20    So it is going to depend on a witness-by-witness

21  basis that you -- and so you might be able to inquire that,

22  "Did you receive this communication, this report."  The jury

23  won't be able to see what you're questioning about yet, and

24  then if you can lay some of that we call a foundation, then

25  you might be able to inquire into the statements in there.

1    All right.  Do you understand?

2             THE DEFENDANT:  Yes.  Thank you, your Honor.

3             THE COURT:  Okay.  32 is next.  And that is described

4    as Disk 1, Page 2 -- I think it's a '6.  Let me just make

5    sure.  Yes, 262 is the Bates.  And the way Mr. Haas described

6    it was, quote, "allowed search of phone."

7             So what's the theory of relevancy here, Mr. Haas?

8             THE DEFENDANT:  That is them saying that when I was

9    in my custodial interview that I allowed them, told them they

10   could search my phone, which is a lie.  And video is recorded.

11   And also they needed to serve a warrant to get my phone, and

12   they never got the password to search the phone.

13            If I really told them they could search the phone, I

14   would have gave it to them the first day when they asked me

15   for it.  Then wouldn't have needed a password or a warrant.

16   And it's not on the video.  It's a lie.  During the custodial

17   interview, they say that I gave them permission to search my

18   phones.  I'd like to see that in that video.

19            THE COURT:  Okay.  What's the government's response?

20            MR. JONAS:  Judge, I think that portion of the video

21   that's referred to in this report is being played.  It's one

22   of our clips, if I remember correctly.  So and, you know,

23   under -- if the defendant thinks the portion that we're

24   playing doesn't sufficiently explain everything, then as we

25   discussed ad nauseam, under 106 he can request or point us out

1    to an extension of that clip that maybe explains it further.

2    But I do think that what he is talking about is included in

3    what the government is presenting.

4              THE COURT:  Okay.  So --

5              THE DEFENDANT:  What they're talking about, your

6    Honor, does not exist whatsoever.  The --

7              THE COURT:  All right.  The video will show it one

8    way or the other.  Do you know who authored this report?  It

9    reads like a kind of surveillance log type or a, like,

10   day-of-arrest type of time entries.

11             MR. JONAS:  Your Honor, we believe that's -- I don't

12   have the whole report here, just the page at issue, that it

13   was FBI Special Agent Chris Potts who is on the government's

14   witness list.  So the defendant can certainly cross-examine

15   him regarding that statement.

16             THE COURT:  Okay.  So again, you may very well be

17   able to ask about this, Mr. Haas, and then the document itself

18   might not actually come in.

19             All right.  Next is, 33 is identified as Disk 1.  It

20   doesn't have a page number on the list, but it's described as

21   Kostuchowski, 265 total; 194 calls, 71 texts.  So this one,

22   I'm not sure what you were talking about, Mr. Haas.  What is

23   this?

24             THE DEFENDANT:  I'm sorry.  That's a report that is

25   Disk 1, Page 223.  They claim that I made 194 calls to them.

1   When the real toll records showed up, it was 25.

2           THE COURT:  Okay.  The government's response?

3           THE DEFENDANT:  And --

4           MR. JONAS:  Judge, we believe -- I believe this is

5   authored by FBI agent, Special Agent Chris Potts.  He'll be a

6   witness at the trial.  The defendant can certainly

7   cross-examine Mr. -- Agent Potts about this.

8           THE COURT:  Okay.  All right.  Very good.  And the

9   next one, it's the Bates right before it, Page 222.  So it's

10  Exhibit 34, and it's described as, quote, "agreed-to meeting."

11  And Mr. Haas, so it's your -- go ahead.

12          THE DEFENDANT:  The FBI came -- called me four times

13  with a blocked telephone number.  The fifth call finally had a

14  number, so I answered it.  And they said, "You need to meet up

15  with us."

16          I said, "No, I'm not meeting up with you."

17          They said, "You don't have a choice.  You do have to

18  meet up with us."  So that's when I allowed them the address

19  of the job site I was at, and they showed up.  And that video

20  will prove the rest of it, the video that I made, that they

21  showed up, walked up.  I said, "What do you want?  Why are you

22  here harassing me?  Why -- are you here arresting me" --

23          THE COURT:  Okay.  I think --

24          THE DEFENDANT:  -- and he said, "No, let's just be

25  friends" --

1       THE COURT:  I think I get it, that your position is

2   that the author of this report which I'm -- let's see.  Who

3   does the -- who is the author of the report, Mr. Jonas or

4   Ms. Kelly?

5       MR. JONAS:  Again, I believe it's Special Agent Chris

6   Potts of the FBI.

7       THE COURT:  Okay.

8       MR. JONAS:  Judge, the defendant is free to

9   cross-examine Agent Potts about it, and Agent Potts will say

10  what he's going to say.

11      THE COURT:  All right.  So, yes, again, it can be

12  marked for identification in case Mr. Potts denies that he

13  even authored that.

14      All right.  Next was 35.  This was described as Disk

15  16, Page 188.  And it's described as "Lombardo anti-Semitic

16  conspiracy theory content."  Now, I believe Mr. Lombardo is

17  not going to be testifying, though.  So what's the theory of

18  admissibility here, Mr. Haas?

19      THE DEFENDANT:  That was Mr. Lombardo writing a

20  report saying that they were investigating me for posting

21  conspiracy theory and anti-Semitic comments online which are

22  not illegal.

23      THE COURT:  Okay.  The government's response?

24      MS. KELLY:  Your Honor, I think it may have been a

25  report authored by FBI Special Agent Caitlin Thomas and

1  Operations Specialist Rafael Gutierrez.  And the topic of the

2  report was discussing Mr. Haas' VK posts under the name Fox

3  News.  And in that report, it states that Fox News posted

4  anti-Semitic content and conspiracy theory content.

5        We don't know from -- the purpose for which Mr. Haas

6  wishes to introduce this particular statement.  I think it may

7  cross the line into veering off into his proving up the

8  validity of certain beliefs about the Jewish people and

9  religion.

10       THE DEFENDANT:  Absolutely not, your Honor.  That is

11  the proof --

12       MS. KELLY:  I think --

13       THE DEFENDANT:  -- that -- my protected speech.  That

14  is what that does.  It proves that they were investigating me,

15  violating my rights for five years for protected speech.

16       MR. JONAS:  Your Honor, the report is dated December

17  17th, 2019.  This was months after the defendant was arrested,

18  not a contemporaneous report during the course of the

19  investigation that would explain why he's being investigated.

20  This is more of a factual report of what he posted online as

21  the specialist found.

22       THE DEFENDANT:  Because it's a factual report, does

23  that mean that it's a fact that it's illegal to say

24  anti-Semitic conspiracy theories?  What if he learned that

25  they're not Semites and it's not a theory, it's a fact?

1      THE COURT:  Okay.  I'm going to have to circle back

2 because I don't even see a reference to that.  I do have, I

3 think, the cover page, in essence, which is dated December 17

4 but it starts out with, it has a case ID number, and then it

5 describes the victim of Kostuchowski and threatening,

6 harassing communications.

7      Do you have a problem, Mr. Haas, if this -- it's not

8 authored by any of the -- is it authored by any of the

9 government witnesses at this point?

10      MS. KELLY:  Yes, your Honor.  Operations Specialist

11 Gutierrez is intended -- will be called to testify.

12      THE COURT:  Okay.  What is he going to testify on?

13      MS. KELLY:  He's going to testify about phone records

14 and contacts between Mr. Haas' phone and Joe Kostuchowski's

15 phone as well as the VK content.

16      THE DEFENDANT:  He is the gentleman that manufactured

17 these fake toll records.

18      THE COURT:  All right.  Let me find that page.  And

19 you might be able to cross him on the statement in there.

20      All right.  Next is 36 which is described as Disk 16,

21 Page 216.  And that one, I don't think I was able to find

22 that.  It's described as 2016 interview with Tim Robertson.

23 So was the government able to locate this one?

24      MS. KELLY:  Yes, your Honor.  It's at page, Bates

25 stamp Page 1275.

1          THE DEFENDANT:  That is the document where

2    Kostuchowski admits that he was there in October 2016.

3          THE COURT:  Okay.  So that's the purpose of it,

4    Mr. Haas?

5          THE DEFENDANT:  Yes, to prove their bad faith

6    investigation, retaliatory action of my First Amendment

7    protected speech.

8          THE COURT:  All right.  So I think I understand.  Let

9    me -- I'll locate it and if I can just find --

10          MR. JONAS:  Your Honor, as with the other reports, he

11    can certainly cross-examine the witness on this, but we think

12    the report itself is inadmissible unless it gets admitted for

13    impeachment purposes.

14          THE COURT:  All right.  Thank you.

15          MS. KELLY:  Your Honor, we'd also point out that the

16    author of this note is Tim Robertson.  I realize that in the

17    copy we produced to defendant, that name was redacted.  We

18    have recently produced an unredacted version of this note.

19    And the author was not Joseph Kostuchowski but Tim Robertson.

20          THE DEFENDANT:  That's even better, your Honor.

21          THE COURT:  Okay.  And it might be some kind of

22    impeachment by contradiction.  And if -- is Robertson

23    testifying or not?

24          MS. KELLY:  No, not for the government.  No.

25          THE DEFENDANT:  They subpoenaed his reports and now

1    they've appeared, so that helps.

2           THE COURT:  All right.  Again, let me look at it and

3    I can reserve ruling on this one.  37 is, Page 218 is the

4    Bates number.  And the quote just says, "Anti-Semitic."

5    Mr. Haas?

6           THE DEFENDANT:  It was another FBI report claiming

7    that I'm making anti-Semitic comments when I'm pro-Palestine.

8    I'm pro-Semites.

9           THE COURT:  Okay.  Thank you.  I understand your

10   theory on that.

11          MS. KELLY:  Your Honor, we'd point out that this

12   report is a Department of State report, not an FBI report.

13          THE COURT:  All right.  38 is Bates 245 and 246.  And

14   it was described as Kelley.  And then, Mr. Haas, you wrote,

15   "wanted free diagnosis for his home."

16          THE DEFENDANT:  Yes.  I asked if I mentioned his

17   father again.  He was harassing me at the job site and asking

18   me questions about what I was doing at the job site, and then

19   Kostuchowski started asking me if I have a driver's license

20   and insurance on my truck and a job permit and a business

21   license and harassing me about the job site because I wasn't

22   listening to him about whatever else he had to allow.

23          THE COURT:  Yes, but this document, though, what's

24   the relevancy of the document?

25          THE DEFENDANT:  Kelley admitted to harassing me about

1    the job site, asking me about it.

2              THE COURT:  It says, "wanted free diagnosis for his

3    home."

4              THE DEFENDANT:  Yes, waterproofing a basement.  It's

5    a big job.  It's real expensive.  It's very involved.  I had

6    to excavate, digging the entire foundation of the house and

7    installing drain tile and a waterproof membrane around the

8    foundation.  And he was asking me questions about his

9    basement.  And I told him, "I don't give free diagnoses.  If

10   you want a diagnosis, give me $100."  And he got angry about

11   it.  That's when he threatened to beat my ass.

12             THE COURT:  Is Kelley going to testify at least in

13   the government's case in chief?

14             MS. KELLY:  No, your Honor.

15             THE COURT:  Okay.  So if the government does not

16   offer him at least in the case in chief, you might not be able

17   to get this in in your case in chief just by introducing a

18   document like this.  If you testify as to this encounter

19   then -- and the government offers a rebuttal witness, then you

20   might then be able to ask Mr. Kelley about the statements in

21   this report.

22             All right.  Do you understand that, Mr. Haas?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  All right.  Next is 39.  Okay.  This one

25   is labeled Page 182 on the list, and that is the Bates label.

1   And it's -- has an acronym, "JIDF, lion's den."  So what's

2   going on here, Mr. Haas?

3           All right.  Can you unmute yourself?

4           THE DEFENDANT:  I'm sorry.  That was the FBI or State

5   Department, whoever made that report, stating that their basis

6   for their investigation against me was a Jewish internet watch

7   group who identifies anti-Semitism and points it out to

8   government officials.  There's also in the stuff they sent me

9   today about the JIDF, Jewish Internet Defense Force which you

10  could find on Google if you researched it, that's also one of

11  the photos I want to admit into evidence.

12          THE COURT:  Okay.  What's the government's position

13  on this Defense Exhibit 39?

14          MS. KELLY:  Your Honor, it's hearsay.  It's a report

15  of a complaint that was (inaudible) to the public that was

16  received by the State Department (inaudible) to report other

17  people's statements about Mr. Haas and statements sent by

18  Mr. Haas to others.

19          THE COURT:  Okay.  Mr. Haas, can you mute yourself

20  again?  We're getting feedback.

21          Okay.  Ms. Kelly, can you go ahead one more time and

22  summarize?

23          MS. KELLY:  One is that it's hearsay.  It's a

24  complaint received by the State Department from a member of

25  the public that contains hearsay within hearsay about

1  statements purportedly made to and from Mr. Haas.  There also

2  is no relevance.  It's a complaint received by the State

3  Department in 2018.  And in light of your Honor's ruling, at

4  least at this stage, it does not appear relevant to the issue

5  of whether Mr. Haas threatened Joseph Kostuchowski or made the

6  internet postings (inaudible) --

7        THE DEFENDANT:  Your Honor, it was relevant enough

8  for them to put in their reports against me basing their

9  investigation off of it.  Allow me to read this to you:  "The

10  Jewish Internet Defense Force is an organization that uses

11  social media to mobilize support for campaigns against

12  websites and Facebook groups that promote or portrays what it

13  describes as Islamic terrorism or anti-Semitism."

14        Now, if you look right here, that's Google.  That's

15  what Google has to allow on it.  Right here.  See that?

16  Google search, JIDF, Jewish Internet Defense Force.  They are

17  the terrorists trying to take away our First Amendment by

18  reporting us as terrorists.

19        THE COURT:  Okay.  Thank you.  I understand your -- I

20  understand your theory.  Okay.  Let's go on to -- I'll take it

21  under advisement.

22        No. 40 is labeled Page 197 on Disk 6, 16.  And it's

23  described as "landlord interview."  And I don't think I was

24  able to find this one either.  What's the Bates number if

25  either the -- yes.  Is 197 the Bates number?

1          MS. KELLY:  Your Honor, we have Bates 1216 and 1262.

2          THE COURT:  Mr. Haas, please mute yourself.

3          All right.  One more time.

4          MS. KELLY:  We have -- if this is the FBI interview

5   memorandum of Ottawa Police Detective Kyle Booras, we have

6   Bates Haas 1260 to 1262.

7          THE COURT:  All right.  I'll find --

8          THE DEFENDANT:  Your Honor, what that --

9          THE COURT:  Let me ask the government --

10         THE DEFENDANT:  I wanted to say:  Defense of

11  habitation, the defense that conduct constituting a criminal

12  offense is justified if an aggressor unjustifiably threatens

13  the defendant's place of abode or premises and the defendant

14  engages in conduct that is harmful to the aggressor.  So --

15         THE COURT:  Okay.  Thank you.

16         THE DEFENDANT:  -- to protect that place of abode --

17         THE COURT:  All right.  I understand.  This was the

18  argument about eviction.  So is this on Disk 16?  Let me ask

19  the government.

20         MS. KELLY:  Yes, your Honor.

21         THE COURT:  Okay.  I'll take a look at that.

22         THE DEFENDANT:  And that definition is from the

23  Black's Law Dictionary.

24         THE COURT:  Okay.  Thank you.

25         So 41, I think I know what's going on, but let me

1    just ask Mr. Haas.  This is, Page 434 is the Bates label.

2    It's described as "World Trade Center, hyphen, WTC, Israelis."

3            THE DEFENDANT:  The post should explain it all.

4            THE COURT:  Okay.  Thank you.  I understand.

5            Now, 42 is -- 42, it says, "Entire disk, text

6    messages to Kostuchowski."  And again, as I described earlier,

7    Mr. Haas, you have to be more specific in identifying the

8    particular ones that you think are admissible rather than just

9    a blanket blast of all text messages to Mr. Kostuchowski.

10           I believe there were -- how many does the government

11   believe there are here?

12           MS. KELLY:  It depends on how they're counted.  There

13   are at least 70 individual photographs drive that number.  If

14   you count the photographs separately, it can drive that number

15   up to close to 100 if not over that.  I -- the FBI --

16   (inaudible) but at least 70.

17           THE COURT:  Okay.  Mr. Haas, how many --

18           THE DEFENDANT:  If years of my life are at stake for

19   going to prison, is it too much to ask the jury to see 100

20   messages?  It will take 20 minutes.

21           THE COURT:  So do you agree that that's the quantity?

22           Mr. Haas?

23           THE DEFENDANT:  Oh, I'm sorry.  You're asking me?

24           THE COURT:  Yes.  About 70 text messages?

25           THE DEFENDANT:  I'm not exactly sure.  I don't have

1    my telephone.  But originally, they claimed it was in the

2    hundreds and then they said it was 71.  So I'm not exactly

3    sure.

4              THE COURT:  Okay.  And again, the point is that it's

5    not just a vying point, although that is part of it.  It's

6    actually identifying the relevancy and admissibility of each

7    of the exhibits.  We try --

8              THE DEFENDANT:  They're taking my text messages out

9    of context and trying to say that I sent something that I

10   didn't.

11             THE COURT:  Okay.

12             THE DEFENDANT:  So I think the jury should see it

13   all.

14             THE COURT:  I just repeat one last time, in terms of

15   trying to narrow down the texts that -- and any of the photos,

16   too, that you think actually go to the particular charged

17   statements or if there are some uncharged statements that you

18   think, now that they're admitted, that you want to introduce

19   testimony about, then you can identify that and try to offer

20   those specific ones.

21             THE DEFENDANT:  Okay.  Thank you, your Honor.

22             THE COURT:  So 43 is -- right.  So this again, this

23   appears to be a report.  It's Bates 109.  And I'm sorry.  Let

24   me just -- no, right.  This is where the numbering changed

25   some.  It's disk -- on the list, it says Disk 20, Page 109.  I

1    think the Bates is 2359.  And it's, "All talk, keyboard

2    warrior, won't ever do anything" is the quote.  Is that -- can

3    we just ask -- no, I understand.  Let me -- so just mute

4    yourself for a minute.

5         All right.  Let me ask the government, is this a

6    report authored by Kostuchowski?

7         MS. KELLY:  No, it's not.

8         THE COURT:  Okay.  Well, who authored it?

9         MS. KELLY:  It's authored by Agent Caitlin

10   (inaudible).

11        THE COURT:  Say that again.

12        MS. KELLY:  It was authored by Special Agent Caitlin

13   Thomas.

14        THE COURT:  Okay.  Does the government dispute that

15   Agent Kostuchowski made the statements that are reported in

16   this report?

17        MS. KELLY:  No, not on this page.

18        THE COURT:  All right.  So when Kostuchowski

19   testifies, Mr. Haas, you can ask him about making that

20   statement.  All right?

21        THE DEFENDANT:  Thank you, your Honor.

22        THE COURT:  All right.  And again, it's a document

23   only if you need to perfect the impeachment, we call it, to

24   complete the impeachment.  But it sounds like, as the

25   government just said, he's going to admit that he said those

1    words.

2           All right.  Almost there.  44 is described as Disk

3    24, Page 334 to 335.  And it is further described on the list

4    as 171 total; 25 calls, 146 texts.

5           THE DEFENDANT:  Yes.  That is just the true number of

6    how many texts and calls that I made to them.  After they

7    claimed I made 194 calls, it went down to 25.

8           THE COURT:  All right.  And if you can mute yourself.

9           The government, who authored this report?

10          MS. KELLY:  Operations Specialist Gutierrez.

11          THE COURT:  Okay.  So you agree then that Mr. Haas

12   can cross Gutierrez on this?

13          MS. KELLY:  Yes.

14          THE COURT:  All right.  No. 45 is Bates 2732.  On the

15   list, it's described as 344.  That might have been the PDF

16   pagination.  And it says, "272 total, graph shows 272

17   communications."  So let me just shortcut this.  Is this also

18   authored by Mr. Gutierrez?  For the government?

19          MS. KELLY:  Yes.

20          THE COURT:  All right.  So the same ruling, that

21   Mr. Haas can ask about that total in that graph.

22          And then lastly, Defense 46 is described as -- yes.

23   This is Bates 240.  And the Bates numbering, Mr. Haas, if you

24   don't know, that's that number in the lower right corner that

25   is -- it has "Haas" and the number.  All right.  And so this

1    one is, it says, quote, "Anti-Semitic remarks."  And -- okay.

2    So who is Raquel Katie or Katie Raquel?  I'm asking the

3    government.

4         MS. KELLY:  I don't know her title.  She works at the

5    FBI.  I think she has a similar role as Operations Specialist

6    Gutierrez.

7         THE COURT:  Okay.  And then, Mr. Haas, is it the same

8    argument you had on a similar document, that you believe this

9    is -- shows the source of the investigation as well as that it

10   is an investigation of anti-Semitic remarks?

11        THE DEFENDANT:  Yes, your Honor.

12        THE COURT:  All right.  So I understand.  I'll take

13   that under advisement.  Okay.  And then --

14        THE DEFENDANT:  Your Honor, I'd also like to point

15   out, in a few of those comments, they said I made anti-Semitic

16   and racist remarks.  I'm talking about Israelis.  They're

17   white.  I'm white.  And I'm pro-Palestine.  Palestinians are

18   not white.  So I'd like to know where this racist thing came

19   from.  I'm not racist.  I'm against my own people in the

20   Middle East, the white people.  They don't belong there.

21        THE COURT:  Okay.

22        THE DEFENDANT:  So I'd like to know where that -- I

23   want that added, also.

24        THE COURT:  Well, there's no free-floating --

25        THE DEFENDANT:  So it will be on the same page with

1      that, is what I'm saying just for the record.

2              THE COURT:  Okay.

3              THE DEFENDANT:  I'm going to be asking --

4              THE COURT:  Okay.  I don't see that on that

5      particular document.  And I don't think it would be worth

6      injecting another avenue along those lines, but if you can

7      identify some other point of cross-examination on the witness

8      who actually is testifying, you might be able to ask questions

9      along that line to show some kind of bias in that

10     investigation.

11             Okay.  And then just circling back, the defendant

12     also offered Government Exhibit 106 in its redacted --

13     unredacted form.  I'll take that under advisement as well.

14             Okay.  All right.  That's the exhibits.  Let me try

15     to just move through the important pieces.  I think we're

16     coming up to 4:50.  And I understand the burdens on all of you

17     as well as the MCC.

18             So we've already discussed that the defendant has no

19     other witnesses under subpoena or that he believes will

20     voluntarily appear.  And so is it your plan -- it's your right

21     either way, Mr. Haas.  It's completely up to you.  Just so

22     that I understand for scheduling purposes because I need to

23     tell the jury when they come in what the approximate length of

24     the trial is, at this time is it your plan to testify?

25             THE DEFENDANT:  Yes, your Honor.

1          THE COURT:  All right.

2          MS. SINGER:  Judge, can I --

3          THE COURT:  Yes.

4          MS. SINGER:  Can you hear me?  The screen is frozen

5  for me, but if you can hear me.

6          THE COURT:  Yes, I can hear you.

7          MS. SINGER:  Okay.  With that, in terms of your

8  question regarding Mr. Haas testifying, he just indicated

9  "yes."  How is it that the Court (inaudible) that the --

10         THE COURT:  Okay.  So here is, I think, the best way

11  to do this.  Mr. Haas, rather than testify in some kind of

12  narrative form -- and when I say "narrative," it's just fancy

13  legal talk for like narrating like the entire story from start

14  to finish.  It is best if you break up your testimony by

15  questions.  And I will tell the jury that I instructed you to

16  do it that way so they don't find it weird that you're saying,

17  "Now, you know, what did you do next, what did they say to you

18  next" and so on.

19         By breaking it up it will be, number one, easier for

20  the jury to follow rather than just getting a whole stream of

21  conscience from start to finish and, number two, it does give

22  the government a chance to object.  All right.  So they are

23  entitled to object to the testimony or questions that they

24  believe will elicit inadmissible testimony.  So it would allow

25  the government a chance to do that as well.

1       So you should be planning on --I'm sure you've been

2  planning your testimony already, but you need to break it up

3  into questions.  Okay.  And -- all right.  So do you

4  understand that?

5       THE DEFENDANT:  I'm -- I'm not -- I'm not sure.  Is

6  narrating allowed?  Am I allowed to just tell my story?

7       THE COURT:  No.  What I'm telling you is that you're

8  not allowed to do that because it allows in all sorts of

9  irrelevant and inadmissible -- oh, hold on.  We -- okay.  I

10  think Ms. Singer is back.

11       MS. SINGER:  I'm here.  I just wanted to -- I got

12  you.

13       THE COURT:  Okay.  So all right.  So that's why

14  you're required to structure it in questions because it is

15  again better for the jury, and also it allows the government

16  to interpose objections and for me to decide them.  And what

17  you -- what you can do is, and if Ms. Singer is willing to do

18  this, one possibility is for you to write up your questions

19  and give it to Ms. Singer.

20       And although I -- you're not allowed to have what we

21  call hybrid.  It's really like combined.  You can't have

22  combined representation where the lawyer parachutes in and

23  makes a special appearance and like cross-examines one witness

24  or something like that.  But what has been effective in both

25  civil and in a criminal case is to have you write out the

1   questions, and then Ms. Singer will ask them.  And it's a

2   little bit more natural because she's asking, "What happened

3   next after the agents" -- it gives a better flow.  But she is

4   your standby counsel, so she can't adjust, you know, the

5   questions and so on.  And again, I can instruct the jury that

6   she's reading off questions that you've prepared.

7           So let me ask Ms. Singer, are you willing to do

8   something like that?

9           MS. SINGER:  Obviously, if the Court directs me to,

10  if that's the way the Court wants it done, I will.  I think

11  Mr. Haas, if that's -- yes.  I mean, if that's the way the

12  Court wants it done, then that's --

13          THE COURT:  Yes.  Do you have some other proposal?

14          MS. SINGER:  No.  I mean, unless -- I'm not sure what

15  Mr. Haas really wants in this situation but, I mean -- and I

16  can speak to him more about that, but if that -- I think the

17  only other way is that he on his own kind of breaks up the

18  testimony either by, you know, saying, okay, "I'm going to

19  talk about X now," right, and then he kind of talks about the

20  situation, let's just say, for example, when they came to the

21  house and then he transitions into another section.

22          But if Mr. Haas wants to write up questions and get

23  them to me and then I'm just asking the questions and that's

24  the way to do it, that's fine.

25          THE COURT:  Okay.  I'll ask Mr. Haas' opinion in one

1  minute.  Let me see if the government has anything to

2  interject on this.

3       MR. JONAS:  No, your Honor.  We think your proposal

4  is fine.

5       THE COURT:  Okay.  Mr. Haas, any other comments on

6  this?

7       THE DEFENDANT:  No.  That's fine.  But while you were

8  talking about questions, I also have some voir dire questions

9  that I'd like to have added.  Should I send those to you, or

10 how should we go about that?

11      THE COURT:  There was a deadline for that.  However,

12 given your pro se status, I'll let you propose them.  What you

13 should do is, I think -- have you been mailing to Ms. Singer

14 and then she uploads for you?

15      THE DEFENDANT:  I've been sending stuff to her and to

16 the courthouse.  And I think that's how -- you guys had

17 mentioned that something ended up on there twice or something.

18 I think the clerk is also doing it.

19      THE COURT:  A lot -- many things ended up on there

20 twice but in any event, send them to at least Ms. Singer,

21 okay, and then she can upload it to the docket.  I think she

22 is probably beating us, the mail process.  So you need to do

23 that as soon as possible.  Okay.  And if I get it too late,

24 then I'm not going to be able to consider them because I do

25 plan on posting sometime in, you know, middle or late next

1    week the proposed voir dire questions -- well, not the

2    proposed voir dire questions, the voir dire questions.  Okay.

3    You've got to get that out the door as soon as possible.

4            The other possibility is if you have some key

5    questions in what I -- again, I hope will be daily phone calls

6    to Ms. Singer, then you can tell her what they are, and she

7    can -- maybe she can write them down and post them that way.

8            The MCC attorney advisor did respond that the MCC

9    should be able to accommodate the request about the -- more

10   access to the law library, the discovery computer, as well as

11   daily calls.  So I'll provide Ms. Singer some -- a contact

12   point to follow up on that.  So get that voir dire stuff out

13   as quickly as possible.  It was due many months ago.  On

14   the --

15           THE DEFENDANT:  Thank you, your Honor.

16           THE COURT:  Okay.  On the length of the openings, so

17   plan on opening statements being no longer than 20 minutes.

18   Okay.  And so I will have instructions about, you know, where

19   people can stand or in these pandemic days, you most likely

20   are going to have to deliver the opening statements from the

21   tables.  But keep in mind, Mr. Haas, that it's 20 minutes

22   long.

23           Just do remember opening statements are a preview of

24   evidence.  All right.  So you have to have a good faith basis

25   that this kind of evidence will come in.  That would include

1    if you believe that you're going to testify and you have

2    personal knowledge, then (inaudible) --

3            You can use the first person.  The government, I

4    think, had asked in one of its motions for instructions to

5    preclude you from using the first person.  That is, I think,

6    way too awkward and it really kind of undermines the

7    presentation.  But again, opening statements, have a good

8    faith basis that this is going to be admissible evidence, and

9    that's what you can include in there.

10           Let's see.  What else did I have on my agenda?  Okay.

11   The cross-examination, that's not a point in time for you to

12   testify or again, you have to have a good faith basis for the

13   questions that you're asking the witnesses.  And that's also

14   not a time to kind of editorialize.

15           In response to an answer, you know, don't say, "I

16   don't believe you," you know, for example.  This is not quite

17   like the TV or movies where lawyers just editorialize all the

18   time.  So just be aware, just as I came this close to

19   terminating your appearance at this pretrial conference, that

20   I will terminate lines of questioning and entire examinations

21   if you don't comply with decisions that I make.

22           All right.  The change of clothes, do work with

23   Ms. Singer on that.  Any other questions, Mr. Haas?

24           THE DEFENDANT:  No, sir.  Thank you.

25           THE COURT:  Okay.  Anything else for the government

1    at this time?

2           MS. KELLY:  Your Honor, we have a few more topics to

3    raise.  The subject of exhibits, there were three ISP clips

4    that have been revised in some sense since we submitted the

5    404(b) motion.  Two were expanded, and one was reduced.  Two

6    were expanded to include additional statements that Mr. Haas

7    made, and we sent him the revised clips and the revised

8    transcripts.

9           One, Exhibit 13, was cut back in light of your

10   Honor's order on the State Department.  The beginning of that

11   clip talked about the State Department.  It was Mr. Haas'

12   commentary about different guys coming out to see him.  So in

13   light of your Honor's order, we cut that back.

14          We also have had Officer Mullen listen to the clips

15   and review the transcripts of those clips for accuracy, and he

16   on occasion has edited the transcript.  And as he's done that,

17   we've provided Mr. Haas (inaudible) -- to identify where those

18   changes were made.  That process is just about complete.  But

19   we wanted to call to everyone's attention that we've made

20   those changes.

21          THE COURT:  All right.  Yes, the cutting down in

22   compliance with the motion in limine, that's not a problem.

23   The updated drafts are not a problem because transcripts are

24   routinely updated as trial gets closer.  But what are the ones

25   that you said that you expanded?

1          MS. KELLY:  Number -- it's, transcript number is

2   probably easiest to follow.  It's Exhibits 210 and 215.  And I

3   can go through exactly what line they now start on, but the

4   idea was to include additional statements by Mr. Haas in some

5   sense in reaction to some of the argument he's made about the

6   clips being too short.

7          With regard to Exhibit 10 which is transcript 210, it

8   originally ended at the bottom of Page 17.  It now -- it now

9   goes on to Page 18, Line 23.  And there's some more commentary

10  by Mr. Haas along the fact that he says he's on Russian social

11  media.

12         The other clips, Exhibit 15, transcript 215 now

13  starts on Line 16 and references Mr. Haas' comment about Joe

14  saying he was a keyboard commando, so we included some

15  additional texts there.  And then the --

16         THE COURT:  All right.  And so --

17         MS. KELLY:  -- exhibits that -- sorry.

18         THE COURT:  Yeah.  So 210 and 215 correspond to some

19  of the actual clips.  What's the exhibit numbers?

20         MS. KELLY:  Exhibit 10 and Exhibit 15.

21         THE COURT:  All right.  So can you file, also supply

22  this to Mr. Haas, a 210 and 215.  Highlight the addition so

23  that I can see exactly what was added and so that he can see

24  that as well.  And put that on the docket by Monday.  And then

25  we can discuss then as needed when -- well, probably at a

1   break on the first day of trial depending on when you're going

2   to introduce those.  Okay.

3          MR. JONAS:  Your Honor, yes.  So, your Honor, the ISP

4   video, the Illinois State Police video that we've been

5   discussing, the plan as of the moment is to have Trooper

6   Mullen testify.  He's the one who drove the car with the

7   defendant and engaged with the defendant.

8          The issue is that he's got a very small window to

9   testify both due to vacation -- I think we raised it with the

10  Court previously -- and also I think he told us there's a

11  family issue.  If we cannot get him on the stand within the

12  small window he's given us which is Monday afternoon and

13  Tuesday morning -- frankly, Judge, I'm not sure we'll be able

14  to do that given how long jury selection may take -- what we

15  would propose doing is introducing another Illinois State

16  trooper who can discuss generally how this works in terms of

17  transporting the prisoner and the video in the car.

18         We could also get -- because that person wasn't in

19  the car, they can't necessarily authenticate the video.  We

20  have submitted and filed a 902(11) notice regarding the video

21  along with a certification from the Illinois State Police.

22         So what we want to know is whether the defendant is

23  going to challenge the authenticity of that video or whether

24  or not it's not going to be an issue whether we call Officer

25  Mullen or another Illinois State trooper.

1          THE COURT:  When did you provide the 902(11)

2  certification?

3          MR. JONAS:  It was recent, Judge.  It probably was as

4  late as last -- it may have been last week or earlier this

5  week.  I don't have it in front of me.  I apologize.

6          MS. KELLY:  When it was filed, your Honor, or when it

7  was produced to the defendant?

8          THE COURT:  When was the notice produced to the

9  defendant?

10         MS. KELLY:  September, I believe, 2019 timeframe.

11         MR. JONAS:  Your Honor --

12         THE COURT:  The 902(11) certification.

13         MS. KELLY:  Your question is when the certifications

14  themselves were produced to the defendant?

15         THE COURT:  Right.

16         MS. KELLY:  I believe it's September 2019.  I'll be

17  able to confirm in a minute.

18         MR. JONAS:  Judge, we filed just a few days ago on

19  July 20th an actual notice.  We did this on the (inaudible)

20  200.  As Ms. Kelly says, the certification itself was

21  submitted a long time ago.

22         MS. KELLY:  The Bates stamp --

23         THE COURT:  I see.  Okay.  Mr. Haas, do you have

24  objection to the authenticity of the Illinois State Police

25  video, the transportation video?

1          THE DEFENDANT:  No, your Honor.  I object to the

2     amount, the limited amount that they're going to show to the

3     jury taking what I say out of context.

4          THE COURT:  Okay.  All right.  I think that is a

5     sufficient concession.  And the fact that the certification

6     was supplied back in September 2019 is obviously a lot of

7     notice to concession of liability.

8          All right.  Anything else?

9          MR. JONAS:  No, your Honor.  Just so our sort of pick

10    list is, you want a motion on admissibility of the vk.com

11    records received from Russia through the MLAT process.  We

12    will send out revised stipulations based upon the discussions

13    today.  And your Honor, if the defendant continues to agree to

14    the stipulations, it's our understanding we may not need those

15    records per the MLAT.

16         We will revise the exhibit list to have a column

17    where it cross-references to the number in the 404(b) motion.

18    We will revise the exhibit list to have a column where the

19    transcripts correspond to the underlying recording that the

20    transcripts are of.  And we will upload to the docket by

21    tomorrow grand jury Exhibits 9, 12, 14, and I believe 8.

22         I believe there may be one other thing that you asked

23    us to do that I don't recall, Judge.

24         THE COURT:  I think there was one other.

25         MS. KELLY:  Did you cover the expanded ISP clips?

1          MR. JONAS:  The expanded ISP clips you wanted us to

2     send but I don't think...

3          THE COURT:  Well, the expanded ISP clips, it's not so

4     much the clips as the transcripts of the expanded clips.

5          MR. JONAS:  As I go through my notes, I don't see

6     anything else for the government's pick list.  I think that's

7     it.

8          THE COURT:  I think that is correct.

9          MR. JONAS:  Other than that, your Honor, the

10    government has nothing else to raise with the Court.  We are

11    looking forward to your -- the guidance on jury selection and

12    are curious to see how that's going to play out.

13         THE COURT:  Yes.  We all are.  As I said, I got it

14    late yesterday.  I need to pull out relevant sections because

15    some of it is kind of internal to the court, but I will try to

16    do that tonight.  It will probably be pretty late tonight.

17    And that way, you can take a look at it.  It's going to

18    involve a whole another courtroom, splitting up the voir dire

19    panel into two courtrooms.  But you'll get the details.

20         Okay.  Thank you very much.  Have a good evening,

21    everyone.  And as of right now, really the next time in court

22    is going to be the first day of -- and I do think jury

23    selection will take the entire day but just in case, be ready

24    to deliver opening statements.  I doubt we'll get to

25    witnesses, but be ready to deliver opening statements on

1    Monday afternoon if we are able to get to it.

2              MS. SINGER:  Your Honor?

3              THE COURT:  Yes?

4              MS. SINGER:  I don't -- there was some open issue

5    that -- I think there's some open issues on the docket.  And I

6    don't know if you want me to address those now or you want to

7    do it at another time.  But, you know, there's --

8              THE COURT:  Yes.  Go ahead.

9              MS. SINGER:  So there's some -- docket 125 was a

10   motion that Robert, Mr. Haas, filed regarding some Docket 53,

11   54, 55, 56, 59, 60, and 61 being put back on the docket.  I

12   don't know --

13             THE COURT:  Yes.

14             MS. SINGER:  -- if that's been addressed.

15             THE COURT:  Yeah.  I posted a docket entry.  From

16   what I could tell, those motions, they were supposed to be

17   refiled, and quite a few of them actually were and covered by,

18   yes, his later motions.  So I --

19             THE DEFENDANT:  Your Honor, I wanted those to be -- I

20   wanted those to be unsealed.

21             THE COURT:  I don't think they're sealed.  I don't

22   think anything other than the indictment on this docket is

23   sealed.

24             THE DEFENDANT:  I also wrote a motion that I wanted

25   the protective order on my discovery removed.

1          MS. SINGER:  That's docket 126, your Honor.  He

2     filed, under docket 126, he asked to remove a protective

3     order.

4          THE COURT:  Okay.  Yes, that, there was at least one

5     aspect of that motion was for disclosure.  So I'll take a look

6     at that again, 126.  Okay.

7          MS. SINGER:  And your Honor, I know that the Court

8     requires a pretrial statement.  The government filed theirs at

9     docket 133, I believe.  I don't know what Mr. Haas' -- I don't

10    think it was filed as a joint pretrial statement.  But I don't

11    know if the Court wanted something or...

12         THE COURT:  Yes.  That was, you know, up to Mr. Haas

13    if he wanted to file something as well.  It actually is not

14    quite correct because I think it only has Counts 1 through 5.

15    It doesn't have the other counts.  So I'm going to have to add

16    those anyway.

17         Mr. Haas, that's just a neutral statement that I'm

18    going to read to the jury about what the charges are and that

19    you plead not guilty to all of them just so that they have

20    some sense, when I ask them the question, "Hey, have you heard

21    anything about this case," or "Do you know anything about this

22    case," they can -- they'll have some sense of what the case is

23    about.  But that's all it is:  It's a neutral statement to

24    give the jury a preview.

25         Okay.  Anything else, Ms. Singer?

1          MS. SINGER:  Yes, your Honor.  Sorry.  There's -- at

2  docket 132 was a motion in limine that the government filed

3  regarding instructions for the defendant.

4          THE COURT:  Yes.

5          MS. SINGER:  I don't see a ruling on that, but maybe

6  I missed it.

7          THE COURT:  Yeah.  I entered and continued that to

8  basically what we just talked about.

9          MS. SINGER:  Okay.  There was -- they were requesting

10  to have his -- there were various things in there regarding

11  his -- for lack of a better word, his behavior in court and

12  how he acted in court but I --

13          THE COURT:  Yes.

14          MS. SINGER:  If that's been addressed, okay.

15          THE COURT:  Yes.  I've addressed it as much as I

16  think I need to address it in terms of warnings about

17  following decisions and terminating appearances.  That was

18  also where the government had asked about, to preclude him

19  from referring to himself in the first person.

20          MS. SINGER:  And then, your Honor, Mr. Haas -- I

21  don't know if Mr. Haas wants to bring this up with the Court

22  right now.  It does have to do with COVID precautions.  I know

23  that we're waiting on this order that you're going to put out,

24  but I don't -- Mr. Haas, and again, if he wants to address it,

25  I only bring it up so that he has all the information

1    regarding mask wearing during transport, during the trial, and

2    kind of the requirements of him, the other attorneys, the

3    government, witnesses, as well as jurors during the trial.

4              THE COURT:  Yes.  I'll make sure that he gets a copy

5    of the excerpts as well.  The transport, I have no authority

6    over.  The marshal service will deal with that.  I'm sure they

7    will insist on him being masked.  And having now held a

8    hearing, a couple hearings where individuals were speaking

9    with masks, we are going to at least try in the first

10   instance, all of us, to be masked at all times even when

11   speaking on the record and --

12             THE DEFENDANT:  Your Honor, I object to all of it.

13   This is violating my due process.  I need to be able to see

14   these people's facial expressions.

15             THE COURT:  Let me --

16             THE DEFENDANT:  -- and --

17             THE COURT:  Yeah.  It would be wonderful if I could

18   just finish as opposed to being interrupted.

19             Witnesses are an exception to that.  So you will have

20   a right to confront them.  But yes, other than -- and there's

21   going to be precautions about the microphone cover and so on,

22   details that I don't think we need to get into in the pretrial

23   conference.  But on the big question about whether witnesses

24   will be masked, they will not be masked.

25             All right.  Anything else?

1          MR. JONAS:  Your Honor, one quick issue from the

2    government.  Just a small point just so the record is clear,

3    in your order from last night on the motion to dismiss the

4    vindictive prosecution, your order 204, you state that in the

5    interest of time and because the answer is clear, there's no

6    need for a government response.

7          The government had responded, docket 189.  We filed

8    our response on July 15th.  I just want to make sure that your

9    Honor doesn't think that we were derelict in our duties.

10         THE COURT:  I did not catch that, but I appreciate

11   you telling me.

12         Okay.  We are adjourned.  I will see you on the first

13   day of trial.  And obviously, there will be further

14   communications through deliveries from the attorney advisor.

15   Thank you.

16         MR. JONAS:  Thank you, Judge.

17      (Proceedings adjourned at 5:17 p.m.)

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2          I, Judith A. Walsh, do hereby certify that the

3    foregoing is a complete, true, and accurate transcript of the

4    videoconference proceedings had in the above-entitled case

5    before the Honorable EDMOND E. CHANG, one of the judges of

6    said court, at Chicago, Illinois, on July 23, 2020.

7

8    /s/ Judith A. Walsh, CSR, RDR, F/CRR_____   September 2, 2020

9    Official Court Reporter

10   United States District Court

11   Northern District of Illinois

12   Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25