IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
Plaintiff, )
v. ) No. 19 CR 00486
ROBERT ANTHONY HAAS, ) Chicago, Illinois
) July 31, 2020
Defendant. ) 12:30 p.m.

TRANSCRIPT OF TELEPHONIC PROCEEDINGS

BEFORE THE HONORABLE EDMOND E. CHANG

APPEARANCES TELEPHONICALLY:

For the Plaintiff: HON. JOHN R. LAUSCH, JR.
United States Attorney
BY: MS. ERIN E. KELLY
MR. BARRY JONAS
Assistant United States Attorneys
219 South Dearborn Street, Suite 500
Chicago, Illinois 60604
(312) 353-5300

For the Defendant: MR. ROBERT ANTHONY HAAS,
Pro se;

For the Defendant as standby counsel: BEDI & SINGER, LLP
BY: MS. DENA M. SINGER
53 West Jackson Boulevard
Suite 1505
Chicago, Illinois 60604
(312) 525-2017

Court Reporter: Judith A. Walsh, CSR, RDR, F/CRR
Official Court Reporter
219 South Dearborn Street, Room 2118
Chicago, Illinois 60604
(312) 702-8865
judith_walsh@ilnd.uscourts.gov

(Proceedings heard telephonically:)

THE CLERK: The United States District Court for the Northern District of Illinois is in session. The Honorable Edmond E. Chang presiding.

19 CR 486, USA versus Robert Anthony Haas.

THE COURT: All right. This is Judge Chang. I'm going to ask the government to announce its appearances.

MS. KELLY: Erin Kelly for the United States.

MR. JONAS: Barry Jonas for the United States.

THE COURT: Okay. And then, Mr. Haas, go ahead and state your first and last name.

THE DEFENDANT: Robert Haas.

THE COURT: All right. And then Ms. Singer?

MS. SINGER: Dena Singer.

THE COURT: Okay. We're here on Ms. Singer's renewed motion to withdraw. So let me give you a sense of where we're at in terms of the technology and the attorney-client conferral. The headset solution which would have been ideal is not suitable.

We're not able to program the headsets in time, in part due to the fact that we are -- we're going to have to try the case in the chief judge's courtroom, Courtroom 2541, in order to maintain sufficient distancing for the jurors and for the limited number of people from the public who we can accommodate as well. And that has caused us to -- and our

systems department to be working around the clock on trying to reprogram that courtroom so that it can be used as the courtroom for the trial.

What we think we can accomplish, Ms. Singer, is the other idea that you had proposed which was some kind of chat-by-text feature. And we have -- so the systems department is building out two iPads that would have a chat feature through MS Teams and so that you would be able to text chat with Mr. Haas. And the iPad would then be put in a plastic bag at the end of each trial day and then stored in chambers, and then we would bring it out for each trial day. So that, the systems department thinks it can get done by Monday.

So I guess the question for you, Ms. Singer, is if I am able to accomplish that, are you comfortable with that solution? And if you're not, then I can -- I'll allow you to withdraw at least for in-court representation purposes. Go ahead.

MS. SINGER: Thank you. Again, Dena Singer. Your Honor, with the -- in mind of a chat function on two iPads, would the Court allow me to sit apart from counsel table?

THE COURT: Yes. I would block out the first row of the gallery for you as well as there would be no one in the second row of the gallery behind you as well.

MS. SINGER: And I guess my other question would be how -- I mean, would we know this before Monday if it works,

or would it be a matter of seeing on Monday if it works or not?

THE COURT: They're literally building it out now, so I would hope that we can test it today. If we're not able to test it today, then we'll test it over the weekend, but I'll -- in other words, if we're at the point where we're testing it over the weekend, I would alert you by email whether or not we've been able to accomplish it.

MS. SINGER: Okay.

THE COURT: All right. I mean, and you can think about it too since if you ultimately don't feel comfortable with it -- because I hear some hesitation. And I'm trying to be accommodating, you know.

MS. SINGER: No, and I do appreciate that, your Honor. I know that. I do. I appreciate that. I know this is unprecedented times, and I know your Honor has been working kind of around the clock on this as well. So I think, you know, if that's feasible then I think -- you know, I think I can -- I can make that work.

THE COURT: Okay. And the other thing I'll note is I'm trying to set up an overflow courtroom where the public can watch. Again, there would only be a certain number allowed in. They would duct tape the seating so that -- well, put duct tape like Xs and otherwise mark it off.

If you're not comfortable being in the courtroom

itself, another possibility -- but this I have not explored with the systems department yet -- would be to like reserve seating for you in there. And, you know, maybe that would be more comfortable for you. I'm not sure. But I'm not sure how the iPad chat would work not sitting near him.

MS. SINGER: I think that --

THE COURT: Would that be something that you would be interested in?

MS. SINGER: Yes. I would like -- I mean, I would feel much more comfortable with that, I mean, with the iPad function if that works in an overflow room if -- you know, obviously, the less people that I'm near, your Honor, the more comfortable I would be is basically the bottom line.

THE COURT: Okay.

MS. SINGER: I would still be requesting in either room and while I'm in the building to be allowed to wear a mask and face shield and gloves, but if we don't have the issue of the microphone, then I don't see why that would be any sort of problem for the Court.

THE COURT: And the face shield is fine.

MS. SINGER: Okay.

THE COURT: The gloves, do you have the kind that can type on a touchscreen?

MS. SINGER: Yeah, I would -- sure, of course. I would work through all that with the iPad obviously, your

Honor. I would make that work if I have to take them off to type and stuff like that, but I just mean in general while I'm in the building. When I dropped it off today, the disk even, I am in gloves when I come into the building. So I would work through that with the iPad, though, obviously.

THE COURT: Okay. Mr. Haas, any comments you want to make?

THE DEFENDANT: About that or just in general?

THE COURT: On that specific topic first.

THE DEFENDANT: No.

THE COURT: All right. And then the last thing I'll just note is if -- if we can't make the chat function work, the other -- it's not -- this is not the same option. Basically, you'd be withdrawing from in-court presence but it's still my -- because you had mentioned like just being on the phone sort of.

But because I would still ask you to be available to Mr. Haas to confer at the end of each trial day, you know, by phone from the MCC if he has any questions for you, if you are able to observe the trial in the courtroom, the overflow courtroom, then at least he wouldn't have to describe to you what has happened that day. And so that if worse comes to worst where you're not able to chat with him in a realtime scenario, then just bear in mind, you know, plan -- I guess this is plan Z or something like that, might be something

where at least you can observe what's happened, and that way you could have more productive discussions with him at the end of trial days over the phone. All right?

MS. SINGER: Judge, your Honor, I would have no problem with that. In addition, I mean, if there are further, you know, kind of out-of-court -- I mean, if that is what happens and he needs other exhibits brought to the court on a disk or things like that, I obviously will avail myself to him and the Court in this situation.

THE COURT: Okay.

MS. SINGER: I guess one question I have, though, is if -- if that plan Z, as you said, if there's an overflow room, is the video being -- I mean, is it video or audio in the overflow room?

THE COURT: It's -- I think it will be -- I think it's only audio, but I'd have to check on that with Systems.

MS. SINGER: I only ask, your Honor, because if it is video, then I'm not sure why I couldn't be watching the video outside of the building. I don't know the system. But, I mean, we kind of had explored earlier when your Honor said that, you know, a video or phone function really wouldn't work and --

THE COURT: Yes.

MS. SINGER: -- that's --

THE COURT: Correct. It's not our conferencing

system.

MS. SINGER: Okay.

THE COURT: Yeah. This is, like it's internally streamed. So that would not be possible.

MS. SINGER: Okay. Well, if there's an overflow room that it's being shown in and either I could watch the trial from there basically with or without the chat function, you know, whatever the Court can accommodate in terms of that, I would -- assuming there's less people in there than in the courtroom, then I would prefer to sit in the overflow room.

THE COURT: So let me check on these things. As we talked about this, it also occurs to me, though, that I don't know if the exhibits are going to display there. I just thought of that. So I will check into those things.

Okay. And then you're still -- are you still willing to come into the courtroom for the questioning of the defendant on his direct exam?

MS. SINGER: Yes.

THE COURT: All right.

MS. SINGER: I would ask to be -- you know, if I could come in, and then I would leave again.

THE COURT: Right. Okay.

MS. SINGER: Limiting my time in the courtroom for myself as well as kind of keeping distance for everybody else as well.

THE COURT: All right. Okay. I did have another topic, and I think Mr. Haas has maybe a topic or two but let me -- I wanted to ask Mr. Haas about the voir dire questions because nothing hit the docket yet.

So can you just verbally describe to me what voir dire questions you had in mind for jury selection?

THE DEFENDANT: You know what, I don't have them in front of me, your Honor. I left them up in my room. They're about their beliefs basically, is what it all boils down to because their belief will make them biased against this entire case.

THE COURT: All right. Can you try to search your memory, give me -- just give me one example.

THE DEFENDANT: Hold on one second. I might have it. Hold on. I'm looking.

Okay. I do have them actually. There's six of them: "Can you be fair and impartial if you hear anti-Semitic comments?"

Number two: "Can you be fair and impartial if someone were to deny the Holocaust occurred?" Number three: "Can you be fair and impartial if someone shares conspiracy theories?" Number four: "If someone makes anti-Israel comments, can you be fair and impartial?" Number five: "Do you have the right to defend yourself verbally against physical attack?" Number six: "If you hear atheist beliefs,

can you be fair and impartial?"

THE COURT: Okay. All right. Thanks for describing those. I will take it under advisement. Given that nothing had hit the docket but I needed to get something to the jury department at least as to the written questionnaire, I have posted the -- a series of questions that they'll answer in writing.

One of them was to the effect of that some evidence may involve profane words and anti-Jewish statements. Having to see or hear evidence of that type is, of course, generally not a basis to avoid the responsibility of jury service.

THE DEFENDANT: I'm sorry.

THE COURT: Having said that --

THE DEFENDANT: I couldn't hear what you were saying.

THE COURT: Yes. And this is being delivered to you in paper. I don't know if the MCC has done that already. But I've asked them to deliver this to you in paper as well.

THE DEFENDANT: The document 225?

THE COURT: Yes.

THE DEFENDANT: I actually happen to have that in front of me right now.

THE COURT: Okay. So if you look at question -- it's on the back side of the questionnaire. Look at question 14. It doesn't quite ask for everything you've asked, but it is on anti-Jewish statements and profanity. Okay. But I understand

your questions now. I'll take it under advisement.

MS. SINGER: Your Honor?

THE COURT: Yes. Who is this?

MS. SINGER: Yes. I -- I know that they have been mailed. There has been some mail sent by Mr. Haas to my office. I have not received it yet. I will obviously check again tomorrow. And if I receive it, I will put it on the docket immediately.

THE COURT: Okay. Thank you.

THE DEFENDANT: Your Honor, I'd just like to put it on the record, I would have sent it out Monday night but there was a flood in the building on the sixth or eighth floor, so there was no legal mail that went out Monday. It was put in legal mail Tuesday evening.

THE COURT: Okay. I understand. And thankfully, the description was concise and to the point, so I think I got a sense of what you want to ask.

All right. One other topic I had was the -- there had been some mention, Mr. Haas, that you had -- that you might offer into evidence the video of the May 8, 2019, interview with Kostuchowski and Agent Kelley. Excerpts of those videos -- or maybe it's the complete thing, I don't know -- were posted on vk.com that the government is introducing. And we talked about this at the pretrial a little bit, Government's Exhibits 76 and 78.

So do you intend to offer anything other than those two vk.com video posts --

THE DEFENDANT: No, just --

THE COURT: -- for --

THE DEFENDANT: -- those, your Honor. I only have a couple extra minutes of it. But I have no access to it, so I can't at this moment.

THE COURT: All right.

THE DEFENDANT: At this juncture.

THE COURT: Okay. The other thing I did want to discuss is exhibit logistics. And the issue is, of course, that Mr. Haas will be sitting in the witness stand when he's testifying. So he won't be obviously at a computer, and nor does he have one, to display the exhibits that he wants. Here's what I would propose, that Mr. Haas be allowed to bring up with him an exhibit list, his exhibit list with the numbers and the description and so on.

And that's another thing you'll be getting, Mr. Haas, is just I typed in your exhibit list and then put in a column for the decisions on the exhibits. So and maybe you bring that chart up or you bring whatever your own handwritten chart is.

THE DEFENDANT: Excuse me, your Honor. Was that document 213?

THE COURT: That might have been the -- oh, no.

You're right. So you're about to get the government's exhibit chart. But yes, you should have already gotten 213.

THE DEFENDANT: Yes, I have that.

THE COURT: All right. And I know this is an extra burden on the government, but I'm not sure how else to do this in a way that's efficient, is for then Mr. Haas to say, when you're ready to introduce an exhibit, is to ask the government to put on the screen defense exhibit whatever the number is, because Ms. Singer has turned them into JERS exhibits with file names and so on.

So let me ask the government, do you have any objection to that?

MS. KELLY: Erin Kelly, your Honor. I have some concern about it. We would need to have assurance that what Mr. Haas intends to present is what we have so that there is no argument that we failed to display an exhibit or engaged in any impropriety with respect to the display of those exhibits.

So I would like some confirmation that what Ms. Dena Singer gave us is exactly what he wants to show and is exactly the right exhibit number.

THE COURT: Well, it is -- I think we're just going to have to count on the fact that Ms. Singer filed an exhibit chart that I posted which was based on our pretrial conference discussion and using Bates numbers. So I don't anticipate that there's an issue with that, nor would I allow any kind of

criticism like that to occur in front of the jury in any event.

Any other objection other than that one?

MS. KELLY: How would we be displaying these exhibits? From my recollection, Mr. Haas identified, for example, one page of a report, so that would be what was displayed. If there is -- I don't know if there are multipage exhibits because I haven't yet seen what Ms. Singer dropped off but --

THE COURT: Well, if --

MS. KELLY: -- I can -- go ahead.

THE COURT: This is Judge Chang. Oh, wait. I'm sorry. Go ahead, Ms. Singer.

MS. SINGER: I was just going to say, I mean, I followed the Court's chart. Based on the Court's chart, there are not multipage exhibits. I delivered a disk both to the Court and to the government this morning, and there are not multipage exhibits. I basically extracted the pages, the specific Bates stamped page that the Court identified and turned that into a single PDF and identified it as the Court instructed me to do so on the chart.

So it's not as if, for example, a five-page 302 is in one PDF. It would only be the one page that the Court identified in the chart that would be in that PDF.

THE COURT: Right. And --

THE DEFENDANT: And I identified every page individually. I haven't put multiple pages together.

THE COURT: Yes. I'm going to double-check that. I thought there might have been a couple that were just like maybe two pages or so but -- and I will double-check it. But for the most part, the reports aren't coming in substantively anyway.

So again, I think it will be up to Mr. Haas to identify, "Please turn to Page" -- if there is, and I will double-check this, "Please turn to Page 2 of Exhibit 35" and identify it specifically. So you would be doing nothing, you know, for him in any way other than just displaying what he has asked to be displayed.

All right. Any other concerns?

MS. KELLY: I do have a couple topics to raise on different subjects, your Honor, if we've moved past this one.

THE COURT: Okay. So go ahead. I do have limited time because I've got a change of plea at 1:00 o'clock.

MS. KELLY: Your Honor asked that we file a discovery index. We did so earlier this week. I'd just like to confirm that there are no outstanding discovery issues, no technological issues with disks or anything that we should try to address today with Mr. Haas before the trial begins Monday.

THE COURT: Okay. Anything on that point, Mr. Haas?

THE DEFENDANT: I did send a motion with a list of

other things that I wanted added. You had told me to get the motion to you as soon as possible but because of the weekend and then the flood on Monday, I wasn't able to get it into the mail again until Tuesday, but it was the list of the stuff from that other disk that you had told me to specify specific items that you'd like to -- that I'd like shown instead of the entire disk.

THE COURT: Okay. All right. Well, I'll have to wait until that hits the docket.

MS. KELLY: The other issue, your Honor -- I'm sorry.

THE COURT: Go ahead.

MS. KELLY: The other issue, your Honor, is you had issued a ruling regarding certain defenses Mr. Haas had asserted which included an argument that he had made about self-defense. Yesterday, we delivered two 302s. The attorney advisor arranged to do that, to deliver two 302s to Mr. Haas involving interviews with TFO Joseph Kostuchowski.

Joseph Kostuchowski did recall some additional conversation that occurred between the two of them including a statement that after referring to Mr. Haas as a keyboard warrior, Joe Kostuchowski made a comment along the lines of, "I'll be right there."

So I'd just point out to the Court that there was some additional content of that interview that TFO Joe Kostuchowski recalls and that those reports had been provided

to Mr. Haas. We don't think it should change your Honor's ruling, but we bring it forward for everyone's attention that there is some additional information that we produced to Mr. Haas about that conversation.

THE COURT: Okay. I'm sorry. What else did he say?

MS. KELLY: He said, "I'll be right there" to Mr. Haas. So this was a conversation that occurred by telephone. After TFO Joe Kostuchowski left the area he had met with Mr. Haas, he drove away.

There will be testimony that there was a phone call placed by Mr. Haas to Joe Kostuchowski where they had a conversation and that Joe Kostuchowski said to Mr. Haas, "I'll be right there" or something along that line.

THE COURT: Okay. And then what was the other 302?

MS. KELLY: There were two 302s. There was some additional recollection of conversation between the two of them while they were together at the May 8th interview, additional conversation where I believe Mr. Haas asked Joe Kostuchowski whether he supported Jews, and TFO Kostuchowski recalls responding affirmatively.

There was also some conversation where TFO Kostuchowski recalls that Mr. Haas called TFO Kostuchowski a pedophile and some conversation about that. But that all should be in the 302s that Mr. Haas received yesterday.

THE COURT: Okay. Anything else for the government?

MS. KELLY: You had asked at the pretrial conference, to my recollection, that the government provide, was it, a highlighted version of two clips that we had expanded. Did you still want us to file something on the docket that identified the additional sections?

THE COURT: It would still be useful to see that.

MS. KELLY: Okay.

THE COURT: All right.

MS. KELLY: That's all --

THE COURT: Anything else?

MS. KELLY: -- for the government. No, your Honor.

THE COURT: Okay. Mr. Haas, go ahead.

THE DEFENDANT: I -- I don't have anything to say.

THE COURT: All right. Okay. So we'll -- I'll be in touch over the weekend, Ms. Singer, or maybe tonight and, of course, we'll loop in the government, too, as to whether we were successful in getting the iPads to work out. Okay. Thanks very much.

THE DEFENDANT: Your Honor?

THE COURT: Oh, yes.

THE DEFENDANT: I'd like to ask Ms. Singer if she could possibly call me at 2:00 o'clock today instead of 1:00 o'clock. There's a couple things I have to do right now scheduled with the prison staff.

MS. SINGER: I'll let them -- I'll ask MCC if we can

change the time to 2:00 o'clock.

THE DEFENDANT: Okay. Thank you very much.

THE COURT: All right. Bye-bye.

(Proceedings adjourned at 12:55 p.m.)

* * * * * * * *

C E R T I F I C A T E

I, Judith A. Walsh, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had telephonically in the above-entitled case before the Honorable EDMOND E. CHANG, one of the judges of said court, at Chicago, Illinois, on July 31, 2020.

*/s/ Judith A. Walsh, CSR, RDR, F/CRR* September 3, 2020

Official Court Reporter
United States District Court
Northern District of Illinois
Eastern Division