1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION

3  UNITED STATES OF AMERICA,          )
                                      )
4              Plaintiff,             )
                                      )
5              v.                     )  No. 19 CR 00486
                                      )
6  ROBERT ANTHONY HAAS,              )  Chicago, Illinois
                                      )  August 4, 2020
7              Defendant.             )  8:57 a.m.

8                    VOLUME 2

9              TRANSCRIPT OF PROCEEDINGS

10     BEFORE THE HONORABLE EDMOND E. CHANG, and a Jury

11  APPEARANCES:

12  For the Plaintiff:        HON. JOHN R. LAUSCH, JR.
                              United States Attorney
13                            BY:  MS. ERIN E. KELLY
                                   MR. BARRY JONAS
14                            Assistant United States Attorneys
                              219 South Dearborn Street, Suite 500
15                            Chicago, Illinois 60604
                              (312) 353-5300
16
    For the Defendant:        MR. ROBERT ANTHONY HAAS,
17                            Pro se;

18  For the Defendant as      BEDI & SINGER, LLP
    standby counsel:          BY:  MS. DENA M. SINGER
19                            53 West Jackson Boulevard
                              Suite 1505
20                            Chicago, Illinois 60604
                              (312) 525-2017
21

22  Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
                              Official Court Reporter
23                            219 South Dearborn Street, Room 2118
                              Chicago, Illinois 60604
24                            (312) 702-8865
                              judith_walsh@ilnd.uscourts.gov
25

156

1                              I N D E X

2   OPENING STATEMENT ON BEHALF OF THE GOVERNMENT  Page 164

3   OPENING STATEMENT ON BEHALF OF THE DEFENDANT   Page 170

4

5   WITNESS                      DX      CX     RDX     RCX

6   JOSEPH KOSTUCHOWSKI

7        By Ms. Kelly          177             231

8        By Mr. Haas                   217

9   RICHARD MULLEN

10       By Ms. Kelly          235

11       By Mr. Haas                   256

12  CHRISTOPHER POTTS

13       By Mr. Jonas          261

14       By Mr. Haas                   268

15  RAFAEL GUTIERREZ

16       By Ms. Kelly          271             319

17       By Mr. Haas                   314             320

18                          E X H I B I T S

19  NUMBER                          IDENTIFIED      RECEIVED

20  Government Exhibit

21       Nos. 76 and 78                              188
         Nos. 79 and 80                              197
22       Nos. 81 and 82                              207
         Nos. 83 through 87                          210
23

24

25

1                          E X H I B I T S

| NUMBER | IDENTIFIED | RECEIVED |
|--------|-----------|----------|

Government Exhibit

|  |  |  |
|--------|-----------|----------|
| Nos. 5, 7 through 17, 20 through 22, and 25 through 28 |  | 242 |
| Nos. 207 through 217, 220 through 222, and 225 through 228 |  | 243 |
| Nos. 29 through 35 |  | 264 |
| No. 96 |  | 273 |
| No. 97 |  | 275 |
| No. 98 |  | 277 |
| No. 102 |  | 281 |
| No. 43 |  | 287 |
| No. 50 |  | 289 |
| No. 48 |  | 291 |
| No. 53 |  | 291 |
| No. 51 |  | 294 |
| No. 54 |  | 295 |
| No. 57 |  | 296 |
| No. 58 |  | 301 |
| No. 59 |  | 302 |
| No. 60 |  | 303 |
| No. 61 |  | 304 |
| No. 62 | 305 |  |
| No. 64 |  | 305 |
| No. 65 |  | 306 |
| No. 66 |  | 307 |
| No. 68 |  | 308 |
| No. 70 |  | 309 |
| No. 73 |  | 310 |
| No. 74 |  | 310 |
| No. 75 |  | 311 |
| No. 77 |  | 313 |

1          (Proceedings heard in open court.  Jury out.)

2          THE COURT:  19 CR 486, United States versus Robert

3     Haas.  Can I get appearances today?  For the government?

4          MS. KELLY:  Erin Kelly for the United States.

5          MR. JONAS:  Barry Jonas for the United States.

6          THE COURT:  Mr. Haas, you can just state your first

7     and last name.

8          THE DEFENDANT:  Robert Haas.

9          THE COURT:  And I see standby counsel Dena Singer

10    sitting in the gallery there.

11         All right.  So are there any issues that either side

12    would like to discuss before we bring the jury in?

13         MS. KELLY:  Your Honor, this morning I was in the

14    parking garage coming to work, and I did not recognize the

15    juror initially, but we did ride the same elevator down in the

16    parking garage.  He gestured that I --

17         THE COURT:  One moment.  I'm sorry.

18         Sir, the number of public attendees that are allowed

19    are -- is now reached.  Courtroom 1425.  You're welcome.

20         MS. KELLY:  This morning, I was coming in to work,

21    and I rode the same elevator down as one of the jurors.  I

22    didn't recognize that he was a juror at first, but we rode the

23    same elevator down.  He gestured that I enter the elevator and

24    exit the elevator before him, and I said "thank you."  And

25    that was the extent of the interaction.

1           THE COURT:  Okay.  Anything you want to say about

2  that, Mr. Haas?

3           THE DEFENDANT:  No, sir.

4           THE COURT:  All right.  I'm not sure I would

5  recognize all the jurors with the masks.

6           MS. KELLY:  It wasn't until late in the process that

7  I thought he might be a juror, and then I saw him enter the

8  courthouse behind me.

9           THE COURT:  All right.  And for the record, we are

10  providing jurors with validated parking at one of the nearby

11  garages.

12           All right.  Anything else?

13           MR. JONAS:  Your Honor, the defendant now has a copy

14  of the stipulations as agreed upon yesterday.  I just want to

15  make sure there are no issues because it will determine

16  whether or not we need to call an extra witness.

17           THE COURT:  All right.  Mr. Haas, you're on board

18  with the "Bob was here" stip?

19           THE DEFENDANT:  Yes.

20           THE COURT:  All right.  And have you signed it?

21           THE DEFENDANT:  No, not yet.

22           THE COURT:  All right.  Can you go ahead and do that

23  now?

24           All right.  And then do you want to retrieve it from

25  him, or how do you want to --

1      MR. JONAS:  I'm fine retrieving it if the marshals

2 want to grab it, and I'll take it from them.

3      THE COURT:  Okay.  Anything else for the government?

4      MR. JONAS:  No, your Honor.

5      THE COURT:  Mr. Haas, I wanted to confirm on the

6 limiting instructions that we had discussed at the pretrial

7 conference and that had also been provided to you in writing,

8 you'll remember that there are two limiting instructions that

9 I proposed, one on uncharged statements and conduct and one on

10 disagreement or agreement with your beliefs as being

11 irrelevant for the trial.

12      So what's your position now as to whether you want

13 those limiting instructions to be given?

14      THE DEFENDANT:  I object, your Honor.  I don't want

15 it.

16      THE COURT:  Okay.

17      THE DEFENDANT:  It --

18      THE COURT:  Go ahead.

19      THE DEFENDANT:  Nobody can tell me how I felt before

20 this happened and what led up to this.  The jury needs to hear

21 it.

22      THE COURT:  Okay.

23      THE DEFENDANT:  You cannot stop the jury from hearing

24 the facts of the matter that led up to this.

25      THE COURT:  All right.  Bring your mask up to -- over

1    your nostrils again, please.  Thank you.

2         That's not the purpose of these limiting instructions

3    which I did try to explain the first time.  I'll give one more

4    go, and then I'll make a decision on it.  On uncharged acts

5    and statements, it's generally the case that under Rule 404(b)

6    of the rules of evidence, the government isn't allowed to

7    introduce other misconduct that's not charged unless it has

8    relevancy to certain issues at the trial and is not based on

9    some sort of bad character or propensity inference.

10        And so I made a very detailed ruling on this before

11   the trial, but it is usually advisable to tell the jury that

12   they cannot consider that evidence except for those limited

13   purposes.  It's generally thought of as protective of the

14   defendant.  Having said that, there are some defendants who

15   strategically prefer not to call attention to those uncharged

16   statements and conduct.

17        So with that explanation, do you still object to that

18   instruction?

19        THE DEFENDANT:  I want them to see all of it, and I

20   want -- I want the redacted things made public, also.

21        THE COURT:  Okay.  All right --

22        THE DEFENDANT:  There is no reason to keep them in

23   the dark from the facts of the matter.  You are taking things

24   out of context and putting your own words into my mouth when

25   that happens.

1          THE COURT:  All right.  So I will not give the

2    instruction on the Rule 404(b) evidence given that there is a

3    strategic decision that defendants sometimes make.  That's not

4    exactly the premise of what Mr. Haas is getting at, but I

5    don't think that I'm failing in safeguarding his rights by not

6    giving that instruction.  So I won't give the limiting

7    instruction on uncharged acts.

8          However, with regard to beliefs, I think that's still

9    necessary whether Mr. Haas wants it or not, both to protect

10   his rights and also to make sure the jury is not confused that

11   their agreement or disagreement with his beliefs have any

12   bearing on whether he's guilty or not guilty.

13         Okay.  Given that I'm going to give that instruction,

14   the question is when do I give it.  And my inclination is to

15   give it even before opening statements because the beliefs

16   will start being previewed by both sides, I anticipate.  So

17   what's the government's position on that?

18         MS. KELLY:  That's fine, your Honor.

19         THE COURT:  Okay.  Mr. Haas, do you have any

20   position, now that I've decided I'm going to give that one,

21   that instruction, when to give it?

22         THE DEFENDANT:  No, your Honor.

23         THE COURT:  Okay.  Then I'll give it before openings.

24         Okay.  Anything else from either side?

25         MS. KELLY:  No, your Honor.

1        THE DEFENDANT:  No, your Honor.

2        THE COURT:  All right.  Then we're ready for the

3   jury.

4        (Pause.)

5        MS. KELLY:  Your Honor, did you say we were going to

6   get another microphone?

7        THE COURT:  Yes.  When Mike gets back, I'll ask him

8   to do that.

9        MS. KELLY:  Thank you.

10       (Proceedings heard in open court.  Jury in.)

11       THE COURT:  Please be seated.

12       All right.  Good morning, ladies and gentlemen, and

13  welcome back.  I hope you had a good evening.  We are ready to

14  begin the trial.  We're going to, as I said, start with

15  opening statements.  Remember, opening statements are just a

16  preview of the evidence.  The statements of the lawyers and of

17  Mr. Haas during opening statements, they're not evidence

18  themselves.  All right.

19       I do also want to read you what I'll call a limiting

20  instruction.  And this may happen from time to time during

21  trial.  And this is a point of law that I want you to follow

22  as you would any other instruction that I give you during the

23  trial.

24       You will hear evidence of the defendant's beliefs

25  about the federal government, the Jewish religion, and other

1   topics.  You might or might not agree with those beliefs.

2   Your agreement or disagreement with those beliefs must not be

3   considered in making your decisions about the case.  Instead,

4   the evidence must be considered only for whether or not the

5   government has met its burden of proving the elements of the

6   offenses.  More specifically, you may consider or not

7   consider, it is up to you based on the evidence, the

8   defendant's beliefs as evidence of the defendant's motive or

9   intent.  Okay.  So that's the limited purpose of that

10  evidence.

11          All right.  With that in mind, I'll invite the

12  government counsel to deliver her opening statement.

13          OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

14          MS. KELLY:  Good morning.  The defendant, Robert

15  Haas, believes that Jewish people are terrorists against the

16  United States, that terrorists are traitors --

17          THE COURT:  One moment.  Let me turn off that mike.

18  That might help.

19          Okay.  Give it a try.

20          MS. KELLY:  The defendant, Robert Haas, believes that

21  Jewish people are terrorists against the United States, that

22  terrorists are traitors, and that the punishment for treason

23  is death.  A person is allowed to hold those beliefs, but in

24  this case when defendant transformed his beliefs into threats,

25  he committed a crime.  Defendant used words as weapons on the

Case: 1:19-cr-00486 Document #: 262 Filed: 09/11/20 Page 11 of 177 PageID #:1863
Opening statement - government
165

1    internet when he described how he planned to carry out those

2    threats saying that he will follow people home, he will cut

3    people's throats, and he will butcher their families.  By

4    making those statements, defendant crossed the legal line.

5           Defendant said, among other things:  "Anyone who

6    tries to stop the truth is guilty of treason, and they must be

7    killed.  I don't care if it's a cop, prosecutor, judge,

8    politician, or elite.  You try to stop me from telling the

9    truth, I will cut every throat in your home.  Try me."

10          The defendant also said:  "I push death, son, not

11   intimidation.  I won't make threats.  I'll just come kill you

12   who represent Jews and try to obstruct my First Amendment

13   rights.  Best choose your sides wisely.  Take heed.  When we

14   round you up, it's your future terrorist families who will

15   also be a liability.  We will get you."

16          In addition, defendant said:  "If I am prosecuted for

17   telling the truth, I'm killing everyone involved.  Down to the

18   bitch Jews crying pressing charges.  Jews will pay for their

19   crimes against humanity in my lifetime.  Bet your ass,

20   bitches, I'm coming to get ya."

21          The threats defendant made, those threats to kill,

22   are what brought us here today.  Defendant is charged in this

23   case with threatening to assault or murder law enforcement

24   officers and other people.  Defendant did not just express his

25   views about religion, and he's not charged just for being

1    angry.  Defendant committed a crime by threatening to kill

2    people who don't see the world just like he does.  Defendant

3    used threats to intimidate and to retaliate.  And defendant

4    made those statements, made those threats with the intent of

5    putting another person in fear of physical violence.  That is

6    not protected speech.

7           The charges against defendant fall into two general

8    categories.  The first category is the threats that defendant

9    made against an FBI task force officer named Joe Kostuchowski.

10   The second category of charges involves threats defendant

11   posted online to the world where he talked about killing law

12   enforcement officers, Jewish people, and other members of the

13   public.  The evidence will show that the government has met

14   its burden to prove each charge against the defendant beyond a

15   reasonable doubt.

16          I'm going to begin by describing the first category

17   of charges which are the threats that defendant directed to

18   Task Force Officer Joe Kostuchowski.  The FBI received a

19   complaint from the Simon Wiesenthal Center about statements

20   that defendant had made online.  An FBI supervisor authorized

21   an investigation of that complaint and assigned that

22   investigation to Joe Kostuchowski.  Joe Kostuchowski traveled

23   to Ottawa, Illinois, where defendant lived and worked to talk

24   to defendant about the complaint.

25          Joe Kostuchowski wanted to know whether defendant

1    made those statements; if he did make the statements, why he

2    made those statements; and whether defendant might be a danger

3    to the public or might hurt somebody.  Joe Kostuchowski was

4    there to talk.  He did not draw his gun.  He did not touch the

5    defendant, and he did not arrest the defendant.

6            That meeting didn't last long because defendant flew

7    off the handle.  Defendant yelled at Joe Kostuchowski, cursed

8    at him, and called him a worthless piece of trash.  Less than

9    an hour after that meeting ended, defendant began to text Joe

10   Kostuchowski on his work cellular phone.  Over the next 48

11   hours, defendant sent Joe Kostuchowski an avalanche of over 70

12   text messages.

13           The night of the interview after the interview

14   occurred, Joe Kostuchowski read a text message from defendant

15   telling Joe to take off his gun and badge and come meet true

16   evil.  The next day, Joe Kostuchowski read another text

17   message from defendant stating:  "I'm not afraid to walk out

18   my door in the morning.  You should be, however, considering

19   you support Jewish terrorism, and your anti-American bullshit

20   is going to get you killed."

21           Joe Kostuchowski did not reply to any of these text

22   messages, but defendant persisted in contacting Joe and

23   started leaving him voicemail messages as well.  In one

24   voicemail message, Joe Kostuchowski heard defendant say in an

25   angry tone of voice that Joe is guilty of treason and he needs

1    a bullet in his head for it.

2         On June 11, 2019, defendant was arrested for

3    threatening Joe Kostuchowski.  An Illinois State police

4    officer drove the defendant from Ottawa, Illinois, to Chicago

5    in an Illinois State police vehicle.  Defendant was recorded

6    during that car ride.  On his way to Chicago, defendant made

7    additional threats directed to Joe Kostuchowski, and he did

8    that in the presence of the police officer.  And when he did

9    that, he doubled down on the threats he had been making

10   earlier.

11        You are going to be hearing some profane words during

12   the trial including the statements that defendant made in the

13   presence of the Illinois State police officer during that car

14   ride.  During that vehicle transport, defendant said, among

15   other things:  "He needs to die.  Am I wrong?  This is

16   pro-terrorism right here, what this guy's doing.  That's a

17   fact.  A jury of my peers, they'll say kill this motherfucker.

18   I know it.  He needs a fucking .12-gauge to his fucking throat

19   and pull the trigger and pop his head off his fucking

20   shoulders, and it's going to happen."

21        The defendant also said:  "I don't like terrorists in

22   my country.  It's my constitutional duty to kill them."

23   Defendant went on to say:  "I don't care if it's ten years

24   from now.  I'm going to get this fucking faggot for this shit.

25   Terrorist motherfucker."

Opening statement - government

1      That covers the first category of charges.  Now I'm

2   going to talk about the second category of charges which

3   relates to statements that defendant made online.  A threat

4   doesn't have to be directed to a single person to constitute a

5   crime.  A threat can be made in a posting online that is

6   directed toward groups of people.

7      Defendant made these posts on a social media website

8   called vk.com.  Defendant posted these threats under two

9   different screen names.  One screen name was "Robert Haas,"

10   and the other screen name was "Fox News."  In these posts,

11   defendant threatened to kill people over and over again, and

12   he described how he would make these deaths happen.

13      How will all this evidence be presented to you over

14   the coming days in this trial?  FBI Task Force Officer Joe

15   Kostuchowski is the government's first witness.  He's going to

16   talk to you about his interactions with the defendant and the

17   text and voicemail messages that he received from the

18   defendant.  He will tell you about the impact that defendant's

19   words had on him and the fear that he felt for himself and for

20   his family.

21      You will also watch portions of the video of

22   defendant's car ride in the Illinois State police vehicle from

23   Ottawa to Chicago.  And you will see and hear defendant's

24   words including his tone of voice when he made those threats.

25      You will also read the posts that defendant made on

1    vk.com.  I read some of them to you just a few minutes ago,

2    and you will see more of them.  You will see the explicit,

3    graphic, and disturbing nature of defendant's statements,

4    about his intent and the actions to be taken.

5        This case is not about a disagreement over religion.

6    This case is about the threats that defendant made, his

7    threats to hurt people, his threats to cut people's throats

8    and butcher their families, his efforts to intimidate and to

9    retaliate against Joe Kostuchowski.  After you hear the

10   evidence, we will ask that you return the only verdict that is

11   supported by the evidence, and that is a verdict of guilty on

12   all counts.

13       THE COURT:  All right.  Mr. Haas, you can deliver

14   your opening statement.

15       OPENING STATEMENT ON BEHALF OF THE DEFENDANT

16       THE DEFENDANT:  My name is Robert Haas.  I'd like to

17   thank you all for being here again.  I've been preparing for

18   this for over a year to speak to you guys because I believe

19   this is the only fair way to have a shot in this society in

20   these times.

21       My beliefs have everything to do with why this is

22   happening.  And it's a long story how it started and what made

23   me start researching these things, but I found a lot of things

24   that the federal government and the people who provide our

25   media to us are hiding from us, and I expose it online.  And

Case: 1:19-cr-00486 Document #: 262 Filed: 09/11/20 Page 17 of 177 PageID #:1869
Opening statement - defendant
171

1   I'm called a Nazi and a racist and an anti-Semite and a Muslim

2   and an ISIS recruiter and every possible thing that you can

3   think of when I'm just standing alone by myself as an American

4   citizen trying to expose what's really happening in the world.

5        And I learned it by leaving this country and living

6   inside Moscow for a year and studying the history there.  And

7   the history that we are taught is completely the opposite of

8   reality.

9        MS. KELLY:  Your Honor --

10        THE DEFENDANT:  It's disinformation.

11        THE COURT:  All right.  You may continue.

12        I'll just remind the jury that what's said in opening

13   statement is not actually evidence.

14        THE DEFENDANT:  This is not evidence.  This is my

15   beliefs.  This is what I've read, when I've learned from the

16   Russians, what I've learned from Europeans in general about

17   the Holocaust, about Jewish beliefs, their Talmud belief

18   system, what they think about Christians and Muslims and the

19   rest of the world in general.

20        And you can see it plain as day.  Just study the

21   State of Israel's actions and their Rothschild founders, how

22   they behave and how they've treated the world and how every

23   war that we've ever had is a banker war for these people.  And

24   the people who protect them and hide this from you are the

25   same people who come and threaten me, pointing guns in my face

1    saying, "Get on the ground or we're going to shoot you.  We

2    need to have a chat about what you say online."  Harassing my

3    friends, harassing my family, visiting my landlord, telling

4    her she needs to evict me from my building because of what I

5    say online.  I don't care what I'm convicted of, you can't go

6    to my landlord and tell them that they should evict me from my

7    building.

8              MS. KELLY:  Your Honor, objection.

9              THE DEFENDANT:  These are my beliefs.

10             THE COURT:  Overruled.

11             THE DEFENDANT:  These people are protecting the

12   people who come and put their knee on your throat until you

13   die because they don't approve of something you do.

14             MS. KELLY:  Your Honor, again, this is argumentative.

15             THE DEFENDANT:  This is what I believe.

16             THE COURT:  All right.  The objection is overruled.

17   However, Mr. Haas, I did explain what the purpose of opening

18   statement is.  I explained it before the trial as well.  So

19   try to confine your remarks to the purpose of opening remarks.

20             THE DEFENDANT:  Yes, your Honor.

21             I've been investigated for almost five years now,

22   probably about five years.  The first time they made contact

23   with me was October of 2016, the first time the FBI came out.

24   I asked them if they had specific threats they wanted to talk

25   about, and they did not.  They had a complaint from a couple

Case: 1:19-cr-00486 Document #: 262 Filed: 09/11/20 Page 19 of 177 PageID #:1871
Opening statement - defendant
173

1    Jewish organizations that said I made anti-Semitic comments.

2          If you study when Semitism actually is, it's a

3    language.  And Jews don't speak a Semitic language.  So their

4    complaints aren't even legitimate.  They are just using

5    subterfuge to circumvent the truth to try and shut me down so

6    I can't explain to a jury of my peers or anyone on the

7    internet what's really happening in the world.

8          When you look at this evidence the prosecutors are

9    going to show you, I've said some angry things.  Anger is not

10   a crime.  Let me read something for you:  "It is well

11   established that speech involving government impropriety

12   occupies the highest rung" --

13         MS. KELLY:  Your Honor --

14         THE COURT:  Mr. Haas, the objection is sustained.

15   Opening remarks are confined to a preview of the evidence.

16   And you can talk about the charges themselves but not these

17   legal principles which I will tell the jury what the governing

18   law is.  All right.  So please move on.

19         THE DEFENDANT:  Yes, your Honor.

20         In 2018, February of 2018, the State Department came

21   to my house, threatened me with guns in my face and said, "Get

22   on the ground or we're going to kill you" because they wanted

23   to have a chat with me.  They flew from Washington to stay in

24   my town because of something they didn't like that I said

25   online which is technically terrorism if you've researched the

Case: 1:19-cr-00486 Document #: 262 Filed: 09/11/20 Page 20 of 177 PageID #:1872
Opening statement - defendant
174

1  definition of terrorism.  It's using the threat of violence or

2  force to enforce a political --

3          MS. KELLY:  Again, your Honor, objection.

4          THE COURT:  Sustained.  Please move on to factual

5  statements.

6          THE DEFENDANT:  Yes, your Honor.

7          I've been dealing with this for years now.  And it's

8  all resulted and snowballed from me telling the truth online

9  and being attacked by people for doing it.  And it angers me.

10  And I respond with anger.  And I'll admit, I fell into the

11  trap and argued back with these people and went to their

12  level, but I didn't call the police and report it.  And maybe

13  I should have and got them reported for supposedly making

14  threats.

15          But it's up to you to decide what a true threat is.

16  There is no fine line that says what a threat is in the

17  Supreme Court or in these courts.

18          MS. KELLY:  Your Honor, objection.

19          THE COURT:  That can stand but move on, please,

20  again, to a preview of the evidence.

21          THE DEFENDANT:  In my evidence against me, there's

22  photos of Israelis planting explosives in the World Trade

23  Center on August 18th, 2001.  These are the people I'm

24  protecting myself against.

25          MS. KELLY:  Your Honor --

1      THE COURT:  All right.  Sustained.  The jury will

2  disregard that last remark based on the pretrial decisions.

3      All right.  Please move on.

4      THE DEFENDANT:  I believe I'm protecting myself from

5  the most dangerous organization in the world:  Zionism, the

6  Rothschild family, the Rockefellers, George Soros, the illegal

7  apartheid State of Israel.  And the federal government,

8  they're toadies.  They're security guards who come and harass

9  and try to pummel people like me into keeping my mouth shut

10  because we're exposing the true problem on the planet today:

11  Zionism, thieves, bankers who want to control everyone.

12      I believe I'm a real American trying to expose these

13  people for you and to uphold your First Amendment which is

14  very hard to do with these forces working against me.  They

15  call me a racist.  I'm pro-Palestine.  I'm a white guy.  I'm

16  atheist.  I'm very atheist.  I won't lie.  But I defend

17  Muslims in the Middle East that I have nothing to do with

18  because I've studied the real history and learned what's

19  really happening in the world.

20      And it aggravates me greatly to, once you

21  understand -- once you understand what's really happening,

22  it's hard to keep your mouth shut.  And the only way to really

23  learn it is to start researching online.  Now we have the

24  internet, and the government can't keep us in the dark

25  anymore.  Now we can actually contact people from these other

Opening statement - defendant

1    countries and speak to them.

2          Like I said, I lived in Russia for a year.  Everyone

3    told me, "They're going to kill you when you go there."  When

4    I went there, I was treated like a movie star.  The Russians

5    loved Americans.  They just dislike our government, and now I

6    understand why.

7          I'm finished for now, your Honor.

8          THE COURT:  All right.  Thank you.

9          All right.  The government may call its first

10   witness.

11         MS. KELLY:  Your Honor, we call Joseph Kostuchowski.

12         THE COURT:  All right.

13       (Pause.)

14         THE COURT:  All right.  If you can just have a seat

15   on the witness stand there.  Is there a microphone cover

16   there?  I'm sorry.  Mr. Kostuchowski, is it?

17         THE WITNESS:  Yes.

18         THE COURT:  Can you come on down from the witness

19   stand again and then pick up one of those microphone covers

20   that you see on the small table by that podium, one of those

21   white -- yes, there you go.  And then go ahead and slip that

22   on -- there's an opening on one end -- on to the tip of the

23   microphone.

24         Okay.  If you can face me, you can remain seated but

25   raise your right hand.

Kostuchowski - direct

177

```
 1        (Witness sworn.)

 2              THE WITNESS:  I do.

 3              THE COURT:  All right.  Now, and then you may remove

 4    your mask now.

 5              All right.  You may begin.

 6          JOSEPH KOSTUCHOWSKI, GOVERNMENT'S WITNESS, SWORN

 7                         DIRECT EXAMINATION

 8    BY MS. KELLY:

 9    Q.  Good morning.

10    A.  Good morning.

11    Q.  Could you please state your name for the record?

12    A.  Joseph Kostuchowski.

13    Q.  Could you spell your last name?

14    A.  K-o-s-t-u-c-h-o-w-s-k-i.

15    Q.  Are you currently employed?

16    A.  Yes.

17    Q.  What is the name of your employer?

18    A.  Cook County Emergency Management and Regional Security.

19    Q.  When did you join the Cook County department of emergency

20    management and regional security?

21    A.  July of 2013.

22    Q.  What is your job title with Cook County?

23    A.  I'm an information officer.

24    Q.  Do you perform any work for the FBI?

25    A.  Yes, I do.
```

Kostuchowski - direct

178

1    Q.   What is your job title with the FBI?

2    A.   I'm a task force officer.

3    Q.   What is a task force officer with the FBI?

4    A.   I work on the joint terrorism task force.  We investigate

5    guardians on the team that I was on.

6    Q.   When you became a task force officer, did you take an

7    oath?

8    A.   Yes, I did.

9    Q.   What was the nature of the oath you took?

10   A.   I was sworn in as a special deputy U.S. marshal assigned

11   to the FBI's joint terrorism task force.

12   Q.   As a task force officer, have you worked for the FBI on a

13   full-time or on a part-time basis?

14   A.   Full-time.

15   Q.   In year 2019, what were your responsibilities as an FBI

16   task force officer?

17   A.   I was on the guardian squad.

18   Q.   What is a guardian?

19   A.   A guardian's a complaint or information that comes in from

20   either the general public as a "see something/say something."

21   It could come in from law enforcement, other law enforcement

22   agencies.  If they think that someone may be getting

23   radicalized, we go out and we conduct investigations into

24   that.

25           MS. KELLY:  Your Honor, I just want to pause for a

Kostuchowski - direct

179

1  minute and ask that maybe the microphone be moved a little

2  closer.

3          THE COURT:  All right.  You can do that.

4          MS. KELLY:  Okay.  Thank you.

5  BY MS. KELLY:

6  Q.  Did the FBI authorize you to investigate violations of

7  federal criminal law?

8  A.  Yes.

9  Q.  Did you have authority to investigate whether a person

10  made a threat in violation of federal law?

11  A.  Yes, I did.

12  Q.  Were you assigned to work within a particular squad within

13  the FBI?

14  A.  Yes, I was.

15  Q.  What was the name of the squad?

16  A.  It's CT5, counterterrorism 5.

17  Q.  In year 2019, were you assigned to work on an

18  investigation involving Robert Haas?

19  A.  Yes, I was.

20  Q.  How did Robert Haas come to the attention of the FBI in

21  2019?

22  A.  There's a place called the Simon Wiesenthal Center, and

23  they -- they saw postings that Robert Haas put out on a site

24  called VK.  And they said that these postings were the most

25  violent postings against Jewish people that they've seen.

Kostuchowski - direct

180

1  Q.  Did you treat that report as a complaint?

2  A.  Yes.

3  Q.  Where was the complaint made?

4  A.  It was in Los Angeles.

5  Q.  Were you assigned to work on that investigation?

6  A.  Yes, I was.

7  Q.  Who assigned you to work on the investigation?

8  A.  Supervisory Special Agent Vic Lombardo.

9  Q.  Did you know anything about the complaint from the Simon

10 Wiesenthal Center before Agent Lombardo assigned you to work

11 on the investigation?

12 A.  No, I did not.

13 Q.  Did you read the complaint?

14 A.  Yes.

15 Q.  What was the general nature of it?

16 A.  The general nature was that all Jews should be killed.

17 Q.  Did the complaint identify how the Simon Wiesenthal Center

18 learned of the statements that it thought were made by Robert

19 Haas?

20 A.  That was like -- it was on VK.  It was postings, and his

21 name was attributed to those postings.

22 Q.  What is VK, to your knowledge?

23 A.  VK, from what I understand, is Russian Facebook.

24 Q.  How did you learn about VK?

25 A.  An analyst with the FBI gave me the information.

Kostuchowski - direct

181

1   Q.   In 2019 did you interview Mr. Haas?

2   A.   Yes, I did.

3   Q.   Why did you conduct that interview?

4   A.   I needed to, one, identify that it was Mr. Haas that I'm

5   interviewing.  Two, I needed to find out if by chance the

6   postings that were attributed to Mr. Haas, that Mr. Haas made

7   those postings.  Three, I'd like to find out if those -- what

8   he meant by those postings.  Four, whether he was going to

9   carry out anything that was said within the postings and

10  ultimately if he was planning on carrying it out if he had the

11  ability.

12  Q.   Through your investigation, did you identify where

13  Mr. Haas lived?

14  A.   Yes, I did.

15  Q.   What town did he live in?

16  A.   Ottawa, Illinois.

17  Q.   What was the date of your interview with Mr. Haas?

18  A.   May 8th, 2019.

19  Q.   Was anyone else present during the interview?

20  A.   Yes.

21  Q.   Who was present?

22  A.   Matthew Kelley from the State Department and two police

23  officers from the Ottawa Police Department.

24  Q.   Did you contact Mr. Haas to arrange the meeting?

25  A.   Yes, I did.

Kostuchowski - direct

182

1   Q.   How did you contact him?

2   A.   I called him on his phone.

3   Q.   When did you contact him?

4   A.   The morning of 20- -- May 8th, 2019.

5   Q.   Which phone number did you dial?

6   A.   347-951-4034.

7   Q.   Did the person who answered the phone with the number

8   ending in 4034 identify himself to you?

9   A.   Yes, he did.

10  Q.   What, if anything -- or how did he identify himself to

11  you?

12  A.   He said it was Robert Haas.

13  Q.   What, if anything, did Mr. Haas say during that phone

14  call?

15  A.   He said that he doesn't talk to fucking FBI faggots.

16  Q.   What did you say to Mr. Haas during the phone call?

17  A.   I told Mr. Haas that there was a complaint that we were

18  investigating and that we needed to speak to him in person and

19  it wouldn't take very long.

20  Q.   Before you met Mr. Haas for the interview, was this your

21  only phone call with him, or did you have additional phone

22  calls?

23  A.   That's the first phone call.

24  Q.   Did you force Mr. Haas to meet with you?

25  A.   No, I did not.

Kostuchowski - direct

183

```
 1   Q.   What did you tell him?
 2   A.   I told him that we needed to meet and speak about the
 3   complaint.
 4   Q.   Did you threaten to arrest Mr. Haas?
 5   A.   No, I did not.
 6   Q.   Did you raise your voice to Mr. Haas during this phone
 7   call?
 8   A.   No, I did not.
 9   Q.   Did you threaten Mr. Haas' physical safety?
10   A.   No.
11   Q.   Did Mr. Haas agree to an interview?
12   A.   Yes.
13   Q.   Did he give you a meeting location?
14   A.   Yes, he did.
15   Q.   Where was the meeting location?
16   A.   He was on a job site in Ottawa, Illinois, on Washington
17   Street.
18   Q.   Did you go to that location?
19   A.   Yes, I did.
20   Q.   Did you drive to Ottawa from the Chicago area?
21   A.   Yes, I did.
22   Q.   About how long was the drive?
23   A.   About an hour and a half.
24   Q.   Do you remember what route you took?
25   A.   I believe 57, Route 57 to 80 and then 80 to Ottawa.
```

Kostuchowski - direct

184

1   Q.   About what time of day did you meet with Mr. Haas?

2   A.   11:00 a.m.

3   Q.   Was he present at the location he gave you?

4   A.   Yes, he was.

5           THE COURT:  One moment.

6           MS. SINGER:  Thank you.  Your Honor, I apologize.

7   I'm having -- that monitor is not working correctly.

8           THE COURT:  One of the monitors?

9           MS. SINGER:  Yes.

10          THE COURT:  All right.  One moment.  Is it turned on?

11          THE DEFENDANT:  No.  It's blacked out.

12          THE COURT:  Okay.  One moment.  We'll try to get

13  Systems up here as promptly as we can.

14          MS. KELLY:  Would you like me to wait, your Honor?

15          THE COURT:  Yes.  You should wait.

16      (Pause from 9:42 a.m. to 9:55 a.m.)

17          THE COURT:  All right.  Ladies and gentlemen, we're

18  just going to take a break now so that you can be more

19  comfortable in the jury room while we try to figure out what

20  the problem is.  All right.  All rise.

21      (Recess had from 9:55 a.m. to 10:57 a.m.)

22          THE COURT:  All right.  Please be seated.

23          Ladies and gentlemen, I apologize, of course, for the

24  technical gremlins that popped up.  And actually, we were able

25  to fix the chat computer relatively quickly.  There was an

1    issue with the display for the jurors who are outside of the

2    jury box.  And I do appreciate, I think it was Ms. Pollock who

3    brought it to our attention.  If that ever happens that you

4    can't see what's being displayed when there should be

5    something displayed -- it's not always the case that something

6    should be showing -- but please do raise your hand and get my

7    attention.

8         And as I said yesterday, too, if you have trouble

9    hearing, let me know as well.  So again, my apologies.  Thank

10   you for your patience.  We are ready to resume the direct

11   examination.

12        Mr. Kostuchowski, do you understand you're still

13   under an oath to tell the truth?

14        THE WITNESS:  Yes, sir.

15        THE COURT:  All right.  You may begin.

16        MS. KELLY:  Your Honor, at this time, I would ask

17   whether defendant agrees to a stipulation that he is the

18   person who met with Joe Kostuchowski on May 8th, 2019.

19        THE COURT:  Okay.  And we discussed this, Mr. Haas,

20   beforehand about identification.  Do you agree to that

21   identification?

22        THE DEFENDANT:  I agree.

23        THE COURT:  All right.  Ladies and gentlemen, again,

24   a stipulation is just an agreement between the parties that

25   certain facts are true.  And you just heard the defendant

Kostuchowski - direct

186

1    agree that he did meet with Mr. Kostuchowski on May 8th, 2019.

2         All right.  You may proceed.

3    BY MS. KELLY:

4    Q.  Before we took the break, you had mentioned that Mr. Haas

5    was present at the location he gave you, correct?

6    A.  Yes.

7    Q.  What did he appear to be doing at that location?

8    A.  He said he was waterproofing a home.  So he had a trench

9    dug around the home and then the trench was leading toward the

10   street.

11   Q.  When you arrived at Mr. Haas' work site, did you identify

12   yourself?

13   A.  Yes, I did.

14   Q.  What did you say to Mr. Haas to identify yourself?

15   A.  I gave him my name, where I'm from, and I had my

16   credentials out.

17   Q.  Could you describe those credentials for the jury?

18   A.  It has my photo on it.  It also says that I'm a deputy

19   special U.S. marshal and assigned to the JTTF, which is the

20   FBI joint terrorism task force.

21   Q.  Did you at any point tell Mr. Haas that you were a task

22   force officer with the FBI?

23   A.  Yes.

24   Q.  Did Mr. Haas identify himself to you when you arrived at

25   the job site?

1    A.  Yes, he did.

2    Q.  How did he do that?

3    A.  He gave me the spelling of his name and his date of birth.

4    Q.  Did you observe Mr. Haas' demeanor toward you upon your

5    arrival at the Ottawa job site?

6    A.  Yes, I did.

7    Q.  What did you observe about his demeanor towards you?

8    A.  He was very agitated.  Once again, he said that he doesn't

9    speak to fucking FBI faggots.  He -- his face would contort.

10   He would turn red.  He would yell.  He would use profane

11   language.

12   Q.  Did you notice whether Mr. Haas was carrying a cellular

13   telephone --

14   A.  Yes.

15   Q.  -- during the interview?

16   A.  Yes, he was.

17   Q.  Did he appear to be recording during that meeting?

18   A.  It seemed like it.

19   Q.  Did you tell him not to record the meeting?

20   A.  No, I did not.

21   Q.  Did you tell him to stop recording the meeting?

22   A.  No, I did not.

23        MS. KELLY:  Your Honor, I would request that the

24   Court allow the government to admit into evidence Government

25   Exhibit 76 and to publish that exhibit to the jury.

Kostuchowski - direct

188

1        THE COURT:  All right.  Any objection other than

2    prior objections?  Mr. Haas, any other objections?

3        THE DEFENDANT:  No, your Honor.

4        THE COURT:  All right.  76 and 78 are allowed.

5        (Government Exhibits 76 and 78 received in evidence.)

6        THE COURT:  Okay.  Just one second.  Let me just

7    check.  So ladies and gentlemen, you should be seeing what's

8    actually on the government's computer.  There should just be a

9    "play" button in the center of the screen there.  No?  So

10   here, let me...

11       All right.  Very good.

12       MS. KELLY:  I'm going to now play Exhibit 76.

13       (Government Exhibit 76 played in open court.)

14       MS. KELLY:  Your Honor, just is it possible to turn

15   up the volume a bit and I'll start it over?  Thank you.

16       THE COURT:  I'll give it a shot.  Okay.

17       (Government Exhibit 76 played in open court.)

18   BY MS. KELLY:

19   Q.  Officer Kostuchowski, does this video accurately depict a

20   portion of your meeting with Mr. Haas on May 8, 2019?

21   A.  Yes, it does.

22   Q.  Can you see yourself in this video?

23   A.  Yes.

24   Q.  Do you recognize the other person's voice in the video?

25   A.  Yes, I do.

Kostuchowski - direct

189

1    Q.   Whose voice is it?

2    A.   Robert Haas.

3    Q.   When you asked Mr. Haas whether he was all online, what

4    did you mean by that question?

5    A.   I meant was he just posting things online or was he going

6    to follow through with anything that he was just -- he was

7    posting.

8    Q.   Did his answer satisfy you?

9    A.   No, it didn't.

10   Q.   Why not?

11   A.   He was acting irrational, in my opinion.  He -- I couldn't

12   believe just by him saying, "No, I'm not going to do anything"

13   with the way he's been acting and speaking to me for the time

14   that I came up upon him that I could trust what he was saying.

15   Q.   Did you ask Mr. Haas for any identification?

16   A.   Yes, I did.

17   Q.   Why did you ask him for identification?

18   A.   I wanted to make sure I was talking to the right person.

19   Q.   Did he have any identification?

20   A.   No, he didn't.

21        MS. KELLY:  Your Honor, I believe you've also

22   admitted into evidence Exhibit 78.  At this point, I'd request

23   permission to publish it to the jury.

24        THE COURT:  78 is in.  Go ahead.

25      (Government Exhibit 78 played in open court.)

Kostuchowski - direct

190

BY MS. KELLY:

Q.   Officer Kostuchowski, is this a recorded portion of your
May 8th, 2019, interview with Mr. Haas?

A.   Yes, it is.

Q.   Do you recognize the voice in this video?

A.   Yes, I do.

Q.   Whose voice is it?

A.   Robert Haas'.

Q.   Do you see yourself in the video?

A.   Yes, I do.

Q.   What are you wearing?

A.   A black jacket, blue shirt.

Q.   Did you tell Mr. Haas that he could not talk about Jews
online anymore?

A.   No, I did not.

Q.   Do you get paid to support terrorists?

A.   No, I don't.

Q.   During this recording, did Mr. Haas mention the Talmud?

A.   Yes, he did.

Q.   Did he say, "Read your Talmud"?

A.   Yes, he did.

Q.   Had you ever heard of the Talmud before your meeting with
Mr. Haas?

A.   I had looked it up online prior to the interview because
part of the complaint from the Simon Wiesenthal Center had the

Kostuchowski - direct

191

1    Talmud in it, and I had no idea what it was, so I just Googled

2    it.

3    Q.  Did you say anything to Mr. Haas about the Talmud?

4    A.  I asked him which version of the Talmud he was speaking

5    of.

6    Q.  Did he answer that question?

7    A.  No.

8    Q.  Did you discuss the topic of Palestinians?

9    A.  It came up.

10   Q.  What, if anything, did you say to Mr. Haas about

11   Palestinians?

12   A.   I asked Mr. Haas if he knew that Palestinians carried

13   Israeli passports.

14   Q.  Why did you ask him that question?

15   A.   I wanted to see if he knew that that's -- many

16   Palestinians do carry Israeli passports and are Israeli

17   citizens.

18   Q.  Did Mr. Haas answer your question about the passports?

19   A.  No, he did not.

20   Q.  Where did you obtain an understanding that Palestinians

21   may carry Israeli passports?

22   A.   From prior investigations that dealt with Palestinians,

23   they gave me their passport as identification, and the

24   passport was an Israeli passport.

25   Q.  Did you observe Mr. Haas' demeanor after you asked him

Kostuchowski - direct

192

1   that question?

2   A.  Yes.

3   Q.  What was his reaction?

4   A.  He became very agitated again.

5   Q.  Did he swear at you?

6   A.  Yes.

7   Q.  Did you say anything to Mr. Haas in response to his

8   profanity?

9   A.  Yes.  I asked him if he knew that profanity is the crutch

10  of the conversational cripple.

11  Q.  Did he respond to that comment?

12  A.  He -- I believe he said, "Am I offending you?"

13  Q.  Do you recall what, if anything, you said in response to

14  that question?

15  A.  I don't remember.

16  Q.  Did Mr. Haas during this interview call you any other

17  names or insult you?

18  A.  He called me a kike pedophile.

19  Q.  What, if anything, did you say in response?

20  A.  Excuse me.  There was more to it than that.  He called me

21  a kike pedophile and said that I was going to go to jail

22  because of that and that pedophiles don't do well in jail, is

23  what he said to me.  My response to that was if he knew that

24  from personal experience.

25  Q.  Why did you ask him that?

Kostuchowski - direct

193

1  A.  I wanted to know where he got this information and see

2  what he would say.

3  Q.  Did you threaten any physical violence against Mr. Haas

4  during the May 8th, 2019, interview?

5  A.  No, I did not.

6  Q.  Did you threaten to beat him up?

7  A.  No.

8  Q.  Where were you standing during that interview?

9  A.  The entire time, I never left the curb.  I never entered

10  the area that he was working on.

11  Q.  Did any of the other law enforcement officers in your

12  presence threaten physical violence against Mr. Haas during

13  the May 8th, 2019, interview?

14  A.  No, they did not.

15  Q.  Did you discuss with Mr. Haas the complaint that the FBI

16  had received from the Simon Wiesenthal Center?

17  A.  No, I did not.  I didn't have an opportunity.  He was just

18  throwing out insults and profanity, and he didn't give me an

19  opportunity to talk to him about the complaint.

20  Q.  Approximately how long did the interview last?

21  A.  About 20 minutes.

22  Q.  How did the interview end?

23  A.  We left the -- left the area.

24  Q.  Did your observations of Mr. Haas' behavior during the

25  interview cause you any concerns?

1   A.  Yes, they did.

2   Q.  What were those concerns?

3   A.  Well, if he would treat a federal officer the way he was

4   treating me that he would treat a citizen even worse.

5   Q.  Did you hear from Mr. Haas after the interview ended?

6   A.  Yes, I did.

7   Q.  When?

8   A.  I was driving away from Ottawa.  I was probably about five

9   minutes outside of Ottawa when my phone rang.

10   Q.  What was your cellular phone number?

11   A.  312-882-4227.

12   Q.  Was that your work cellular phone number?

13   A.  Yes, it is.

14   Q.  Did you recognize the voice of the person who called?

15   A.  Yes, I did.

16   Q.  Who was the caller?

17   A.  That was Robert Haas.

18   Q.  How did you recognize the voice of the caller as the voice

19   of Robert Haas?

20   A.  It's the same voice from the call in the morning to set up

21   the interview and the same voice from the interview out in

22   Ottawa, Illinois.

23   Q.  What did Mr. Haas say to you during this phone call?

24   A.  He said to, "Take off your badge and your gun, you pussy,

25   and come back here."

1  Q.  What, if anything, did you say to Mr. Haas during this

2  phone call?

3  A.  I told him he was a keyboard warrior and that he wouldn't

4  do anything.  And eventually I told him, "Yeah, I'll be right

5  back."

6  Q.  What did you mean by the phrase "keyboard warrior"?

7  A.  It's a term for someone who is like a troll on the

8  internet.  They go on the internet and they try to cause

9  problems, instigate problems.

10 Q.  Why did you tell Mr. Haas that he was a keyboard warrior?

11 A.  It was just a way of ending the conversation.  I put up

12 with a lot of abuse the entire time during the interview, and

13 I really didn't want to continue.

14 Q.  Why did you say, "I'll be right there"?

15 A.  In order to end the conversation.

16 Q.  Did you go back to Mr. Haas' job site?

17 A.  No, I did not.  Mr. Haas was trying to make this personal.

18 It was not personal.  It was my job to go there and interview

19 him.  That's all I wanted to do.  Mr. Haas wanted to make it

20 personal and wanted to fight, and I have nothing to gain by

21 doing that.  That doesn't answer any question that I had for

22 him to find out if he was the person that posted those

23 messages.

24 Q.  Did Mr. Haas contact you on any other occasions?

25 A.  Yes, he did.

Kostuchowski - direct

196

1   Q.  When did he next contact you?

2   A.  It wasn't very much longer after the phone call that I

3   started receiving text messages.

4   Q.  Did your phone identify the phone number of the person who

5   sent you the text messages?

6   A.  Yes, it did.

7   Q.  What phone number sent you the text messages?

8   A.  347-951-4034.

9   Q.  May I refer to that number as "the Haas phone"?

10  A.  Yes.

11  Q.  Did the Haas phone send you more than one text message?

12  A.  Yes.  There were constant text messages.

13  Q.  What dates did you receive the text messages?

14  A.  The 8th of May 2019 and the 9th of May 2019.

15  Q.  Did you keep a copy of all the text messages that you

16  received from the Haas phone?

17  A.  Yes, I did.

18  Q.  Did you make copies of them?

19  A.  I did.

20  Q.  How did you do that?

21  A.  I took screenshots and then put the screenshots to a disk.

22  Q.  Are you going to testify about every text message that you

23  received from the Haas phone?

24  A.  No, I am not.

25  Q.  Are you going to testify only about certain messages?

1    A.  Yes.

2          MS. KELLY:  Your Honor, at this point I would move

3    for admission both Exhibit 79 and Exhibit 80 and request

4    permission to publish to the jury.

5          THE COURT:  All right.  Any objections other than the

6    previous ones, Mr. Haas?

7          THE DEFENDANT:  No, your Honor.

8          THE COURT:  All right.  It's allowed.

9       (Government Exhibits 79 and 80 received in evidence.)

10   BY MS. KELLY:

11   Q.  Officer Kostuchowski, I displayed Government Exhibit 79.

12   What is this exhibit?

13   A.  It's a copy of my -- a text message from my phone.

14   Q.  What is the date identified at the top left -- or the top

15   of the page?

16   A.  It's Wednesday, May 8th, 2019.

17   Q.  Is there a timestamp in the lower right corner?

18   A.  Yes, there is.

19   Q.  What time is shown in the timestamp?

20   A.  It's small, but it looks like 11:50 a.m.

21   Q.  Is there a phone number identified in this exhibit from

22   where you received the text messages?

23   A.  Yes, there is.

24   Q.  Can you identify for the jury what that phone number is

25   and where on the page it appears to be?

1   A.   Yes.  It's in the top left portion of the text, and it's

2   347-951-4034.

3   Q.   Is this the phone number that sent you the text messages

4   on May 8th and May 9th, 2019?

5   A.   Yes, it is.

6   Q.   Is there any text in the green box on this page?

7   A.   Yes, there is.

8   Q.   Can you read what it says?

9   A.   "Faggot FBI bitch begging for it."

10  Q.   Is there a black box below the area of the text message

11  that you just read?

12  A.   Yes, there is.

13  Q.   Did Mr. Haas send you additional content on May 8th, 2019,

14  that has been blacked out or redacted in this exhibit?

15  A.   Yes.

16          MS. KELLY:  Your Honor, at this point, I'd ask for a

17  limiting instruction.

18          THE COURT:  All right.  Yes.  Ladies and gentlemen,

19  in advance of trial, the parties and I reviewed the exhibits

20  to try to make the trial go as smoothly as possible.  And for

21  some of the exhibits, you will see blacked-out areas.  We call

22  these redactions.  And that was through that pretrial process

23  where I made decisions requiring that some parts of these

24  exhibits be redacted.  All right.  So don't try to infer

25  what's behind them or not.  It's irrelevant.  And that's the

1    reason, though, that you'll see redactions on some of these

2    exhibits.

3            All right.  Go ahead.

4    BY MS. KELLY:

5    Q.  I believe you had mentioned, Officer Kostuchowski, that

6    the timestamp on the bottom right of this page was 11:50 a.m.?

7    A.  Correct.

8    Q.  Did you receive this text message before or after your

9    interview with Mr. Haas?

10   A.  After the interview.

11   Q.  Could you identify what appears on Page 2 of this exhibit?

12   A.  Another text message from Mr. Haas.

13   Q.  What time did you receive the text message identified on

14   this page?

15   A.  7:27 p.m.

16   Q.  And was that on May 8th, 2019?

17   A.  Yes.

18   Q.  Can you read the text message that appears on this page?

19   A.  "Take off the gun and badge like you said you would, you

20   pussy.  Come meet true evil.  I got something for you

21   terrorists."

22   Q.  What did you interpret this message to mean?

23   A.  A threat to me.

24   Q.  Where were you located when you received the text message?

25   A.  In Cook County, Illinois.

Kostuchowski - direct

200

1   Q.  I'm now displaying what we have marked as Government

2   Exhibit 80.  Can you identify this document?

3   A.  Yes.  It's another screenshot of a text message.

4   Q.  Is there more than one text message contained in Exhibit

5   80?

6   A.  No.

7   Q.  Well, if I scroll through some of the pages, is there more

8   than one text message identified in this exhibit?

9   A.  Yes.

10  Q.  When did you receive the text messages identified in

11  Exhibit 80?

12  A.  On Thursday, May 9th, 2019.

13  Q.  What phone number sent you these text messages?

14  A.  347-951-4034.

15  Q.  And that's the Haas phone?

16  A.  Yes, it is.

17  Q.  Where were you located when you received the text messages

18  identified in Exhibit 80?

19  A.  In Cook County, Illinois.

20  Q.  I'm going to turn to Page 2.  Can you identify what is

21  displayed on Page 2 of this exhibit?

22  A.  Another screenshot of a text message sent by Mr. Haas.

23  Q.  What time did you get this text message?

24  A.  At 12:17 a.m.

25  Q.  Can you read the text message aloud?

Kostuchowski - direct

1    A.   "Wanna play?  Any American who learns this will want you

2    dead.  That's a fact.  Lol."

3    Q.   And again, the text messages that we're going to talk

4    about in Exhibit 80 were messages you received on May 9th,

5    2019?

6    A.   Yes.

7    Q.   Turn to Page 3.  Can you identify this document or this

8    message?

9    A.   Yes.  It's another text message.

10   Q.   What time did you receive the message?

11   A.   12:23 a.m.

12   Q.   Could you read the message aloud?

13   A.   "Why don't you call me private some more and see if that

14   doesn't piss me off enough.  Lol."

15   Q.   Do you recall ever calling Mr. Haas private?

16   A.   No, I don't.

17   Q.   Turning to the next page of the exhibit, is this another

18   text message that you received from the Haas phone?

19   A.   Yes, it is.

20   Q.   What time did you receive this message?

21   A.   12:31 a.m.

22   Q.   What does the message say?

23   A.   "Anyone enforcing Judaism needs to die, bitch.  Don't

24   force an American.  You violated my rights already, boy.  You

25   owe me with your kike bullshit Moloch worshipping paedo crap."

Kostuchowski - direct

202

1    Q.   When Mr. Haas wrote that you violated his rights already,

2    what did you understand him to mean?

3    A.   He felt that I violated his civil rights.

4    Q.   Had you violated his rights?

5    A.   No, I had not.

6    Q.   When Mr. Haas said "you owe me," what did you understand

7    him to mean by that?

8    A.   I really don't know.

9    Q.   What does the word "paedo crap" mean to you?

10   A.   A pedophile.

11   Q.   What did you understand that Mr. Haas meant by his use of

12   the word "paedo" in this text message?

13   A.   He was calling me a pedophile.

14   Q.   Turning to Page 5 of the exhibit, can you identify what

15   appears on this page?

16   A.   Yes.  Another text message from Mr. Haas.

17   Q.   What time did you receive the text message?

18   A.   12:32 a.m.

19   Q.   What does the message say?

20   A.   "You are trash, and you will pay."

21   Q.   Turning to the next page of this exhibit, is this another

22   text message that you received from the Haas phone?

23   A.   Yes, it is.

24   Q.   What time did you receive the text message?

25   A.   12:50 a.m.

Kostuchowski - direct

203

1    Q.  What does the message say?

2    A.  "Get in my way, old man.  You're washed up.  Don't play

3    with real men, you coward terrorist bitch.  Lol.  Physically

4    you're a joke.  Mentally you're a donkey.  You don't stand a

5    chance."

6    Q.  Looking now at the next page of this exhibit, can you

7    identify what's displayed?

8    A.  It's another text message from Mr. Haas.

9    Q.  What time did you receive the text message?

10   A.  10:18 a.m.

11   Q.  Could you read the message aloud?

12   A.  "You're now on my list.  You better pray people don't wake

13   up while your bloodline is alive.  I am telling the world what

14   you support personally, Jew boy."

15   Q.  What did you interpret this text message to mean?

16   A.  It's a threat to my family.

17   Q.  And why did you believe that?

18   A.  From the way it's written, that "you better hope that no

19   one wakes up while your bloodline is alive," which is my

20   family.

21   Q.  Turning to the next page of this exhibit, is this another

22   text message from the Haas phone?

23   A.  Yes, it is.

24   Q.  What time did you receive this message?

25   A.  12:50 a.m.

Kostuchowski - direct

204

1    Q.   Could you please read the message?

2    A.   "Get in my way, old man.  You're washed up.  Don't play

3    with real men, you coward terrorist bitch.  Lol.  Physically

4    you're a joke.  Mentally you're a donkey.  You don't stand a

5    chance."

6    Q.   I think we read this before.

7    A.   Yeah.

8    Q.   Okay.  Somehow I skipped and read one twice.  I apologize.

9         I'm now looking -- I'm now showing you what appears

10   to have a Page 9 on the bottom.  Can you identify this

11   message?

12   A.   Another text message from Mr. Haas.

13   Q.   What time did you receive this message?

14   A.   10:21 a.m.

15   Q.   Could you read the message?

16   A.   "They and their security guards will be tortured for their

17   war crimes and treason against humanity.  I dare you to get in

18   the way, Pops.  Make me snap on you."

19   Q.   I've now turned to the next page of the exhibit.  Could

20   you identify what this is?

21   A.   Another text message from Mr. Haas.

22   Q.   What time did you receive it?

23   A.   10:32 a.m.

24   Q.   Could you read it aloud?

25   A.   "There's a reward dead or alive for some of your kike

1  masters in Moscow.  Do you believe you can stop me from

2  collecting that shit?"

3  Q.  Now turn to the next page of the exhibit.  What time did

4  you receive this text message?

5  A.  10:37 a.m.

6  Q.  What does the message say?

7  A.  "I thought you wanted to chat, you monkey Jew.  You coward

8  old man.  You know I get what I want, and I think you deserve

9  death."

10  Q.  What did you interpret this message to mean?

11  A.  He's saying that he's going to kill me.

12  Q.  Officer Kostuchowski, can you identify this document?

13  A.  It's another text message from Mr. Haas.

14  Q.  What time did you receive it?

15  A.  11:04 a.m.

16  Q.  What does the message say?

17  A.  "I'm not afraid to walk out of my door in the morning.

18  You should be, however, considering you support Jewish

19  terrorism, and your anti-American bullshit is going to get you

20  killed."

21  Q.  What did you interpret this message to mean?

22  A.  That he was going to try to harm me in some way as I'm

23  leaving my house, that he may be watching my house.

24  Q.  I have now turned the page of the exhibit.  Is this

25  another text message from the Haas phone?

1    A.   Yes, it is.

2    Q.   What is it?

3    A.   It's a link to VK.

4    Q.   What time did you receive it?

5    A.   1:33 p.m.

6    Q.   Turn to the next page of the exhibit.  Is this another

7    text message from the Haas phone?

8    A.   Yes, it is.

9    Q.   What time did you receive it?

10   A.   6:33 p.m.

11   Q.   Could you read it aloud, please?

12   A.   "Joe, you're a Yiddish Polock, not a Semite.  You

13   paedophile Jew maggot.  Come try to stop me and see what

14   happens to you and yours.  Lolol."

15   Q.   What did you interpret this message to mean?

16   A.   It seems like he's trying to stop me from continuing my

17   investigation and saying that if I did continue the

18   investigation that he would harm me.

19   Q.   Did you believe that these text messages were jokes?

20   A.   No, I did not.

21   Q.   How did the text messages that you identified for the jury

22   make you feel?

23   A.   I worried for the safety of my family and myself.

24   Q.   Did they disturb you?

25   A.   Yes.

Kostuchowski - direct

207

1  Q.  Did you respond to any of the text messages?

2  A.  No, I did not.

3  Q.  Did you ever call Mr. Haas in response to any of the text

4  messages?

5  A.  No, I did not.

6  Q.  Did you attempt in any way to block Mr. Haas from

7  contacting you?

8  A.  Yes.  I used the blocking mechanism on my phone to block

9  the text messages.

10 Q.  Did he continue to contact you after you attempted to

11 block him?

12 A.  Well, the text messages stopped, but then I started

13 getting voice messages.

14        MS. KELLY:  Your Honor, I would ask, we seek to move

15 into evidence and seek permission to publish to the jury

16 Exhibits 81 and 82.

17        THE COURT:  All right.  Do you have any objection,

18 Mr. Haas?

19        THE DEFENDANT:  No, your Honor.

20        THE COURT:  All right.  81 and 82 are allowed.

21    (Government Exhibits 81 and 82 received in evidence.)

22 BY MS. KELLY:

23 Q.  Officer Kostuchowski, I've displayed for you what we've

24 marked as Government Exhibit 81.  Can you identify this

25 exhibit?

Kostuchowski - direct

208

1   A.   It's a photo of my cell phone.

2   Q.   Is there a phone number identified on the first page of

3   this exhibit?

4   A.   Yes, there is.

5   Q.   Whose phone number is that?

6   A.   It's Robert Haas' phone number.

7   Q.   Is this a screenshot of a log of calls from the Haas

8   phone?

9   A.   From my phone.

10  Q.   When did you take these -- or did you take these

11  screenshots?

12  A.   They were taken in July of 2020.

13  Q.   I'm going to turn to Page 3 of this exhibit.  Do you see

14  an entry for a call on May 9th?

15  A.   Yes.

16  Q.   Is that referring to May 9th, 2019?

17  A.   Yes, it is.

18  Q.   Was there a missed call on May 9th, 2019?

19  A.   Yes.

20  Q.   What's a missed call, to your understanding?

21  A.   It wasn't picked up.

22  Q.   Did you receive a call from Mr. Haas on May 10th, 2019?

23  A.   Yes.

24  Q.   What does the screenshot say about that call?

25  A.   It says, "auto-rejected."

Kostuchowski - direct

209

1    Q.   What does "auto-rejected call" mean to you?

2    A.   When a person's blocked, it goes directly to voicemail, so

3    it auto-rejects the call, but you're able to leave a message.

4    Q.   Did Mr. Haas leave voicemail messages on your phone?

5    A.   Yes, he did.

6    Q.   Were you able to identify the phone number that the caller

7    used to leave the voicemail messages?

8    A.   Yes, I was.

9    Q.   I've now placed on your screen Government Exhibit 82.  Can

10   you identify this document?

11   A.   Yes.  It's a screenshot of the voicemails that were left

12   on my phone.

13   Q.   Did you take this screenshot?

14   A.   Yes.

15   Q.   About when did you take it?

16   A.   July 2020.

17   Q.   How did you identify Mr. Haas as the person who called and

18   left the voicemails?

19   A.   From the phone number for one and the voice itself.

20   Q.   How many voicemail messages did Mr. Haas leave on your

21   phone?

22   A.   There were seven.

23   Q.   Did you keep all of them, or did you delete any of them?

24   A.   The first two that I got, I deleted without even listening

25   to them.  I didn't want to hear any more of what he had to

Kostuchowski - direct

210

1    say.

2    Q.   How many messages did you save, if any?

3    A.   Five messages.

4    Q.   Did you listen to the messages that you saved?

5    A.   Yes, I did.

6    Q.   When did you listen to them?

7    A.   After they were left.

8    Q.   Does the screenshot identified as Government Exhibit 82

9    identify the messages that you saved, the voicemail messages?

10   A.   Yes, it does.

11   Q.   And you testified that you listened to the five voicemail

12   messages that you saved?

13   A.   Yes, ma'am.

14   Q.   Are those voicemail messages identified as Government

15   Exhibits 83 through 87?

16   A.   Yes, ma'am.

17           MS. KELLY:   Your Honor, I'd move for admission and

18   seek permission to publish Government Exhibits 83 through 87.

19           THE COURT:   All right.   Any objection other than the

20   prior ones, Mr. Haas?

21           THE DEFENDANT:   No, your Honor.

22           THE COURT:   83 to 87 are allowed.

23      (Government Exhibits 83 through 87 received in evidence.)

24   BY MS. KELLY:

25   Q.   Officer Kostuchowski, when did you receive the first

Kostuchowski - direct

211

1    voicemail message from Mr. Haas that you saved on your phone?

2    A.   Saturday, May 11th, 9:52 p.m.

3    Q.   Is that the bottom entry that's identified in the

4    screenshot marked as Exhibit 82?

5    A.   Yes, it is.

6    Q.   I'm now going to play what's marked as Government Exhibit

7    83.   And Officer Kostuchowski, is this the voicemail message

8    that you received on May 11, 2019, at about 9:52 p.m.?

9    A.   Yes.

10        (Government Exhibit 83 played in open court.)

11   BY MS. KELLY:

12   Q.   Officer Kostuchowski, what did you think that Mr. Haas was

13   telling you in this voicemail?

14   A.   That he was going to shoot me.

15   Q.   How did it make you feel?

16   A.   I was worried for my safety.

17        MS. KELLY:   I'm now going to play what's marked as

18   Government Exhibit 84.

19        (Government Exhibit 84 played in open court.)

20   BY MS. KELLY:

21   Q.   Officer Kostuchowski, when did Mr. Haas leave the

22   voicemail message that's identified as Exhibit 84?

23   A.   May 11th, 10:06 p.m., 2019.

24        MS. KELLY:   I'm now going to play Government Exhibit

25   85.

Kostuchowski - direct

212

 1           (Government Exhibit 85 played in open court.)

 2    BY MS. KELLY:

 3    Q.   Is Exhibit 85 another voicemail message that you received

 4    from Mr. Haas?

 5    A.   Yes, it is.

 6    Q.   When did Mr. Haas leave that voicemail message?

 7    A.   Sunday, May 12th, 1:19 p.m., in 2019.

 8           MS. KELLY:  I'm playing Government Exhibit 86.

 9          (Government Exhibit 86 played in open court.)

10    BY MS. KELLY:

11    Q.   Could you identify what we just played as Government

12    Exhibit 86?

13    A.   It's a voice message left by Mr. Haas.

14    Q.   When did Mr. Haas leave you this voicemail message?

15    A.   Monday, May 13th, 7:05 a.m.

16           MS. KELLY:  Now playing Government Exhibit 87.

17          (Government Exhibit 87 played in open court.)

18    BY MS. KELLY:

19    Q.   Officer Kostuchowski, can you identify this recording?

20    A.   Yes.  That's another recording left from -- by Mr. Haas on

21    my phone.

22    Q.   When did Mr. Haas leave you this voicemail message?

23    A.   Tuesday, May 14th, 9:31 p.m.

24    Q.   When you received the voicemail messages from Mr. Haas,

25    were you located in the Northern District of Illinois?

Kostuchowski - direct

213

1    A.   Yes, I was.

2    Q.   Did you return any of Mr. Haas' phone calls?

3    A.   No, I did not.

4    Q.   Did the communications from him disturb you?

5    A.   Yes, they did.

6    Q.   Did you fear for your safety or the safety of anyone close

7    to you?

8    A.   Yes.

9    Q.   Did you speak to anyone about those concerns?

10   A.   I talked to my family, and I gave a description of

11   Mr. Haas' car and Mr. Haas and told them if they saw the car

12   around their house that they should call the police.

13   Q.   Did you speak to anyone in your neighborhood?

14   A.   I also spoke with the neighbor across the street, gave the

15   same description of the car and Mr. Haas and told him that if

16   he sees the car around the house that he should call me.

17   Q.   Did you have any further interaction with Mr. Haas after

18   he left the voicemail messages?

19   A.   One more -- one other time afterwards.

20   Q.   Did you ever see him again?

21   A.   Once.

22   Q.   When?

23   A.   When he was being arrested.

24   Q.   When was Mr. Haas arrested?

25   A.   June 11th, 2019.

Kostuchowski - direct

214

1   Q.   Do you know why he was arrested?

2   A.   He was arrested for threatening to kill me.

3   Q.   Where did the arrest take place?

4   A.   Ottawa, Illinois.

5   Q.   Did you travel to Ottawa for the arrest?

6   A.   Yes, I did.

7   Q.   Why did you do that?

8   A.   My job was to keep an eye on the door to his home and to

9   identify him when he comes out so that he could be arrested.

10  Q.   Did you call Mr. Haas on the day of his arrest?

11  A.   Yes, I did.

12  Q.   Why did you call him?

13  A.   Trying to get him out of the house so the arrest could be

14  made safely.

15  Q.   Why did you want him to go outside?

16  A.   We can -- we can't control the inside of his home.  And

17  also we knew he had a dog inside the house, and we didn't want

18  to have to hurt the dog.  We wanted to make the arrest as

19  safely as possible, and bringing him outside, you can control

20  the area at least and see what he has on him when he's

21  outside.

22  Q.   When you placed the call -- how many calls did you place

23  to Mr. Haas on the date of the arrest, to your recollection?

24  A.   Two.

25  Q.   Did you speak to him?

1   A.   No.

2   Q.   Did Mr. Haas eventually go outside?

3   A.   Yes.

4   Q.   Did Mr. Haas see you at the scene of his arrest?

5   A.   Yes, he did.

6   Q.   Did you observe his reaction?

7   A.   Yes.

8   Q.   What was his reaction?

9   A.   He seemed to be upset that I was there.

10  Q.   Did he say anything to you?

11  A.   He said to "get my dog away from that faggot."

12  Q.   What happened with Mr. Haas' dog?

13  A.   When Mr. Haas was arrested, he was walking his pit bull.

14  And when he was being handcuffed, an officer was standing

15  holding the leash of his pit bull next to -- next to Mr. Haas.

16  I was worried that the pit bull may not take it well that his

17  master is being handcuffed, so I took the leash from the

18  officer.  And it was also a very hot day out, and it was in

19  the sun.  So I took the leash from the officer, and I took his

20  dog about three businesses away from where he was being

21  handcuffed, and I sat on a bench in the shade with the dog.

22  Q.   What happened to the dog?

23  A.   A business owner agreed to take the dog because he said he

24  knew Mr. Haas and he also knew the dog, and he said that the

25  dog was a good dog.

Kostuchowski - direct

216

1  Q. Did you physically touch Mr. Haas on the date of his

2  arrest?

3  A. No, I did not.

4  Q. Did you go inside of the building where he lived?

5  A. No, I did not.

6  Q. Did you talk to any of Mr. Haas' neighbors?

7  A. No, I did not.

8  Q. Were Mr. Haas' text messages and voicemail messages

9  welcome?

10  A. No, they were not.

11  Q. Did you encourage Mr. Haas in any way to send you text

12  messages or leave you voicemail messages?

13  A. No.

14  Q. Were you required to take time away from the performance

15  of your other official duties to address Mr. Haas' behavior

16  towards you?

17  A. Yes, I was.

18  Q. Can you describe how his conduct impacted the performance

19  of your other duties?

20  A. I had to take time away from other investigations in order

21  to write reports, speak with the Assistant U.S. Attorney in

22  regards to the case, not to mention prepping and whatnot for

23  the trial itself.

24  Q. Did you have any contact with Mr. Haas whatsoever outside

25  the performance of your official duties as an FBI task force

1  officer?

2  A.  No, I did not.

3  Q.  Did you have any personal animosity towards Mr. Haas?

4  A.  No.

5  Q.  What were you hoping to accomplish through your

6  investigation of the complaint made by the Simon Wiesenthal

7  Center?

8  A.  I was hoping to assess whether Mr. Haas was a threat to

9  the general public or to himself.

10          MS. KELLY:  No further questions at this time.

11          THE COURT:  All right.  Cross-examination?

12          THE DEFENDANT:  Thank you, your Honor.

13                     CROSS-EXAMINATION

14  BY THE DEFENDANT:

15  Q.  Can you tell me what is a true threat?

16          MS. KELLY:  Objection, your Honor.  Calls for a legal

17  conclusion.

18          THE COURT:  Sustained.  Mr. Haas, I will give a

19  definition of a true threat to the jury at the end of the

20  trial.  So the agent's belief as to what it is is not

21  governing in this case.

22          THE DEFENDANT:  Okay.  Well, I'd like to read this:

23  "In affirming the inarguable principle" --

24          THE COURT:  Mr. Haas, I believe you're about to read

25  from a -- from a case or a legal treatise and this --

1          THE DEFENDANT:  This is a Supreme Court decision.

2          THE COURT:  And if I may interrupt, now is not the

3    time to deliver argument about the law.  We will have a jury

4    instructions conference during -- outside the presence of the

5    jury, and then I will tell the jury what law applies in this

6    case.  So please refrain from reading into the record any

7    citation from any case.

8          THE DEFENDANT:  Well, your Honor, I'd like to

9    understand what he believes is protected speech and what he

10   believes is not protected speech and who governs his decisions

11   on what is and what isn't.

12         THE COURT:  All right.  And that particular -- at

13   least, that is a factual question, but it is not relevant.  So

14   please move on to another line of questioning.

15         THE DEFENDANT:  So these guys can just make their own

16   choices about who they can investigate and why on their own

17   discretion at any time and go put their knee in someone's neck

18   because they don't like what they're saying --

19         THE COURT:  All right.  Mr. Haas, let's -- we have

20   discussed this particular point.  It's terminated.  Now move

21   on to another line of questioning.

22   BY THE DEFENDANT:

23   Q.   Okay.  Have you ever read the Jewish Talmud?

24   A.   No.

25   Q.   So me talking about it, you have no clue what I'm actually

1 speaking about when I speak about the Talmud?

2 A.  I looked up the Talmud online prior to interviewing you.

3 I don't remember you speaking of the Talmud other than saying

4 the word "Talmud," that I should read it.

5 Q.  Extermination of the Christians is a necessary

6 sacrifice --

7 THE COURT:  Mr. Haas, again, this is not the time for

8 you to testify either.  So you're posing questions to

9 Mr. Kostuchowski, so please go ahead and do that.

10 THE DEFENDANT:  Well, I'm trying to elicit some

11 information for the jury to deliberate properly on this case

12 what the actual circumstances of these matters are.  I feel I

13 was defending myself against attack by --

14 THE COURT:  Mr. Haas, we have had pretrial

15 discussions about the particular matter that you're referring

16 to.  I have made a decision on that.  And in any event, this

17 way of introducing evidence is improper.

18 So you can put questions to Mr. Kostuchowski.  You

19 too will have an opportunity to testify if you so choose,

20 which is completely up to you.  But reading from that text at

21 this point is prohibited, so please move on from that question

22 as well.

23 BY THE DEFENDANT:

24 Q.  Okay.  Do you expect the jury to believe I agreed to a

25 meeting, or was it a seizure?

1    MS. KELLY:  Objection, your Honor.  The question is

2  argumentative and calls for a legal conclusion.

3    THE COURT:  Well, it is argumentative.  Mr. Haas,

4  just go ahead and repose the question.  Scrub out that first

5  part about, "Do you expect the jury to believe," and then just

6  ask Mr. Kostuchowski factual questions.

7  BY THE DEFENDANT:

8  Q.  Did I agree to the meeting, or did you tell me, "You don't

9  have a choice"?

10  A.  You agreed to the meeting.

11    THE DEFENDANT:  Could we -- could we play that video

12  again, the first video when he came to the job site, your

13  Honor, and see if it looks like I agreed to this meeting --

14    THE COURT:  All right.  One second.

15    THE DEFENDANT:  -- voluntarily?

16    THE COURT:  So you're asking for Government Exhibit

17  76, I believe, to be --

18    THE DEFENDANT:  Yes, sir.

19    THE COURT:  -- played?

20    THE DEFENDANT:  Yes, sir.

21    THE COURT:  Okay.  So I am going to ask the

22  government to do that.

23    Ladies and gentlemen, because of the safety concerns,

24  the health safety concerns that we have in this trial, all the

25  exhibits are obviously being published in a way that is

Kostuchowski - cross

221

1   digital format.  We're trying to reduce your contact with

2   paper and so on.

3            THE DEFENDANT:  Your Honor, I'd like to point

4   something out to the jury, also.  Make a note that when he --

5            THE COURT:  Mr. Haas, you cannot directly address the

6   jury at this point.

7            THE DEFENDANT:  Okay.

8            THE COURT:  You had your opening statement.  You'll

9   have a closing argument just as the government will.  And just

10  as the government can't address the jury, you cannot either at

11  this point.

12           THE DEFENDANT:  Yes, sir.

13           THE COURT:  All right.  So the defendant did prepare

14  some exhibits, and we went through some effort with the help

15  of standby counsel as well and the Court to turn them into

16  digital exhibits.  Some of them overlap with the government

17  exhibits.

18           And obviously, because Mr. Haas does not have the

19  computer to display, I am going to from time to time ask the

20  government to display certain exhibits.  And that's all

21  they're doing.  They're just following my instruction to

22  display the exhibits at different times.  So this happens to

23  be one of them.

24           So I am going to ask the government, since it's not

25  terribly long, to just go ahead and replay all of Government

1    Exhibit 76 at the defendant's request.

2          And one second.  I'm going to publish it to the jury.

3    Okay.

4        (Government Exhibit 76 played in open court.)

5          THE COURT:  One moment.  Could you pause it.

6          Ms. Reihl?

7          JUROR REIHL:  Your Honor, is there any way to enhance

8    or increase the volume of the witness' voice in the video?

9          THE COURT:  So I can try to turn up the room volume

10   some more.  I think -- have you maxed out your volume?

11         MS. KELLY:  That's a good question.  Do I know how to

12   figure that out, that's the second question.

13         THE COURT:  Okay.  I'm going to turn that off for a

14   minute while you --

15         MS. KELLY:  I think I have to exit all of this to try

16   to deal with the volume.

17         THE COURT:  There are certain limits to the room

18   volume because then the feedback, you heard that little bit of

19   ringing.  So I think I'm at the max for that, but I appreciate

20   you asking.

21         MS. KELLY:  Not easily.  I could exit and -- exit the

22   program and up it on the computer.

23         THE COURT:  Would it take long to reenter the

24   program?

25         MS. KELLY:  Barry?  No, it shouldn't take long.

Kostuchowski - cross

223

1          THE COURT:  Yes, so if you can give that a try.

2          MS. KELLY:  So I was about 100 percent.

3          THE COURT:  All right.  That's the best we can do,

4     I'm afraid.

5          JUROR REIHL:  Thank you, your Honor.

6          THE COURT:  You will have an opportunity when you

7     deliberate to obviously have access to all of the exhibits.

8     There's a computer set up.  You might have already seen it.

9     And I'll describe how to do that.  And maybe you'll be able to

10    play it in a way that you can hear more.

11         So let's go back to Government Exhibit 76 and resume

12    from where you were at.

13         MS. KELLY:  I believe I'll have to start it over if

14    you don't mind, your Honor.

15         THE COURT:  That's fine.

16       (Government Exhibit 76 played in open court.)

17         THE COURT:  All right.  Next question?

18    BY THE DEFENDANT:

19    Q.  Do you expect Americans to be calm or angry when you make

20    an illegal seizure against their First Amendment protected

21    speech?

22         MS. KELLY:  Objection, your Honor.

23         THE COURT:  Sustained.

24    BY THE DEFENDANT:

25    Q.  Why did you tell me you came to the job site when I asked

Kostuchowski - cross

224

1   what you're doing here?

2   A.   That there was a complaint against you.

3        THE DEFENDANT:   This woman here just asked to turn up

4   the volume so she could hear that.   I'd like to make a note

5   that he said, "Let's just be friends."   He never said why he

6   was there, and he never showed me any --

7        THE COURT:   Okay.   Mr. Haas, it's -- again, this is

8   not the time to make a note or testify.   You will have an

9   opportunity to do so if you so choose.   So ask another

10  question, please.

11  BY THE DEFENDANT:

12  Q.   Did you show me credentials?

13  A.   Yes, I did.

14  Q.   Can we play the first 30 seconds of that video?

15       THE COURT:   It's now been played twice.   So you can

16  present argument at the end of the case on what you believe

17  the exhibits showed and you --

18       THE DEFENDANT:   Your Honor --

19       THE COURT:   One second.   Mr. Haas, one second.   Just

20  to make a clean record, only one of us can talk at a time.   So

21  let me just finish.

22       Also, during your testimony, I'll allow you to play

23  76 one more time.   Next question.

24       THE DEFENDANT:   Your Honor, what is the penalty for

25  perjury?

Kostuchowski - cross

225

1          THE COURT:  I'm --

2          THE DEFENDANT:  He's --

3          THE COURT:  Mr. Haas --

4          THE DEFENDANT:  The video shows him not --

5          THE COURT:  Mr. Haas, please stop.

6          THE DEFENDANT:  -- showing ID or saying why he is

7    there.

8          THE COURT:  Mr. Haas, let's go to sidebar.  Please

9    put on your headset.

10        (Proceedings heard at sidebar:)

11         THE COURT:  All right.  A sound check.  Ms. Kelly?

12   Mr. Jonas?  Mr. Haas?  And Ms. Singer?

13         Okay.  All right.  Mr. Haas, asking questions of the

14   Court is clearly impermissible when you're asking what the

15   penalty of perjury is for a witness.  It's clearly

16   argumentative.  I understand you're not a lawyer, but you well

17   know that that type of question is impermissible.

18         I want you to get through this cross-examination.

19   You made a couple of good factual points.  All right.  So

20   focus on that rather than coming off the rails and asking

21   questions in front of the jury about penalties of perjury.

22   All right.  You are smart enough to know that that was clearly

23   impermissible.  So move on from this line of questioning or I

24   will terminate the cross-examination.  I do not want to do

25   that.

Kostuchowski - cross

1        THE DEFENDANT:  I'm sorry, your Honor.  I did not

2   know that that was wrong to do.  And I'd like to know what his

3   punishment is going to be for perjuring himself and lying.

4   There's video evidence.  Right now, you just saw it.  He did

5   not show me identification or state why he was there.  He

6   said, "Let's just be friends" and never showed me any

7   identification.  That is him approaching me at the job site.

8        THE COURT:  Mr. Haas --

9        THE DEFENDANT:  That never happened.

10        THE COURT:  One moment.  So you will be able to make

11   those kinds of factual arguments, as I said, during your

12   closing argument.  I discredit, that is another way of saying

13   I do not believe you when you say that you did not know it was

14   improper to ask me in front of the jury what the penalty for

15   perjury is and to just outright argue to the jury during

16   cross-examination that the witness is committing perjury.  I

17   do not believe you.  So take the warning to heart to focus on

18   factual questions posed to the witness, or I will terminate

19   this cross-examination.

20        All right.  The sidebar is adjourned, and we will

21   resume questioning.

22      (Proceedings heard in open court:)

23        THE COURT:  Okay.  You may resume as we discussed.

24   BY THE DEFENDANT:

25   Q.  At the job site, I had told you white people have no

Kostuchowski - cross

227

1  business in that desert.  And you told me, Palestinians'

2  passports, what do Palestinians' passports say.  Why would you

3  say that at that juncture?

4  A.  I wanted to know whether you knew that Palestinians

5  carried Israeli passports.

6  Q.  When you arrived at the job site, you stated that I said,

7  "I'm not talking to no FBI faggots."  Was that in the video

8  just now?

9  A.  That was not in the video.

10  Q.  But that was when you first walked up and approached me at

11  the job site, correct?

12  A.  No.  This isn't the whole -- a video from the time that I

13  pulled up.

14  Q.  Can you tell me, who counted the calls and the texts on

15  your phone?

16  A.  No, not really, I can't.  I didn't count them.

17  Q.  There's three different references of numbers of calls and

18  texts on the phone.  And the first one states that it was 194

19  calls --

20        MS. KELLY:  Your Honor, objection.

21        THE COURT:  Mr. Haas, this is not a proper form of a

22  question nor likely the proper witness given what he just

23  testified to in terms of the not knowing who counted the calls

24  and texts.  You might be able to craft a question to him about

25  the number of calls and texts, but that's not the way to do

1    it.

2                THE DEFENDANT:  Okay.  I understand, your Honor.

3    BY THE DEFENDANT:

4    Q.  At the job site, me and you were bickering back and forth,

5    and you told me, "You're just a keyboard warrior.  You're all

6    talk.  You'll never do anything."  And I said, "Take off your

7    gun and badge."

8                Is that professional FBI behavior to say something

9    like that in a situation where someone is aggravated?

10               MS. KELLY:  Your Honor, I'm objecting to the question

11   in part that it's overly compound.

12               THE COURT:  Why don't you ask him about the

13   factual -- those factual premises first, all right, what was

14   said back and forth.  So go ahead and do that first, and then

15   we'll see what questions you can ask from that.

16   BY THE DEFENDANT:

17   Q.  At the job site, do you recall saying, "You're all talk,

18   you're just a keyboard warrior, you'll never do anything," and

19   me replying, "Take off the gun and badge?

20   A.  No, sir.  I don't remember you saying that.

21   Q.  But you do remember saying it on the phone half an hour

22   later?

23   A.  That's when it occurred.

24   Q.  When I said, "Call me private some more" in the voicemail,

25   why would I say that to you?

Kostuchowski - cross

229

1    A.  I have no idea.

2    Q.  It wasn't because I believed that I got four private phone

3    calls two seconds before you called my phone?

4              MS. KELLY:  Objection, your Honor.

5              THE COURT:  Sustained.  He already gave an answer.

6    You will have an opportunity to testify.

7    BY THE DEFENDANT:

8    Q.  Okay.  Were you being coached or reading from notes today?

9    A.  No.

10   Q.  So you remembered all those dates and times off the top of

11   your head just now, and you didn't meet the prosecutor a few

12   days ago to be --

13             MS. KELLY:  Objection, your Honor.

14             THE COURT:  Okay.  So the back half of that question,

15   "Have you met with government attorneys to prepare for

16   testimony?"

17             THE WITNESS:  Yes, I did.

18             THE COURT:  All right.  Now, before you ask your next

19   question, ladies and gentlemen, it is proper under the law for

20   an attorney to interview and meet with witnesses in advance of

21   trial.

22             All right.  You can ask your next question.

23   BY THE DEFENDANT:

24   Q.  When you came to arrest me, can you tell me what day that

25   was?

1    A.   It was the 11th of June.

2    Q.   On the 11th of June when you guys jumped out of your truck

3    and ran up to me, Vic Lombardo screamed, "Camera, camera,

4    camera, someone's filming, camera, camera."  Can --

5             MS. KELLY:  Your Honor --

6             THE DEFENDANT:  -- you tell me why he would say

7    something like that?

8             THE COURT:  All right.  Mr. Haas, that was compound.

9    Compound means that there are multiple parts to the question.

10   So especially in cross-examination, it makes it very difficult

11   to deliver an answer that has meaning.  Okay.  So try to break

12   up the factual pieces first one at a time.  Go ahead.

13   BY THE DEFENDANT:

14   Q.   Can you tell me why your supervisor would yell, "Camera,

15   camera, camera, someone's filming, camera, camera," when my

16   neighbor pulled out a camera when you guys were surrounding me

17   with my dog on the street?

18   A.   I can't tell you why somebody else would do something.

19   Q.   When you took the dog from me, you walked over and sat

20   down on my neighbor's bench in front of his shop, the person

21   who took the dog, and you smiled at me while you were petting

22   my dog.  Why would you do that?

23   A.   I was feeling happy at the time.

24            THE DEFENDANT:  No further questions, your Honor.

25            THE COURT:  Okay.  Any redirect?

1    MS. KELLY:  Yes, your Honor.

2                    REDIRECT EXAMINATION

3    BY MS. KELLY:

4    Q.  Officer Kostuchowski, could you remind the jury

5    approximately how long your interview with Mr. Haas was on May

6    8th, 2019?

7    A.  It was about 20 minutes.

8    Q.  Did the two video clips that we played as Government

9    Exhibits 76 and 78 appear to you to record the entirety of

10   your interview?

11   A.  No, it did not.

12   Q.  And did you testify on direct examination about some

13   additional interactions you had with Mr. Haas that were not

14   displayed in those two video recordings?

15   A.  Yes, I did.

16                   MS. KELLY:  No further questions.

17                   THE COURT:  All right.  Any recross based on that?

18                   THE DEFENDANT:  No.  There's no way for me to prove

19   he's lying.

20                   THE COURT:  Okay.  Then you are excused, but hold on

21   one minute because we've come to the lunch break anyway, and

22   I'm going to let the jury out first.

23                   All right.  Ladies and gentlemen, let's take a lunch.

24   Given again the logistics, we'll go longer than an hour, to

25   1:15 is when we'll resume testimony.  We do have a lunch

1  spread for you that should be waiting for you in the jury

2  room.

3      Because I'm not going to see you for an entire hour

4  and 15 minutes, let me remind you:  Do no research into the

5  case, not the facts, not the law, not the parties.  Don't

6  communicate about the case, not amongst yourselves and not

7  with anyone else.  And if you happen to need to leave the

8  floor for any reason, remember to take that north bank of

9  elevators.  And the case participants are going to still keep

10 ignoring you if they encounter you.  All right.  I'll see you

11 at 1:15.

12      All rise.

13    (Proceedings heard in open court.  Jury out.)

14      THE COURT:  Okay.  Mr. Kostuchowski, before you leave

15 can you first -- I'm going to ask you to do a couple -- not

16 that quite yet.  If you can -- this part doesn't have to be on

17 the record.

18      Do you have anything else for the record?

19      MS. KELLY:  I do.

20    (Witness excused.)

21      THE COURT:  Okay.  You can be seated.

22      All right.  What have you got for the record?

23      MS. KELLY:  Your Honor, we object to the commentary

24 by Mr. Haas that witnesses are lying.  At the tail end of

25 Officer Kostuchowski's examination, Mr. Haas said to the

1    effect, "I can't prove he's lying."  We feel it's an improper

2    statement to be made in front of the presence of the jury, and

3    we'd ask that it stop.

4            THE COURT:  Yes.  Mr. Haas, as I instructed you

5    before trial, during trial, at that sidebar that we had, you

6    cannot make commentary like that in the presence of the jury,

7    and you well know it.  You are smart enough to know that.  So

8    you need to stop that, or I will terminate your

9    cross-examinations sooner.

10           And I don't want to do this either, but if you start

11   to testify and it goes off the rails like that, then I will

12   terminate your own direct examination.  Do you understand?

13           THE DEFENDANT:  Yes, sir.

14           THE COURT:  Anything else?

15           MS. KELLY:  No, your Honor.

16           THE COURT:  All right.  I'll see you at 1:15.

17        (Recess from 12:09 p.m. to 1:15 p.m.)

18

19

20

21

22

23

24

25

234

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3    UNITED STATES OF AMERICA,        )
                                       )
 4                   Plaintiff,        )
                                       )
 5                   v.                )  No. 19 CR 00486
                                       )
 6    ROBERT ANTHONY HAAS,             )  Chicago, Illinois
                                       )  August 4, 2020
 7                   Defendant.        )  1:19 p.m.

 8
                         TRANSCRIPT OF PROCEEDINGS
 9
             BEFORE THE HONORABLE EDMOND E. CHANG, and a Jury
10
      APPEARANCES:
11
      For the Plaintiff:           HON. JOHN R. LAUSCH, JR.
12                                 United States Attorney
                                   BY:  MS. ERIN E. KELLY
13                                      MR. BARRY JONAS
                                   Assistant United States Attorneys
14                                 219 South Dearborn Street, Suite 500
                                   Chicago, Illinois 60604
15                                 (312) 353-5300

16    For the Defendant:           MR. ROBERT ANTHONY HAAS,
                                   Pro se;
17
      For the Defendant as         BEDI & SINGER, LLP
18    standby counsel:             BY:  MS. DENA M. SINGER
                                   53 West Jackson Boulevard
19                                 Suite 1505
                                   Chicago, Illinois 60604
20                                 (312) 525-2017

21

22    Court Reporter:             Judith A. Walsh, CSR, RDR, F/CRR
                                   Official Court Reporter
23                                 219 South Dearborn Street, Room 2118
                                   Chicago, Illinois 60604
24                                 (312) 702-8865
                                   judith_walsh@ilnd.uscourts.gov
25
```

Mullen - direct

235

1          (Proceedings heard in open court.  Jury in.)

2              THE COURT:  Please be seated.

3              Okay.  Welcome back from lunch, ladies and gentlemen.

4    We are ready to resume the case.

5              The government may call its next witness.

6              MS. KELLY:  Your Honor, we call Richard Mullen.

7              THE COURT:  Okay.  Mr. Mullen, you can stay seated

8    but please do face me, raise your right hand.

9          (Witness sworn.)

10             THE WITNESS:  I do.

11             THE COURT:  All right.  Now, if you can remove your

12   mask, please.

13             Okay.  Ms. Kelly?

14              RICHARD MULLEN, GOVERNMENT'S WITNESS, SWORN

15                         DIRECT EXAMINATION

16   BY MS. KELLY:

17   Q.  Good afternoon.

18   A.  Good afternoon.

19   Q.  Could you please state your name for the record, spelling

20   your last name?

21   A.  Sure.  It's Richard Mullen, M-u-l-l-e-n.

22   Q.  Are you currently employed?

23   A.  Yes.

24   Q.  Where do you work?

25   A.  Illinois State Police.

Mullen - direct

236

1   Q.   When did you join the Illinois State Police Department?

2   A.   2000.

3   Q.   So about 20 years ago?

4   A.   About 20 years.

5   Q.   What is your current job title or rank?

6   A.   I am a sergeant on patrol.

7   Q.   When did you become a patrol sergeant?

8   A.   In 2013.

9   Q.   Could you describe for the jury your job responsibilities?

10  A.   Sure.  As a patrol officer, I'd be responsible for what

11  anyone would consider standard patrol duties which would be

12  traffic enforcement, making arrests, preliminary criminal

13  investigations as necessary, handling crashes, responding to

14  calls of service, things like that.

15       As a sergeant specifically, I'd also have the added

16  task of being a field supervisor, handling administrative

17  duties as necessary, things like that.

18  Q.   Do you know of a person by the name Robert Haas?

19  A.   Yes.

20  Q.   How did you become familiar with the name Robert Haas?

21  A.   I was asked to give aid to an FBI unit last year.

22  Essentially, my role was to be a transport officer as they

23  would be in Ottawa executing an arrest warrant.

24  Q.   What was the date of Mr. Haas' arrest?

25  A.   I believe it was June 11th, 2019.

Mullen - direct

237

1   Q.   Where was the location of Mr. Haas' arrest?

2   A.   It was in Ottawa, Illinois.

3   Q.   After Mr. Haas was taken into custody, did someone escort

4   him to your Illinois State police vehicle?

5   A.   Yes.

6   Q.   Where was Mr. Haas seated inside the vehicle during the

7   transport?

8   A.   He was seated in the rear seat area.  It's a Ford

9   Explorer, the rear seat area of the vehicle.  There is a

10  transport cage in the vehicle between the driver, which was

11  me, and the back seat, which is where he was at.  He was

12  seated on the rear passenger side.

13  Q.   You mentioned that you picked Mr. Haas up in Ottawa,

14  Illinois.  Where did you drive him to, what city?

15  A.   Chicago.

16  Q.   Approximately how long was the drive from Ottawa to

17  Chicago that day?

18  A.   Approximately two hours.

19  Q.   Did your Illinois State police vehicle have video and

20  audio recording devices?

21  A.   Yes, it did.

22  Q.   Can you describe -- let's start with the video device.

23  A.   Sure.

24  Q.   Could you describe the video device?

25  A.   The video in the squad car is like any other normal dash

1  camera that would be on most squad cars anymore.  It's mounted

2  to the windshield.  It can capture video to the front of the

3  car, but it can also capture video on the inside of the car as

4  well.

5  Q.  Did your Illinois State police vehicle have a microphone?

6  A.  Yes, it does.

7  Q.  Could you describe it?

8  A.  Sure.  It is a wireless microphone that is typically worn

9  on the officer so that when we're outside of the vehicle,

10  audio could be captured, or if we're inside the vehicle it

11  could be captured there as well.  As I said, it's a remote.

12  It's wireless.  It's something that we would normally wear on

13  our body.

14  Q.  During Mr. Haas' transport from Ottawa to Chicago, did you

15  place the microphone inside of your Illinois State police

16  vehicle?

17  A.  Yes.  It was in the vehicle.

18  Q.  Where did you place it?

19  A.  I took it out of the pouch which is normally worn on my

20  belt, and I placed it -- I kind of wedged it under the front

21  passenger seat headrest and the seat of the car where it would

22  stay put.

23  Q.  While Mr. Haas was being transported to Chicago, was the

24  microphone connected in any way to the dash camera?

25  A.  Yes.

Mullen - direct

239

1    Q.   How was it connected?

2    A.   It's a wireless connection.

3    Q.   Were the audio and video recording devices in normal

4    operating condition when you drove Mr. Haas from Ottawa to

5    Chicago?

6    A.   Yes.

7    Q.   And did they function properly during that drive?

8    A.   Yes.

9    Q.   When did you start audio recording Mr. Haas?

10   A.   The audio started before he was brought to my car, so the

11   entire duration that he was with me, there was audio.

12   Q.   When did you stop audio recording Mr. Haas?

13   A.   Once I arrived at -- once I arrived in Chicago at the

14   destination.

15   Q.   After you completed the drive to Chicago, did you make a

16   disk of the recording of Mr. Haas' transport?

17   A.   Yes.

18   Q.   Have you watched the recording of the transport from

19   Ottawa to Chicago?

20   A.   Yes.

21   Q.   Did you watch the whole recording?

22   A.   Yes.

23   Q.   Does the recording accurately depict what was seen and

24   heard during the drive?

25   A.   Yes, it does.

Mullen - direct

240

1    Q.   Have you also reviewed video clips identified as

2    Government exhibits?  And I'm going to go through one by --

3    batch by batch with you.

4    A.   Okay.

5    Q.   Identified as Government Exhibits, we'll start with, 5?

6    A.   Yes.

7    Q.   7 through 17?

8    A.   Yes.

9    Q.   20 through 22?

10   A.   Yes.

11   Q.   And 25 through 28?

12   A.   Yes.

13   Q.   Could you describe very generally what those exhibits are?

14   A.   They are brief video clips from the transport that day.

15   They also include the audio from those portions of the video

16   clip.

17   Q.   Before testifying, have you listened to the recordings of

18   the exhibits that I just mentioned?

19   A.   Yes.

20   Q.   And I believe you stated in your testimony that those

21   exhibits contain a recording of a portion of the transport,

22   correct?

23   A.   That's right.

24   Q.   Are you going to discuss in your testimony what occurred

25   during the entire 90-minute drive from Ottawa to Chicago?

Mullen - direct

241

1   A.   No.

2   Q.   Are you going to focus your testimony on what occurred

3   during a portion of that car ride?

4   A.   Yes.

5   Q.   Did Mr. Haas engage in conversation with you during that

6   approximate -- was it 90 minutes or two hours?

7   A.   It was probably closer to two hours.

8   Q.   Okay.  We'll go with two hours.  Did Mr. Haas engage in

9   conversation with you during the approximate two-hour drive?

10  A.   Yes, he did.

11  Q.   Approximately what percentage of the time do you believe

12  he was speaking with you?

13  A.   I would say he's probably talking close to 90 percent,

14  somewhere between 80 and 90 percent of the ride.

15  Q.   Did you have any opportunity to observe Mr. Haas' demeanor

16  during that drive?

17  A.   Yes.

18  Q.   What, if anything, did you notice?

19  A.   Well, I could observe -- obviously, I could hear his

20  voice.  I could observe him through the rearview mirror as we

21  were driving.  His demeanor towards me was generally polite

22  and cooperative but as he would talk about, well, Joe

23  Kostuchowski, he was very agitated, some times more than

24  others, disgusted through those portions of the conversation.

25  Q.   Have you also reviewed transcripts of the video clips that

Mullen - direct

242

1   you intend to discuss in your testimony?

2   A.  Yes.

3   Q.  Did you read along from the transcripts as you listened to

4   the video clips that you intend to discuss in your testimony?

5   A.  Yes.

6   Q.  Do the transcriptions accurately reflect your conversation

7   with Mr. Haas during the vehicle ride?

8   A.  Yes.

9   Q.  Are those transcripts identified as Exhibits 207 through

10  217, 220 through 222, and 225 through 228?

11  A.  Yes.

12          MS. KELLY:  Your Honor, at this point I would seek to

13  admit into evidence the video clips identified as Government

14  Exhibits 5, 7 through 17, 20 through 22, and 25 through 28.

15          THE COURT:  All right.  Any objection other than

16  previous objections?

17          THE DEFENDANT:  No, your Honor.

18          THE COURT:  All right.  Those are allowed.

19      (Government 5, 7 through 17, 20 through 22, and 25

20        through 28 received in evidence.)

21          MS. KELLY:  And I would seek permission to publish to

22  the jury the exhibits marked for identification, the

23  transcripts identified as 207 through 217, 220 through 222,

24  and 225 through 228.

25          THE COURT:  All right.  Any objection other than the

1    previous ones?

2            THE DEFENDANT:  No, your Honor.

3            THE COURT:  All right.  Those are allowed in as well.

4        (Government Exhibits 207 through 217, 220 through 222,

5         and 225 through 228 received in evidence.)

6    BY MS. KELLY:

7    Q.  Officer Mullen, were there some portions or words in the

8    recording of the transport that were difficult for you to

9    understand?

10   A.  Yes.

11   Q.  Are those portions identified in any way in the

12   transcript?

13   A.  Yes.

14   Q.  How?

15   A.  I believe they are identified with the letters "UI" for --

16   Q.  And what does UI mean to you?

17   A.  Unintelligible.

18   Q.  Did you give Mr. Haas any notice as to whether the

19   transport was being audio and video recorded?

20   A.  Yes.  Prior to Mr. Haas being placed in my vehicle, I had

21   a sign printed on an 8-1/2-by-11 sheet of paper.  I don't

22   remember verbatim exactly what it said, but it said,

23   "Attention, please know that the -- there may be audio and

24   video recording taking place during the transport."

25           MS. KELLY:  I'm now going to play what is marked as

Mullen - direct

244

1    Government Exhibit 5.

2         (Government Exhibit 5 played in open court.)

3    BY MS. KELLY:

4    Q.   Officer Mullen, what does this video clip show?

5    A.   That video shows me setting up the squad car, preparing

6    for the transport.  That is the sign that I was just referring

7    to that I placed in the squad that I wanted to show to the

8    camera just so everybody could see what it was specifically

9    printed on it and where it is that I placed it in the vehicle.

10   Q.   What did the sign say?

11   A.   It said, "Attention, the car is equipped with video and/or

12   audio recording devices.  You may be recorded during

13   transport."

14        MS. KELLY:  I'm now displaying on the left side of

15   the screen what I will play as Government Exhibit 7 and on the

16   right side of the screen as Government Exhibit 207.

17        I'm going to hit pause for a minute.  Is the volume

18   on this loud enough?  I don't know if everyone can hear it.

19        THE COURT:  Yes.  I think if you can try to increase

20   it, go ahead.  Or are you still at your maximum?

21        MS. KELLY:  I am at my maximum, I know.

22        THE COURT:  I've got it as high as I can go without

23   getting that feedback which will then drown out everything

24   else.

25        MS. KELLY:  Okay.  I'll start over.

Mullen - direct

245

BY MS. KELLY:

Q.  Officer Mullen, are you able to hear?

A.  Barely.

MR. JONAS:  Your Honor, can I just --

Your Honor, if there's a speaker, we can put the microphone by the speaker, and that may help with the audio.

THE COURT:  Let me see.

Go ahead and play it again.

(Pause.)

THE COURT:  Okay.  Judy, we can go off the record.

(Discussion off the record.)

THE COURT:  Okay.  You've heard the results.  That's the best we can do.

(Government Exhibit 7 played in open court.)

THE DEFENDANT:  Your Honor, I object.  That's obviously not what I was saying there.  Part of it was skipped or something happened there.  There was --

THE COURT:  All right.  I appreciate that.  You can cross-examine on that if you'd like.

BY MS. KELLY:

Q.  Officer Mullen, starting with the beginning, who is driving the vehicle in this clip?

A.  That's me.

Q.  Who is sitting in the back seat?

A.  Mr. Haas.

Mullen - direct

246

1          MS. KELLY:  Your Honor, at this point, I'd ask

2    whether Mr. Haas is amenable to stipulating that he is the

3    person riding in the seat of the vehicle.

4          THE COURT:  All right.  Do you agree to that?

5          THE DEFENDANT:  That is me.  Yes, sir.

6          THE COURT:  All right.  You can proceed.

7    BY MS. KELLY:

8    Q.  During the transport from Ottawa to Chicago, did Mr. Haas

9    identify the names of any FBI officers?

10   A.  Yes.

11   Q.  Who did he identify?

12   A.  Joe Kostuchowski.

13   Q.  At some point, did Mr. Haas mention Joe's last name to

14   you?

15   A.  He did.

16   Q.  Later in your testimony, are we going to play that clip

17   for the jury?

18   A.  Yes.

19   Q.  When Mr. Haas said to you in this clip, "I'll show

20   everyone who is all talk," what did you understand him to mean

21   by that statement?

22   A.  Well, the way I would interpret that statement was that

23   he's not just going to talk about things, he's going to take

24   action.  Whatever -- at this point in time, I didn't know a

25   lot about what was exactly going on but in this case, I took

Mullen - direct

247

1    it to mean that he was going to take action.

2            MS. KELLY:  I'm now going to play Government Exhibit

3    8, and that's on the left-hand side of the screen.  Government

4    Exhibit 208, the transcript, is on the right-hand side of the

5    screen for identification.

6        (Government Exhibit 8 played in open court.)

7    BY MS. KELLY:

8    Q.  Officer Mullen, who did you believe that Mr. Haas was

9    referring to in this clip?

10   A.  Joe Kostuchowski.

11           MS. KELLY:  I'm now going to play Government Exhibit

12   9, and the transcript marked as Government Exhibit 209 is

13   shown on the screen for identification.

14       (Government Exhibit 9 played in open court.)

15   BY MS. KELLY:

16   Q.  When Mr. Haas referred to "this guy who is having me

17   arrested," did you believe that Mr. Haas was referring to

18   anyone in particular?

19   A.  Yes.

20   Q.  Who?

21   A.  Joe Kostuchowski.

22           MS. KELLY:  Now I'm going to play Government Exhibit

23   10.  The transcript 210 is also shown on the screen for

24   identification.

25       (Government Exhibit 10 played in open court.)

1    BY MS. KELLY:

2    Q.  I'm going to pause that for a minute.  Did Mr. Haas say to

3    you:  "It's not going to be some Unabomber random bullshit.

4    I'm going to go get somebody, a real terrorist, and I'm going

5    to pop them right in the fucking forehead"?

6    A.  Yes.

7    Q.  What did you understand Mr. Haas to mean when he talked

8    about popping someone in the forehead?

9    A.  I understand that to mean he's going to shoot somebody in

10   the forehead with a gun.

11       (Government Exhibit 10 played in open court.)

12   BY MS. KELLY:

13   Q.  Did Mr. Haas tell you that he was on Russian social media?

14   A.  Yes.

15       THE DEFENDANT:  Excuse me, your Honor.  I object.

16   Every time that you can't understand what I'm saying is when

17   they say I made a threat.

18       THE COURT:  Again, Mr. Haas, you can address it on

19   cross-examination and ask about specific portions if you like.

20   Overruled.

21       MS. KELLY:  I'm now playing Government Exhibit 11.

22       (Government Exhibit 11 played in open court.)

23   BY MS. KELLY:

24   Q.  Officer Mullen, when Mr. Haas said, "He needs to die and

25   needs a .12-gauge to his throat," what did you understand that

1    Mr. Haas was talking about?

2    A.   I interpret that as he needs to have a .12-gauge shotgun

3    put under his head, the trigger pulled, and shoot his head

4    off.

5    Q.   And did you have any understanding as to who Mr. Haas was

6    talking about shooting?

7    A.   Yes.

8    Q.   Who?

9    A.   Joe Kostuchowski.

10        MS. KELLY:   Now playing Government Exhibit 12.

11        (Government Exhibit 12 played in open court.)

12   BY MS. KELLY:

13   Q.   In this clip, Officer Mullen, did you ask Mr. Haas whether

14   he was talking about Joe during the last clip we marked -- we

15   played that was marked as Government Exhibit 11?

16   A.   Yes.

17   Q.   And how did Mr. Haas respond to your question?

18   A.   He said that yes, he was talking about Joe.

19        MS. KELLY:   Now playing Government Exhibit 13.

20        (Government Exhibit 13 played in open court.)

21   BY MS. KELLY:

22   Q.   Did Mr. Haas describe in Government Exhibit 13 his views

23   regarding Jewish people and the U.S. government?

24   A.   Yes.

25        MS. KELLY:   Now playing Government Exhibit 14.

Mullen - direct

1       (Government Exhibit 14 played in open court.)

2  BY MS. KELLY:

3  Q.  Did Mr. Haas tell you that he is "98 percent certain that

4  Joe knows every single thing I'm telling you right now"?

5  A.  Yes.

6  Q.  And did Mr. Haas say to you, "And he still supports it,

7  and if that's the case, he does need to die"?

8  A.  Yes.

9  Q.  When Mr. Haas made those statements to you, what did you

10  think he meant by them?

11  A.  The conversation prior to that was talking about the

12  Israelis blowing up the World Trade Center and other of

13  Mr. Haas' beliefs and that Joe Kostuchowski was protecting and

14  not arresting those people.  And if that was, in fact, the

15  case -- and that's what he's saying, he's 98 percent certain

16  that's what was going on, and if that's the case, he needs to

17  die.

18        MS. KELLY:  Now playing Government Exhibit 15.

19      (Government Exhibit 15 played in open court.)

20  BY MS. KELLY:

21  Q.  Did Mr. Haas say to you, "He needs to die, dude, he does"?

22  A.  Yes.

23  Q.  Who did you believe Mr. Haas was referring to, if anyone?

24  A.  Joe Kostuchowski.

25        MS. KELLY:  Playing Exhibit 16.

1      (Government Exhibit 16 played in open court.)

2  BY MS. KELLY:

3  Q.  Officer Mullen, in this video clip, did Mr. Haas say to

4  you, "It's to the point now where somebody is going to say

5  something online, and I'm going to smash some innocent

6  person"?

7  A.  Yes.

8  Q.  When he talked about smashing an innocent person, what did

9  you think he meant?

10  A.  I took it to mean that he was going to harm somebody in

11  some way.

12      MS. KELLY:  Now playing Government Exhibit 17.

13     (Government Exhibit 17 played in open court.)

14      MS. KELLY:  I think we've lost a little sound here

15  for sure.  If I could just check one more thing, your Honor,

16  just to see if there's any other ideas.

17      THE COURT:  All right.

18     (Pause.)

19      MS. KELLY:  I'll give it one more try.

20     (Government Exhibit 17 played in open court.)

21  BY MS. KELLY:

22  Q.  Officer Mullen, have you listened to this clip before

23  today?

24  A.  Yes.

25  Q.  And how recently have you listened to it?

Mullen - direct

252

1  A.  Today.

2  Q.  Was the sound a little more audible to you then?

3  A.  Yes.  I mean, this was just not a very loud -- I mean, you

4  could hear -- in the clip, I couldn't even hear really what he

5  said at the time, so I had to ask him to repeat it.  So it

6  just wasn't as loud as some of the other clips.

7  Q.  Did Mr. Haas say to you during this clip, "I don't think

8  this guy can protect himself from me really"?

9  A.  Yes.

10 Q.  Who did you think Mr. Haas was referring to when he said

11 "this guy"?

12 A.  Joe Kostuchowski.

13        MS. KELLY:  Now playing Government Exhibit 20.

14     (Government Exhibit 20 played in open court.)

15        MS. KELLY:  Your Honor, some of these are sounding a

16 little better than others to me.  And I hate to inconvenience

17 anyone, but could we take a very short break to see if there's

18 something we could do?

19        THE COURT:  Okay.  That's fine.  We can take 15

20 minutes.

21        MS. KELLY:  Thank you.  I appreciate it.

22        THE COURT:  All right.  All rise.

23     (Recess from 1:55 p.m. to 2:21 p.m.)

24        THE COURT:  All right.  Please be seated.

25        All right.  Ladies and gentlemen, I apologize again

Mullen - direct

1    for the technical difficulties.  Another system was rigged up,

2    so we'll see how that helps.  At least I hope you got your

3    snack.  Okay.  So at least that was accomplished.

4              Okay.  We're ready to resume questioning.

5    Mr. Mullen, do you understand you're still under an oath to

6    tell the truth?

7              THE WITNESS:  Yes.

8              THE COURT:  Okay.  And is there any objection to

9    replaying Government Exhibit 17, Mr. Haas?

10             THE DEFENDANT:  No, your Honor.

11             THE COURT:  All right.  Go ahead.

12        (Government Exhibit 17 played in open court.)

13             MS. KELLY:  Now I'm going to play Government Exhibit

14   20.

15        (Government Exhibit 20 played in open court.)

16             MS. KELLY:  I apologize, your Honor.  Can I start

17   this clip from the beginning?

18             THE COURT:  All right.  Go ahead.

19        (Government Exhibit 20 played in open court.)

20             MS. KELLY:  Now playing Government Exhibit 21.

21        (Government Exhibit 21 played in open court.)

22             MS. KELLY:  Now playing Government Exhibit 22.

23        (Government Exhibit 22 played in open court.)

24   BY MS. KELLY:

25   Q.  Officer Mullen, when Mr. Haas said, "It's my

Mullen - direct

254

1   constitutional duty to kill them," who did you believe

2   Mr. Haas was referring to?

3   A.  Well, he was referring to terrorists in general, and he

4   had spoken earlier about Joe Kostuchowski being a protector of

5   the terrorists.

6   Q.  When Mr. Haas told you that it was your oath to kill

7   treasonist terrorists, what did you think he meant by that

8   statement?

9   A.  Well, once again, I mean, similar as to what he said about

10  his duty, he was stating that it was my duty as well to kill

11  terrorists, anybody who supported terrorism.

12        MS. KELLY:  Now playing Government Exhibit 25.

13     (Government Exhibit 25 played in open court.)

14        MS. KELLY:  Now playing Government Exhibit 26.

15     (Government Exhibit 26 played in open court.)

16        THE DEFENDANT:  Excuse me, your Honor.  I object to

17  this.  I'd really like to admit photos of the Israelis in the

18  World Trade Center so I don't sound like some psycho here

19  talking in front of the jury.  I'd like those photos admitted.

20        THE COURT:  Overruled.  Next question.

21        MS. KELLY:  Now playing Government Exhibit 27.

22     (Government Exhibit 27 played in open court.)

23  BY MS. KELLY:

24  Q.  Officer Mullen, did Mr. Haas say, "I'm going to get this

25  fucking faggot for this shit"?

Mullen - direct

1    A.   Yes.

2    Q.   Who did you understand, if anyone, that Mr. Haas was

3    referring to in this clip?

4    A.   Joe Kostuchowski.

5         MS. KELLY:   Now playing Exhibit 28.

6         (Government Exhibit 28 played in open court.)

7    BY MS. KELLY:

8    Q.   Officer Mullen, when Mr. Haas said, "Kill 700 people, the

9    world would be at peace," what did you understand him to mean,

10   if anything?

11   A.   I really didn't know exactly who he was referring to with

12   the entire 700 people, but I took it to mean that he believed

13   there were 300 people that were responsible for the World

14   Trade Center, supporting terrorism.  He believed it to be

15   around 300 but they have bodyguards, so double it, and if

16   they're gone, the problems are gone.

17   Q.   Officer Mullen, do you recall what your destination was in

18   Chicago?

19   A.   I believe we were going to the FBI headquarters.

20   Q.   After you transported Mr. Haas to Chicago, did you obtain

21   the recording of Mr. Haas' transport?

22   A.   Yes.

23   Q.   Did you tell anyone that Mr. Haas had spoken about Joe

24   Kostuchowski during the car ride?

25   A.   Yes.

Mullen - cross

1   Q.  Do you recall who you mentioned this to?

2   A.  No, I don't.  I don't know who it was.

3   Q.  Was it another law enforcement official?

4   A.  Yes.

5        MS. KELLY:  No further questions at this time.

6        THE COURT:  All right.  Cross-examination?

7               CROSS-EXAMINATION

8   BY THE DEFENDANT:

9   Q.  Did I ever personally say that I was going to go and kill

10  Joe Kostuchowski?

11  A.  Yes, I believe so.

12  Q.  Can you tell me where that happened at and why it's not

13  evidence against me?

14  A.  I believe the first time I noticed it was in clip 10 that

15  we watched here.

16  Q.  Clip 10?  It says, "It probably be this guy honestly

17  because he is a fucking terrorist."  Did I say I was going to

18  go do it, or did I say it would probably be someone like this

19  guy?

20  A.  I believe you said you were going to harm someone, and

21  then you specifically mentioned him.

22  Q.  How many times did I say, "I'm going to teach the world

23  what happened, and they will get this guy"?

24  A.  I don't know an exact number, but I do know that you said

25  that a lot.

Mullen - cross

1   Q.  Multiple --

2   A.  Yes, multiple times.

3   Q.  How many minutes of this video was excluded today?

4   A.  I don't know the exact number of minutes, but it would be

5   the majority of the conversation that we had.

6   Q.  And why would you think that they're not allowing the jury

7   to see the complete video?

8          MS. KELLY:  Your Honor, objection.

9          THE COURT:  Sustained.

10  BY THE DEFENDANT:

11  Q.  Our meeting was immediately after I was swarmed by

12  multiple officers, correct?

13  A.  You were brought to my car right after you were taken into

14  custody, yes.

15  Q.  Multiple officers with assault rifles pointing at me and

16  my dog on the street in front of my home?

17  A.  I don't know --

18  Q.  At least a dozen?

19  A.  I wasn't there for that part --

20  Q.  At least a dozen --

21  A.  -- so I don't know.

22  Q.  Would you be upset after having guns pointed at you?

23         MS. KELLY:  Objection, your Honor.  Relevance.

24         THE COURT:  Sustained.

25  BY THE DEFENDANT:

Mullen - cross

258

1  Q.  What do you do if you even think a potential suspect may

2  have a gun?

3          MS. KELLY:  Same objection.

4          THE COURT:  Sustained.

5  BY THE DEFENDANT:

6  Q.  Did I seem aggressive towards you at all during that ride?

7  A.  No.

8  Q.  Do you believe somebody would be upset after having

9  multiple guns pointed at their head and at their dog?

10          MS. KELLY:  Objection, your Honor.  Relevance.  It

11  calls for speculation.

12          THE COURT:  It's sustained as to this witness.  You

13  will have a chance to testify as to your interpretation of

14  events.

15  BY THE DEFENDANT:

16  Q.  Okay.  Did I ever say anything other than possible

17  conspiracy theory ideology that made no sense to you other

18  than inaudible comments?

19  A.  I'm sorry.  Could you reword -- I mean, could you say that

20  again, repeat it?

21  Q.  Did I say anything to you other than conspiracy theory

22  ideas that didn't make sense to you, things that -- I mean,

23  obviously some things were inaudible, but was anything

24  incoherent or made me sound like I have some sort of mental

25  problems or something like that?

Mullen - cross

259

1   A.  I don't know that I could make that determination.

2   Q.  But in this -- in these clips, many of them are butchered,

3   and it sounds like I'm saying things that don't make sense?

4           MS. KELLY:  Your Honor, objection.

5           THE DEFENDANT:  Correct?

6           THE COURT:  Sustained as to argumentative, Mr. Haas.

7           THE DEFENDANT:  Okay.

8           THE COURT:  You can just try to focus, if you can

9   maybe think of -- pull quotes out of transcripts, for example.

10  BY THE DEFENDANT:

11  Q.  What did I say just before each clip of the videos?

12  A.  I don't know.

13          THE DEFENDANT:  I'm finished, your Honor.

14          THE COURT:  Any redirect?

15          MS. KELLY:  No, your Honor.

16          THE COURT:  Okay.  You're excused.  Before you go,

17  though, I'm going to ask you to put your mask back on.  And

18  then before you take the mike cover off, can you take a couple

19  gloves, a pair of gloves, put them on, and then take a wipe

20  out of that bottle.  Wipe down the table surface in front of

21  you and then when you stand up, just wipe down the chair and

22  the armrests.  And then you can take the mike cover and put it

23  all in that wastebasket.

24          THE WITNESS:  Okay.

25      (Pause.)

1    THE COURT:  Ladies and gentlemen, usually I try to

2    take the midafternoon break closer to 3:00 to break it up

3    right in the middle.  Depending on how the testimony goes, I

4    might just try to soldier on through the rest of the

5    afternoon.  However, if you need another break, that is

6    perfectly fine.  Just raise your hand.

7        And that goes for any part of the trial.  Just raise

8    your hand, don't be shy about it, and we'll take a break if

9    you need it.  Okay.  It might work out that I naturally have

10    to take another break in any event, but if I'm kind of just

11    forging ahead, please stop me.  All right.  Okay.  Thank you.

12        (Witness excused.)

13    THE COURT:  Okay.  You can call your next witness.

14    MR. JONAS:  Your Honor, the government calls

15    Christopher Potts.

16    THE COURT:  Mr. Potts, just grab one of those

17    microphone covers.  There should be an opening at one end of

18    the microphone cover, if you could slip it over the top of the

19    microphone phone.  If you could have a seat, and you can

20    remove your mask.  And you can stay seated, but please raise

21    your right hand.

22        (Witness sworn.)

23    THE WITNESS:  Yes, sir.

24    THE COURT:  You may proceed.

25    MR. JONAS:  Thank you, Judge.

| | |
|---|---|
| 1 | CHRISTOPHER POTTS, GOVERNMENT'S WITNESS, SWORN |
| 2 | DIRECT EXAMINATION |
| 3 | BY MR. JONAS: |
| 4 | Q.  Sir, can you state and spell your name, please? |
| 5 | A.  Yes, sir.  Christopher, C-h-r-i-s-t-o-p-h-e-r, Potts, |
| 6 | P-o-t-t-s. |
| 7 | Q.  Mr. Potts, what do you do for a living? |
| 8 | A.  Sir, I'm a special agent with the Federal Bureau of |
| 9 | Investigation. |
| 10 | Q.  And how long have you been an agent with the FBI? |
| 11 | A.  Sir, approximately two years. |
| 12 | Q.  What did you do prior to joining the FBI? |
| 13 | A.  Sir, I was an infantry officer. |
| 14 | Q.  In the Army? |
| 15 | A.  Yes, sir. |
| 16 | Q.  For how long? |
| 17 | A.  Approximately eight years, sir. |
| 18 | Q.  And as an FBI agent, where are you currently assigned? |
| 19 | A.  Sir, here in the Chicago field office of the FBI. |
| 20 | Q.  Are you assigned to a particular squad? |
| 21 | A.  I am, sir. |
| 22 | Q.  And what does that squad do? |
| 23 | A.  Sir, I'm on a joint gangs task force. |
| 24 | Q.  Have you always been on the joint gang task force since |
| 25 | joining the FBI? |

1    A.  Sir, I've always been permanently assigned to the gang

2    task force, but I have done rotations on other squads as well.

3    Q.  As part of the rotation, were you ever on a domestic

4    terrorism squad or some other CT squad?

5    A.  Yes, sir.  It's an all-hazards assessment squad.

6    Q.  As part of being on that squad, were you ever assigned to

7    the investigation of the defendant --

8    A.  Yes, sir.

9    Q.  -- Robert Haas?

10   A.  Yes, sir.

11   Q.  And as a result of being assigned to the investigation,

12   did you meet the defendant?

13   A.  I did, sir.

14          MR. JONAS:  And, your Honor, at this time I would ask

15   if there's a stipulation to an in-court identification of the

16   defendant during the course of his meeting with the agent.

17          THE COURT:  All right.  Mr. Haas, do you stipulate

18   that it is agreed that you met Mr. Potts on that day?

19          THE DEFENDANT:  Yes.

20          THE COURT:  All right.  Go ahead.

21   BY MR. JONAS:

22   Q.  What were the circumstances of you meeting with the

23   defendant?

24   A.  Sir, an arrest and a custodial interview.

25   Q.  What do you mean by "a custodial interview"?

Potts - direct

263

1   A.   Sir, after the defendant was taken into custody, we

2   interviewed him at the FBI Chicago field office.

3   Q.   Can you either pull your microphone a little closer or

4   lean more into it?

5   A.   Yes, sir.  Is that better?

6   Q.   That's better.  Thank you.

7        Where is the FBI Chicago field office?

8   A.   The address, sir?

9   Q.   Yes.  The neighborhood.

10  A.   It's 2111 West Roosevelt Road.

11  Q.   And when you interviewed him, you said this was after he

12  was arrested?

13  A.   Yes, sir.

14  Q.   What was the date?

15  A.   Sir, June 11th of 2019.

16  Q.   Was the interview with him recorded?

17  A.   Yes, it was, sir.

18  Q.   Video and audio?

19  A.   Yes, sir.

20  Q.   And have you reviewed the recording in preparation for

21  your testimony here today?

22  A.   I have, sir.

23  Q.   Does the recording accurately and fairly represent the

24  interview you did of the defendant on June 11th, 2019?

25  A.   Yes, it does, sir.

Potts - direct

1    Q.   About how long is -- was the interview?

2    A.   Approximately one hour.

3    Q.   So are we going to play the whole hour here for the jury?

4    A.   No, we're not.

5             MR. JONAS:  Your Honor, at this time I would offer

6    into evidence Government's Exhibits 29 through 35 which are

7    the clips of the June 11th FBI interview.

8             THE COURT:  Any objection, Mr. Haas, other than

9    previous ones?

10            THE DEFENDANT:  No, your Honor.

11            THE COURT:  All right.  It's allowed.

12      (Government Exhibits 29 through 35 received in evidence.)

13   BY MR. JONAS:

14   Q.   Agent Potts, before I play the first recording, tell the

15   jury generally what it is you talked to the defendant about.

16   A.   Sir, generally speaking, it was Mr. Haas' interaction with

17   Task Force Officer Joe Kostuchowski.

18            MR. JONAS:  I'm going to play, Judge, if that's okay

19   if I can publish Government's Exhibit 29.

20            THE COURT:  You may.

21            MR. JONAS:  Hopefully, the sound works fine.

22      (Government Exhibit 29 played in open court.)

23   BY MR. JONAS:

24   Q.   This -- when the defendant said to you that TFO

25   Kostuchowski was guilty of treason, was that something that he

Potts - direct

265

1    repeated throughout the interview?

2    A.   It seemed to be a general theme, sir.

3    Q.   Did you understand what he was talking about?

4    A.   I don't, sir.

5         MR. JONAS:   Your Honor, if we could play Government's

6    Exhibit 30.

7         THE COURT:   You may.

8       (Government Exhibit 30 played in open court.)

9    BY MR. JONAS:

10   Q.   Agent Potts, you and the defendant used the pronoun "he"

11   during this portion of the conversation.  Who were you both

12   referring to?

13   A.   Task Force Officer Joe Kostuchowski, sir.

14   Q.   And in this clip, another individual came into the scene,

15   into the room.  Who was that?

16   A.   Sir, that was Task Force Officer Mike Bannock.

17        MR. JONAS:   If I can play Government's Exhibit 31.

18        THE COURT:   All right.

19      (Government Exhibit 31 played in open court.)

20   BY MR. JONAS:

21   Q.   Did you know what VK was prior to this interview?

22   A.   No, sir.

23   Q.   Have you since learned what it is?

24   A.   Yes, sir.

25   Q.   What's your understanding what VK is?

1    A.  Sir, it's very similar to Facebook but it's like a Russian

2    site, sir.

3    Q.  Did the defendant discuss with you whether or not he

4    posted things to VK?

5    A.  He did mention that, sir.

6         MR. JONAS:  Play Government's Exhibit 32.

7         (Government Exhibit 32 played in open court.)

8    BY MR. JONAS:

9    Q.  Agent Potts, you made a comment about, "you could provide

10   us."  What did you mean by that?

11   A.  I was asking if he would be willing to provide us the cell

12   phone, his cell phone that he used to communicate with Task

13   Force Officer Kostuchowski in order for us to compare those

14   text messages.

15   Q.  And did he provide you with his cell phone?

16   A.  He did not, sir.

17         MR. JONAS:  If I could play Government's Exhibit

18   33.

19         (Government Exhibit 33 played in open court.)

20   BY MR. JONAS:

21   Q.  Agent Potts, the defendant said that he called Joseph

22   Kostuchowski because he was pissed off.  Did he ever -- did

23   the defendant ever tell you in this interview that he was

24   scared of the TFO Kostuchowski?

25   A.  Not to my recollection, sir.

Potts - direct

267

1    Q.  Did he ever tell you he was intimidated by him?

2    A.  Not to my recollection, sir, no.

3         MR. JONAS:  I'll play another, Government's Exhibit

4    34.

5         (Government Exhibit 34 played in open court.)

6         MR. JONAS:  I'll play Government's Exhibit 35.

7         (Government Exhibit 35 played in open court.)

8    BY MR. JONAS:

9    Q.  Agent Potts, did the defendant ever explain why he

10   believes TFO Kostuchowski knew what he claims that the TFO

11   knew?

12   A.  No, sir.

13        THE DEFENDANT:  Your Honor, I object again.  I want

14   these photos of the Israelis that I sent to Joe admitted

15   before this jury.  I sent them to Joe.  He sent them to --

16        THE COURT:  Mr. Haas, there have been discussions and

17   many sessions leading up to today's trial where you had --

18        THE DEFENDANT:  You said it's irrelevant.  This is

19   relevant now.  It's relevant.  It's very relevant right now.

20        THE COURT:  Mr. Haas, not through this witness.  All

21   right.  If you want to raise something outside the presence of

22   the jury, you'll be entitled to do that.

23        The objection is overruled.  Next question.

24        MR. JONAS:  Your Honor, I have no further questions

25   for the witness.

1      THE COURT:  All right.  Cross-examination?

2                  CROSS-EXAMINATION

3  BY THE DEFENDANT:

4  Q.  Were you present when I was arrested in front of my house?

5  A.  I was, sir.

6  Q.  Who was the gentleman yelling, "Camera, camera, camera,

7  they're filming, camera, camera"?

8  A.  Sir, I don't know.

9  Q.  Would he do that so you don't put your knee in my neck and

10  suffocate me?

11      MR. JONAS:  Objection.

12      THE COURT:  Sustained.

13  BY THE DEFENDANT:

14  Q.  When did I say that you can search my phone during our

15  custodial interview?  Because that's what you said in reports.

16  A.  Sir, it was my understanding that when you offered your --

17  you offered the phone to us in order for us to compare those

18  text messages with Joe Kostuchowski's text messages.  That was

19  consent which was later rescinded, which is why we did not

20  search your phone at that time, sir.

21  Q.  When I was arrested on the street, you asked me if I

22  wanted to go and get my phones to get contacts out of it, and

23  I said, "No, you're not getting my phone."  Where would you

24  gather that I said you can search my phones from that

25  conversation?

Potts - cross

1          MR. JONAS:  I'm going to object.  I think there's a

2    lot of testimony in that statement.

3          THE COURT:  Sustained.  So Mr. Haas, you can back up.

4    You can try to establish particular facts and then move

5    forward from there.

6    BY THE DEFENDANT:

7    Q.  All right.  If I allowed you to search my phone, would you

8    have needed a warrant to get it?

9    A.  No, sir.  We can search things on consent.

10   Q.  Then how come you needed a warrant?

11         MR. JONAS:  Objection.

12         THE COURT:  Sustained.

13   BY THE DEFENDANT:

14   Q.  When you saw photos from August 18th, 2001, with Israelis

15   removing a window and planting explosives, was that not proof

16   of terrorism inside the United States?

17         MR. JONAS:  Objection.

18         THE COURT:  Sustained.

19         THE DEFENDANT:  No further questions, your Honor.

20         THE COURT:  Any redirect?

21         MR. JONAS:  No, Judge.

22         THE COURT:  All right.  Mr. Potts, you're excused.

23   So I'm going to ask you first to put on a pair of gloves.  And

24   actually, you can put your mask on, too.  After you've got the

25   gloves on, then go ahead and take out one of the disinfecting

1    wipes, wipe down the table surface in front of you and then

2    the armrest and the chair itself.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  And then you can throw that into the

5    wastebasket and then take the mike cover and also throw that

6    into the wastebasket.

7              THE WITNESS:  Yes, sir.

8         (Witness excused.)

9              THE COURT:  All right.  You can announce your next

10   witness.

11             MS. KELLY:  Your Honor, the government calls Rafael

12   Gutierrez.

13             THE COURT:  Mr. Gutierrez, if you could, as you come

14   on up, and on that small table there, there's those white

15   squares.  Pick one of those up.  Those are microphone covers.

16   Head over to the witness chair, please.  And you can slip one

17   end of the microphone cover over the tip of the microphone.

18             Now, before you sit down, does the chair still look

19   wet?

20             THE WITNESS:  It does not.

21             THE COURT:  Okay.  Then go ahead and sit down.

22             All right.  If you could, remove your mask now.  And

23   you can remain seated, but please raise your right hand.

24        (Witness sworn.)

25             THE WITNESS:  I do.

Gutierrez - direct

271

1        THE COURT:  All right.  Ms. Kelly?

2        RAFAEL GUTIERREZ, GOVERNMENT'S WITNESS, SWORN

3                    DIRECT EXAMINATION

4    BY MS. KELLY:

5    Q.   Good afternoon.

6    A.   Good afternoon.

7    Q.   Could you please state your name for the record spelling

8    your last name?

9    A.   Rafael Gutierrez, G-u-t-i-e-r-r-e-z.

10   Q.   Where are you currently employed?

11   A.   FBI.

12   Q.   When did you join the FBI?

13   A.   September 2016.

14   Q.   What is your current job title?

15   A.   I'm a staff operations specialist.

16   Q.   What is a staff operations specialist?

17   A.   We are a tactical analyst that assists investigators with

18   reviewing social media records, telephone analysis records, as

19   well as any other tasks we're assigned.

20   Q.   When did you become a staff operations specialist for the

21   FBI?

22   A.   In April 2019.

23   Q.   Have you received any training in the review of cellular

24   phone records?

25   A.   I have.

Gutierrez - direct

272

1  Q.  Could you describe that training?

2  A.  Yes.  During my basic training course at the FBI academy,

3  Quantico, Virginia.

4  Q.  Have you received any training in how to perform internet

5  searches including searches of social media accounts?

6  A.  I have.

7  Q.  Could you describe that training?

8  A.  Yes.  I received training at the FBI academy in Quantico,

9  Virginia, as well as doing it on a daily basis at work.

10  Q.  Do you work with FBI special agents and task force

11  officers on investigations?

12  A.  I do.

13  Q.  Are you assigned to a particular unit within the FBI?

14  A.  Yes.  I'm assigned to CT5, part of the joint terrorism

15  task force.

16  Q.  When were you assigned to work in CT5?

17  A.  Approximately in May 2019.

18  Q.  Did you work on an investigation involving Robert Haas?

19  A.  Yes.

20  Q.  During your investigation, did you review Mr. Haas'

21  cellular phone records?

22  A.  I did.

23  Q.  What categories of phone records did you review?

24  A.  I reviewed Sprint subscriber records as well as Sprint

25  toll records.

1  Q.  What is a subscriber record?

2  A.  A subscriber record is a document provided by a

3  subscription service that indicates who that service is

4  subscribed to.

5  Q.  What is a cellular phone toll record?

6  A.  A toll record is a document with individual transactions

7  that were placed from a certain device.

8  Q.  Did you focus on any particular time period when reviewing

9  these phone records?

10  A.  I did.  I focused between May 8th, 2019, through June

11  11th, 2019.

12  Q.  Why did you focus on that particular time period?

13  A.  That's the timeframe that TFO Kostuchowski interacted with

14  Mr. Haas.

15          MS. KELLY:  Your Honor, at this time we move into

16  evidence Exhibit 96 and request permission to publish to the

17  jury.

18          THE COURT:  Any objection other than prior ones,

19  Mr. Haas?

20          THE DEFENDANT:  No, your Honor.

21          THE COURT:  All right.  96 is allowed.

22      (Government Exhibit 96 received in evidence.)

23  BY MS. KELLY:

24  Q.  Mr. Gutierrez, can you identify this document?

25  A.  Yes.  This is a Sprint subscriber record.

Gutierrez - direct

274

1    Q.   Was Sprint the name of Mr. Haas' cell phone carrier?

2    A.   Yes, it was.

3    Q.   Does this Sprint subscriber record relate to a phone

4    number?

5    A.   Yes, it does.

6    Q.   What phone number?

7    A.   347-951-4034.

8    Q.   May I call that phone number from time to time "the Haas

9    phone"?

10   A.   Yes, you may.

11   Q.   Whose name is associated with this account?

12   A.   Robert Haas.

13   Q.   Does the record identify a billing address for the

14   account?

15   A.   It does.

16   Q.   What is the billing address?

17   A.   222 West Main Street, Ottawa, Illinois.

18   Q.   According to the subscriber record identified as Exhibit

19   96, when did Mr. Haas begin using Sprint as his carrier for

20   the Haas phone?

21   A.   December 13, 2018.

22   Q.   According to this record, was Mr. Haas' Sprint account

23   active through June 11th, 2019?

24   A.   It was.

25            MS. KELLY:   Your Honor, I'd ask to move Exhibit 97

Gutierrez - direct

275

1   into evidence and publish it to the jury.

2            THE COURT:  Any objection other than previous ones?

3            THE DEFENDANT:  No, your Honor.

4            THE COURT:  All right.  97 is in.

5        (Government Exhibit 97 received in evidence.)

6            THE DEFENDANT:  Your Honor, I don't recall objecting

7   to any of this.

8            THE COURT:  Yes, that might be.  I just wanted to

9   make sure if there are any at all.

10  BY MS. KELLY:

11  Q.  Mr. Gutierrez, can you identify Government Exhibit 97?

12  A.  Yes.  This is a Sprint toll record associated to the Haas

13  phone number ending in 4034.

14  Q.  Could you summarize for the jury what is described on the

15  first page of this record?

16  A.  Yes.  These are the individual transactions that were

17  conducted using the mobile device ending in 4034, everything

18  from the incoming call to include the phone number, the number

19  that was dialed, the direction of the call along with a date

20  and time.  And the column name that indicates "call type," it

21  indicates what type of transaction it was.

22  Q.  Did the FBI obtain these records from Sprint?

23  A.  Yes.

24  Q.  Did Sprint provide the FBI with any written documentation

25  that described the contents of the phone records?

Gutierrez - direct

276

1    A.   Yes, they did.

2    Q.   Did you review that documentation from Sprint?

3    A.   I did.

4    Q.   Could you please focus for a moment on the column called

5    "Call type"?

6    A.   Yes.

7    Q.   Did the Sprint records describe what the different call

8    types mean?

9    A.   Yes.

10   Q.   Does the first line of the record say "text detail"?

11   A.   Yes.

12   Q.   What is a text detail?

13   A.   Text detail is a text message.

14   Q.   Does the next line say "WiFi"?

15   A.   Yes, it does.

16   Q.   What does the reference to WiFi mean?

17   A.   WiFi can either be a voice phone call or a text message.

18   Q.   Further down the page, do you see an entry called "voice"?

19   A.   Yes.

20   Q.   What does "voice" mean?

21   A.   A voice phone call.

22   Q.   According to the Sprint records, can a text message be

23   sent over a WiFi network?

24   A.   Yes.

25   Q.   Can a voice call be placed over the WiFi network?

Gutierrez - direct

1  A.  Yes.

2  Q.  For the entries in the Sprint records that say "WiFi," do

3  the Sprint toll records differentiate whether that contact was

4  in the form of a voice call or a text message?

5  A.  They do not.

6  Q.  Approximately how many pages are in this exhibit?

7  A.  396.

8  Q.  Did you have an opportunity to examine all of these toll

9  records?

10  A.  Yes.

11  Q.  After you examined them, what did you do?

12  A.  I created an Excel spreadsheet filtering out contacts

13  between Mr. Haas and TFO Kostuchowski.

14       MS. KELLY:  Your Honor, we seek the admission of

15  Exhibit 98 and permission to publish it to the jury.

16       THE COURT:  Any objection, Mr. Haas?

17       THE DEFENDANT:  No, your Honor.

18       THE COURT:  All right.  98 is in.

19     (Government Exhibit 98 received in evidence.)

20       MS. KELLY:  Your Honor, I misspoke earlier.  We just

21  admitted 98, and I'm going to ask the witness to describe what

22  it is.  I'd also at this point seek to admit Exhibit 96 which

23  is the entirety of the Sprint -- or 97 which is the entirety

24  of the Sprint toll records.

25       THE COURT:  Okay.  I think you did that, also.

Gutierrez - direct

278

1          Is there any objection to 97, Mr. Haas?

2          THE DEFENDANT:  No, your Honor.

3          THE COURT:  All right.  It's in.

4  BY MS. KELLY:

5  Q.  Mr. Gutierrez, can you describe Exhibit 98?

6  A.  Yes.  This is the Excel spreadsheet that I created

7  filtering out communication between Mr. Haas and TFO

8  Kostuchowski.

9  Q.  What information did you use to prepare this document?

10  A.  I utilized Sprint-provided toll records.

11  Q.  Was that Exhibit 97?

12  A.  It was.

13  Q.  Do you know Joe Kostuchowski's phone number?

14  A.  I do.

15  Q.  What is his phone number?

16  A.  312-882-4227.

17  Q.  How did you become familiar with Joe Kostuchowski's phone

18  number?

19  A.  TFO Kostuchowski was assigned to CT5, and I'm familiar

20  with that phone number being his FBI-assigned mobile number.

21  Q.  Would the summary that has been marked as Exhibit 98

22  assist you in describing the contacts between the Haas phone

23  and Joe Kostuchowski?

24  A.  Yes.

25  Q.  According to the Sprint records, what is the date of the

1   first contact from the Haas phone to Joe Kostuchowski?

2   A.   May 8th, 2019.

3   Q.   Did Mr. Haas contact Joe Kostuchowski on May 9th, 2019?

4   A.   Yes.

5   Q.   Did Mr. Haas contact Joe Kostuchowski on May 11th, 2019?

6   A.   Yes.

7   Q.   Do the Sprint records identify the nature of the May 11,

8   2019, contacts from Mr. Haas to Joe Kostuchowski?

9   A.   Yes.

10  Q.   What are the nature of those contacts?

11  A.   Voice and WiFi.

12  Q.   According to Sprint records, did Joe Kostuchowski contact

13  Mr. Haas?

14  A.   Yes.

15  Q.   How many times according to the Sprint records did Joe

16  Kostuchowski contact Mr. Haas?

17  A.   On three occasions.

18  Q.   Do you know the dates of those contacts?

19  A.   Yes.  The first one was on May 8th, 2019, and the last two

20  were on June 11th, 2019.

21  Q.   In connection with your investigation, did you also review

22  the toll records for Joe Kostuchowski's phone?

23  A.   I did.

24  Q.   Where did you obtain those records?

25  A.   Through Special Agent Caitlin Thomas.

Gutierrez - direct

1  Q.  Did Joe Kostuchowski's toll records identify contacts for

2  Mr. Haas?

3  A.  Yes.

4  Q.  According to Joe Kostuchowski's toll records, did Mr. Haas

5  contact Joe Kostuchowski on May 8th, 2019?

6  A.  Yes.

7  Q.  What about May 9th, 2019?

8  A.  Yes.

9  Q.  What about May 11th, 2019?

10  A.  Yes.

11  Q.  Did you ever compare the number of contacts identified in

12  Mr. Haas' toll records to the number of contacts for Mr. Haas

13  that are identified in Joe Kostuchowski's phone records?

14  A.  I did.

15  Q.  What, if anything, did you observe after making that

16  comparison?

17  A.  I made -- I noticed a major drop-off in text messages on

18  TFO Kostuchowski's toll records after May 9th.

19  Q.  Do you have any understanding as to why Joe Kostuchowski's

20  phone records reflect a drop-off in the number of contacts

21  after May 9 or on or after May 9, 2019?

22  A.  Yes.  I'm aware that TFO Kostuchowski blocked the Haas

23  phone number on May 9th, 2019.

24  Q.  Where did you learn that Joe Kostuchowski blocked

25  Mr. Haas' phone number on May 9th, 2019?

1    A.   I reviewed a report authored by TFO Kostuchowski.

2    Q.   What type of phone did Joe Kostuchowski use in year 2019

3    for work purposes?

4    A.   A Verizon Samsung Galaxy S9.

5    Q.   How do you know that?

6    A.   That's a phone I have, and it's standard issued FBI phone.

7    Q.   Are you familiar with what happens when a person blocks a

8    number on a Samsung Galaxy phone?

9    A.   Yes, I am.

10   Q.   How did you gain that knowledge?

11   A.   By reviewing the Samsung and Verizon websites.

12   Q.   What happens?

13   A.   When a phone number is placed on the reject list on the

14   Galaxy S9, any incoming text messages are automatically

15   blocked.  As far as any incoming phone calls, they are

16   automatically rejected and routed to the voicemail.

17             MS. KELLY:  Your Honor, I move for the admission of

18   Exhibit 102 and permission to publish it to the jury.

19             THE COURT:  Any objection, Mr. Haas?

20             THE DEFENDANT:  No, your Honor.

21             THE COURT:  All right.  102 is in.

22        (Government Exhibit 102 received in evidence.)

23   BY MS. KELLY:

24   Q.   Mr. Gutierrez, I'm showing you what we marked as Exhibit

25   102.  Did you create this document?

Gutierrez - direct

282

1    A.   I did.

2    Q.   Where did you obtain the information in this chart?

3    A.   The Sprint toll records.

4    Q.   Could you describe this document for the jury?

5    A.   Yes.  This is a chart that I created using the Sprint toll

6    records which lay out the -- all the contacts that Mr. Haas

7    placed to TFO Kostuchowski.

8    Q.   Could you read the first line at the top of the chart?

9    A.   "Robert Haas toll records for 347-951-4034 between May

10   2019 through June 2019."

11   Q.   Does this chart identify the total number of contacts from

12   the Haas phone to Joe Kostuchowski based on Mr. Haas' toll

13   records?

14   A.   Yes.

15        THE DEFENDANT:  Your Honor, I object.  This is just a

16   document that they fabricated.  These are not the real

17   numbers.

18        THE COURT:  Overruled.

19   BY MS. KELLY:

20   Q.   You testified a few minutes ago that you read a report

21   that Joe Kostuchowski blocked Mr. Haas' phone number; is that

22   correct?

23   A.   That's correct.

24   Q.   Does the chart identified as Exhibit 102 identify all of

25   the times according to the Sprint records that Mr. Haas' phone

Gutierrez - direct

1  transmitted a message or called Joe Kostuchowski including

2  contacts that were blocked by Joe Kostuchowski's phone?

3  A.   That's correct.

4  Q.   What information is represented in the column on the left

5  side of the graph?

6  A.   The amount of contacts.

7  Q.   What information is contained in the row at the bottom of

8  the page?

9  A.   The date of the contact.

10 Q.   On May 8th, 2019, how many times did the Haas phone

11 contact Joe Kostuchowski?

12 A.   On six -- six times.

13 Q.   How many times did the Haas phone contact Joe Kostuchowski

14 on May 9th, 2019?

15 A.   102.

16 Q.   What about May 14th, 2019?

17 A.   20 times.

18 Q.   May 26th?

19 A.   26 times.

20 Q.   May 31st?

21 A.   37 times.

22 Q.   When was the last contact according to the Sprint records?

23 A.   June 3rd of 2019.

24 Q.   And how many times did the Haas phone contact Joe

25 Kostuchowski on June 3rd, 2019?

Gutierrez - direct

284

A.   Six times.

1

2          THE DEFENDANT:  Your Honor, I object again.  I would

3    have to be on crack to call somebody that many times and they

4    would have to be on crack to believe --

5          THE COURT:  Mr. Haas --

6          THE DEFENDANT:  -- that I would --

7          THE COURT:  Mr. Haas, as we have discussed before,

8    certain arguments must be made outside the presence of the

9    jury, and some have been already.  You have had an opportunity

10   to discuss each of the exhibits.  You'll have an opportunity

11   to testify.  That objection is overruled, and the jury will

12   disregard the remark.

13         You can ask your next question.

14         MS. KELLY:  At this point, your Honor, I'd seek

15   permission to read a stipulation into the record which has

16   been marked as Government Exhibit 111.

17         THE COURT:  All right.  Go ahead.

18         MS. KELLY:  And may I publish it to the jury?

19         THE COURT:  Is it -- has it been signed?

20         MS. KELLY:  Yes, your Honor.

21         THE COURT:  Okay.  Then you can go ahead and do that.

22         And, ladies and gentlemen, I just want to let you

23   know that because this is a government exhibit, it is a

24   stipulation, it's an agreement between both sides, but it's

25   been turned into a government exhibit with a number so that

1     you will have it available for you when you deliberate.  So

2     you don't have to try to copy this down verbatim.

3              All right.  Ms. Kelly?

4              MS. KELLY:  "It is hereby stipulated and agreed by

5     and between the United States of America by John R. Lausch,

6     Jr., United States Attorney for the Northern District of

7     Illinois, and defendant, Robert Anthony Haas, that Robert Haas

8     had an account under the user name 'Bob was here' on the

9     social media website vk.com, an online social media and social

10    networking service based in Russia," dated August 4th, 2020.

11    BY MS. KELLY:

12    Q.   Mr. Gutierrez, did you perform any internet searches

13    concerning Robert Haas?

14    A.   I did.

15    Q.   What was the nature of the searches that you performed?

16    A.   I conducted Google searches in order to identify Mr. Haas'

17    VK account.

18    Q.   Can you describe in a little bit more detail how you

19    performed those searches?

20    A.   Yes.  I plugged in Mr. -- Robert -- the name "Robert Haas"

21    into the Google search bar along with "VK."

22    Q.   Did you locate any social media content related to Robert

23    Haas?

24    A.   I did.

25    Q.   And you had mentioned VK a minute ago.  What is VK, to

Gutierrez - direct

1   your knowledge?

2   A.   VK is a Russian-based social media platform similar to the

3   U.S.-based Facebook.

4   Q.   When you performed your searches, did you find any content

5   relating to Robert Haas on the website vk.com?

6   A.   I did.

7   Q.   Did you review vk.com's website?

8   A.   I did.

9   Q.   Does it identify where vk.com is headquartered?

10  A.   Yes.   It's headquartered in St. Petersburg, Russia.

11  Q.   On how many occasions did you perform searches of vk.com?

12  A.   On several occasions.

13  Q.   When you performed those searches, did you capture any

14  content that you located on vk.com?

15  A.   I did.

16  Q.   How did you do that?

17  A.   I used photo software to capture a screenshot, and I saved

18  it to my FBI computer and uploaded them to the case file.

19  Q.   Are the internet posts that we are going to discuss in

20  your testimony posts that you found online at vk.com?

21  A.   Yes.

22  Q.   Did you take the screenshots identified in the exhibits

23  that you are going to discuss in your testimony?

24  A.   Yes.

25          MS. KELLY:  Your Honor, I'd move to admit Exhibit 43

1   and seek permission to publish it to the jury.

2            THE COURT:  All right.  Any objection, Mr. Haas?

3            THE DEFENDANT:  No, your Honor.

4            THE COURT:  All right.  Go ahead.

5        (Government Exhibit 43 received in evidence.)

6   BY MS. KELLY:

7   Q.   Mr. Gutierrez, can you identify Government Exhibit 43?

8   A.   Yes.  This is a VK Fox News post that was made on December

9   29th, 2018.

10  Q.   Could you describe the layout of this post?

11  A.   Yes.  At the top is the original post which was made by

12  Fox News.  At the bottom, there are comments to the original

13  post.

14  Q.   Could you read the first line underneath the post by --

15  before we do that, when is the post dated?

16  A.   December 29th, 2018.

17  Q.   When are the comments dated?

18  A.   December 29th, 2018.

19  Q.   Could you please read the first line under the post made

20  by Fox News?

21  A.   "Anyone who tries to stop the truth is guilty of treason,

22  and they must be killed."

23  Q.   Is there a name underneath the post made by Fox News with

24  a symbol next to it?

25  A.   Yes, there is.

Gutierrez - direct

288

1    Q.  Do you know what that is?

2    A.  Yes.  It's a hyperlink that routes you to Mr. Haas' VK

3    profile.

4    Q.  And how do you know that this is a hyperlink that leads

5    you to the Robert Haas VK profile?

6    A.  Because I clicked on it.

7    Q.  Okay.  Could you please read the first comment underneath

8    the post made by Fox News?

9    A.  Yes.  The first comment is:  "I don't care if it's a cop,

10   prosecutor, judge, politician, or elite.  You try to stop me

11   from telling the truth, I will cut every throat in your home.

12   Try me."

13   Q.  And what name did the person use to make that comment?

14   A.  Robert Haas.

15   Q.  Is there a second comment?

16   A.  Yes.

17   Q.  Could you read the second comment?

18   A.  "Defend kikes and go with them.  I promise."

19   Q.  Is there a name associated with the second comment?

20   A.  Yes.  Robert Haas.

21   Q.  Did you make an effort to identify who used the Robert

22   Haas account on vk.com?

23   A.  I did.

24   Q.  And as you heard, we just read a stipulation mentioning

25   the user name "Bob was here"?

Gutierrez - direct

289

1    A.  I did.

2    Q.  Through your investigation, were you able to associate the

3    user name "Bob was here" with Robert Haas?

4    A.  Yes, I was.

5         MS. KELLY:  Your Honor, I seek the admission of

6    Government Exhibit 50 and permission to publish it to the

7    jury.

8         THE COURT:  Any objection to 50?

9         THE DEFENDANT:  No, your Honor.

10        THE COURT:  It's allowed.

11      (Government Exhibit 50 received in evidence.)

12   BY MS. KELLY:

13   Q.  Mr. Gutierrez, could you identify Government Exhibit 50?

14   A.  Yes.  This is an image posted by VK Fox News on January

15   24th, 2019.

16   Q.  Now, you mentioned Fox News.  What does Fox News signify

17   in this post in the one we just saw?

18   A.  This post is a mobile screenshot of a Robert Haas profile.

19   Q.  Focusing on the Fox News insignia that we see there for a

20   moment --

21   A.  Oh, yes.

22   Q.  -- what does that signify to you?

23   A.  That's a VK public page titled "Fox News."

24   Q.  Could you describe the content of this posting?

25   A.  Yes.  It's a mobile screenshot of a Robert Haas profile.

Gutierrez - direct

1  Q.  Can you read the line that appears to have a picture of a

2  house in front of it?

3  A.  "Lives in Chicago."

4  Q.  Does the post identify the number of the Robert Haas

5  account's friends?

6  A.  Yes.

7  Q.  What do you understand the reference to the number of

8  friends to mean?

9  A.  The amount of friends he had on the social media platform.

10  Q.  Is there a circle around the number 389?

11  A.  Yes, there is.

12  Q.  Did you make that circle, or is it in the original image?

13  A.  I did not make them.  It's part of the original image.

14  Q.  Did you perform any analysis to identify who used the name

15  Fox News on vk.com?

16  A.  I did.

17  Q.  Can you summarize the analysis that you performed to

18  determine who posted under the Fox News account?

19  A.  Yes.  I reviewed over 900 posts made by Fox News dating

20  back to December 2018.

21          MS. KELLY:  Your Honor, I seek the admission of

22  Exhibit 48 and permission to publish it to the jury.

23          THE COURT:  Okay.  Any objection to 48?

24          THE DEFENDANT:  No, your Honor.

25          THE COURT:  It's allowed.

Gutierrez - direct

291

1        (Government Exhibit 48 received in evidence.)

2   BY MS. KELLY:

3   Q.   Could you identify this exhibit?

4   A.   Yes.  This is a Fox News image posted on January 17th,

5   2019.

6   Q.   Could you describe the photograph?

7   A.   Yes.  It's a rock with the etching, "Bob was here."

8   Q.   Does the phrase "Bob was here" have any significance to

9   you based on your investigation?

10  A.   Yes, it does.

11  Q.   What is that significance?

12  A.   "Bob was here" is a user name that VK user Robert Haas

13  utilizes.

14  Q.   Under which account?

15  A.   His personal one titled "Robert Haas."

16          MS. KELLY:  Your Honor, I seek the admission of

17  Exhibit 53 and permission to publish.

18          THE COURT:  Any objection?

19          THE DEFENDANT:  No, your Honor.

20          THE COURT:  53 is allowed.

21        (Government Exhibit 53 received in evidence.)

22  BY MS. KELLY:

23  Q.   Mr. Gutierrez, what is this document?

24  A.   This is an image posed by Fox News on January 17th, 2019.

25  Q.   That is the second page -- this is what I'm looking for.

Gutierrez - direct

292

1    I'm sorry.  I put up the wrong page.

2            You now should have in front of you Government

3    Exhibit 53.  Do you see that, with the exhibit sticker?

4    A.   Yes.

5    Q.   Okay.  Could you describe what this document is?

6    A.   Yes.  This is a Fox News post made on January 28th, 2019.

7    Q.   What is the name of the account that posted the content in

8    the top post?

9    A.   Fox News.

10   Q.   What is the date of the top post?

11   A.   January 28th, 2019.

12   Q.   Are there any comments underneath the post?

13   A.   Yes, there are.

14   Q.   Mr. Gutierrez, could you please read the post made by

15   account IGP starting with the words "Funny page"?

16   A.   "Funny page you got over here.  How about adding the

17   message button to the page so I can PM, contact the admin?"

18   Q.   What does "PM, contact the admin," mean to you?

19   A.   PM means private message in order to contact the

20   administrator of the Fox News website.

21   Q.   When was this comment posted?

22   A.   January 29th, 2019.

23   Q.   Could you read the next comment posted by account IGP?

24   A.   Yes.  "BTW," which is short for "by the way," "converting

25   the page to a community got a certain advantage.  You can

1    invite people.  You can't invite people to pages, only share

2    the page on a wall."

3    Q.  Did anyone respond to that comment?

4    A.  Yes.

5    Q.  Which account?

6    A.  Robert Haas.

7    Q.  On what date?

8    A.  January 29th, 2019.

9    Q.  And what did the Robert Haas post say in response?

10   A.  "IGP, it's my page."

11   Q.  Turning the page of this exhibit, are there additional

12   comments, Mr. Gutierrez?

13   A.  Yes, there are.

14   Q.  What account made the first comment on the second page?

15   A.  Robert Haas.

16   Q.  On what date?

17   A.  January 29th, 2019.

18   Q.  What does the comment say?

19   A.  "IGP, you know anyone else who would do this?"

20   Q.  Did the Robert Haas account make another comment stating,

21   "IGP, maybe Fox News will sue me"?

22   A.  Yes.

23   Q.  Based on your investigation, was the Fox News user name on

24   VK the real Fox News network, or was it someone posting under

25   that name?

1    A.  It was someone posting under that name.

2           MS. KELLY:  Your Honor, I seek the admission of

3    Government Exhibit 51 and permission to publish.

4           THE COURT:  Any objection?

5           THE DEFENDANT:  No, your Honor.

6           THE COURT:  All right.  51 is in.

7        (Government Exhibit 51 received in evidence.)

8    BY MS. KELLY:

9    Q.  Mr. Gutierrez, is this another vk.com post?

10   A.  Yes, it is.

11   Q.  What is the date of the post?

12   A.  January 27th, 2019.

13   Q.  Was the content posted by account name Fox News?

14   A.  Yes, it was.

15   Q.  Could you please read this post aloud?

16   A.  "The next time some federal pig tries to intimidate me,

17   I'm following it home and taking its Jew lover family from it.

18   Future Jew loving terrorists must go, too."

19   Q.  Could you read the following paragraph?

20   A.  "As a matter of fact, killing feds who support Jews is

21   righteous, and they're guilty of treason.  Saying there's some

22   good Jews is treason and deserves a throat cutting.  Don't say

23   lying maggot shit and we won't hurt you, bitch."

24          THE DEFENDANT:  Your Honor, I object.  The photos of

25   the Israelis in the World Trade Center are blacked out.

Gutierrez - direct

295

1          THE COURT:  Overruled.

2          THE DEFENDANT:  If a piece of evidence constitutes --

3          THE COURT:  Mr. Haas, that objection has been ruled

4     on.

5          So you may proceed with your next question.

6          MS. KELLY:  Your Honor, we seek the admission of

7     Government Exhibit 54 and permission to publish.

8          THE COURT:  Any objection to 54?

9          THE DEFENDANT:  No, your Honor.

10         THE COURT:  It's allowed.

11         (Government Exhibit 54 received in evidence.)

12    BY MS. KELLY:

13    Q.  Mr. Gutierrez, is this another vk.com post?

14    A.  Yes, it is.

15    Q.  Was it posted by the Fox News account?

16    A.  Yes, it was.

17    Q.  When was this post made?

18    A.  January 29th, 2019.

19    Q.  Could you please read the paragraph under the name, the

20    user name?

21    A.  "The next fed that plays billy bad ass, I will slither up

22    behind like a fucking snake and cut to the spine through the

23    Adam's apple.  They all sleep somewhere with future

24    terrorists."

25    Q.  Could you describe the photograph that appears underneath

1    the text?

2    A.   Yes.   It's a light-skinned hand holding a yellow box

3    cutter with a blade.

4    Q.   Is there a comment underneath this post?

5    A.   Yes, there is.

6    Q.   What account posted the comment?

7    A.   Robert Haas.

8    Q.   Could you read the first two lines of the comment?

9    A.   "As a kike owned poison Heinz company says, good thing

10   comes to those who wait in the bushes for kikes and kike

11   lovers."

12         THE DEFENDANT:   Excuse me, your Honor.   What does

13   that last line say right there?   I'd like him to read that.

14         THE COURT:   The witness has already read the part

15   that was asked.   And if on cross-examination you want to ask

16   about this particular one, that's perfectly fine.

17         MS. KELLY:   Your Honor, we seek the admission of

18   Exhibit 57 and permission to publish.

19         THE COURT:   Okay.   Any objection to 57?

20         THE DEFENDANT:   No, your Honor.

21         THE COURT:   It's allowed.

22      (Government Exhibit 57 received in evidence.)

23         THE DEFENDANT:   Your Honor, I do object to you

24   keeping the jury in the dark about all these --

25         THE COURT:   Mr. Haas, commentary on the prior

1    evidentiary decisions shall not be made in front of the jury.

2    We have had -- we have had multiple pretrial conference

3    sessions to try to get you to this point.  You've had --

4              THE DEFENDANT:  I'm being railroaded, your Honor.  I

5    want --

6              THE COURT:  Mr. Haas --

7              THE DEFENDANT:  -- the jury to see the full truth.

8              THE COURT:  Mr. Haas, please stop speaking so that I

9    can finish the point.

10             And we've had multiple discussions before the trial

11   to try to see if we can have this run as smoothly as possible.

12   And I want to continue to give you that opportunity to ask

13   questions and offer exhibits especially during your testimony,

14   but you cannot repeat argument in front of this jury.

15             THE DEFENDANT:  Your Honor, you're offering --

16             THE COURT:  No.  Mr. Haas, if -- if you continue to

17   put argument in front of the jury, then I will have to take

18   steps such as terminating your ability to examine the witness.

19   I do not want to do that.

20             Let's convene a sidebar so Mr. Haas can, outside the

21   presence of the jury, tell me what he wants to say.

22        (Proceedings heard at sidebar:)

23             THE COURT:  Okay.  Mr. Haas, go ahead.

24             THE DEFENDANT:  Your Honor, you are keeping the jury

25   from seeing the full evidence.  If a piece of evidence

Gutierrez - direct

298

1    constitutes a link in a chain of events, it is relevant.  The

2    main limitation of the relevance rule is that the connection

3    must be based on reason and logic.  Is it not reasonable or

4    logical when the information is there, part of the post, that

5    the jury should see at all?

6           THE COURT:  Mr. Haas, you are not at the point,

7    first, of asking questions.  And so the direct examination of

8    the government is not the time for you to try to introduce

9    exhibits or parts of exhibits.  We went through an exhibit

10   examination before the trial.  And again, you will have an

11   opportunity during your direct examination to offer additional

12   exhibits.

13          Sometimes as a trial goes on, there are opportunities

14   to revisit prior evidentiary decisions, but that must be done

15   outside the presence of the jury because you're just putting

16   argument in front of them.  So again, I believe you're well

17   aware of that line, and you have repeatedly crossed it

18   intentionally.  I do not want to take away from you the

19   opportunity to examine this witness or others, but I have

20   little other recourse by which to give you an incentive to

21   comply.

22          So you must understand this warning.  And if you want

23   to revisit -- and I actually had made a note to revisit at

24   least one of these exhibits at the end of the day outside the

25   presence of the jury, but you will stop presenting argument in

1    front of the jury.

2          THE DEFENDANT:  Your Honor, these -- these posts that

3    they are showing the jury is creating a false intent.  It is

4    showing them -- it is taking the posts out of the context that

5    it was originally in.  That is the rule for the remainder of

6    related writings.  That is why that rule is made so they can't

7    do this to me.

8          THE COURT:  And this is --

9          THE DEFENDANT:  They are changing the context of the

10   post, every single one of these posts.

11         THE COURT:  Mr. Haas, you're done with this line of

12   argument because you have made it before and I have decided it

13   before.  Again, it is possible to revisit evidentiary

14   decisions during a trial.  And we have already reviewed

15   exhibits before trial that you will be presenting to the jury.

16   So you well know this line and you continue to cross it.  So

17   stop repeating the arguments that you have made before in

18   front of the jury, and we can take it up outside the presence

19   of the jury.

20         The sidebar is adjourned, and the government can

21   continue its line of questioning.

22      (Proceedings heard in open court:)

23   BY MS. KELLY:

24   Q.  Mr. Gutierrez, I believe we were on Government Exhibit 57.

25   Could you identify this document?

Gutierrez - direct

300

1    A.   Yes.  This is a VK Fox News post.

2    Q.   What is the date?

3    A.   February 1st, 2019.

4    Q.   Could you please read the first paragraph under the post?

5    A.   "Funny when bitch feds come around with opinions about my

6    attitude.  I need anger management.  I'll manage my anger on

7    Jew lover pigs guilty of treason with a baseball bat and razor

8    blade, faggot.  Time is up, pigs.  I warned ya."

9    Q.   Is there a comment underneath this post?

10   A.   Yes.

11   Q.   Which account made the comment?

12   A.   Robert Haas.

13   Q.   What was the date of the comment?

14   A.   February 1st, 2019.

15   Q.   Could you please read the first line?

16   A.   "Killing Jew lover feds is pro-American security and

17   totally acceptable."

18        MS. KELLY:  Your Honor, I seek the admission of

19   Exhibit 58 and permission to publish.

20        THE COURT:  Any objection to 58?

21        THE DEFENDANT:  Yes, your Honor.

22        THE COURT:  All right.  Let's adjourn to sidebar --

23   we'll convene a sidebar.  Excuse me.

24      (Proceedings heard at sidebar:)

25        THE DEFENDANT:  Your Honor, I'm not being given a

1    fair trial here.

2            THE COURT:  Okay.  Did you have a specific objection

3    to 58?

4            THE DEFENDANT:  Again, they are taking everything out

5    of context here, your Honor.  Every single post, they are

6    putting their own intent into it.

7            THE COURT:  Okay.  And this is why I have been asking

8    you whether there was any objection other than prior

9    objections.  So you have preserved your objection as to the

10   redactions on the exhibits.  So do you have any objection

11   other than the previous ones to 58?

12           THE DEFENDANT:  No, your Honor.

13           THE COURT:  All right.  58 is allowed.

14       (Proceedings heard in open court:)

15           THE COURT:  All right.  58 is allowed.

16       (Government Exhibit 58 received in evidence.)

17   BY MS. KELLY:

18   Q.  Mr. Gutierrez, could you please identify the post

19   identified as Government Exhibit 8 -- 58?

20   A.  Yes.  This is a Robert Haas VK post made on February 7,

21   2019, and reposted by Fox News.

22   Q.  Could you please read the first line under the post?

23   A.  "If I thought feds were following me around, I would have

24   to hurt them for their unAmerican activities, a/k/a treason."

25   Q.  Could you please read the line underneath the redacted

1    section?

2    A.  "Supporting Jews is treason against not only Americans but

3    humanity altogether, so you best take heed, State Department,

4    FBI, state police, etcetera."

5         MS. KELLY:  We next seek the admission of Exhibit 59

6    and permission to publish.

7         THE COURT:  Any objections other than previous ones?

8         THE DEFENDANT:  No.

9         THE COURT:  All right.  59 is allowed.

10        (Government Exhibit 59 received in evidence.)

11   BY MS. KELLY:

12   Q.  Mr. Gutierrez, could you please describe Government

13   Exhibit 59?

14   A.  Yes.  This is a VK Fox News post made on February 11th,

15   2019.

16   Q.  What does the post say?

17   A.  "Anyone trying to make" -- excuse me.  "Anyone trying to

18   take your freedom of speech, kill them, the judge, prosecutor,

19   complaining witnesses, and their families."

20   Q.  Is there a hyperlink at the bottom of that post?

21   A.  Yes, there is.

22   Q.  What name is associated with the hyperlink?

23   A.  Robert Haas.

24        MS. KELLY:  We next seek the admission of Exhibit 60

25   and permission to publish.

Gutierrez - direct

303

1    THE COURT:  Any objection to 60 other than previous

2    ones?

3    THE DEFENDANT:  No, your Honor.

4    THE COURT:  60 is allowed.

5    (Government Exhibit 60 received in evidence.)

6    BY MS. KELLY:

7    Q.  Mr. Gutierrez, could you please describe Government

8    Exhibit 60?

9    A.  Yes.  This is a VK Fox News post made on February 12th,

10   2019.

11   Q.  Could you please read the first paragraph of this post?

12   A.  "These faggot feds thought they could push me to stop

13   telling the facts.  They didn't know I think they're a joke.

14   Bitches.  I push death, son, not intimidation.  I won't make

15   threats, I'll just come kill you who represent Jews and try to

16   obstruct my First Amendment rights."

17   Q.  Could you please read the section of the post starting

18   with, "Best choose your side"?

19   A.  "Best choose your side wisely.  Take heed.  When we round

20   you up your -- it's your future terrorist families who will

21   also be a liability.  We will get you."

22   Q.  Is there a comment at the bottom of the post?

23   A.  Yes, there is.

24   Q.  What's the name of the account that made the comment?

25   A.  Robert Haas.

Gutierrez - direct

1    Q.  What's the date of the comment?

2    A.  February 12th, 2019.

3    Q.  What does the comment say?

4    A.  "Your time is up, clowns."

5            MS. KELLY:  We seek the admission of Exhibit 61,

6    permission to publish.

7            THE COURT:  Any objection other than previous ones?

8            THE DEFENDANT:  No, your Honor.

9            THE COURT:  61 is allowed.

10       (Government Exhibit 61 received in evidence.)

11   BY MS. KELLY:

12   Q.  Could you describe this post?

13   A.  Yes.  It's a VK Robert Haas post made on February 13th,

14   2019, and reposted by Fox News.

15   Q.  Was this posted on vk.com?

16   A.  Yes, it was.

17   Q.  Are all the posts that we have discussed in your testimony

18   and will discuss posted on vk.com?

19   A.  Yes, they were.

20   Q.  And I may have missed it.  Did you -- could you give us

21   the date of the post?

22   A.  February 13th, 2019.

23   Q.  Could you please read the post?

24   A.  "If I am prosecuted for telling the truth, I'm killing

25   everyone involved down to the bitch Jews crying pressing

Gutierrez - direct

305

1    charges.  Jews will pay for their crimes against humanity in

2    my lifetime.  Bet your ass bitches, I'm coming to get ya."

3                MS. KELLY:  Your Honor, we next seek to introduce

4    Exhibit 62.

5                THE COURT:  All right.  Any objection other than the

6    previous ones?

7                THE DEFENDANT:  No, your Honor.

8    BY MS. KELLY:

9    Q.   Could you describe Exhibit 62?

10   A.   Yes.  It's a VK post made by Robert Haas on February 13th,

11   2019.

12   Q.   Could you please read the post?

13   A.   "I would consider killing a federal officer the same as

14   killing a Jew.  They are terrorists and protect terrorists."

15               MS. KELLY:  We seek to admit Exhibit 64.

16               THE COURT:  Okay.  Any objection other than the

17   previous ones, Mr. Haas?

18               THE DEFENDANT:  No, your Honor.

19               THE COURT:  It's allowed.

20         (Government Exhibit 64 received in evidence.)

21   BY MS. KELLY:

22   Q.   Mr. Gutierrez, could you identify this post?

23   A.   Yes.  It's a VK Fox News post made on February 14th, 2019.

24   Q.   Could you please read the text of this post?

25   A.   "I have decided amongst myself the next fed who comes

Gutierrez - direct

306

1  pointing guns like jump-out boys because they wanna chat, I

2  will butcher their families."

3  Q.  Can you continue reading?

4  A.  "Whoever, owing allegiance to the United States, levies

5  war against them or adheres to their enemies, giving them aid

6  and comfort within the United States or elsewhere, is guilty

7  of treason and shall suffer death."

8          MS. KELLY:  We seek the admission of 65.

9          THE COURT:  Any objection other than previous ones?

10          THE DEFENDANT:  No, your Honor.

11          THE COURT:  65 is allowed.

12      (Government Exhibit 65 received in evidence.)

13  BY MS. KELLY:

14  Q.  Mr. Gutierrez, what is this document?

15  A.  These are VK posts made by Robert Haas.

16  Q.  What account posted the content in this document?

17  A.  Robert Haas.

18  Q.  What are the dates of the posts?

19  A.  February 14th, 2019.

20  Q.  Could you please read the first comment identified on this

21  page that I've blown up?

22  A.  "The day I run up on a maggot fed, there won't be no hands

23  up, it will be head popped off" -- excuse me.  "It will be

24  head popped open off its shoulders before it blinks."

25  Q.  Is there another comment two entries down by the Robert

1    Haas account?

2    A.  Yes, there is.

3    Q.  Could you please read that comment?

4    A.  "You maggot terrorist kike lovers best get to fleeing my

5    country to somewhere humanity won't hunt you bitches down.

6    Lol."

7              MS. KELLY:  We seek the admission of 66.

8              THE COURT:  Any objection other than previous ones?

9              THE DEFENDANT:  No, your Honor.

10             THE COURT:  66 is allowed.

11         (Government Exhibit 66 received in evidence.)

12   BY MS. KELLY:

13   Q.  Could you please describe Government Exhibit 66?

14   A.  Yes.  It's a VK Robert Haas post made on February 15th,

15   2019, and reposted by Fox News.

16   Q.  Could you please read the post?

17   A.  "I don't know how many -- how many in my friends list are

18   pigs or Jews, so listen, faggots.  You absolutely will not

19   stop me.  Anyone who attempts to, I have every right to cut

20   that person's family up like meat.  You baby cocksuckers will

21   not do a fucking thing to me without paying flesh reparations.

22   I don't give a fuck who or what you think you are, you are a

23   traitor to Americans and humanity.  I will make you pay.  Kill

24   Hasbara JIDF agents."

25             MS. KELLY:  We seek the admission of Exhibit 68.

Gutierrez - direct

308

1        THE COURT:  Any objection other than previous ones?

2        THE DEFENDANT:  No, your Honor.

3        THE COURT:  68's allowed.

4        (Government Exhibit 68 received in evidence.)

5    BY MS. KELLY:

6    Q.  Could you please describe Exhibit 68?

7    A.  Yes.  This is a VK Fox News post made on February 16th,

8    2019.

9    Q.  Could you please read the post?

10   A.  "The next cop who tries to intimidate me for telling the

11   truth, I'm going to stab its entire family to death:  Fact."

12   Q.  Could you read the language underneath the redacted

13   section?

14   A.  "Defend Jews and aggravate me, you will lose everything

15   you love, I promise.  Jews and Jew-loving trash."

16   Q.  Are there any comments underneath the post?

17   A.  Yes, there are.

18   Q.  What account made the comments?

19   A.  Robert Haas.

20   Q.  What is the date of the comments?

21   A.  February 16th, 2019.

22   Q.  Could you please read the first comment?

23   A.  "If the cop doesn't have family, I'm taking his bosses and

24   himself."

25   Q.  Could you read the second comment?

Gutierrez - direct

309

1  A.  "I'm probably going to bash his face off his skull as I

2  extract his employer's home location."

3          MS. KELLY:  We seek the admission of Exhibit 70.

4          THE COURT:  Any objection other than previous ones?

5          THE DEFENDANT:  No, your Honor.

6          THE COURT:  70 is allowed.

7      (Government Exhibit 70 received in evidence.)

8  BY MS. KELLY:

9  Q.  Could you please describe this exhibit?

10  A.  Yes.  This is a VK Robert Haas post made on February 23rd,

11  2019, and reposted by Fox News.

12  Q.  Could you read the post?

13  A.  "These faggot Jews are burnt up when it comes to silencing

14  me.  Anyone who tries, I'll kill its family while extracting

15  who sent em'.  Defend terrorist kikes and die, maggots.  Try

16  me.  I'm gonna get you, pieces of dog shit Jews."

17          THE DEFENDANT:  Your Honor, I object.  These aren't

18  real threats.  These are just blanket statements.  And if they

19  were real threats --

20          THE COURT:  Mr. Haas, that's argument, and you know

21  it's argument.  Sustained.

22          Next question.

23          MS. KELLY:  We seek the admission of Exhibit 73.

24          THE COURT:  Any objection other than the previous

25  ones?

1          THE DEFENDANT:  No, your Honor.

2          THE COURT:  It's allowed.

3       (Government Exhibit 73 received in evidence.)

4    BY MS. KELLY:

5    Q.  Could you please describe Exhibit 73?

6    A.  Yes.  This is a VK Robert Haas post made on April 5th,

7    2019, and reposted by Fox News.

8    Q.  Could you please read the post?

9    A.  "Hello, my name is Bob, and I'm an agnostic extremist.

10   Extremely mean and obnoxious with the facts.  I can't help it.

11   I hate ignorance and stupidity, and I'm going to personally

12   kill Hasbara JIDF agents in my country and their terrorist

13   kike families.  100 percent, you best leave fast, but there's

14   nowhere to hide from me.  I'll go anywhere."

15          MS. KELLY:  We seek the admission of Exhibit 74.

16          THE COURT:  Any objection --

17          THE DEFENDANT:  No, your Honor.

18          THE COURT:  -- other than previous ones?

19          Just to preserve your prior objection, any objection

20   other than the previous ones?

21          THE DEFENDANT:  No, your Honor.

22          THE COURT:  All right.  It's in.

23       (Government Exhibit 74 received in evidence.)

24   BY MS. KELLY:

25   Q.  What is Exhibit 74?

Gutierrez - direct

311

1   A.   This is a VK Robert Haas post made on April 7th, 2019, and

2   reposted by Fox News.

3   Q.   Could you please read the paragraph of the post?

4   A.   "Lots of feds, federal officers, State Department, AIPAC,

5   Jews will be killed when Americans see the Jewish trash plan.

6   I'm okay with killing feds.  As a matter of fact, I am going

7   to make this happen.  They have met their ending here."

8              MS. KELLY:  We next seek the admission of Exhibit 75.

9              THE COURT:  Any objection other than previous ones?

10             THE DEFENDANT:  No, your Honor.

11             THE COURT:  It's allowed.

12        (Government Exhibit 75 received in evidence.)

13  BY MS. KELLY:

14  Q.   Mr. Gutierrez, could you please describe Exhibit 75?

15  A.   Yes.  This is a VK Robert Haas post made on May 12th,

16  2019, and reposted by Fox News.

17  Q.   Could you please read the post?

18  A.   "This FBI officer demonstrated through behavior that he

19  is, in fact, guilty of treason and must be exterminated for

20  his anti-American treason.  He said, 'What do Palestinians'

21  passports say on them?'  They say, 'Kill Hasbara agents.'"

22  Q.   Is there a caption toward the bottom of this post?

23  A.   Yes, there is.

24  Q.   What does it say?

25  A.   "FBI Jew and his retard friend."

Gutierrez - direct

312

1   Q.   Does this post identify the number of views?

2   A.   Yes.

3   Q.   How many?

4   A.   331.

5   Q.   Could you describe the photograph that appears in this

6   post?

7   A.   Yes.  It's actually a still image of a video that was

8   posted, and towards the middle in the black coat is TFO

9   Kostuchowski.

10  Q.   How do you know what Joe Kostuchowski looks like?

11  A.   He was assigned to CT5.

12  Q.   In addition to the internet posts that you discussed in

13  your testimony, did you find any other vk.com content

14  associated with Robert Haas?

15  A.   Yes, I did.

16  Q.   What was the format of that content?

17  A.   Videos.

18  Q.   Have you reviewed before testifying today the videos that

19  the government has identified as Government Exhibits 76 and

20  78?

21  A.   I have.

22  Q.   What is the name of the account that posted the videos?

23  A.   Robert Haas.

24  Q.   Were those videos posted on vk.com?

25  A.   They were.

Gutierrez - direct

1   Q.  Did you locate any additional videos on vk.com?

2   A.  I did.

3           MS. KELLY:  Your Honor, we seek the admission of

4   Government Exhibit 77.

5           THE COURT:  Any objection other than previous ones?

6           THE DEFENDANT:  No, your Honor.

7           THE COURT:  All right.  77 is allowed.

8        (Government Exhibit 77 received in evidence.)

9        (Government Exhibit 77 played in open court.)

10  BY MS. KELLY:

11  Q.  Mr. Gutierrez, what is this video?

12  A.  This is a video that was posted by Robert Haas on May

13  12th, 2019, with the title "Treasonous FBI agent Joe in

14  Chicago."

15  Q.  Does the screenshot depict a phone?

16  A.  Yes, it does.

17  Q.  And what is the first line?

18  A.  "Faggot FBI bitch."

19  Q.  Is a mobile number identified?

20  A.  Yes.

21  Q.  Do you recognize that phone number?

22  A.  Yes, I do.

23  Q.  Whose phone number is it?

24  A.  That's the phone number assigned to FBI TFO Kostuchowski.

25  Q.  Mr. Gutierrez, did you find this video on the internet?

1   A.  I did.

2   Q.  And you found it through a Google search?

3   A.  Yes.

4        MS. KELLY:  Nothing further at this time, your Honor.

5        THE COURT:  Cross-examination?

6                    CROSS-EXAMINATION

7   BY THE DEFENDANT:

8   Q.  You're the FBI's analyst of telephone communications?

9   A.  That's not my only job title but yes, I did review

10  telephone records.

11  Q.  On June 10th, 2019, a report was produced that there was

12  194 calls from my telephone to Joe Kostuchowski's phone.  And

13  then there was a second analysis made that admitted it was

14  only 25 calls.  That's 87 percent of those calls were

15  fictitious, or less than 13 percent of them were real.

16        MS. KELLY:  Your Honor, object.

17  BY THE DEFENDANT:

18  Q.  Can you tell me which one of those two numbers is real?

19  Was it 194 or was it 25 calls?

20        THE COURT:  All right.  Mr. Haas, in order to try to

21  set up some kind of impeachment, break it up one fact at a

22  time.  All right.  So start with one and then move on to the

23  second one and then see where you can get.  All right.  But

24  that was a compound question.

25  BY THE DEFENDANT:

Gutierrez - cross

1    Q.  Was it 194 calls or was it 25 calls?

2    A.  Between what timeframe?

3    Q.  Total, altogether.

4    A.  It exceeded that number.

5    Q.  It exceeded which number?

6    A.  The 1- -- can you ask your question again?

7    Q.  Are you telling me I called this gentleman 194 times in

8    one day within a 24-hour period?

9    A.  No.  I think between the entire timeframe, between May 8th

10   of 2019 through June 11, 2019, there was over 100 contacts.

11   Q.  100 contacts or telephone calls?

12   A.  Contacts.

13   Q.  Contacts?

14   A.  Correct.

15   Q.  This says 194 calls and 71 texts.

16   A.  That would be incorrect.

17   Q.  That would be incorrect or correct?

18   A.  Incorrect, sir.  I did not observe 195 -- '4 phone calls.

19   Q.  It's on Exhibit 32 of mine.  It's the FBI report from your

20   headquarters.

21        MS. KELLY:  Your Honor, if I'm thinking of the same

22   report, we may need a sidebar to see who the author was.

23        THE COURT:  All right.

24      (Proceedings heard at sidebar:)

25        THE COURT:  All right.  Mr. Haas, are you referring

1    to a government exhibit or a defense exhibit?

2              THE DEFENDANT:  Defense Exhibit 33.

3              MS. KELLY:  33.

4              THE COURT:  Okay.  33.  Yes, I believe Mr. Potts is

5    the author of that report.  Is that correct, Ms. Kelly?

6              MS. KELLY:  Yes.

7              THE COURT:  Okay.  On the July 26th order, Mr. Haas,

8    I tried to explain in the chart of your exhibits that these

9    statements are all from reports authored by Christopher Potts.

10   If Potts testifies at trial, then Haas may cross-examine Potts

11   on the statements in his report.  So this is not the author

12   and witness, and so the question as put to him is improper

13   impeachment.

14             THE DEFENDANT:  Okay, your Honor.

15        (Proceedings heard in open court:)

16             THE DEFENDANT:  Can we go back to Government Exhibit

17   74?

18             THE COURT:  All right.  So you're asking the

19   government to explain -- I'm sorry, to display Government

20   Exhibit 74?

21             THE DEFENDANT:  Yes.  Government Exhibit 74.

22             THE COURT:  All right.  I'll ask the government to do

23   that.

24             THE DEFENDANT:  And can we zoom in on this document

25   right here?  Just the document, not any of the other text or

Gutierrez - cross

1    anything else, just the page right there.  Yes.

2    BY THE DEFENDANT:

3    Q.  Can you read that to us, please, sir?

4    A.  The entire document, sir?

5    Q.  Yes.  It will just take a minute.

6            MS. KELLY:  Your Honor, objection.  I think this is

7    crossing into some of the prior rulings.

8            THE COURT:  Okay.  I'll allow it because this was --

9    this piece of it was allowed.  And I'll allow Mr. Haas to get

10   it in at this time.

11           Just do the best you can.  I know there can be some

12   fuzziness to it.

13   BY THE WITNESS:

14   A.  Yes.

15           "Disarmament Commission, Civilian Weapons

16       Confiscation Study Group, New York, 29 through 31st, July

17       2013.  The issue of military-grade weaponry in the hands

18       of civilians looms ever larger in the face of the global

19       implementation of 22 agenda 21 by member nations.  In

20       particular, the United States of America has an estimated

21       500 million weapons in the hands of its civilian

22       population.  This is not just a static problem, it is a

23       massive dynamic problem for the process of confiscation

24       as there will be those who refuse to surrender their

25       firearms.  The conclusion of discussions by the CWCSG led

1    to the adoption of proposed agenda to begin the process

2    for introducing to member nations a framework by which

3    they can begin codification" -- I believe -- "of national

4    laws to disarm civilians within their borders through a

5    graduated process.  Within the discussion framework, we

6    have identified several problem areas that must be

7    addressed.  They are:  One, classification of

8    military-grade weapons to be made illegal for possession;

9    two, creation of programs to provide reasonable

10    compensation for voluntary surrender of said arms; 3,

11    codification of laws to begin the restricting and strict

12    licensing of consumable firearms; 4, codification of laws

13    to begin the restricting and strict licensing of

14    hunting-grade firearms; codification of laws to restrict

15    the sale of and possession of ammunition and components

16    to manufacturer ammunition; 6, finally, codification of

17    laws to completely makes any and all firearms illegal to

18    own, possess, or use outside of military and law

19    enforcement usage; 7, creation of a United Nations police

20    task force with the specific mission of assisting member

21    nations with the collection of weaponry from civilian

22    hands.  The CWCSG will submit its findings and final

23    recommendations once we have created the codification

24    framework for member nations for a full review by the

25    Office of the Secretary General."

| | |
|---|---|
| 1 | THE COURT: Next question. |
| 2 | BY THE DEFENDANT: |
| 3 | Q. No. 7, "Creation of a United Nations police task force |
| 4 | with the specific missions of assisting member nations with |
| 5 | the collection of weaponry from civilian hands," does this |
| 6 | sound like terrorism -- |
| 7 | THE COURT: All right. |
| 8 | THE DEFENDANT: -- to you? |
| 9 | THE COURT: Mr. Haas, hold on one second. |
| 10 | Mr. Gutierrez, do you have personal knowledge of this |
| 11 | document? |
| 12 | THE WITNESS: I do not. |
| 13 | THE COURT: Okay. Move on from this document. |
| 14 | THE DEFENDANT: Okay. Can we go to -- you know, |
| 15 | that's it, your Honor. I'm finished with this witness. |
| 16 | THE COURT: Any redirect examination? |
| 17 | MS. KELLY: Yes, your Honor. |
| 18 | REDIRECT EXAMINATION |
| 19 | BY MS. KELLY: |
| 20 | Q. Mr. Gutierrez, through your investigation, were you able |
| 21 | to ascertain approximately how many text messages that Robert |
| 22 | Haas sent to Joe Kostuchowski? |
| 23 | A. Well over 100. |
| 24 | MS. KELLY: No further questions. |
| 25 | THE COURT: Any recross based on that? |

1                    RECROSS-EXAMINATION

2     BY THE DEFENDANT:

3     Q.  You have a detailed phone list, but you only know that it

4     was well over 100.  You don't know how many?

5     A.  Without seeing my report, I don't recall the exact number.

6                THE DEFENDANT:  That's it, your Honor.

7                THE COURT:  All right.  Any redirect on that?

8                MS. KELLY:  No, your Honor.

9                THE COURT:  Okay.  Mr. Gutierrez, you are excused.

10    So I'm going to ask you to first put on a pair of gloves

11    actually because you're going to help us disinfect the area

12    that you just sat in.  And you can put on your mask, too.

13                All right.  And then after that, could you pull out a

14    wipe, disinfecting wipe, and you can wipe down the table

15    surface in front of you as well as then the chair, the armrest

16    of the chair.  And then after you've done that, you can just

17    throw all of that into the wastebasket and also throw the mike

18    cover into the wastebasket.  Thanks.

19         (Witness excused.)

20                THE COURT:  This is like the end of the "Sound of

21    Music," that movie where you're all looking off stage for,

22    "The Von Trapp Family singers."  They don't come in.

23                Actually, you can announce the name of your next

24    witness.

25                MS. KELLY:  Your Honor, may I confer with Mr. Jonas

1  for one moment?

2         THE COURT:  All right.

3      (Pause.)

4         MS. KELLY:  Your Honor, the government rests its

5  case.

6         THE COURT:  All right.  Let's have a sidebar.

7      (Proceedings heard at sidebar:)

8         THE COURT:  All right.  Let me just do a mike check

9  again.  Ms. Kelly, Mr. Jonas, can you hear me?  Yes?

10  Mr. Haas, give me a thumbs up.  And Ms. Singer?

11         All right.  Okay.  With the government resting the

12  case, Mr. Haas, do you want to present any motion?

13         THE DEFENDANT:  Not right now, your Honor.

14         THE COURT:  All right.  Mr. Haas, there is a federal

15  rule of criminal procedure, Rule 29, which says that if you

16  want to move for acquittal at the end of the government's

17  case, now is the time to make that motion.  Actually, I think

18  standby counsel is going to confer with you, so why don't you

19  read the notepad.

20      (Pause.)

21         THE DEFENDANT:  Yes, I'd like to make a Rule 29

22  motion.

23         THE COURT:  Okay.  So go ahead and just briefly state

24  your grounds as to why you think the government has not met

25  its burden of proof on the elements.

1    THE DEFENDANT:  First of all, they haven't proved any

2  of their charges.  I never specifically said I was coming to

3  kill someone, saying, "I'm coming to kill you, Judge Chang."

4  I never said anything like that.  I never said, "I'm coming to

5  kill Officer Kostuchowski" --

6    THE COURT:  Actually, you know, let me interrupt.  So

7  actually, what I think what would make sense is to let the

8  jury go, and then we can talk a little bit more easily because

9  there's obviously not going to be -- we're not going to start

10  with Mr. Haas' testimony today.

11    Does that make sense to you, Mr. Haas?

12    THE DEFENDANT:  Yes, your Honor.

13    THE COURT:  And the government?

14    MS. KELLY:  Yes, your Honor.

15    THE COURT:  All right.  Okay.  So we'll take this up

16  in a minute.  We'll end the sidebar.

17    (Proceedings heard in open court:)

18    THE COURT:  All right.  Ladies and gentlemen, we will

19  proceed tomorrow with the defense case, if any.  All right.

20  So we're going to end our trial day a little bit early.  I'm

21  going to give you your daily warnings.  You can probably

22  repeat these back to me better than I can say them.  Do no

23  research into the case, not the facts, the law, or the

24  parties.  Don't communicate with anyone about the case, even

25  amongst yourselves.  Continue to take the north bank of

1    elevators on the far end.  If you can, report again between

2    either 8:00 or 8:30 tomorrow morning.

3         Also, just as a court-wide instruction as we are

4    holding jury trials during this -- the pandemic, you do need

5    to stay in for lunch tomorrow.  I think a couple of you went

6    out.  So we are providing that lunch, or you can bring lunch.

7    There is a refrigerator and a microwave.  But I'm afraid you

8    can't go off and get your own lunch.

9         All right.  Have a good evening.  I will see you

10   tomorrow.

11        (Proceedings heard in open court.  Jury out.)

12        THE COURT:  All right.  Please be seated.

13        Okay.  Mr. Haas, you can resume with your Rule 29

14   motion.

15        THE DEFENDANT:  I'm sorry.  What was that?

16        THE COURT:  You can resume with your Rule 29 motion.

17   You were arguing about the elements.

18        THE DEFENDANT:  Your Honor, I'm looking for my

19   indictment, and I can't seem to find it.  Is there any

20   possibility we can do this tomorrow morning in the beginning?

21        THE COURT:  We could.  I think we're probably ahead

22   of schedule at this point.  Is that right?  The government

23   thinks -- agrees with that?

24        MR. JONAS:  Yes, your Honor.

25        THE COURT:  All right.  That's fine.  We'll do that.

1    Do you think you know where it is?

2              THE DEFENDANT:  Yeah, I know exactly where it is.

3              THE COURT:  Okay.

4              THE DEFENDANT:  I didn't bring it with me.  I didn't

5    think I was going to need it today.

6              THE COURT:  All right.  We'll take it up tomorrow

7    morning then first thing.

8              All right.  And then so, Mr. Haas, you still intend

9    to testify?

10             THE DEFENDANT:  Yes, your Honor.

11             THE COURT:  All right.  So have you written out your

12   questions yet, or are you going to do that tonight, you think?

13             THE DEFENDANT:  I have, but I'm going to add some

14   more to it now --

15             THE COURT:  All right.

16             THE DEFENDANT:  -- after today.

17             THE COURT:  And I want to ask Ms. Singer, are you

18   still comfortable with presenting the questions?

19             MS. SINGER:  From here?

20             THE COURT:  Yes.

21             MS. SINGER:  Yes.  I haven't -- your Honor, I have

22   not seen the questions obviously at this point but, I mean, I

23   can -- but at this point, I am, your Honor.

24             THE COURT:  Okay.  Why don't we -- we'll take up the

25   Rule 29 tomorrow morning, but why don't you also -- so are you

1      going to be comfortable with taking the paper from him?

2                MS. SINGER:  That's fine.

3                THE COURT:  So then I am going to ask you to just try

4      to take a look at it first thing in the morning.

5                MS. SINGER:  Perfect.

6                THE COURT:  Because you might need to confer with him

7      about the way it's formatted possibly.  I don't know what it's

8      going to look like and I have no intention, of course, on

9      reading it.

10               THE DEFENDANT:  Your Honor --

11               THE COURT:  One second.

12               And you're going to then ask questions from the end

13     of that table, correct?

14               MS. SINGER:  Correct.

15               THE COURT:  Okay.  Mr. Haas, you were going to say

16     something?

17               THE DEFENDANT:  I was going to say, I can put all my

18     questions on two or three sheets facing up and lay them out on

19     the table right there for her so she doesn't have to touch

20     them, also.

21               THE COURT:  Yes.  You can talk to Ms. Singer about

22     how to best do that.

23               Okay.  Is there anything else for the government

24     right now?

25               MR. JONAS:  Yes, your Honor.  We discussed, I think

1   it was yesterday morning, the government anticipates a

2   rebuttal case based upon what we expect Mr. Haas to testify

3   about.  For sure, I think we're going to call Agent, State

4   Department Agent David Noordeloos.  And as I discussed

5   yesterday, your Honor, I expect the rebuttal testimony to go

6   beyond those few clips that we identified in our 404(b)

7   motion.

8           I have with me transcripts of the clips of the

9   January 25th and 26th, 2018, meeting that Agent Noordeloos had

10  with the defendant.  I haven't looked at them myself.  I trust

11  that they're accurate, these clip transcripts.  I can hand the

12  copy to the Court, to the defendant, to Ms. Singer if they

13  want.  I don't know if anyone wants it.

14          THE COURT:  Okay.  So I -- if you could email them to

15  the proposed order account, I'd rather take it that way.

16          MR. JONAS:  Sure.

17          THE COURT:  And I bet Ms. Singer would rather have a

18  PDF, too, so include her in the email.  And then if Mr. Haas

19  wants, you can hand him the paper copy.

20          Now, the video clips themselves, do you have those

21  burned to a disk already?

22          MR. JONAS:  Yes.  Yes, one day it's audio, the second

23  day it's video, but I have a disk of them.

24          THE COURT:  All right.  And has that disk been

25  provided to Mr. Haas yet or not because it was rebuttal?

1        MR. JONAS:  The clips have not.  He has the entire

2   recordings, but these particular clips, no.

3        THE COURT:  Of course, they're a subset of recordings

4   that have already been turned over in discovery long ago,

5   correct?

6        MR. JONAS:  Correct.

7        THE COURT:  Okay.  Now, let me ask the deputy

8   marshals here, is Mr. Haas allowed to take a disk back with

9   him?

10       THE MARSHAL:  I don't know if he has the ability to

11   play it anywhere.

12       THE COURT:  That is -- the MCC, I've already arranged

13   with them --

14       THE MARSHAL:  Okay.

15       THE COURT:  -- that Mr. Haas, even in quarantine, has

16   access to a discovery computer, but can he physically take one

17   through receiving and discharge?

18       THE MARSHAL:  Yes, absolutely.

19       THE COURT:  So I'm going to ask you, do you have a

20   disk with you?  Okay.  So along with the paper copies of the

21   transcripts, provide Mr. Haas that disk as well.

22       MR. JONAS:  Your Honor, again, I haven't reviewed

23   them, so I'm assuming that everything is accurate.  I wanted

24   to qualify that.

25       THE COURT:  All right.  Why don't you hand it to the

1    marshals so they can just make sure there's no paperclip or

2    binder clip or anything.

3         MR. JONAS:  Actually, there is a paperclip in there.

4    I apologize.

5         THE DEFENDANT:  Thank you, your Honor.  I appreciate

6    that.  I know that's not normal protocol here.

7         THE COURT:  All right.  Anything else for the

8    government?

9         MR. JONAS:  No, your Honor.

10        MS. KELLY:  No, your Honor.

11        THE COURT:  All right.  Mr. Haas, did you have

12   anything else?

13        THE DEFENDANT:  No, your Honor, not at this point.

14        THE COURT:  Let me just raise one thing then.  This

15   issue of the World Trade Center photo which I think Mr. Haas

16   brought up repeatedly, I don't think any defense exhibit that

17   I allowed had that particular photo.  I am inclined to allow

18   the defendant during his testimony to show on one exhibit that

19   photo so that he can explain that this is his belief.

20        Again, the jury has already gotten the instruction

21   that whether they agree or disagree with the belief is not at

22   issue in the case, but the presence of the beliefs obviously

23   have relevance to motive and intent.  But I am inclined to

24   allow him to show at least that photo one time.  It's

25   repeatedly all over the other exhibits.

1        I think there is a Rule 403 risk with allowing that

2   photo at all and certainly more than one time.  So I am

3   inclined to allow him to show it one time.

4        THE DEFENDANT:  Your Honor, it's not one photo.  It's

5   four of them.  It's a group of four photos.

6        THE COURT:  I will try to identify from the exhibits

7   that you previously proposed the set of four.  And I think I

8   will be able to -- yes, I think I'll be able to turn it into a

9   PDF and then make it available to the government so then they

10  can display it.  So I'm going to let you do that for one

11  exhibit.  Do you understand, Mr. Haas?

12       THE DEFENDANT:  Yes, your Honor.

13       THE COURT:  The other thing I want to point out,

14  Mr. Haas, is this:  If you keep making -- well, I suppose in a

15  rebuttal case, if you present argument to the jury during what

16  is supposed to be cross-examination of the government's

17  witnesses then at the very least, I'm going to require that

18  before you make an objection you ask for a sidebar instead.

19  You just say, "Sidebar."  And then so you request a sidebar.

20  And I'll listen to it.  And if it's along the same lines,

21  which it repeatedly was, then I'll rule on that and then the

22  questioning will resume.

23       So at the very least, we will do that.  And I'm going

24  to tell the jury that I have instituted this procedure because

25  I think the jury is entitled to know why this new procedure

1   has come up.  So that is what's going to happen if you do that

2   during the government's rebuttal case.  Do you understand

3   that?

4          THE DEFENDANT:  I understand, your Honor.

5          THE COURT:  Okay.  We're adjourned -- oh, Ms. Singer?

6          MS. SINGER:  Sorry.  Your Honor, for the purposes of

7   his direct, if there -- the disks or the documents that he

8   wants played, is the government going to be displaying those

9   because I don't have -- or do you want me to bring --

10          THE COURT:  No, the government is going to be

11  displaying them.  That's why I --

12          MS. SINGER:  I just wanted -- okay.

13          THE COURT:  I provided to the government the -- you

14  did most of the legwork on it, and then we had to fix a few

15  things.  I provided that to the government.  They have that.

16  At this point the only thing they wouldn't have is the World

17  Trade Center photo exhibit.

18          MS. SINGER:  I just wanted to make sure.  Thank you.

19          THE COURT:  Okay.  Thanks, guys.

20      (Proceedings adjourned from 4:18 p.m. to August 5, 2020,

21      at 8:45 a.m.)

22

23

24

25

C E R T I F I C A T E

       I, Judith A. Walsh, do hereby certify that the foregoing is a complete, true, and accurate transcript of the proceedings had in the above-entitled case before the Honorable EDMOND E. CHANG, one of the judges of said court, at Chicago, Illinois, on August 4, 2020.


*/s/ Judith A. Walsh, CSR, RDR, F/CRR*_____   September 11, 2020

Official Court Reporter

United States District Court

Northern District of Illinois

Eastern Division