331

```
 1                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                             EASTERN DIVISION

 3   UNITED STATES OF AMERICA,          )
                                        )
 4              Plaintiff,              )
                                        )
 5              v.                      )  No. 19 CR 00486
                                        )
 6   ROBERT ANTHONY HAAS,               )  Chicago, Illinois
                                        )  August 5, 2020
 7              Defendant.              )  8:57 a.m.

 8                              VOLUME 3

 9                      TRANSCRIPT OF PROCEEDINGS

10         BEFORE THE HONORABLE EDMOND E. CHANG, and a Jury

11   APPEARANCES:

12   For the Plaintiff:        HON. JOHN R. LAUSCH, JR.
                               United States Attorney
13                             BY:  MS. ERIN E. KELLY
                                    MR. BARRY JONAS
14                             Assistant United States Attorneys
                               219 South Dearborn Street, Suite 500
15                             Chicago, Illinois 60604
                               (312) 353-5300
16
     For the Defendant:        MR. ROBERT ANTHONY HAAS,
17                             Pro se;

18   For the Defendant as      BEDI & SINGER, LLP
     standby counsel:          BY:  MS. DENA M. SINGER
19                             53 West Jackson Boulevard
                               Suite 1505
20                             Chicago, Illinois 60604
                               (312) 525-2017
21

22   Court Reporter:           Judith A. Walsh, CSR, RDR, F/CRR
                               Official Court Reporter
23                             219 South Dearborn Street, Room 2118
                               Chicago, Illinois 60604
24                             (312) 702-8865
                               judith_walsh@ilnd.uscourts.gov
25
```

1                          I N D E X

2    WITNESS                        DX     CX    RDX    RCX

3    ROBERT HAAS

4        Through Ms. Singer        346

5        By Ms. Kelly                     370

6    DAVID NOORDELOOS

7        By Mr. Jonas              412

8        By Mr. Haas

9    MATTHEW NAJDANOVICH

10       By Mr. Jonas              481

11       By Mr. Haas                      485

12                        E X H I B I T S

13   NUMBER                         RECEIVED IN EVIDENCE

14   Government's Exhibit

15       Nos. 112 through 125 and 1 and 2        419

16       Nos. 237 through 250                    425

17       Nos. 201 and 202                        444

18       Nos. 3, 4, 126, 127, and 128            460

19       Nos. 203, 204, 251, 252, and 253        460

20   Defendant's Exhibit

21       No. 6                                   353

22       No. 5                                   355

23       No. 7                                   358

24       No. 19                                  360

25

1         (Proceedings heard in open court.  Jury out.)

2              THE COURT:  19 CR, United States versus Haas.  Let's

3    get appearances for the government.

4              MS. KELLY:  Erin Kelly for the United States.

5              THE COURT:  And, Mr. Haas, if you could state your

6    first and last name.

7              THE DEFENDANT:  Robert Haas.

8              THE COURT:  And standby counsel?

9              MS. SINGER:  Dena Singer.

10             THE COURT:  All right.  Good morning, everyone.

11             MR. JONAS:  And Barry Jonas for the United States,

12   Judge.

13             THE COURT:  Good morning to you as well.

14             All right.  Let's pick up on the Rule 29 motion.

15   Mr. Haas, did you want to present further on that?

16             THE DEFENDANT:  Your Honor, I don't believe they have

17   met the burden of proof.  They have not proven my intent.  My

18   intent was self-defense.  And they are saying that I did it

19   out of malice to make threats, and that's absolutely not what

20   happened.

21             THE COURT:  Okay.  Given the standard is whether,

22   viewing the evidence in the light most favorable to the

23   government at the Rule 29 stage, whether a rational jury could

24   find the defendant guilty beyond a reasonable doubt.

25   Mr. Haas, I have already decided before the trial that

1    self-defense as a matter of law does not apply in this case.

2    Entrapment, that defense may be offered during your testimony.

3    And we're waiting for that testimony in any event.

4        In the government's case in chief, there is

5    sufficient evidence on all 13 counts to satisfy, given that

6    favorable standard to the government, that the defendant

7    committed violations both of threatening a federal law

8    enforcement officer under Section 115 and transmitted a threat

9    in interstate commerce under 875(c).

10       The overlapping element is that the defendant made

11   true threats, which means a serious expression of intent to

12   commit violence on a person or a group of persons.  The

13   content of the messages viewed in the light most favorable to

14   the government themselves would be sufficient to meet that

15   standard.  Additional contextual circumstances in terms of the

16   tone of the verbal threats and the surrounding circumstances

17   with regard to the defendant's motive is more than sufficient

18   to meet that.  For very many of those same reasons, the

19   government has met the Rule 29 barrier for the defendant's

20   intent to deliver a true threat or at the very least knowledge

21   that a reasonable person would perceive the threats as true

22   threats.

23       On the 115 counts, there's the additional intent

24   elements to impede or intimidate or interfere with a

25   government official in the performance of official duties or

1   with intent to retaliate against the officer for performing

2   official duties.  And that is met again by the content and

3   circumstances of the defendant's statements.

4           THE DEFENDANT:  Your Honor --

5           THE COURT:  And then -- you presented your motion,

6   and I'm now deciding it, Mr. Haas.

7           And then with respect to the 875 counts, the

8   additional element is interstate commerce.  And given the

9   evidence on the vk.com being a Russian social media site, that

10  element too has been met.

11          Okay.  Any other issues to take up before we situate

12  the defendant on the stand?

13          MR. JONAS:  Your Honor, can we just very briefly

14  discuss scheduling for today?  What I anticipate is, of

15  course, the defendant will testify.  It's my understanding

16  there are no other witnesses that he plans on calling.  We

17  then, as discussed we have, I think, two rebuttal witnesses.

18  I don't think -- I don't expect that the testimony will take

19  us through the end of the day.

20          I also assume we're going to have a charging

21  conference.  There are some instructions the government would

22  like to discuss with the Court.  What I'm asking is even if a

23  charging conference were done before 4:30, can we just do

24  closings tomorrow morning.

25          THE COURT:  That's what my plan was.  Are you all

1     right with that, Mr. Haas?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  No matter what, we'll do closings

4     tomorrow morning even if you finish early today.

5              MR. JONAS:  Thank you, Judge.

6              THE COURT:  Who are your rebuttal witnesses?

7              MR. JONAS:  State Department Agent David Noordeloos

8     and Ottawa Police Officer Matthew Najdanovich.

9              THE COURT:  Okay.  Yes.  He was on your may-call as

10    well.  All right.

11             Okay.  Any other issues?

12             MS. SINGER:  Judge, could I have one moment?

13             THE COURT:  Yes.

14             MS. SINGER:  I just need to communicate with him, and

15    I may just have to ask one thing of the Court.

16             Thank you.  Your Honor, in terms of Mr. Haas'

17    testimony, he has prepared questions that he would like me to

18    ask.  He has a copy of that for himself as well.  I would ask

19    if he be allowed to bring that up to the bench with him if he

20    chooses because it does have the exhibit numbers that he would

21    like shown during his testimony.

22             THE COURT:  Yes.  I was even going to suggest that he

23    bring up the order with the exhibit chart so that he --

24    because it's not so much factual information on there, but

25    maybe that would help him, too.  But at the very least, yes,

1   he can bring a copy of the questions with the exhibit numbers

2   next to them.  It's no different than a lawyer having the

3   direct exam written out with exhibit references in it.  So

4   that's fine with me.

5          MS. SINGER:  Thank you.

6          THE DEFENDANT:  Your Honor, I have a question --

7          THE COURT:  Yes.

8          THE DEFENDANT:  -- about the other evidence that I

9   asked to have admitted yesterday, last night.  Did you look at

10  that and prepare it?

11         THE COURT:  I have not seen any other motion that you

12  filed.

13         THE DEFENDANT:  No.  We spoke about it last night

14  before -- when we were leaving the courtroom about those

15  photos you were going to admit.

16         THE COURT:  Oh, you're right.

17         THE DEFENDANT:  Four photos.

18         THE COURT:  Yes.  So Defense Exhibit -- and it's

19  going to be Defense Exhibit 7 that you had proposed.  It's a

20  December 31st, 2018, text.  It has the four photos.  I emailed

21  this to Ms. Singer last night, too, just to keep her in the

22  loop.

23         MS. SINGER:  I did receive it.

24         THE COURT:  So and I also emailed it to the

25  government.  So when you request them to display it --

338

1          MR. JONAS:  I have a copy I can hand to the

2    defendant.

3          THE COURT:  Yes.  Thank you.

4          MR. JONAS:  Mr. Haas, are you okay if I hand you a

5    copy of the exhibit?

6          THE DEFENDANT:  Yes.

7          THE COURT:  All right.  For the record, Mr. Jonas is

8    handing Mr. Haas a copy of Defense Exhibit 7.

9          THE DEFENDANT:  Your Honor, this is only two of the

10   photos.  There's four photos on the page that I was looking

11   for.  It was discovery Page 320 --

12         THE COURT:  So the exhibits that you had proposed --

13         THE DEFENDANT:  -- on disk 1.

14         THE COURT:  Yes.  Go ahead.  Go ahead.  You were

15   saying something.

16         THE DEFENDANT:  That was it.  That was it.  Disk 1,

17   Page 320.

18         THE COURT:  Okay.  The problem with 320 was that it

19   also contained parts of a *New York Times* article.  So that

20   additional evidentiary problem unfortunately infects that

21   proposed exhibit.  It was Exhibit 18.  And so I did my best to

22   give you some leeway despite the Rule 401 and 403 problems

23   with this particular line of evidence, but yes, I cannot give

24   you 18.  So you're going to have to live with Exhibit 7.

25         THE DEFENDANT:  Your Honor, the rules of evidence

1   state that a newspaper is self-authenticating and that it is

2   allowed unless there's a question of its authenticity.  And I

3   did file a motion to have the original brought into court, and

4   you denied that, your Honor.

5         THE COURT:  It's not a question of authenticity which

6   is a 901 issue, Rule 901 issue.  It's a matter of hearsay

7   rules as well and also relevance and, as I said before, Rule

8   403.  So you can use that Defense 7 but I'm not -- I'm still

9   disallowing Defense 18.

10        So you can work that into your direct examination.

11  There's no doubt that you're going to have to reformulate some

12  questions on the fly probably.  And then for redirect

13  examination, if there's any -- obviously, you haven't written

14  those down.  So you are going to have to make some attempts

15  from the witness stand to formulate questions to ask yourself.

16  So you can make a note now somewhere on your exam outline for

17  Defense 7 to remind yourself to ask yourself that question.

18  But I don't think you prepared one in advance for Ms. Singer,

19  right, on this particular exhibit?

20        MS. SINGER:  Correct.

21        THE DEFENDANT:  No.  She can just add that to No. 15.

22        THE COURT:  Oh, okay.  Do you understand?  He just

23  said add it to No. 15.  Does that make sense to you?

24        THE DEFENDANT:  Defense 7, add that to the exhibit

25  for No. -- question 15.

1          MS. SINGER:  I'll figure it out.

2          THE COURT:  Okay.  All right.  Anything else,

3     Mr. Haas?

4          THE DEFENDANT:  No, your Honor.

5          THE COURT:  All right.  So before --

6          THE DEFENDANT:  I'm sorry.

7          THE COURT:  Go ahead.

8          THE DEFENDANT:  Is it possible I could have a break

9     in between so I can write my follow-up questions?

10          THE COURT:  The way it will work is after

11     cross-examination, I'd be willing to give you a pause so you

12     can try to think of some redirect questions, but it's not

13     going to be a long one.  Maybe we'll shoot for the midmorning

14     break or something like that, but not during the direct exam.

15     Once we get going, unless we hit a natural break, then I'm not

16     going to just break.

17          THE DEFENDANT:  No, I understand.  There's just no

18     way for me to get these questions to her.  I need a moment to

19     write them down.

20          THE COURT:  What I mean -- that's what I meant by,

21     you will have to think of some questions on the fly because

22     for redirect examination -- and this is what lawyers have to

23     do, too.  Depending on how the cross-examination goes, you

24     will have to formulate some redirect questions.  You're not

25     going to have to write them down in a way that Ms. Singer will

1    then ask the question.

2        I'm saying that you can just jot some notes to

3    yourself on what the questions that you're going to ask

4    yourself on redirect examination.  Okay.  So redirect happens

5    after the cross-examination.  All right.  You understand that?

6        THE DEFENDANT:  I understand.  But I'm supposed to

7    just narrate?

8        THE COURT:  No.  At that point you're going to be --

9    it will be awkward.  And I tried to remove as much of the

10   awkwardness as possible, but you're going to have to ask

11   yourself the -- you'll have to ask yourself the question.  And

12   then that way, the government will have an opportunity to

13   object to the question, and then I'll decide whether you can

14   answer it.

15       THE DEFENDANT:  You want me to ask myself the

16   question in the third person sitting on the stand?

17       THE COURT:  You can do it however you like on that

18   one, like if you want to say the first person or if you want

19   to use third person.  That doesn't matter to me.  It is --

20   like I said, we talked about this during the pretrial.  It is

21   awkward.  I'm trying to minimize that awkwardness for the

22   direct exam.

23       I can't do anything else about that for the redirect

24   because I don't think it's fair to the jury to just wait for

25   you to write everything out and then give it to Ms. Singer,

1   plus even though you are pro se and I'm trying to give you

2   leeway here, it's not like I would take a break and let

3   lawyers type out all their questions for redirect.  That's not

4   the way it goes.

5           THE DEFENDANT:  I understand.

6           THE COURT:  Okay.  Anything else for the government?

7           MR. JONAS:  Your Honor, just if I can ask Mr. Haas,

8   we made some minor corrections to the transcripts for the

9   testimony of David Noordeloos last night.  Both Ms. Singer and

10  the Court has it.  Would you like a hard copy?

11          THE COURT:  Why don't you just give it to him.  These

12  are -- it's an updated form of the transcripts that the

13  government anticipates introducing in Mr. Noordeloos'

14  testimony.

15          MR. JONAS:  Yes, your Honor.  And we sent the

16  defendant a small, a page and a half report that Agent

17  Noordeloos wrote.  We sent it Monday to the MCC.  I don't know

18  if he received it or not.  I'm going to leave that here as

19  well.

20          THE COURT:  All right.

21          MR. JONAS:  Nothing else from the government, your

22  Honor.

23          THE COURT:  Now, Mr. Haas, so in a moment I'm going

24  to ask you to just take the witness stand so that you don't

25  have to walk past the jurors.  However, if we have to have a

1   sidebar during the testimony, you are going to have to come

2   off the stand and then go back there to your seat at the table

3   so that you can read what's happening -- or actually, get your

4   headset and listen to what's happening.  When you do that,

5   though, try to remember to put your mask back on before you

6   leave that witness stand and walk back to the table.  All

7   right?

8            THE DEFENDANT:  Yes, sir.

9            THE COURT:  Okay.  So why don't you come on up.  You

10  can bring a copy of your questions.

11           THE DEFENDANT:  Can I bring a pen?

12           THE COURT:  A pen?  Yes, that's fine.

13           Can you grab a mike cover?

14           MS. SINGER:  Your Honor?

15           THE COURT:  Yes.

16           MS. SINGER:  Do you want me to -- for hearing

17  purposes for the transcript, is it better for me to stand, or

18  do you want me to stay seated here?

19           THE COURT:  How is it, Judy?  Was it okay with her

20  sitting?

21           THE COURT REPORTER:  It's fine.

22           THE COURT:  She'll let us know if you need to stand,

23  but I think sitting might be okay.

24           All right.  Let's get the jury.

25       (Pause.)

1          MS. SINGER:  Your Honor, unless directed otherwise,

2    I'm just going to be reading these questions as written.

3          THE COURT:  That's right.  I'm going to tell the jury

4    that, too.

5          I just want to make sure, Mr. Haas, you understand

6    you do have a right to not testify.  And if you decided to not

7    testify, I would instruct the jury that they could take no

8    hint or suggestion of guilt just because you decided to not

9    testify.

10          THE DEFENDANT:  I understand.

11          THE COURT:  And you still wish to testify?

12          THE DEFENDANT:  Absolutely.

13          THE COURT:  Okay.

14       (Proceedings heard in open court.  Jury in.)

15          THE COURT:  All right.  Please be seated.

16          Okay.  Good morning, ladies and gentlemen.  Welcome

17    back.  Sorry for the delay.  We were just trying to put

18    everything in place so that everything goes smoothly as

19    possible going forward.  We are ready to begin the defense

20    case.

21          Now, I want to let you know a couple things.  One is,

22    the defendant again has decided to represent himself, of

23    course.  And what that means is we don't have the usual back

24    and forth between a lawyer and the witness on the stand.  So

25    what I did authorize Mr. Haas to do, though, to try to break

1    up the testimony to improve your comprehension and

2    understanding as well as to give the government an opportunity

3    to object to questions is I have authorized him to write down

4    what his questions are, and then he's provided those questions

5    to Ms. Singer, the standby counsel. And so Ms. Singer is

6    simply going to read the questions as-is, as Mr. Haas gave

7    them to her. And at least we'll try to start out this way.

8    There's no doubt that there will be times where the defendant

9    is going to have to try to reformulate and reword some

10   questions, and so just if you just bear with us as we go

11   through this process. But that's what's happening in terms of

12   this question and answer.

13         As I mentioned before, too, the defendant has some

14   exhibits to offer. And if they're allowed into evidence, then

15   the government will be displaying the exhibits because we had

16   to turn it into digital evidence. And Ms. Singer and the

17   Court worked to put that together. And so again, the

18   government's just following my direction in putting up

19   exhibits. That's all they're doing when it comes to the

20   defense exhibits.

21         All right. So with those instructions in mind,

22   Mr. Haas, can you face me for a moment? You can stay seated.

23   Raise your right hand.

24       (Witness sworn.)

25         THE DEFENDANT: Yes, sir.

Haas - direct

346

1          THE COURT:  All right.  And then now you can remove

2     your mask.

3          Okay.  All right.  Ms. Singer?

4          ROBERT HAAS, DEFENDANT'S WITNESS, SWORN

5          DIRECT EXAMINATION

6     BY MS. SINGER:

7     Q.   When was the first time the FBI contacted you?

8     A.   The first time they contacted me was October of 2016.

9     Q.   Did they mention why they were there?

10    A.   They visited my mother's house first, and she called me

11    and told me that they were looking for me.  And I asked her if

12    they mentioned why.  And they told her it was because I was

13    denying the Holocaust.

14         MS. KELLY:  Objection, your Honor.  Hearsay.

15         THE COURT:  All right.  Do you have any response to

16    the hearsay objection, Mr. Haas?

17         THE DEFENDANT:  No.

18         THE COURT:  So it's overruled in part and granted in

19    part.  So let me try to explain this to the jury.

20         So there is a concept in the law, ladies and

21    gentlemen, called hearsay.  And I'll try to boil it down for

22    you.  It's something that law students take about two months

23    with.  So let me try to boil this down for you.  When a

24    statement is made out of court, under some circumstances that

25    out-of-court statement can't then be considered as evidence

1   for the truth of what was asserted in that statement.  That's

2   hearsay.  That person is not here in court to be

3   cross-examined.  So that's the general rule.

4        However, there are times when a statement is offered

5   into court that has another purpose to it rather than trying

6   to prove the truth of the statement.  And one of those is just

7   the impact on the listener, so the listener heard the

8   statement and then they either did something or that's now

9   part of their understanding of what is happening.

10       So let me give you an example of that.  So last year

11  when we had sports, remember how terrible the White Sox were?

12  Okay.  And I hope none of you are White Sox fans.  So let's

13  say someone tells me, "The White Sox are great this year.

14  They're amazing.  You should go watch them play."

15       Then I go out to Comiskey or whatever it's called

16  now.  And the issue at trial was, why did I go to see the

17  White Sox play?  The out-of-court statement -- and then I

18  testify, "Well, my friend told me they're great this year."

19  That out-of-court statement could not be considered for the

20  truth of that very debatable proposition, you know, that the

21  White Sox are great, but it can be considered for its impact

22  on me, the listener.  That's why I went.  So that's that

23  dividing line.

24       So you can take that last answer not for the truth of

25  what Mr. Haas says his mother said but just for its impact on

1    Mr. Haas.

2           Okay.  With that understanding, you can ask the next

3    question, Ms. Singer.

4    BY MS. SINGER:

5    Q.   How many times have you been -- how many times visited

6    were you told you don't have a choice and seized to talk

7    without a warrant or charges?

8    A.   Four times since October of 2016.

9    Q.   How many of your friends and family members have they

10   visited?

11   A.   They have visited five of my -- well, two friends and

12   three relatives of mine.  And they told them all not to tell

13   me --

14          MS. KELLY:  Objection.  Hearsay.

15          THE COURT:  Okay.  So finish -- go ahead and finish

16   the answer.  Two friends, three relatives.

17          THE DEFENDANT:  That was it.

18          THE COURT:  Okay.

19          THE DEFENDANT:  Five people total, they've gone and

20   questioned about me.

21          THE COURT:  All right.  So same thing, ladies and

22   gentlemen.  You cannot consider that -- the statements for the

23   truth of the matter, that he was told by friends and neighbors

24   that the FBI or federal government visited him but just its

25   impact on Mr. Haas.

Haas - direct

349

1          All right.  Ms. Singer?

2   BY MS. SINGER:

3   Q.  What is a threat according to the United States Supreme

4   Court?

5          MS. KELLY:  Objection, your Honor.  Calls for a legal

6   conclusion.

7          THE COURT:  Okay.  That objection is sustained.

8   Ladies and gentlemen, I will give you the definition of a true

9   threat under the law at the end of the trial.

10         Next question, Ms. Singer.

11  BY MS. SINGER:

12  Q.  How do you feel about your First Amendment?

13  A.  I feel it's one of the most important rights that

14  Americans have.  You should be allowed to say anything you

15  want without being attacked for it.  I think the public's

16  interest in exposing potential wrongdoing by public employees

17  is especially powerful.  That's the reason we have a First

18  Amendment, is to expose wrongdoings by our own government.

19  And that was the reason that the Constitution gave us a First

20  Amendment.

21         MS. KELLY:  Your Honor?

22         THE COURT:  Okay.

23         MS. KELLY:  At this point, I do object that he's

24  stretching beyond the permissible scope of testimony about --

25         THE COURT:  Okay.  I'll let the answer stand.  And

Haas - direct

350

1   I'll just remind the jury, I will give you the law including

2   the elements of each crime.  And the First Amendment

3   protections are incorporated into the law that I will give

4   you.

5          All right.  Ms. Singer?

6   BY MS. SINGER:

7   Q.  Do you believe that some people who are harassed and

8   threaten your life want to disarm Americans and also take away

9   their Fourth Amendment?

10  A.  I do believe that --

11         MS. KELLY:  Objection, your Honor.

12         THE COURT:  One second.

13         Go ahead.

14         MS. KELLY:  Objection, your Honor.  It stretches

15  beyond the scope of your prior ruling and calls for

16  speculation.

17         THE COURT:  Okay.  Sustained on relevance grounds.

18         Next question, Ms. Singer.

19  BY MS. SINGER:

20  Q.  Thank you.  Do you believe Americans will lose all their

21  constitutional guarantees?

22  A.  I do --

23         MS. KELLY:  The same objection, your Honor.

24         THE COURT:  Okay.  Go ahead and finish the answer

25  this time.

Haas - direct

351

1    THE WITNESS:  I do believe that, and we already have

2   pretty much lost our Fourth Amendment, and the Second

3   Amendment is -- and First Amendment are on their way.

4    THE COURT:  Okay.  The answer may stand.  Ladies and

5   gentlemen, let me remind you that the -- whether you agree or

6   disagree with the defendant's beliefs are not at issue at this

7   trial.  And the truth or falsity of the defendant's beliefs

8   are not at issue at this trial.  His beliefs, though, can be

9   considered by you as relevant evidence as to his motive and

10   his intent.

11    And the defendant, just in responding to the

12   government, it is a criminal defendant who's testifying.  And

13   he is representing himself, so I'll give him some leeway here.

14    All right.  Ms. Singer, please ask the next question.

15   BY MS. SINGER:

16   Q.  Were guns pointed at you during your arrest?

17   A.  Yes.  Multiple officers were pointing assault rifles and

18   handguns at me.

19   Q.  The video of your transport, was it immediately following

20   guns being pointed at you and your dog?

21   A.  Yes.  They put me directly in the back of the police car

22   and transported me to Chicago, and that's when the video was

23   recorded.

24   Q.  Was that the first time federal agents pointed guns at

25   you?

1   A.   No, it was not.  They've done it two other times.

2   Q.   When was the last time?

3   A.   The time before that was Agent Noordeloos of the

4   Department of State.  He pointed guns at me and said, "Get on

5   the ground or I'm going to shoot you.  We need to have a

6   chat."

7   Q.   What do you call the creators of those who support Israel?

8   A.   Can we --

9            MS. KELLY:  Objection, your Honor.  Relevance.

10           THE DEFENDANT:  Can we put up Defense Exhibit 6?

11           THE COURT:  All right.  One second.

12           Okay.  So not for the jury's viewing yet, I'm going

13   to ask the government to just put up on the -- on your laptop

14   Defense 6.

15           THE DEFENDANT:  Your Honor, these are all exhibits

16   that you've approved.

17           THE COURT:  I understand.  There were some which

18   stated that there were additional conditions that needed to be

19   complied with -- this is one of them -- concerning foundation,

20   so I just want to take a look at it.

21           All right.  Do you have some questions about

22   foundation that you had written for Ms. Singer?

23           THE DEFENDANT:  Yes.  "What do you call the creators

24   of the State of -- and people who support the State of Israel?"

25           THE COURT:  Okay.  All right.  Still without showing

1    it to the jury, around what time was this text sent?

2              THE DEFENDANT:  I don't know the exact minute, but it

3    was --

4              THE COURT:  Yes, not the minute, just around what

5    month and year.

6              THE DEFENDANT:  March -- I'm sorry.  May of 2019.

7              THE COURT:  And who did you send it to?

8              THE DEFENDANT:  Kos -- oh, that one was sent to

9    Robert Rochowiak.

10             THE COURT:  Okay.  Any further objections on

11   foundation?

12             MS. KELLY:  If we could clarify the date, your Honor,

13   now that he's recalled the recipient.

14             THE COURT:  Okay.  Is it still sometime in May 2019?

15             THE DEFENDANT:  Yes.

16             THE COURT:  Any other objections based on foundation?

17             MS. KELLY:  No, your Honor.

18             THE COURT:  Okay.  Then Defense 6 is allowed, and

19   I'll put it on the monitor.

20        (Defendant's Exhibit 6 received in evidence.)

21             THE COURT:  Okay.  Go ahead, Mr. Haas.

22             THE DEFENDANT:  Please zoom in on the photo on the

23   right.

24             THE COURT:  Okay.  I'll ask the government to go

25   ahead and zoom in on that.

1    BY THE WITNESS:

2    A.   People who created the State of Israel are called

3    Zionists.  They believe in -- they believe in a God's promised

4    land, promised to them even though in the Torah they are

5    exiled until the return of the Messiah, but they choose to

6    occupy Palestine with the star of Satan on their flag.

7              THE COURT:  Okay.  Next question.

8              THE WITNESS:  That's a Google image of the star of

9    Satan.  Sorry.

10             THE COURT:  Are you done?

11             THE WITNESS:  Yes.

12             THE COURT:  All right.  Next question.

13   BY MS. SINGER:

14   Q.   Why do you believe Nikki Haley is a threat to the USA?

15             THE DEFENDANT:  Can we show Defense Exhibit 5?

16             THE COURT:  All right.  One second.

17             Any further objection to Defense Exhibit 5?

18             MS. KELLY:  Your Honor, if we could have a brief

19   sidebar.

20             THE COURT:  All right.  So, Mr. Haas, can you put

21   your mask back on.  And then you can walk back to your table

22   there and put on the headset.

23        (Proceedings heard at sidebar:)

24             THE COURT:  All right.  Ms. Kelly?

25             MS. KELLY:  Your Honor, I saw a different exhibit pop

1    up first, so -- but I'll go ahead and express the concern now.

2    Mr. Haas has identified a couple of exhibits that have grand

3    jury exhibit stickers on them.  If he plans to introduce them

4    in his testimony, I'd like to propose some sort of a limiting

5    instruction to the jury that they not consider that a document

6    has a grand jury exhibit sticker.  We had filed in the public

7    record copies without that sticker, but it appears that he's

8    using this one.

9            THE COURT:  Yes, I appreciate you flagging that, but

10   I think if your concern is the jury will wonder what is the

11   grand jury, I'm not sure they're really going to inquire into

12   that or take any particular inference from it.  And then

13   otherwise under Rule 6, introducing evidence put before the

14   grand jury at a trial is certainly an exemption.

15           Do you have any concerns, Mr. Haas, about the

16   exhibits having the grand jury sticker on them?

17           THE DEFENDANT:  No, your Honor.

18           THE COURT:  All right.  Anything else from the

19   government?

20           MS. KELLY:  No, your Honor.

21           THE COURT:  All right.  Thanks for flagging that.

22           All right.  We'll resume the testimony.

23      (Defendant's Exhibit 5 received in evidence.)

24      (Proceedings heard in open court:)

25           THE COURT:  All right.  Mr. Haas, you can resume the

Haas - direct

356

1    stand.  And you can remove your mask again.

2              Okay.  And just to orient everyone, Ms. Singer, can

3    you just reask that question with regard to Defense 5 which is

4    allowed into evidence?  And I'll turn the screen on.

5    BY MS. SINGER:

6    Q.  Yes.  Why do you believe Nikki Haley is a threat to the

7    USA?

8    A.  Nikki Haley was the UN ambassador at the time when I sent

9    this message.  She is the reason that the State Department

10   came and pointed guns at me and threatened me.  And she's

11   beholden to the State of Israel.  Any video you watch of her

12   on You Tube or any --

13             MS. KELLY:  Your Honor, objection.

14             THE DEFENDANT:  -- press conference you see of her --

15             THE COURT:  All right.

16             MS. KELLY:  We're going beyond the scope of the

17   exhibit.

18             THE COURT:  Okay.  I'm going to just, given that

19   leeway, complete your answer as concisely as you can.

20   BY THE WITNESS:

21   A.  I don't believe she is loyal to the United States.

22             THE COURT:  Okay.  Next question, please.

23   BY MS. SINGER:

24   Q.  Is she one of those you mentioned who plotted against

25   American constitutional guarantees?  I believe this is in

Haas - direct

357

1    relation to Government Exhibit 74.

2              MS. KELLY:  Objection, your Honor.  Relevance.

3              THE COURT:  All right.  One second.

4              MS. KELLY:  Lack of foundation.  Speculation.

5              THE COURT:  Okay.  The objection is overruled.  I'm

6    going to just remind the jury again that the truth or falsity

7    of the beliefs is not at issue.  The beliefs can go to

8    defendant's motive and intent.  And I'm just going to give

9    leeway to this defendant who is representing himself.

10             All right.  Go ahead and answer, Mr. Haas.

11             THE DEFENDANT:  Can we put up Exhibit No. 74?

12             THE COURT:  All right.  And so this is Government

13   Exhibit 74.  If you could swap that out, I'll ask the

14   government to do that before I turn the monitor on.

15             THE DEFENDANT:  Can we zoom in on that document?

16             THE COURT:  Okay.  Is there a question that you have

17   lined up for Ms. Singer to ask about this?

18             THE DEFENDANT:  Yes.  She asked it already but --

19             THE COURT:  All right.

20             THE DEFENDANT:  -- could you please repeat it?

21   BY MS. SINGER:

22   Q.  Is she one of those you mentioned who plotted against

23   American constitutional guarantees?

24   A.  I absolutely believe that.  Like I said, she was the

25   United Nations ambassador for years.  And this is a United

Haas - direct

1   Nations document speaking of disarming American citizens going

2   door to door to collect weapons, all weapons.

3            THE COURT:  All right.  Next question.

4            MS. SINGER:  Your Honor, I believe this is in

5   relation to the new exhibit.

6            THE COURT:  Defense 7?

7            MS. SINGER:  Yes.

8            THE COURT:  Okay.

9            MS. SINGER:  You mentioned --

10           THE DEFENDANT:  Yes.

11  BY MS. SINGER:

12  Q.  You mentioned multiple times that you shared evidence of

13  Israelis demolishing the World Trade Center on September 11th,

14  2001.

15  A.  Can we pull up that exhibit?

16           THE COURT:  All right.  I'll ask the government to do

17  that.  All right.  One second.

18           THE DEFENDANT:  Can we zoom in on the two photographs

19  on that?

20           THE COURT:  All right.  Defense 7 is allowed.

21      (Defendant's Exhibit 7 received in evidence.)

22           THE DEFENDANT:  Can we zoom in on the whole -- you

23  didn't get the whole photograph there, the -- there you go.

24  Yes, that's better.

25  BY THE WITNESS:

1    A.   As hard as it might be to believe, a group of foreign art

2    students, not U.S. citizens, managed to get temporary

3    construction ID for the entire World Trade Center complex.

4    While they removed a window and extended a wooden balcony

5    while their sponsor was in the Millennium Hotel taking

6    photographs, he hired a helicopter to document the event.  And

7    only a retired flight attendant sees something fishy.

8         Notice the boxes.  This is the red underneath the top

9    right photo.  Notice the boxes of demolition fuse holder,

10   BB18.  What kind of art project are these Israelis up to?  If

11   you notice, the walls from floor to ceiling, walls on the left

12   and right, are lined with boxes of demolition fuse holder made

13   by Dick Cheney's company, LittelFuse, right here in Chicago.

14        They have rappelling gear hanging in the window in

15   the photo on the top left, and he's actually standing on the

16   balcony out the window in that top left photo.  In the bottom

17   photo, you can see him looking over Manhattan on the balcony

18   at dusk about to go up on the side of the building.  Israeli

19   art students.

20   BY MS. SINGER:

21   Q.   Did you share this with FBI and Department of State?

22   A.   I did.  I sent it to multiple agencies, posted it online

23   many times.

24   Q.   What was their reaction to these photographs?

25   A.   There was --

Haas - direct

360

1          MS. KELLY:  Your Honor, the question is fairly

2    compound.  Can we get more specific detail of who, what,

3    where?

4          THE COURT:  All right.  Sustained.

5    BY MS. SINGER:

6    Q.  Do you truly believe Israelis demolished the World Trade

7    Center with 2,000 Americans inside and will do anything to

8    stop this information from spreading?

9    A.  I do believe that.  I believe anybody who shares this

10   information, their life is in danger.

11   Q.  Exhibit -- Defense Exhibit 19.  Do you also believe --

12         THE COURT:  All right.  One moment.

13         Yes, I'll ask the government to pull up Defense 19.

14   And as they're doing that, you can ask the question,

15   Ms. Singer.

16         MS. SINGER:  Thank you, your Honor.

17   BY MS. SINGER:

18   Q.  Do you also believe they have been behind many terrorist

19   attacks in the past?

20   A.  Absolutely, I do.  And I'd like this exhibit to be shown.

21         THE COURT:  It's on the jury monitor now already.

22         THE WITNESS:  Okay.

23         THE COURT:  Defense 19 is in.

24      (Defendant's Exhibit 19 received in evidence.)

25   BY THE WITNESS:

Haas - direct

1    A.   I do believe that they have been behind many terrorist

2    attacks in the past.  The photo you're looking at right now is

3    photos of Menachem Begin.  And if we could zoom in on the two

4    left-hand photos, the ones on the left, you'll see it says he

5    claimed he was the father of terrorism.  Menachem Begin, the

6    terrorist founder of Israel's ruling Likud party, bragged

7    about being the father of terrorism in all the world.  The

8    Likud party is now headed by Benjamin Netanyahu.

9         The bottom three photos show the King David Hotel

10   blown up by this group of Israelis.  The next photo is

11   Menachem Begin, his wanted photo, wanted terrorist.  And then

12   the last one shows him finishing his career as the Israeli

13   prime minister.

14        Now, can we zoom in on the other two photos on this

15   page that are on the right -- I'm sorry, all three of those.

16   This one, the top, the top one -- give me one second here.

17   I'm sorry.

18        Representative Rahm Emanuel, the Democrat Congressman

19   for the Fifth District of Illinois in Chicago, is the son of

20   an Israeli terrorist.  Rahm's father, Benjamin, was a member

21   of the Irgun, the Zionist terrorist organization that coined a

22   new word as they blew up hotels, train stations, and other

23   buildings in Palestine in the 1930s and '40s.  Rahm --

24        MS. KELLY:  Your Honor --

25        THE WITNESS:  -- was an Israeli citizen until he was

Haas - direct

362

1    18 years old when for obvious reasons, he hid his Israeli

2    passport in his underwear drawer.  In 1991, however, he pulled

3    out his Israeli passport to join the Israeli Army to defend

4    Zion reportedly from Saddam's SCUDs.

5             Irgun, the army of his father, is short for Irgun

6    Zvai Leumi --

7             THE COURT:  All right.  Let me -- I'm going to

8    interrupt you there, Mr. Haas.  So what are you reading from?

9             THE DEFENDANT:  I'm reading from a note that I have.

10            THE COURT:  All right.

11            THE DEFENDANT:  I'll just read from the image.

12            THE COURT:  As we discussed before trial, you can

13   bring certain things up for testimony including the questions

14   that you're going to ask yourself and notations about which

15   exhibit is being referred to but not otherwise written notes.

16   Witnesses are not allowed to do that.

17            THE DEFENDANT:  I'll just read from this.

18            THE COURT:  Go ahead.

19            THE DEFENDANT:  Benjamin Emanuel is one of many

20   Rothschild Zionist agents who were relocated to America after

21   the establishment of Israel to produce children born as

22   American citizens to hijack the political process.  His son

23   was former chief of staff of Obama and now serves the

24   Rothschilds as the current mayor of Chicago.  This is an older

25   photograph.  He's obviously not the mayor of Chicago anymore.

Haas - direct

363

1          The one below that says:  The 2nd of July 1946, the

2     King David Hotel in Jerusalem was bombed killing 91 people.

3     Menachem Begin, the sixth prime minister of the State of

4     Israel who was later awarded the Nobel Prize for peace, is the

5     same man who planned the destruction of the King David Hotel.

6          The final photo says:  "Jewish freedom fighters or

7     terrorists."  And those are posters from Great Britain in the

8     1930s and '40s.

9          THE COURT:  All right.  And then once again, ladies

10    and gentlemen, I'll remind you, the truth or falsity of the

11    beliefs is not at issue.  It's just if the defendant held the

12    beliefs.  You can consider that as to motive and intent.

13         THE DEFENDANT:  Can we zoom in just on the bottom one

14    in that row?

15         And that's -- I'm finished with that exhibit.

16         THE COURT:  All right.  Next question.

17    BY MS. SINGER:

18    Q.  What is in the Talmud that makes you feel threatened?

19         MS. SINGER:  This is -- I believe he wants Defense

20    Exhibit 1, your Honor.

21         THE COURT:  All right.  One moment.

22         Okay.  I'll ask the government to put up Defense 1.

23    It's allowed into evidence with the same instruction to the

24    jury.

25         THE DEFENDANT:  Your Honor, I can't -- I can't read

1    these.  They're not clear enough, but I do have it written

2    down what they say.  Can I read those notes?

3              THE COURT:  Are you saying you have a paper copy of

4    the exhibit?

5              THE DEFENDANT:  I have notes that I've taken from the

6    exhibit, the words, the text from the exhibit.

7              THE COURT:  If you don't have the actual exhibit

8    itself, then you cannot just read from notes that you've taken

9    about the exhibit.

10             THE DEFENDANT:  Can we zoom in on the black

11   photograph?

12             THE COURT:  All right.  I'll ask the government to do

13   that.

14             THE DEFENDANT:  I can't read that, your Honor.

15             THE COURT:  Then you'll have to do the best you can

16   in terms of paraphrasing what you think it says.

17             THE DEFENDANT:  This is why I requested that these

18   documents be produced in their full digital clarity.

19             THE COURT:  Mr. Haas, you did have access to

20   discovery, so we're not going to dispute --

21             THE DEFENDANT:  This is all the government --

22             THE COURT:  Mr. Haas, we were not -- we ought not

23   discuss discovery matters before the jury.  So you may testify

24   about what you believe it says, but if you're not able to read

25   it, then you're not able to read it.  So you can go ahead and

1    testify as to what beliefs you derive from what you believe is

2    on there.  Feel free to do that.

3           THE DEFENDANT:  I know you people aren't allowed to

4    research anything right now while the trial is going on, but I

5    beg you --

6           MS. KELLY:  Your Honor --

7           THE COURT:  Mr. Haas, you have to testify to the

8    pending topic which I just described to you in some detail

9    rather than making a direct plea to the jury.

10          THE DEFENDANT:  I was just asking them to research on

11   their own --

12          THE COURT:  Mr. Haas --

13          THE DEFENDANT:  -- in the future --

14          THE COURT:  Mr. Haas, please deliver your answer --

15          THE DEFENDANT:  Yes, your Honor.

16          THE COURT:  -- so that we can continue with your

17   examination and you can get your testimony out there.

18   BY THE WITNESS:

19   A.   In the Jewish Talmud, it states that non-Jews are cattle.

20   We are here to serve them.  They are God's chosen people.  It

21   talks about enslaving non-Jews, raping non-Jews, killing our

22   children.  It says even the best of the Christians should be

23   sacrificed.

24          I wish I could read it to you because I can't --

25   it's -- there's so much disgusting stuff.  When you post it

Haas - direct

366

 1  online, most people don't even believe it and you get -- it's

 2  like poking a beehive.  Israelis and Jewish people come out of

 3  the woodwork to attack you for exposing it.

 4           THE COURT:  All right.  Next question.

 5  BY MS. SINGER:

 6  Q.  Again, I believe this is in relation to Defense Exhibit 1.

 7  The question is:  What do those photos say?

 8  A.  Yeah, I can't read them.

 9           THE COURT:  All right.  Next question.

10  BY MS. SINGER:

11  Q.  Again, Defense Exhibit 1:  Who was involved in the Black

12  Nobility and the Committee of 300?

13  A.  Can we zoom out of this photo back to the original?

14           In the bottom left-hand corner, you can see a photo.

15  It says, "The Black Nobility and the Committee of 300:  The

16  real terrorists."  And the photos surrounding the Free

17  Masonry symbol is George Soros, Rockefeller, two Rothschilds

18  at the top, the Pope, the queen of England, and the black Pope

19  and then their group of, I'm not sure how you pronounce it,

20  Jesuits, people who control the world basically.

21           THE COURT:  Next question.

22  BY MS. SINGER:

23  Q.  Who is the man with Prince Charles?

24  A.  That is Jimmy Savile from the BBC.  He was a host of

25  television shows, a radio DJ, convicted pedophile and knighted

Haas - direct

367

1  by the British royal family.

2  Q.  And who is the man poking Prince Charles in the chest?

3  A.  That's a Rothschild family member.

4  Q.  What does this have to do with our government?

5      MS. SINGER:  And this is, he's requesting Defense

6  Exhibit 8, your Honor.

7      THE COURT:  All right.  I'll ask the government to

8  put on 8.  Okay.  8 is allowed.

9      All right.  Go ahead, Ms. Singer.

10     THE DEFENDANT:  Can we zoom in on the photograph in

11  the middle?

12  BY THE WITNESS:

13  A.  I believe this is relevant at this point because these

14  same people who control the world have hijacked our political

15  process:  APAC, the American-Israel Political Affairs

16  Committee, lobbyists control our government and control our

17  media.  They control our education system.  And if you

18  question it, you are attacked for it.

19     I feel it's a serious threat to the American way, to

20  our constitutional guarantees, to our children's futures.  I

21  don't even have children, but if you have children, you need

22  to put --

23     MS. KELLY:  Your Honor --

24     THE COURT:  Mr. Haas, no direct addressing the jury

25  in this way.  It's just to deliver facts.

 1              THE DEFENDANT:  I'm finished with that.

 2              THE COURT:  Okay.  Next question, please.

 3   BY MS. SINGER:

 4   Q.  You mentioned history we're taught is a lie.  Can you

 5   explain a little?

 6              MS. KELLY:  Objection, your Honor.

 7              THE COURT:  Yes.  Sustained as to its overbreadth.

 8   BY MS. SINGER:

 9   Q.  What made you so upset about this alternate history you

10   learned while in Russia?

11              MS. KELLY:  Same objection, your Honor.

12              THE COURT:  Sustained on the same grounds.

13   BY MS. SINGER:

14   Q.  What is the Haavara Agreement?

15              MS. KELLY:  Objection, your Honor.

16              THE COURT:  Okay.  We need a sidebar on this.

17              Mr. Haas, can you put your mask back on and step back

18   to the counsel table.

19         (Proceedings heard at sidebar:)

20              THE COURT:  All right.  Before I ask Mr. Haas,

21   Ms. Singer, what is the spelling that Mr. Haas provided on

22   that word?

23              MS. SINGER:  H-a-a -- can you hear me?

24              THE COURT:  We're having trouble.  You know what,

25   it's okay.  I'll ask Mr. Haas directly.  How do you spell

1   Haavara?

2              THE DEFENDANT:  H-a-a-v-a-r-a.

3              THE COURT:  All right.  What is it, Mr. Haas?

4              THE DEFENDANT:  It is an agreement between national

5   socialist Germany and national Zionists in the 1930s.

6              THE COURT:  All right.  The objection is sustained.

7   That is irrelevant.  And I've given plentiful leeway for the

8   defendant to express his beliefs and, therefore, this line of

9   questioning is excluded.

10             All right.  Let's return to testimony.

11         (Proceedings heard in open court:)

12             THE COURT:  All right.  You can remove your mask

13  again.

14             And Ms. Singer?

15  BY MS. SINGER:

16  Q.   Where do the -- where do the Rothschilds fit into all of

17  this?

18             MS. KELLY:  Objection, your Honor.

19             THE COURT:  Overruled.  I'll allow the defendant some

20  leeway.

21             Go ahead.

22  BY THE WITNESS:

23  A.   The Rothschilds are international bankers.  They are

24  founders of the State of Israel.  They create our currency.

25  They control all of our banks.  They control the banks of

Haas - direct

370

1    England.  And there's nine countries in the world that don't

2    have Rothschild banks.  They are Syria, China, Russia, Iran,

3    Venezuela, Hungary, North Korea.  These are all countries that

4    we're at war with.  This is a very thorough list of all the

5    countries that we have problems with.  None of them have

6    Rothschild central bank.  It's not a coincidence.

7              THE COURT:  Mr. Haas, that's sufficient for the

8    answer now.

9              Please ask the next question, Ms. Singer.

10   BY MS. SINGER:

11   Q.  Why would these people commit the September 11, 2001,

12   attacks?

13             MS. KELLY:  Objection, your Honor.

14             THE COURT:  Sustained.  There's been sufficient

15   leeway given on other lines of questioning.

16             Next question, please.

17             MS. SINGER:  That's all, your Honor.

18             THE COURT:  All right.  And aside from those written

19   questions, Mr. Haas, at this moment do you want to conclude

20   your direct examination, or do you want to try to formulate

21   some questions to yourself right there?

22             THE DEFENDANT:  I'm finished, your Honor.

23             THE COURT:  All right.  Then we can begin the

24   cross-examination by the government.

25                            CROSS-EXAMINATION

1   BY MS. KELLY:

2   Q.   Good morning, Mr. Haas.

3   A.   Good morning.

4   Q.   You testified that law enforcement investigated you in

5   2016?

6   A.   Yes.

7   Q.   You met with an FBI task force officer named Tim

8   Robertson, correct?

9   A.   Yes.

10  Q.   You don't have any complaints about how Officer Robertson

11  treated you during that interview, do you?

12  A.   I told him I did not wish to speak with him, and he again

13  like all the other officers made an illegal seizure and said,

14  "You don't have a choice.  You will come and meet me."

15  Q.   That is your testimony about Tim Robertson under oath?

16  A.   Yes, ma'am, absolutely.

17  Q.   You claim that he threatened you?

18  A.   He did not threaten me -- well, he threatened me with

19  arrest if I didn't come and speak to him.

20  Q.   He didn't arrest you, did he?

21  A.   No, because I came and met him.

22  Q.   And you only met with him once?

23  A.   Yes, ma'am.

24  Q.   And he never contacted you again, did he?

25  A.   No, he did not.

Haas - cross

1   Q.  You also mentioned the State Department in your testimony,

2   right?

3   A.  Yes, ma'am.

4   Q.  You spoke with a State Department agent named David

5   Noordeloos, right?

6   A.  Yes.

7   Q.  That occurred in 2018?

8   A.  Yes.

9   Q.  That occurred in January 2018?

10  A.  Yes.

11  Q.  And the reason that Agent Noordeloos came to speak with

12  you is because you posted on the public Instagram page of

13  former ambassador Nikki Haley, right?

14  A.  Yes.

15  Q.  And around January 2nd, 2018, you posted several

16  statements on her public Instagram page --

17  A.  Yes.

18  Q.  -- right?

19          And one of the things you said is, "You are going to

20  hang, bitch.  I promise you this"?

21  A.  Did I say I was coming to hang her?

22  Q.  One of the things you said is, "You are going to hang,

23  bitch.  I promise you this."  Correct?  That's what you said?

24  A.  It was obviously protected speech, or I would have been

25  arrested right then and there.  They came wanting me --

Haas - cross

373

1     THE COURT:  Mr. Haas --

2     THE WITNESS:  -- to --

3     THE COURT:  Mr. Haas, please stop.

4     All right.  The jury will disregard the answer.  It

5  was nonresponsive.

6     I believe, Mr. Haas, the question is whether you

7  posted those words.  Did you post those words?

8     THE WITNESS:  I posted those words.

9  BY MS. KELLY:

10 Q.  And you also posted on her Instagram page, "Your lies will

11 not stop the truth.  You're as good as dead now.  You should

12 kill yourself because what humanity is going to do to you

13 Holocaust fakers is going to hurt bad, bitch."

14 A.  Yep, I did.

15 Q.  David Noordeloos came to meet with you on January 25th,

16 2018, right?

17 A.  Yes.

18 Q.  And when he encountered you, you were outside your home?

19 A.  Yes.

20 Q.  And you testified or indicated that he drew a gun?

21 A.  He stepped out of the vehicle with a gun in his hand.

22 That's how I knew something was wrong, and I turned to walk

23 away.

24 Q.  He drew a gun because you made a gesture toward your

25 pocket when you saw him; isn't that right?

1  A.  That's what you have been led to believe.  That is not the

2  facts of the matter.

3  Q.  Are you denying that you made any gesture toward your

4  pocket?

5  A.  No.  I turned and went back towards my house.  My keys are

6  in my pocket.  That's how I open the door, with a key.  So I

7  turned to go back to my house and felt for my keys because I

8  was going to go back in my door.  Gentlemen just jumped out of

9  vehicles with guns.

10  Q.  So you're agreeing with me that you reached toward your

11  pocket?

12  A.  Yes.

13  Q.  And you told Dave Noordeloos that you believe that he was

14  Mossad and you were about to attack him.  Isn't that what you

15  said?

16  A.  I did not say I was about to attack him.

17  Q.  You talked to him about slapping his face off with a

18  chain, didn't you?

19  A.  If I was going to attack him, I would have not turned and

20  went the opposite way.  I would have went towards him and

21  pulled the chain out of my pocket that was on my keys.  It's a

22  keychain.

23  Q.  You had --

24  A.  Keychain.

25  Q.  You had a chain in your pocket, right?

1   A.   Keychain, yes.

2   Q.   And you're denying that you said anything to David

3   Noordeloos about slapping someone's face off with a chain?

4   A.   I'm not denying that.  I said -- I don't remember exactly

5   what I said, but I did not say I was going to slap his face

6   off with a chain.  If he didn't identify himself, it might

7   very well have happened.

8        If he got close enough and didn't say, "FBI, get on

9   the ground, I'm going to shoot you in your head," yes, I might

10  have slapped him in the face.  Anybody approaching me with a

11  gun is going to -- I'm going to take the gun from them.  I'm

12  threatened.  My life is threatened.  You exited your vehicle

13  with a gun.

14  Q.   You're going beyond -- well beyond what I've asked you.

15  A.   I answered your question very thoroughly.

16  Q.   So do you agree or disagree that when you encountered

17  David Noordeloos, you talked about slapping his face off with

18  a chain?

19  A.   I said that ten minutes later after he was inside my

20  house.

21  Q.   Okay.  So you said it.  Okay.

22  A.   I did say it, yes, absolutely.  I defended myself.

23  Q.   You agreed to let David Noordeloos inside your apartment

24  for an interview, right?

25  A.   No.  He demanded.  He said if -- "We're going to have a

1  chat either here or at the police station.  It's your choice."

2  I did not feel like being locked in a room in the police

3  station for five hours, so I allowed them in my house.

4  Q.  So the answer is yes, you agreed to let him in your

5  apartment?

6  A.  Yes.  He made an illegal seizure, yes, without probable

7  cause or a warrant or charges, yes.

8  Q.  During your interview with David Noordeloos, you told him

9  that he seemed pretty calm, right?

10 A.  I don't remember that.

11 Q.  Are you denying saying it?

12 A.  I don't remember saying that.

13 Q.  David Noordeloos treated you with respect during the

14 interview?

15 A.  During the interview, no, not really.  He was okay for a

16 police officer, but not really, no.

17 Q.  He never raised his voice at you?

18 A.  He did not raise his voice at me.

19 Q.  He never threatened you?

20 A.  No.

21 Q.  He didn't arrest you, right?

22 A.  No.  He had no charges.  He had no reason to be there.

23 Q.  And you discussed with David Noordeloos during that

24 interview threats that you said you had received from other

25 people, right?

Haas - cross

377

1   A.   Yeah, hundreds.

2   Q.   And you told David Noordeloos that someone had called you

3   a pedophile online?

4   A.   Yes.

5   Q.   It wasn't law enforcement that called you that name but a

6   private citizen, right?

7        THE DEFENDANT:  I object, your Honor.  This has

8   nothing to do with Noordeloos.

9        THE COURT:  Overruled based on the direct

10  examination.  So please do answer that question.

11       THE WITNESS:  What was the question again?

12       THE COURT:  Please repeat the question.

13  BY MS. KELLY:

14  Q.   The person who called you a pedophile as you relayed the

15  information to Dave Noordeloos was not a law enforcement

16  officer but a private citizen, right?

17  A.   Yes.

18  Q.   And you gave Dave Noordeloos, during that interview,

19  permission to review the contents of your phone?

20  A.   I didn't give him permission to review the contents of my

21  phone.  I showed him specific photographs.

22  Q.   Was he allowed to look at the phone or not?

23  A.   I showed it to him, yes.

24  Q.   And you told Dave Noordeloos that you threaten people

25  back.  That's what you said?

1   A.   I respond sometimes, yes.

2   Q.   You told him that.  You told Dave Noordeloos that you

3   threaten people back?

4   A.   If you're trying to make me lie, it's not going to happen.

5   Yes, I told him that.  If somebody threatens me, I threaten

6   back sometimes.  I defend myself.  I've said that already.

7   Q.   You told David Noordeloos that you were at war with people

8   and you were going to lead the world to exterminate them,

9   right?

10  A.   Absolutely.  I'm at war with terrorists, the real

11  terrorists.  The whole country is supposedly in a war on

12  terrorism --

13       THE COURT:  All right.  Mr. Haas, that does conclude

14  the answer.  I believe you responded.

15       Next question.

16  BY MS. KELLY:

17  Q.   You have held a hatred for Jewish people for a long time;

18  is that true?

19  A.   Have you ever read the Talmud?  They hate you.

20       THE COURT:  Mr. Haas, please do just answer the

21  question.

22       THE WITNESS:  What was the question again?

23  BY MS. KELLY:

24  Q.   You have held a hatred for Jewish people for a long time?

25  A.   Yes.

1    Q.  Years before you ever met Dave Noordeloos?

2    A.  Yes.

3    Q.  Years before FBI Task Force Officer Tim Robertson visited

4    you in 2016?

5    A.  Is being atheist a crime?

6           THE COURT:  Mr. Haas, that's not responsive.  Please

7    confine your testimony to a response to the question.

8    BY THE WITNESS:

9    A.  Yes.

10   BY MS. KELLY:

11   Q.  You believe people who disagree with you are terrorists?

12   A.  I do not.

13   Q.  You believe that people who disagree with you should be

14   killed?

15   A.  I'm atheist.  I love Christians and Muslims.

16          THE COURT:  Mr. Haas --

17          THE WITNESS:  It's the Jews that are a problem.

18          THE COURT:  -- that's not responsive.

19          MS. KELLY:  You believe --

20          THE WITNESS:  It was a very thorough answer.

21          THE COURT:  Mr. Haas, let's have a sidebar.  Please

22   put your mask on and walk back to counsel table.

23      (Proceedings heard at sidebar:)

24          THE COURT:  All right.  Mr. Haas, you have delivered

25   your direct examination, but you are now subject to

1    cross-examination.  You have to answer the questions that are

2    posed to you and just those questions.  You'll have a chance

3    for redirect examination if you can formulate questions that

4    are not objectionable.

5        And otherwise, if you fail to comply with the

6    directive to just answer the question rather than continue to

7    make speeches, I'll have no choice but to strike your direct

8    examination.  I do not want to do that, but that's what I'll

9    do.  I will turn to the jury, and I will instruct them that

10   they cannot consider your direct examination.

11       So I do not want that.  I am sure you don't want

12   that.  So stop making the speeches.  And again, you are more

13   than intelligent enough to know that you are crossing the

14   line, and you're doing it intentionally.  So please do stop so

15   that you can preserve your direct examination, so that you can

16   deliver a redirect examination if possible, and then you can

17   have a closing argument where you actually have your testimony

18   to point to.

19       Do you understand?

20       THE DEFENDANT:  Yes, sir.

21       THE COURT:  Do you have any questions about that?

22       THE DEFENDANT:  No, sir.

23       THE COURT:  All right.  Let's resume the testimony.

24   (Proceedings heard in open court:)

25       THE COURT:  Okay.  You can remove your mask again.

1              And Ms. Kelly.

2    BY MS. KELLY:

3    Q.  You believe people who disagree with your beliefs should

4    be killed?

5    A.  I do not.

6    Q.  That's what you posted repeatedly online, isn't it?

7    A.  Never, ever did I post.  I'd like to see it.  Show me

8    where I said that ever.

9    Q.  Are you denying that you posted repeatedly that if anyone

10   such as law enforcement --

11   A.  Tries to stop me --

12   Q.  -- attempts to --

13              THE COURT:  All right.  Go ahead and complete the

14   question.

15   BY MS. KELLY:

16   Q.  Are you denying that you posted repeatedly online that

17   anyone who tries to investigate you or doesn't subscribe to

18   your beliefs should be killed?

19   A.  I have never said that, never.  Show me.

20   Q.  And you witnessed the internet postings that we displayed

21   for the jury, correct?

22   A.  I did witness them.

23   Q.  And you authored all those posts, didn't you?

24   A.  Yes, ma'am.

25   Q.  You believe that Joe Kostuchowski is a terrorist?

1    A.  I do.

2    Q.  And you believe that Joe Kostuchowski should be killed?

3    A.  In a way, yes, I do.

4    Q.  You believe Jewish people should be killed?

5    A.  Not all Jewish people.

6    Q.  You don't believe there are any good Jewish people, do

7    you?

8    A.  I think most of them are very uneducated and have never

9    read their Talmud.  If they did, they would flee it or they

10   are a terrorist, absolutely.  Read the Talmud --

11            THE COURT:  All right.  Next question.

12            THE WITNESS:  -- I beg you.  I beg you.

13            THE COURT:  Next question.

14   BY MS. KELLY:

15   Q.  When Dave Noordeloos met with you, he tried to talk you

16   out of making threats, didn't he?

17   A.  No.  He said, "You're just a keyboard warrior.  You're all

18   talk.  You'll never do anything."

19   Q.  I'm talking now about the State Department interview with

20   Agent Dave Noordeloos in January 2018.

21   A.  Oh, I'm sorry.  He did --

22            THE COURT:  Wait one second.

23            THE WITNESS:  He did.

24            THE COURT:  All right.  The answer can stand.

25            Next question.

Haas - cross

383

BY MS. KELLY:

Q.  Dave Noordeloos tried to talk you out of making threats, correct?

A.  I never made threats.

Q.  He talked to you during the interview about not making threats, didn't he?

A.  If I had made threats, I would have been arrested, ma'am.

Q.  Are you agreeing or disagreeing as to whether --

A.  I disagree.  I was not -- I've never made a threat.

Q.  He never said --

A.  He accused me of making threats.  He had no charges. Obviously, I had not made threats.

Q.  You're not answering my question.  My question is whether Dave Noordeloos spoke to you during your interview about stopping threats.

A.  He accused me of making threats.  I said, "If I made threats, arrest me."  And he left with his tail between his legs with no charges because I had never made a threat, ma'am.

        THE COURT:  All right.

        THE DEFENDANT:  Never made a threat.

        THE COURT:  The jury will disregard that last answer. It was not responsive.

BY MS. KELLY:

Q.  David Noordeloos asked that you tone down your rhetoric, didn't he?

Haas - cross

1    A.   And I told him I will not.

2    Q.   So the answer to my question is yes, he told you --

3    A.   He did tell me to tone it down.  I told him no,

4    absolutely.

5    Q.   And he told you if you don't tone down your rhetoric, you

6    could get charged with a crime?

7    A.   I don't remember that.

8    Q.   And you didn't tone down your rhetoric, did you?

9    A.   No, I did not.

10   Q.   On January 26th, 2018, you met with Dave Noordeloos a

11   second time, right?

12   A.   Yes, ma'am.

13   Q.   And he never raised his voice during that meeting?

14   A.   No.

15   Q.   Never threatened you?

16   A.   No.

17   Q.   And during that meeting, you told Dave Noordeloos that you

18   cannot control your anger and that you have an anger problem,

19   right?

20   A.   Possibly.

21   Q.   And Dave Noordeloos offered to get you anger management

22   help, didn't he?

23   A.   Yes, he did.

24   Q.   And you did not accept that help?

25   A.   Absolutely not.

1    Q.  And you never --

2    A.  Anger is not a crime, ma'am.

3          THE COURT:  Mr. Haas, that completes the answer.

4          Next question.

5  BY MS. KELLY:

6    Q.  You never heard from Dave Noordeloos again after that

7  January 26, 2018, meeting, did you?

8    A.  No, I did not.

9    Q.  Mr. Haas, I've been reminded to ask you, did you have --

10  do you recall meeting with Dave Noordeloos a third time

11  briefly the next day?

12    A.  I do.

13    Q.  Okay.  And during that meeting -- that would have been on

14  January 27, 2018?

15    A.  I guess.

16    Q.  During that meeting, Dave Noordeloos talked to you about

17  the fact that you had been posting information online about

18  Robert Rochowiak, another State Department agent, correct?

19    A.  Yes.  I posted his business card.

20    Q.  And Dave Noordeloos asked you about that, didn't he?

21    A.  Yes, he did.

22    Q.  And he asked you to stop posting his business card?

23    A.  He did.

24    Q.  And what did you say in response?

25    A.  I told him I will not.  "Am I being charged with this?"

1    Why would I stop posting it?  He's a government agent.  It's

2    public information.  These are facts.  Why would I stop?

3    Q.  So the answer is, no, you refused to stop?

4    A.  Absolutely.

5    Q.  When you showed the jury a couple of exhibits,

6    specifically Exhibit 6 and Exhibit 8 of yours, those were text

7    messages that you sent to State Department Agent Robert

8    Rochowiak, right?

9    A.  I don't have them in front of me.

10   Q.  I am now displaying what was marked as Defense Exhibit 6.

11   Are these text messages that you sent to State Department

12   Agent Robert Rochowiak?

13   A.  Yes, they are.

14   Q.  I'm now displaying Defense Exhibit 8.  Are these

15   additional text messages that you sent to State Department

16   Agent Robert Rochowiak?

17   A.  Yes, they are.

18   Q.  Was Robert Rochowiak with Agent Noordeloos when they

19   interviewed you on January 25th, 2018?

20   A.  Yes, he was.

21   Q.  And what happened was after that interview occurred, you

22   found Agent Rochowiak's business card in your home, right?

23   A.  Yes.

24   Q.  And you began texting Robert Rochowiak, right?

25   A.  Yes, ma'am.

1   Q.  And you began posting his business card online, right?

2   A.  Yes, ma'am.

3   Q.  And you sent Agent Rochowiak dozens of text messages,

4   didn't you?

5   A.  Oh, my gosh.  Yes, I did.

6   Q.  Okay.

7   A.  Exposing the real terrorists in the world.

8          THE COURT:  Mr. Haas, the answer is done.

9   BY MS. KELLY:

10  Q.  And you also post -- started posting messages on vk.com

11  after you met with the State Department, right?

12  A.  Yes, ma'am.

13  Q.  You posted messages under the screen names Robert Haas and

14  Fox News?

15  A.  Possibly.

16  Q.  You posted messages under the VK account name Robert Haas?

17  A.  Possibly.

18  Q.  I thought we discussed a minute ago that the vk.com

19  postings --

20  A.  They are my accounts.  I don't have these photos in front

21  of me.  I don't know what you're talking about.  I make posts

22  every day.  I have no idea what you're talking about.

23  Q.  You saw the exhibits that we showed to the jury which were

24  the postings on vk.com, right?

25  A.  I have.

1    Q.  And some of those postings were under the account name

2    Robert Haas, true?

3    A.  Yes.

4    Q.  And those were your postings, right?

5    A.  Yes.

6    Q.  And then some of the other postings were under the screen

7    name Fox News, correct?

8    A.  Yes.

9    Q.  And those were your postings, right?

10   A.  Yes.

11   Q.  You were in Ottawa, Illinois, when you made the posts?

12   A.  Yes.

13          MS. KELLY:  Your Honor, permission to publish Exhibit

14   43, Government Exhibit 43 which has been admitted in evidence.

15          THE COURT:  All right.  You may.

16   BY MS. KELLY:

17   Q.  Mr. Haas, I'm showing you Government Exhibit 43.  This is

18   a post you made on December 29th, 2018?

19   A.  Are you asking me?

20   Q.  Yes.

21   A.  Yes, ma'am.

22   Q.  And you posted the portion under Fox News as well as the

23   two comments, right?

24   A.  Yes, ma'am.

25          Please note the top sentence:  "Anyone trying to stop

1    the truth" --

2            THE COURT:  Mr. Haas, there's not a pending question

3    right now.

4    BY MS. KELLY:

5    Q.  And what you said in the first comment is, "You try to

6    stop me from telling the truth, I will cut every throat in

7    your home.  Try me."  Correct?

8    A.  Stop me from telling the truth, exactly.

9    Q.  And that's another way of saying that people who disagree

10   with you should be killed, right?

11   A.  No.  If you try to -- if you try to take away my First

12   Amendment, stop me from telling the truth.  I did not say "if

13   you disagree with me."  I said, "stop me from telling the

14   truth."  Can you read?

15   Q.  Your view of the First Amendment and your version of the

16   truth, right?

17   A.  No.

18   Q.  Your version?

19   A.  No.  People argue with me all the time.  I just destroy

20   them in the debate.  Stop me from telling the truth --

21   Q.  You've answered the question.

22   A.  -- then you have violated my rights.

23           THE COURT:  The answer is complete, Mr. Haas.

24           Next question.

25   BY MS. KELLY:

1  Q.  Then you made -- this post again was dated in December

2  2018, about 11 months after you met with the State Department,

3  right?

4  A.  This one?

5  Q.  Yes.

6  A.  It looks like it, yes.

7  Q.  And you continued making posts in January 2019, in

8  February 2019, going up to April 5th, 2019, correct?

9  A.  Possibly.

10         MS. KELLY:  Your Honor, if I may publish to the jury

11  Government Exhibit 70.

12         THE COURT:  All right.

13         MS. KELLY:  It's been admitted into evidence.

14         THE COURT:  Go ahead.

15  BY MS. KELLY:

16  Q.  And you made these posts because you were mad at law

17  enforcement, right?

18  A.  No.

19  Q.  You were angry about the fact that law enforcement had

20  visited you?

21  A.  No.  "Anyone trying to silence me," it says.

22  Q.  So it's not limited --

23  A.  People trying to silence me.  Anyone.  Anyone.

24  Q.  All right.  And what you said in the post identified as

25  Exhibit 70 is, "Anyone who tries, I'll kill its family while

Haas - cross

391

1    extracting who sent him."

2    A.   Self-defense is a blanket statement, a threat that would

3    never happen.

4    Q.   And --

5              THE COURT:  Mr. Haas, that was not responsive.  The

6    jury will disregard that answer.

7    BY MS. KELLY:

8    Q.   And it's your view that killing families is self-defense?

9    A.   No.  That's just to keep them away.  Self-defense.  It's

10   self-defense.

11   Q.   You talk --

12   A.   Make them think twice about coming and violating my rights

13   or hurting me.

14   Q.   You talked about killing families in your post, didn't

15   you?

16   A.   I have.

17   Q.   You're not claiming it's self-defense to kill families,

18   are you?

19   A.   No.  It's self-defense to talk about it, to scare people

20   from coming and harming me for telling the truth, trying to

21   silence me from telling the truth and exposing these

22   disgusting terrorists who terrorize --

23             THE COURT:  All right.  That completes the answer.

24   Next question.

25             MS. KELLY:  Your Honor, if I may publish Government

1    Exhibit 74.

2         THE COURT:  All right.  You may.  And any exhibit

3    that's already been admitted, you can go ahead and publish.

4         MS. KELLY:  Thank you.

5    BY MS. KELLY:

6    Q.  Mr. Haas, this is a post you made on vk.com on April 7,

7    2019, right?

8    A.  Yes, ma'am.

9    Q.  This is a month before you ever met Joe Kostuchowski,

10   right?

11   A.  Yes, ma'am.

12   Q.  And in this post, you said, "I'm okay with okay" -- "I am

13   okay with killing feds.  As a matter of fact, I'm going to

14   make this happen.  They have met their ending here."

15   A.  Yes, ma'am.

16   Q.  And you chose the words that you used in all of your

17   online posts, right?

18   A.  I didn't say, "I'm coming to kill feds."  I said, "I'm

19   okay with it happening and I will make it happen" --

20        THE COURT:  All right.  Mr. Haas, that's

21   nonresponsive.

22        So you can either repose the question or ask another

23   one.

24   BY MS. KELLY:

25   Q.  You chose the words that you used in your online posts,

1  didn't you?

2  A.  That's pretty obvious.

3  Q.  And you wanted those words to have an impact?

4  A.  Well, yeah.  Doesn't everybody?  Isn't that why you use

5  words, to communicate?

6  Q.  And you meant what you said, didn't you?

7  A.  I do, absolutely.  These people protect terrorists.

8  Q.  You talked a minute ago about not saying -- not saying

9  that you were going to kill somebody but that you were going

10  to make it happen, right?

11  A.  By exposing these documents, absolutely, these photos of

12  Israelis, Rahm Emanuel, the Rothschilds, the --

13          THE COURT:  All right.  That completes the answer.

14          THE WITNESS:  -- cartel --

15          THE COURT:  That completes the answer, Mr. Haas.

16  BY MS. KELLY:

17  Q.  But you agree that if you say you're going to do

18  something, you're going to cut someone's throat, that's a

19  threat.  You agree with that?

20  A.  If I say, "I'm coming to kill you, Ms. Kelly," that's a

21  threat.

22  Q.  You agree.  Okay.

23          And you told Dave Noordeloos in January of 2018 that

24  if you said you were going to cut someone's throat, that would

25  be a crime?

1   A.  Yes, that probably is a crime.

2   Q.  After you made the vk.com posts, you met with Joe

3   Kostuchowski, right?

4   A.  Yes, ma'am.

5   Q.  And Joe Kostuchowski is the FBI task force officer who met

6   you at your job site in Ottawa, Illinois?

7   A.  Yes, ma'am.

8   Q.  You gave him the location to your work site for the

9   meeting?

10   A.  After he demanded and said I do not -- again, I do not

11   have a choice, I must meet him --

12   Q.  The answer is yes or no.

13   A.  Yes.  He made an illegal seizure.

14   Q.  You gave him the location to your work site.  You told him

15   where to go, right?

16   A.  Yes, ma'am.

17   Q.  He never physically touched you?

18   A.  No.

19   Q.  He never pointed a gun at you?

20   A.  No.

21   Q.  He didn't arrest you?

22   A.  Threatened to.

23   Q.  He did not arrest you?

24   A.  Did not, no.  He had no charges, no probable cause, no

25   warrant.

Haas - cross

395

1    Q.  The answer is "no," right?

2    A.  That's right.

3    Q.  You were angry that he wanted to speak to you?

4    A.  I was angry that he made an illegal seizure at my job

5    site, told me I don't have a choice, that I have to talk to

6    him about my First Amendment protected speech.  He did not

7    have charges.

8            THE COURT:  All right.  That completes -- that

9    completes the answer.  Next question.

10   BY MS. KELLY:

11   Q.  You were mad.  You were mad at Joe Kostuchowski because he

12   came to talk to you, right?

13   A.  Absolutely.  I was mad about the illegal seizure.

14   Q.  And you knew when Joe Kostuchowski got there that he was

15   with the FBI, right?

16   A.  Yes.

17   Q.  And you told Joe Kostuchowski during that May 8th, 2019,

18   meeting that you will never change your tone?

19   A.  That's right.

20   Q.  And you posted two video clips of that interview to

21   vk.com, true?

22   A.  We've already established this, yes.

23   Q.  Those are the clips that we played to the jury as

24   Government Exhibits 76 and 78, right?

25   A.  Whatever you say.  I guess so, yes.

Haas - cross

396

```
 1   Q.  You saw the two clips and --
 2   A.  I did, yes.
 3   Q.  -- know what they are?  Okay.
 4           And those were the sections of the interview that you
 5   chose to post online?
 6   A.  Yes.
 7   Q.  A few minutes after Joe Kostuchowski left your job site,
 8   you called him on the phone?
 9   A.  Yes.
10   Q.  You called him on his work cellular phone number?
11   A.  Yes, ma'am.
12   Q.  You challenged Joe Kostuchowski to a fight?
13   A.  After he told me, "You're a keyboard warrior, you're all
14   talk, you'll never do anything," I said, "Take off that gun
15   and badge."
16   Q.  The comment about being a keyboard warrior made you mad,
17   right?
18   A.  Of course.
19   Q.  Infuriated you?
20   A.  Infuriated, no.  It's an ignorant comment so I said, "Take
21   off that gun and badge."  I laughed at him because I knew he
22   wouldn't.  He's the coward, not me.
23   Q.  And your response to that comment instead of brushing it
24   off was to challenge him to a fight?
25   A.  Yes.
```

Haas - cross

397

1  Q.  And then you started texting him, right?

2  A.  Yes, ma'am.

3  Q.  You sent him a lot of texts?

4  A.  Yes.

5  Q.  You wanted to show Joe Kostuchowski that you were willing

6  and you were able to hurt him?

7  A.  No.  I was showing him the truth, who the real terrorists

8  were in this planet and that he should really think about who

9  he's harassing when it's a freedom of speech issue.  He had no

10  charges and no warrant.  And he was harassing me --

11         THE COURT:  All right.  That completes the answer.

12         Next question.

13  BY MS. KELLY:

14  Q.  You wanted to show Joe Kostuchowski that he shouldn't mess

15  with you, right?

16  A.  No.

17  Q.  You texted him dozens of times to show him that you

18  were --

19  A.  To show him what he represents.  Read the messages.  "This

20  is who you are."

21         THE COURT:  Next question.

22  BY MS. KELLY:

23  Q.  You told Joe Kostuchowski in a text to take off his gun

24  and badge and meet true evil, didn't you?

25  A.  After he said, "You are all talk, you're just a keyboard

1  warrior, you'll never do anything." He instigated it, 100

2  percent.

3  Q.  And you texted him that you're not afraid to walk out your

4  door but he should be, right?

5  A.  Yes.  I walked out my door and had guns pointed at me, and

6  I'm not afraid --

7          THE COURT:  Mr. Haas, these are yes or no questions.

8  Please confine your answers to yes or no.

9          THE DEFENDANT:  Yes.

10  BY MS. KELLY:

11  Q.  And you left Joe Kostuchowski voicemail messages also?

12  A.  I did.

13  Q.  In one of those voicemail messages, you told Joe

14  Kostuchowski he's guilty of treason and he needs a bullet in

15  his head for it, right?

16  A.  I believe that, yes.  Did I say I was going to do it?

17  Q.  You wanted him to think you were going to do it?

18  A.  If I wanted him to think I was going to do it, I'd say,

19  "I'm going to shoot you in your head."  I'm not a coward.

20  Q.  You sent those messages to frighten Joe Kostuchowski?

21  A.  No.

22  Q.  There's no other reason for sending them, Mr. Haas, is

23  there?

24  A.  To instill the truth into his head, the facts of the

25  matter, what I believe, my beliefs, because I'm allowed to

1    have beliefs.  And my First Amendment guarantees me the right

2    to say them.

3    Q.  And telling Joe that he needed a bullet in his head was

4    your way of sharing your beliefs?

5    A.  Absolutely.

6    Q.  And you talked to Joe Kostuchowski in the text messages

7    about his bloodlines, too, didn't you?

8    A.  Possibly.

9    Q.  You said, "You'd better pray people don't wake up while

10   your bloodline is alive"?

11   A.  Yes.  Humanity, they're not going to -- just like the feds

12   at the Waco compound.  Did they care about the children and --

13        THE COURT:  Mr. Haas, that's nonresponsive.  Please

14   remember our discussion at the sidebar.

15        MS. KELLY:  Your Honor -- oh, it's already published.

16   Okay.

17   BY MS. KELLY:

18   Q.  Mr. Haas, I'm showing you Government Exhibit 80.  This is

19   the group of text messages that you sent to Joe Kostuchowski

20   on May 9th, 2019, isn't it?

21   A.  Yes, ma'am.

22   Q.  And I have displayed on the page one message that you sent

23   at 10:18 in the morning, "You're now on my list."  Right?

24   A.  Yes, ma'am.

25   Q.  And I'm now displaying Page 11 where you texted Joe

Haas - cross

400

1    Kostuchowski, "There's a reward dead or alive for some of your

2    kike masters in Moscow.  Do you believe you can stop me from

3    collecting that shit?"

4    A.   Putin issued a warrant for Rothschild and George Soros --

5    Q.   Is the answer yes or no?  You sent this text, right?

6    A.   Yes, I sent it.

7    Q.   Here's another text message, Page 13 of this document,

8    that you sent at 10:37 in the morning saying, "I thought you

9    wanted to chat, you monkey Jew.  You coward old man.  You know

10   I get what I want, and I think you deserve death."

11        You sent that one, too, right?

12   A.   Yes, ma'am.

13   Q.   And you sent Joe Kostuchowski text messages all throughout

14   the day and evening, correct?

15   A.   No.  He's lying about that.

16   Q.   We looked at one.  Here's one at 10:37 in the morning on

17   Page 13, right?  And if we scroll back, here's one on Page 6.

18   This was at 12:50 in the morning, right?

19   A.   Those are from different days.

20   Q.   They're May 9th.  We'll go to the first page.  The first

21   page of Government Exhibit 80, the top says May 9, 2019,

22   right?

23   A.   Yes.

24   Q.   Then if we -- and the first one at the bottom was at 12:15

25   in the morning, true?

Haas - cross

401

A.   Yes, ma'am.

Q.   And the next one was at 12:17 in the morning?

A.   I don't know that that was the same day.  It might have been.  I don't know.

Q.   Well, you sent a text message at 12:17 in the morning, right?

A.   Possibly.

Q.   You're not disputing this timestamp, are you?

A.   Are you expecting me to remember the exact times?  That's impossible.  That's ignorant.

Q.   The document shows a timestamp of 12:17?

A.   It does.

Q.   The next document shows a timestamp of 12:23 in the morning, right?

A.   Yes, but it doesn't say which day.

Q.   The next one is a timestamp of 12:31 in the morning?

A.   Yes.

Q.   12:32?

A.   Yes.

Q.   12:50 in the morning?

A.   Yes.

Q.   And then we pick back up again at 10:18, right?

A.   Yes, but I don't know which day that was either.

Q.   So the answer to my question is, you were texting Joe Kostuchowski --

Haas - cross

1    A.  I'm not --

2    Q.  -- all throughout the day and evening, weren't you?

3    A.  -- denying I sent him multiple texts.  No, I'm not denying

4    that, but they're lying about the number of texts and the days

5    that it happened.

6    Q.  You weren't joking when you sent Joe Kostuchowski the

7    texts and voicemails, were you?

8    A.  No.

9    Q.  And you were in Ottawa, Illinois, when you communicated

10   with Joe Kostuchowski?

11   A.  Yes.

12   Q.  And then you were arrested --

13   A.  I never made steps to do anything.

14   Q.  You were arrested on June 11th, 2019, right?

15   A.  Yes, ma'am.

16   Q.  And you were driven from Ottawa to Chicago in an Illinois

17   State Police vehicle?

18   A.  Yes.

19   Q.  And you saw the clips of portions of that vehicle ride

20   during this trial?

21   A.  Yes.  Just after they pointed guns at me, yes.

22   Q.  And you're not denying that you made the statements

23   identified in those clips?

24   A.  No, I'm not.

25   Q.  And one of the things you said was that you were going to

1   spend every waking moment of your life making sure that Joe

2   Kostuchowski gets killed?

3   A.   Did I say I was going to kill him?

4   Q.   You said that you were going to spend every waking moment

5   of your life making sure that Joe Kostuchowski gets killed.

6   A.   Yes, I did say that.  "Gets killed."  I didn't say I'm

7   going to --

8           THE COURT:  Mr. Haas, that was a --

9           THE WITNESS:  Yes, sir.

10          THE COURT:  -- yes or no question.

11          THE WITNESS:  Yes, sir.

12  BY MS. KELLY:

13  Q.   You testified about some photographs that you claim show

14  that Jewish people planted bombs in the World Trade Center?

15  A.   Yes, ma'am.

16  Q.   You found those photos on the internet, right?

17  A.   I found them from the *New York Times,* August 18, 2001,

18  article of the Israelis in the World Trade Center building a

19  balcony with a blueprint of their balcony and those same exact

20  photos, August 18th, 2001, *New York Times,* metro section.

21  Q.   The *New York Times* article doesn't say that those photos

22  show Jewish people blowing up the World Trade Center, does it?

23  A.   It says they were art students.

24  Q.   Correct.  Art students from Germany, right?

25  A.   They are Israeli art students, just like Rahm Emanuel

Haas - cross

404

1   isn't from America --

2   Q.   You are not answering my question.

3   A.   He is a dual citizen.  They were dual citizens --

4          THE COURT:  Mr. Haas.

5          THE WITNESS:  -- from Germany --

6          THE COURT:  All right.

7          THE WITNESS:  -- Israeli --

8          THE COURT:  That completes the answer.

9          Next question.

10  BY MS. KELLY:

11  Q.   My question is what the article says.  The article says

12  that those were art students from Germany, true?

13  A.   Yes.

14  Q.   And that *New York Times* article was dated from March of

15  2000, wasn't it?

16  A.   No.  It's August 18th, 2001, three weeks before the World

17  Trade Center collapsed.  August 18th, 2001, three weeks before

18  the World Trade Center was demolished.

19  Q.   The event in the World Trade Center, the art event that

20  the article was referring to, was in March of 2000, right?

21  A.   No.  August 18th, 2001.  It happened then.  Let's -- I

22  would like to --

23          THE COURT:  All right.  That answer is done.  We have

24  reached a Rule 403 point on your -- for your questioning on

25  that.  Please move on.

1   BY MS. KELLY:

2   Q.  Joe Kostuchowski never responded to any of your texts or

3   voicemail messages, true?

4   A.  He did not.

5   Q.  He never invited you to call him or text him, did he?

6   A.  He never asked me to stop.

7   Q.  He never invited you to call him and -- or text him, did

8   he?

9   A.  He called my phone first.  He gave me his number.

10  Q.  Is the answer to my question yes or no?

11  A.  He did not ask me to text him, no.  I didn't ask him to

12  call me either.

13  Q.  In the conversation where he called -- he mentioned that

14  you are a keyboard warrior, that occurred after he left your

15  job site in Ottawa, right?

16  A.  No.  He said it two times at the job site.

17  Q.  And you were mad that he called you that?

18  A.  Absolutely.

19  Q.  And then you called him on the phone?

20  A.  Yes, ma'am.

21  Q.  And you argued, tried to argue with him, right?

22  A.  Yes, ma'am.

23  Q.  And he never called you after that?

24  A.  No.

25  Q.  And he never returned to your job site?

1  A.  No.  I left the job for the day.  I don't know that.

2          MS. KELLY:  No further questions.

3          THE COURT:  All right.  We've come to the point for a

4  midmorning break, so let's do that before we resume.  So let's

5  take 15 minutes.  All rise.

6      (Proceedings heard in open court.  Jury out.)

7          THE COURT:  Please be seated.  You can stay there for

8  the moment, Mr. Haas.

9          So you can use this time if you want to try to

10  formulate some redirect questions.  Do you think you're going

11  to want to do that?

12          THE DEFENDANT:  I'm finished, your Honor.

13          THE COURT:  Okay.  I was going to explain then,

14  whatever you say, the government has a chance to recross.  But

15  you are complete?  Your testimony is complete?

16          THE DEFENDANT:  Yes, sir.

17          THE COURT:  All right.  Is your case complete then?

18          THE DEFENDANT:  Pretty much, yeah.

19          THE COURT:  Is there any other witness you have --

20          THE DEFENDANT:  No.

21          THE COURT:  -- to offer?

22          All right.  So then do you want to, just for the

23  record, make another Rule 29 motion?

24          THE DEFENDANT:  No, your Honor.

25          THE COURT:  All right.  So you have Noordeloos and

1    Najdanovich?

2            MR. JONAS:  Yes, your Honor.

3            THE COURT:  How long do you think it will take?

4            MR. JONAS:  So I think Dave Noordeloos, I'm

5    speculating about an hour or so.  And then if we call Officer

6    Najdanovich, I think he's only going to be less than ten

7    minutes.

8            THE COURT:  All right.  Okay.  Then when we resume, I

9    am going to instruct the jury, Mr. Haas, that in light of how

10   you expressed certain objections yesterday, I have instructed

11   you to ask for a sidebar to make objections during

12   Mr. Noordeloos' direct examination and Mr. Najdanovich's

13   direct examination.

14           So if you have an objection to make during the direct

15   examination, just ask for a sidebar, and we'll have a sidebar

16   and you can express your objection to me outside of the

17   hearing of the jury.  Do you understand?

18           THE DEFENDANT:  Yes, sir.

19           THE COURT:  Okay.  You can resume your seat there and

20   if you want to use the restroom, too.  Let's take 15 minutes

21   from this point.

22       (Recess from 10:36 a.m. to 10:49 a.m.)

23       (Proceedings heard in open court.  Jury out.)

24           THE COURT:  Let's go back on the record.

25           I did receive a note from the court security officer.

1   And the note is written by, it looks like, Ms. Riehl who is

2   the juror sitting in the first seat there.  It says as

3   follows:  "Juror appears to be sleeping, slash, nodding off

4   during testimony, Ms. Claudie," I think her last name is

5   Phillips.  And then it says, "Juror No. 2."

6              So here's what I propose.  I don't know if anyone

7   noticed it.  Did you see that from the government?

8              MS. KELLY:  I did not.

9              THE COURT:  All right.  Mr. Haas, did you notice

10  that?

11             THE DEFENDANT:  I did, but I'm not terribly offended.

12             THE COURT:  Okay.  Ms. Phillips, the one sitting --

13             THE DEFENDANT:  In the front right there.

14             THE COURT:  -- in the front.  Okay.

15             THE DEFENDANT:  I think she was in the front or maybe

16  possibly the second one back.  I don't know if she was

17  nodding.  I think she was just listening with her eyes closed

18  maybe picturing the situation.

19             THE COURT:  All right.  So you don't have any

20  concerns?

21             THE DEFENDANT:  No.

22             THE COURT:  Does the government have any concerns?

23             MR. JONAS:  No, your Honor.

24             MS. KELLY:  No.

25             THE COURT:  So here's what I propose to do is, I'll

1   just ask the courtroom deputy when he goes to let the CSOs

2   know that the jury -- that we're ready for the jury is to just

3   tell the jury that if they feel like they want to get up to

4   just stretch, not walk around but just get up and stand for a

5   little bit during testimony, they can.  And also if they want

6   to bring in coffee or, you know, water, maybe that will help

7   them, if they also want to bring in -- like have a candy or

8   something like that.

9           So I won't make it explicit because if it's -- if it

10  didn't actually happen, like someone is actually sleeping, I

11  don't want to necessarily insult them, but at the same time if

12  they need a little bit of help staying awake if that is, in

13  fact, what's happening, we'll let them know they can do that.

14          So is that all right with the government?

15          MS. KELLY:  Yes.

16          MR. JONAS:  Yes, your Honor.

17          THE DEFENDANT:  Your Honor, I did look at her, and I

18  was just a little curious myself.  And I don't specifically

19  think she was sleeping.  I think she might have just been

20  listening with her eyes closed.

21          THE COURT:  But do you have any objection for me just

22  telling them if they want to -- I'm not going to tell them the

23  purpose.  The way we can explain it is that we've asked them

24  to sit for long periods of time, so if you want to just stand

25  up and stretch, you can do that, and you can bring in coffee,

1    drink, or candy.

2         Okay.  That's what we'll do.  So yes, Mike, if you

3    can just let the CSO know, let them bring them in but tell

4    that to the jury before they come in.  All right.  Thanks.

5         Now if you want to bring Mr. Noordeloos up first.

6         MR. JONAS:  Yes, Judge.

7       (Pause.)

8         THE COURT:  Mr. Haas, when we commence, I'm going to

9    ask you to rest your case in front of the jury so it's known

10   to them.  I'm going to say, "Do you rest your case" when the

11   jury comes back in, so that way you can do it in front of

12   them.  All right?

13        THE DEFENDANT:  Okay.

14        MR. JONAS:  Your Honor, could I make a request?  Your

15   water pitcher is in my line of sight of the witness.

16        THE COURT:  Yes.  You can move it to that back

17   corner.

18        MR. JONAS:  Thank you, Judge.

19        MS. KELLY:  Your Honor, we just noticed that the

20   monitors are displaying our exhibit.

21      (Proceedings heard in open court.  Jury in.)

22        THE COURT:  All right.  Please be seated.  All right.

23   Ladies and gentlemen, thanks for your patience again.

24        And I want to make sure, Mr. Haas, do you rest your

25   case?

1        THE DEFENDANT:  Yes, I do.

2        THE COURT:  All right.  And the government may begin

3    its rebuttal case.

4        So ladies and gentlemen, this is that next step that

5    I had mentioned earlier in the trial that if the defendant

6    puts on a defense case, then the government has an opportunity

7    to put on what's known as a rebuttal case.

8        Now, I do want to tell you that in light of the way

9    that the defendant expressed certain objections during the

10   earlier part of the trial, I have instructed the defendant to

11   ask for a sidebar before he makes objections during the

12   presentation of these rebuttal witnesses.  This is just a

13   procedural matter that I have set up.  It's just a procedural

14   mechanism that I have set up.  This has nothing to do with

15   your decision about the case.  All right.  It's completely

16   irrelevant, just a procedural thing that I have created.

17       Okay.  With that, the government may announce its

18   witness.

19       MR. JONAS:  Yes, your Honor.  The government calls

20   David Noordeloos.

21       THE COURT:  Okay.  And so, Mr. Noordeloos, you can

22   now remove your mask.  All right.  And please raise your right

23   hand.

24     (Witness sworn.)

25       THE WITNESS:  Yes, your Honor, I do.

1     THE COURT:  All right.  Okay.  Mr. Jonas?

2     MR. JONAS:  Thank you, Judge.

3     DAVID NOORDELOOS, GOVERNMENT'S REBUTTAL WITNESS, SWORN

4     DIRECT EXAMINATION

5  BY MR. JONAS:

6  Q.  Sir, would you please state and spell your name?

7  A.  Certainly.  My name is David Noordeloos.  My first name is

8  D-a-v-i-d.  My last name is Noordeloos, N-o-o-r-d-e-l-o-o-s.

9  Q.  What do you do for a living?

10  A.  Sir, I'm a special agent with the United States Department

11  of State's Diplomatic Security Service.

12  Q.  What is the Diplomatic Security Service?

13  A.  The Diplomatic Security Service is the law enforcement and

14  security arm for the U.S. Department of State.  We investigate

15  visa and passport fraud.  We protect the Secretary of State

16  and other senior State Department officials and visiting heads

17  of state beneath the head of state level here in the United

18  States.

19  Q.  How long have you been with the Department of State?

20  A.  18 years, since 2002.

21  Q.  Where were you prior to that?

22  A.  Prior to that, I was a municipal police officer in

23  Michigan for six years.

24  Q.  What is your current position with the Diplomatic Security

25  Service?  And just for ease, can I call it DSS?

Noordeloos - direct

413

1    A.  Certainly, sir.

2    Q.  So what is your current position with DSS?

3    A.  At DSS I am currently assigned to our office of criminal

4    investigations liaison.

5    Q.  What does that mean?

6    A.  My current unit, we handle requests from local, state,

7    tribal, and other federal law enforcement agencies who are

8    requesting investigative assistance overseas where we have

9    embassies and consulates.

10   Q.  Where are you located?

11   A.  My office is physically located in Arlington, Virginia,

12   right outside of D.C.

13   Q.  How long have you been in that position?

14   A.  Since April of this year.

15   Q.  What position with DSS did you have prior to April of this

16   year?

17   A.  Prior to April of this year, I was assigned to our office

18   of protective intelligence investigations for eight years.

19   Q.  What does that mean?

20   A.  In PII, protective intelligence investigations, we

21   investigated threats directed against Department of State

22   senior officials, employees, and facilities worldwide.

23   Q.  And you said you had that -- you were in that position for

24   eight years?

25   A.  Yes, sir, I was.

Noordeloos - direct

414

1   Q.   Were you also in Virginia at the time?

2   A.   Yes, sir.

3   Q.   Were you assigned in your role at PII to ever investigate

4   the defendant, Robert Haas?

5   A.   Yes, sir, I was.

6   Q.   About when were you assigned to do so?

7   A.   In January of 2018.

8   Q.   Why were you assigned to investigate him?

9   A.   Based on interstate threatening communications that he had

10  directed at U.S. Ambassador Nikki Haley who was the U.S.

11  ambassador to the United Nations in New York.

12  Q.   And what were the threatening communications, if you

13  recall them?

14  A.   They were threatening communications to harm Ambassador

15  Haley.

16  Q.   Where were -- how were these sent to her?

17  A.   They were sent to her via social media platform Instagram.

18  Q.   And is that something that DSS agents take seriously?

19  A.   Very much so, sir.

20  Q.   Through your investigation, was DSS or yourself for that

21  matter able to identify who sent the threats?

22  A.   DSS was able to identify the sender of those threats, yes,

23  sir.

24  Q.   And who was that?

25  A.   Mr. Robert Haas.

Noordeloos - direct

415

1   Q.  And as part of the investigation, did you attempt to

2   interview him?

3   A.  Yes, sir, we did.

4   Q.  Why?

5   A.  Whenever you're conducting a threat investigation, sir,

6   it's always in the best interests for the threat investigators

7   to make contact personally with the person who made the

8   original threats.

9   Q.  What's the goal of making contact with him?  What are you

10  trying to accomplish?

11  A.  To understand a baseline of the person's behavior and

12  ideally to understand better the potential risk of violence on

13  the part of the sender.

14  Q.  Are you also trying to mitigate the threat?

15  A.  Very much so.

16  Q.  Did you end up interviewing the defendant?

17  A.  I did.

18  Q.  More than once?

19  A.  Yes, sir.

20  Q.  When was the first interview?

21  A.  The first interview, if I recall correctly, was January

22  25, 2018.

23  Q.  Where was it?

24  A.  That was at his residence in Ottawa, Illinois.

25          MR. JONAS:  Your Honor, at this time I would ask if

Noordeloos - direct

416

1   we can get a stipulation identification of the defendant

2   meeting with Agent Noordeloos.

3           THE COURT:  All right.  Yes, Mr. Haas, do you

4   stipulate, that is, agree that you did meet Mr. Noordeloos on

5   that occasion?

6           THE DEFENDANT:  Yes, sir.

7           THE COURT:  All right.  The identification is made

8   for the record.

9           MR. JONAS:  Thank you, Judge.

10  BY MR. JONAS:

11  Q.  Agent Noordeloos, prior to the January 25, 2018, interview

12  of defendant, did you have any other contact with him?

13  A.  No, sir, I did not.

14  Q.  So you never met him before?

15  A.  I did not.

16  Q.  Did you ever speak to him before?

17  A.  I did not.

18  Q.  Are you aware if anyone else from your office from the DSS

19  ever tried to contact the defendant prior to your January 25th

20  interview?

21  A.  Yes, sir, I am.

22  Q.  And what's your understanding what happened?

23  A.  It's my understanding, sir, that agents from DSS, our

24  Chicago field office, attempted to make contact with Mr. Haas.

25  In those efforts, they spoke to family members of Mr. Haas.

1    Mr. Haas then called the DSS Chicago investigators and spoke

2    to them.

3    Q.   And did his communication, as far as you know, with the

4    DSS investigators from Chicago satisfy the State Department

5    regarding the threats against Nikki Haley?

6    A.   No, sir, it did not.

7    Q.   Why not?

8    A.   The communication Mr. Haas had with the DSS Chicago

9    investigators primarily involved Mr. Haas yelling at the

10   investigators and using profanity directed at them.

11   Q.   So turning to your January 25th, 2018, interview, how many

12   people went with you to the interview site?

13   A.   To the interview site at the initial contact with

14   Mr. Haas, we had four DSS agents in the area and at least two

15   Ottawa, Illinois, police department personnel.

16   Q.   Why so many?

17   A.   Any time we're working on a threat investigation, sir, we

18   definitely want to make sure that we have enough personnel to

19   safely make contact with the person and to protect the public

20   in the area during that initial contact.

21   Q.   And you're saying whenever it's a threat investigation.

22   So does the nature of the investigation also factor into

23   having additional law enforcement officers there?

24   A.   Very much so, sir.  That and the fact that there was a

25   threat of violence that was communicated.

1  Q.  When you met with the defendant, were you wearing a

2  recording device?

3  A.  I was, an audio recording device.

4  Q.  Why?

5  A.  To better document the contact with Mr. Haas, to clarify

6  what was said by all parties, and in the event that the

7  recording could be of use to other DSS personnel in the PII

8  office down the road to include other investigators,

9  operational psychologists, personnel of that type.

10  Q.  Have you listened to the recording of the January 25th,

11  2018, meeting?

12  A.  Yes, sir, I have.

13  Q.  Does the recording fairly and accurately represent what

14  was said during your interview of the defendant on that day?

15  A.  Yes, sir, it does.

16  Q.  Approximately how long was your interview for?

17  A.  To the best of my recollection, an hour and a half.

18  Q.  In preparation for your testimony, have you reviewed clips

19  or segments of that interview?

20  A.  Yes, sir, I have.

21  Q.  And I specifically mean the audio recording.

22  A.  Yes, sir.  I have reviewed the audio recording.

23  Q.  And do we anticipate that we're going to play the entire

24  hour and a half interview for the jury?

25  A.  No, sir.

1    Q.  Have you reviewed Government's Exhibits 112 through 125

2    and Government's Exhibits 1 and 2?

3    A.  Can you restate that?

4    Q.  Sure.  As part of the review of the clips, does that

5    include Government's Exhibits 112 through 125 and Government's

6    Exhibits 1 and 2?

7    A.  The audio clips, yes.

8              MR. JONAS:  Yes.  Your Honor, at this time I would

9    offer into evidence Government's Exhibits 112 through 125 and

10   Government's Exhibit 1 and 2 of audio clips of the January

11   25th, 2018, interview of the defendant by Agent Noordeloos.

12             THE COURT:  All right.  Any objection, Mr. Haas?

13             THE DEFENDANT:  I do object to them just playing

14   clips.  I would like to hear the full context so it's not

15   taken out of context for the jurors, which it obviously is

16   about to be.

17             MR. JONAS:  Objection to the last comment, Judge.

18             THE COURT:  The objection is overruled.  And the jury

19   will disregard everything after Mr. Haas saying that he did

20   object.  And I will just note for the record that the

21   recording was turned over in discovery long ago.

22             All right.  112 through 125 and 1 and 2 are allowed.

23             MR. JONAS:  Thank you, Judge.

24        (Government Exhibits 112 through 125 and 1 and 2 received

25        in evidence.)

1    BY MR. JONAS:

2    Q.   Agent Noordeloos, were transcripts of these clips made as

3    well?

4    A.   Yes, sir, they were.

5    Q.   And have you reviewed the transcripts?

6    A.   Yes, sir, I have.

7    Q.   Do the transcripts accurately reflect what's in the

8    recording?

9    A.   They do.

10   Q.   Would the transcripts --

11            THE DEFENDANT:  Your Honor, I object.  Sidebar.

12            THE COURT:  All right.  You may request a sidebar,

13   and I will give you one.

14       (Proceedings heard at sidebar:)

15            THE COURT:  All right.  Mr. Haas, go ahead and state

16   your objection.

17            THE DEFENDANT:  Your Honor, have you read these

18   transcripts of the recording?

19            THE COURT:  I have.

20            THE DEFENDANT:  And they are intelligent and make

21   sense to you, or are they completely --

22            THE COURT:  Mr. Haas, instead of having a back and

23   forth on that, can you just go ahead and state your objection?

24            THE DEFENDANT:  This is obviously not what was said

25   at that interview.  I make sense when I speak.  This does not

1     make sense.  This is -- this is written by somebody who's

2     illiterate.

3              THE COURT:  Mr. Haas, you will have the opportunity

4     to cross-examine the agent who looks like is about to testify

5     on the clips and what was said.  And I will ask the government

6     during the cross-examination to do what they've done for other

7     parts of this trial, which is if you ask them, for example, to

8     put up a particular video clip and you tell them exactly where

9     to go, and the same thing with the transcript, then I'll ask

10    them to display that.  So you can cross-examine the witness on

11    it, but otherwise the exhibits are allowed.

12             I do think, Mr. Jonas, you need to finish foundation

13    for the transcripts to ensure that all of those foundational

14    elements have been met.  So the objection is overruled

15    conditioned on the foundation being laid.

16             THE DEFENDANT:  Your Honor, two things.  One, do all

17    these sidebars go on to the docket?

18             THE COURT:  Yes, all sidebars are still on the

19    record.

20             THE DEFENDANT:  This is recorded?

21             THE COURT:  Well, the court reporter is transcribing

22    and taking notes on them and then she will -- if and when you

23    order the transcripts, all the sidebars are part of the

24    transcript.

25             THE DEFENDANT:  Okay.  Also, I'd like to make a note

1    then that I did not get these transcripts until yesterday on

2    the DVD.  And I had no access to a computer to plan for this

3    whatsoever.  This is a total violation of my due process.

4         THE COURT:  All right.  So this is a rebuttal case.

5    And so it does happen that when a rebuttal case is put on,

6    evidence, because it has to be responsive to the defense, is

7    not put through the same kind of pretrial vetting.  We do our

8    best, but it's not uncommon for this to happen --

9         THE DEFENDANT:  My due process --

10        THE COURT:  -- and -- just one second.  So you're

11   saying you did not have access to a discovery computer

12   yesterday?

13        THE DEFENDANT:  I did not.  When I got back to the

14   MCC, we were on lockdown.  I got put in my cell, and I had to

15   stay in there all night.  I was allowed to make one cup of

16   coffee with hot water and had to go back to my cell.

17        THE COURT:  I can inquire with the MCC on that, but

18   if they had to take that lockdown measure then that is

19   unfortunately the type of thing that does happen and --

20        THE DEFENDANT:  Again, this is a violation of my due

21   process.

22        THE COURT:  Mr. Haas, I was not done.  It's quite

23   plain that I was not done, so please do not interrupt me.

24        So I will inquire into that.  Let me ask, were you

25   able to make a phone call to Ms. Singer?

1    THE DEFENDANT:  No, nothing.

2    THE COURT:  All right.  Well, and that, I had not

3    been able to arrange.  So we have taken as extraordinary steps

4    as we can to continue to give you access.  A defendant's right

5    to representation by a lawyer is generally the way that we

6    deliver access to the courts.  You did choose to represent

7    yourself.  I did warn you how difficult it would be.

8    Now, secondly, I do want to -- I confirmed this

9    before.  I'll just confirm it again with Mr. Jonas that the

10   recording, the video clips, have been turned over.  The entire

11   audio recording of the interviews with the Department of State

12   in January 2018, those were turned over in discovery, correct?

13   MR. JONAS:  Yes, your Honor.

14   THE DEFENDANT:  No, they weren't.  Only the video

15   from the police station was.  The one from my house was not.

16   This is new.  They just gave me this yesterday.

17   THE COURT:  Mr. Jonas, you can explain.

18   MR. JONAS:  Yes, your Honor.  We can pull out the

19   discovery index if your Honor wants to see it.

20   THE COURT:  Well, it's on the docket, correct?

21   MR. JONAS:  Yes.  Also, Judge, if you recall during

22   the pretrial conference, I raised the fact that that meeting

23   of January 25th was recorded.  The defendant said it wasn't

24   and never followed up.  The other point, Judge -- so he has

25   it.  We've produced it.

1          The other point is the transcripts, a hard copy was

2    given to him at the end of the day yesterday.  It was the same

3    hard copy that was emailed to the Court and Ms. Singer.  Yes,

4    there's been some slight tweaks since that copy, but it's

5    primarily the same.  So he had the opportunity to at least

6    read the hard copy overnight.

7          THE DEFENDANT:  Your Honor, have you read this hard

8    copy?  It's ridiculous.

9          THE COURT:  Mr. Haas --

10          THE DEFENDANT:  It makes no sense.

11          THE COURT:  Mr. Haas, what I did read was the final

12    transcripts that were emailed later.  And you have now had a

13    hard copy of that since the morning.  So again, you can

14    cross-examine on it.  And given that it's a rebuttal case,

15    that is the opportunity that you will have.

16          All right.  Objection is overruled, again,

17    conditioned on the foundation for the transcripts that still

18    need to be laid.

19          MR. JONAS:  Yes, Judge.

20      (Proceedings heard in open court:)

21          THE COURT:  All right.  The objection is overruled.

22          You can go ahead as we discussed at sidebar.

23          MR. JONAS:  Thank you, Judge.  May I proceed?

24          THE COURT:  Yes.  Go ahead.

25          MR. JONAS:  Thank you.

1  BY MR. JONAS:

2  Q.  Agent Noordeloos, I was asking you about transcripts.

3  Have you personally reviewed the transcripts?

4  A.  Yes, sir, I have.

5  Q.  And have you made edits to the transcripts where you saw

6  that maybe it was a word that wasn't correct?

7  A.  I have.

8  Q.  And you've done this multiple times?

9  A.  I have.

10 Q.  And do you believe that the transcripts would aid the jury

11 in understanding your testimony as well as the recordings that

12 will get played?

13 A.  Yes, sir, I do.

14          MR. JONAS:  Your Honor, at this time I would offer

15 into evidence the transcripts which are marked as Government's

16 Exhibits 237 through 250.

17          THE COURT:  All right.  Any objections other than the

18 prior objections that we just discussed?

19          THE DEFENDANT:  No, your Honor.

20          THE COURT:  All right.  They're allowed.

21     (Government Exhibits 237 through 250 received in evidence.)

22          MR. JONAS:  Thank you, Judge.

23 BY MR. JONAS:

24 Q.  And Agent Noordeloos, I have a few questions before we

25 start playing any of these clips.  Did you arrange the

1    interview with the defendant prior to January 25th?

2    A.  No, sir, I did not.

3    Q.  Why not?

4    A.  Oftentimes in threat investigations, it's beneficial to

5    the threat investigator to have unplanned contact with the

6    subject who made the threats.

7    Q.  Can I ask you to move a little closer to the microphone,

8    please?

9    A.  Certainly.  I apologize.  Is this better, sir?

10   Q.  I think so.

11          THE COURT:  And also, I just want to remind the jury

12   that I will be giving you instructions on what the legal

13   definition of a threat is.  All right.  So this is the witness

14   testifying from his perspective only.

15          All right.  Go ahead.

16          MR. JONAS:  Thank you, Judge.

17   BY MR. JONAS:

18   Q.  So I'm sorry, Agent Noordeloos.  You explained that you

19   didn't make contact or try to arrange an interview in advance

20   because you thought it was, as a threat investigator, it was

21   better not to?

22   A.  Yes, sir.  That's what I said.

23   Q.  And why is it better not to try to arrange it in advance?

24   A.  It's better for the threat investigator to have unplanned

25   contact because it helps us better understand the baseline

1   demeanor, behavior, activities of the person who made the

2   threatening communications.

3   Q.   So take us to January 25th, 2018.  How did you first

4   encounter the defendant?

5   A.   I was in a vehicle, an Ottawa PD unmarked vehicle down the

6   street with an Ottawa PD detective.  We had other personnel on

7   an outside perimeter of the block.  We were in radio contact

8   with the other personnel.  We observed a subject who we

9   identified as Mr. Haas come out of the door of his apartment,

10  and then we initiated contact with him.

11  Q.   What were you wearing?

12  A.   Sir, I was wearing a -- like a windbreaker, blue in color.

13  It said "Police" on both sleeves, had a -- our badge insignia

14  on the front, and on the back it also said "Police."

15  Underneath that I was wearing an external body armor carrier

16  that was black in color, and it had a patch right here that

17  said "Police."

18  Q.   So I'm sorry.  You said a moment ago you saw the defendant

19  come out of his apartment?

20  A.   Via his apartment door, yes, sir.

21  Q.   So what happened?

22  A.   At that time, we exited our vehicle.  Immediately when I

23  made eye contact with Mr. Haas, he stopped, began to turn, and

24  he made a furtive movement towards his right front pocket with

25  his right hand.

1        MR. JONAS:  Your Honor, I know this may be a little

2   unusual given everything, but is it possible for the witness

3   to stand up and demonstrate to the jury what he just

4   described?

5        THE COURT:  You can stand up but just stand right

6   where your chair is.  All right.

7        THE WITNESS:  Would you like me to put a mask on,

8   your Honor?

9        THE COURT:  That would be wise.

10        THE WITNESS:  Right here, sir?

11        THE COURT:  Yes.

12   BY MR. JONAS:

13   Q.  What is it that -- can you just demonstrate the move that

14   you saw the defendant do as you exited your vehicle?

15   A.  Definitely.  When we made eye contact, when I made eye

16   contact with Mr. Haas, he stopped, immediately did this, and

17   began to turn his body.

18   Q.  Okay.  Can you sit down?

19   A.  Yes, sir.

20        THE COURT:  And then you can remove your mask after

21   you're seated.

22        THE WITNESS:  Thank you, your Honor.

23        MR. JONAS:  And Judge, just for the record, when the

24   witness said "did this," he put his hand over his left pocket,

25   put his other hand over his hand that was on his left pocket

1    and made a slight turn.

2              THE COURT:  I'm not sure.  I think right and left

3    might be mixed.  Why don't you ask the witness the question.

4    BY MR. JONAS:

5    Q.  So Agent Noordeloos, can you just describe so that the

6    record is clear what hand went on what pocket?

7    A.  Absolutely, sir.  It was the right hand, his right hand to

8    his right pocket.

9    Q.  Okay.  And then he put his other hand over his hand that

10   was on the pocket?

11   A.  Correct.

12   Q.  Thank you.  So did that concern you?

13   A.  Very much so.

14   Q.  Why?

15   A.  In my training and experience both as a federal agent and

16   as a local police officer, that furtive movement made me in

17   fear, and I was concerned that Mr. Haas had a weapon.

18   Q.  So what did you do?

19   A.  I immediately drew my firearm and pointed it at him and

20   ordered him to get to the ground while identifying myself as

21   police.

22   Q.  Did you threaten to kill him?

23   A.  At no time.

24   Q.  Was this all recorded?

25   A.  It was.

1          MR. JONAS:  Your Honor, at this time if we can play

2    Government's Exhibit 112 and publish to the jury along with

3    the corresponding transcript which is 237.

4          THE COURT:  All right.

5          MR. JONAS:  Thank you, Judge.  And I'm going to do

6    the split screen.

7       (Government Exhibit 112 played in open court.)

8    BY MR. JONAS:

9    Q.  Agent Noordeloos, is that you talking?

10   A.  It is, sir.

11      (Government Exhibit 112 played in open court.)

12          THE DEFENDANT:  Your Honor, sidebar.

13          THE COURT:  All right.  You may have a sidebar.

14          THE DEFENDANT:  That video just skipped about five

15   minutes.

16          Your Honor, originally that video --

17          THE COURT:  One second.

18      (Proceedings heard at sidebar:)

19          THE COURT:  All right.  Go ahead.

20          THE DEFENDANT:  That conversation started on the

21   street in front of my apartment building.  We were out there

22   for a good minute or two before we walked upstairs.  Then it

23   skipped to about five minutes into our conversation inside of

24   my apartment.  That is not an accurate reproduction of that

25   conversation.

1          THE COURT:  All right.  Any response from the

2     government?

3          MR. JONAS:  Yes, Judge.  I believe from the recording

4     they're still out on the street, but as we play the recording

5     there's a conversation about them going into the apartment.

6          THE DEFENDANT:  You can hear the difference in the

7     sound.

8          THE COURT:  Mr. Haas, again, you can cross-examine

9     the agent on this point, but the exhibit has been allowed into

10    evidence.  Overruled.

11         (Proceedings heard in open court:)

12    BY MR. JONAS:

13    Q.  Agent Noordeloos, before we continue playing, the

14    defendant said, "I thought you were Mossad.  I was ready to

15    attack you."  Do you know what Mossad is?

16    A.  Yes, sir, I do.

17    Q.  What is it?

18    A.  The Mossad is the nation of Israel's intelligence service.

19    They're equivalent of our Central Intelligence Agency.

20         MR. JONAS:  I'll go back to the recording.

21         (Government Exhibit 112 played in open court.)

22    BY MR. JONAS:

23    Q.  Agent Noordeloos, had you identified yourself as a State

24    Department agent?

25    A.  I had not.

Noordeloos - direct

432

1    Q.   Why not?

2    A.   At that time I had law enforcement raid jacket on, and

3    based on his immediate reaction to the State Department, I

4    felt it would unduly escalate the situation, so I did not

5    identify myself as State Department at that time.

6    Q.   Did you later on in the conversation?

7    A.   Yes, sir.  Indeed, I did.

8              MR. JONAS:  Okay.  Going back to the audio.

9         (Government Exhibit 112 played in open court.)

10             THE DEFENDANT:  Your Honor, I'd like to elicit

11   information for the jury.  This is --

12             THE COURT:  Mr. Haas -- Mr. Haas --

13             THE DEFENDANT:  This is in my living room right now.

14             THE COURT:  Let's have a sidebar.

15        (Proceedings heard at sidebar:)

16             THE COURT:  All right.  Mr. Haas, you were instructed

17   to ask for a sidebar if you were going to pose any objection.

18   Now you've taken the further step of just injecting

19   essentially testimony when you still will have an opportunity

20   to have cross-examination.

21             I do not want to have to warn you again but I will

22   still strike -- I need to have some sanction available so that

23   you comply with my directions.  I'm left with precious few at

24   this time.  One of them is to strike your direct examination

25   from your defense.  That is still available to me.  I don't

Noordeloos - direct

433

1   want to take that step, but if you keep on this course, that's

2   what's going to happen.  What would you like to say?

3            THE DEFENDANT:  Your Honor, this is now ten minutes

4   into talking --

5            THE COURT:  Mr. Haas, that -- again, that is a

6   subject for cross-examination.  The objection is overruled.

7        (Proceedings heard in open court:)

8            THE COURT:  All right.  You may proceed.

9            MR. JONAS:  Thank you, Judge.

10           Let me go back to the audio.

11       (Government Exhibit 112 played in open court.)

12  BY MR. JONAS:

13  Q.  Agent Noordeloos, let me ask you this:  Did you ask to see

14  his phone prior to him offering it?

15  A.  No, sir.

16       (Government Exhibit 112 played in open court.)

17  BY MR. JONAS:

18  Q.  Where were you at this point when you were asking if you

19  could go upstairs?

20  A.  Sir, we were on the sidewalk outside of the entrance door

21  to Mr. Haas' apartment.

22       (Government Exhibit 112 played in open court.)

23  BY MR. JONAS:

24  Q.  Agent Noordeloos, did you tell the defendant he has no

25  choice but to let you into his apartment?

Noordeloos - direct

434

1  A.  At no time did I tell him that, sir.

2  Q.  Did you tell the defendant that you were going to arrest

3  him if he didn't agree to talk to you?

4  A.  No, sir.

5  Q.  What would you have done if he did not agree to talk to

6  you?

7  A.  If he had said he did not want to speak to us, I would

8  have asked him to listen to what I'm saying.  I'm not going to

9  ask him anything.  I would have clearly told him why we were

10  there based on his threats against Ambassador Haley and that

11  the investigation was not going to go away and that it would

12  help if we could talk to him.

13  Q.  Did he ever tell you he does not want you up in his

14  apartment?

15  A.  He never said that, sir.

16  Q.  You were with the police officer who was talking on this

17  recording; is that correct?

18  A.  Yes, sir, I was.

19  Q.  And did you hear the police officer say, "We can talk down

20  at the police station"?

21  A.  Yes, sir.

22  Q.  Was that a demand by the police officer?

23  A.  No, sir, it was not.

24  Q.  Did you want to talk in the apartment?

25  A.  Yes, sir, I did.

1    Q.   Why?

2    A.   As a threat investigator, it's often very helpful on these

3    types of investigations to better understand the person who

4    made the threatening communications to see where they spend

5    most of their time, to see their residence, to make sure there

6    wasn't any objects in the residence that could concern us.

7         MR. JONAS:  Your Honor, at this time I'd like to play

8    Government's Exhibit 113.

9         THE COURT:  All right.  Go ahead.

10       (Government Exhibit 113 played in open court.)

11   BY MR. JONAS:

12   Q.   Agent Noordeloos, you said -- he offered to show you his

13   phone and you said, "If you're getting threats."  Why did you

14   want to look at his phone if he was getting threats?

15   A.   If he was getting threats that fell under federal

16   violations of interstate threatening communications, I was

17   more than happy to see them and have those threats documented.

18   Q.   Did you go up to the apartment?

19   A.   I'm sorry, sir?

20   Q.   Did you go up to the apartment?

21   A.   Yes, sir.

22   Q.   With the defendant?

23   A.   With the defendant.

24   Q.   Who else went up to the apartment?

25   A.   Officer -- or Detective Sergeant Cheatham from Ottawa

Noordeloos - direct

436

1    Police Department, Special Agent Williams from DSS Chicago,

2    and Assistant Special Agent in Charge Robert Rochowiak from

3    DSS Chicago.

4            MR. JONAS:  Judge, I'm going to play Government's

5    Exhibit 114.

6            THE COURT:  All right.

7        (Government Exhibit 114 played in open court.)

8    BY MR. JONAS:

9    Q.  Before we go on, Agent Noordeloos, where are you at this

10   time?

11   A.  At this time we're in Mr. Haas' apartment, sir.

12       (Government Exhibit 114 played in open court.)

13           MR. JONAS:  It jumped.  Actually, let me go back real

14   quick.  All right.

15   BY MR. JONAS:

16   Q.  Before I go on, Agent Noordeloos, you said you read -- and

17   I'm sorry.  Let me just see if I can get that on the screen.

18   I went too far.

19           On the transcript, just to orientate you, on Line 5,

20   you read -- you said, "Is this a threat, you fat slob.  I'll

21   kill everything you love."  I won't read the rest.  Were you

22   saying to the defendant, "Is this a threat," or were you just

23   reading something that he gave you?

24   A.  I was reading something off his phone, sir.

25   Q.  And were you reading something he said or someone sent to

Noordeloos - direct

437

1    him?

2    A.   Something that he said to somebody via message that I was

3    reading off his phone.  Does that make sense, sir?

4    Q.   Yes.

5        (Government Exhibit 114 played in open court.)

6    BY MR. JONAS:

7    Q.   Agent Noordeloos, I just want to go back to the question I

8    asked earlier.  You read something off his phone that says,

9    "Is this a threat," and then the defendant proceeded to say

10   something to that woman.

11   A.   Yes, sir, he did.

12   Q.   Did he ever tell you if he was joking when he was sending

13   these statements to these other people?

14   A.   He made no statement that he was joking, sir.

15           MR. JONAS:  Judge, can I -- of course, the audio was

16   louder when we play it in our offices.  Can I just try to

17   switch to the speaker here?

18           THE COURT:  All right.  You can do that.

19           MR. JONAS:  Thank you, Judge.

20       (Pause.)

21           MR. JONAS:  All right.  Judge, we'll give that a try.

22   I'd like to play Government's Exhibit 115, Judge.

23           THE COURT:  Go ahead.

24       (Government Exhibit 115 played in open court.)

25   BY MR. JONAS:

1  Q.  Agent Noordeloos, why did you ask him if you could grab

2  some chairs?

3  A.  Sir, it was his apartment.  I was hoping that we could

4  sit, have a -- as I anticipated that the conversation might be

5  a little more lengthy, we could sit down, maybe deescalate the

6  situation a little bit and have a productive conversation.

7  Q.  Did he tell you no, you couldn't sit?

8  A.  At no time did he say that, sir.

9  Q.  Did he try to kick you out of the apartment?

10 A.  At no time, sir.

11       MR. JONAS:  Judge, if I can play Government's Exhibit

12 116.

13       THE COURT:  You may.  And go ahead and also announce

14 the government exhibit number for the transcript as well.

15       MR. JONAS:  I'm sorry, Judge.  I should have done

16 that.  The last transcript was 240.  The next transcript is

17 241, Government's Exhibit 241.

18     (Government Exhibit 116 played in open court.)

19 BY MR. JONAS:

20 Q.  The defendant said he's not going to do anything himself,

21 he's not going to give you a charge.  Do you see that?

22 A.  Can you say what line that is, sir?

23 Q.  Sure.  Line 12.

24 A.  Yes, sir.

25 Q.  He says, "I'm not going to give you a charge.  I'm going

Noordeloos - direct

439

1    to let other people do it."

2    A.   Correct.

3    Q.   What was your understanding of what he meant by that?

4    A.   It was my understanding that his intent was to have other

5    people harm others.

6    Q.   So you were there to investigate threats against Nikki

7    Haley.  Did that statement that he wasn't going to do it

8    himself alleviate any concerns you may have had?

9    A.   In no way, sir.

10   Q.   Why not?

11   A.   Because he's saying in that statement based on the

12   previous statements he had directed at Ambassador Nikki Haley

13   that it was still his intent to incite others to take the

14   overt act of harming others.

15            MR. JONAS:  Judge, if I can play Government's Exhibit

16   117.

17            THE COURT:  You may.

18            MR. JONAS:  With the transcript, Government's Exhibit

19   242.

20       (Government Exhibit 117 played in open court.)

21   BY MR. JONAS:

22   Q.   Let me pause for a moment.  Agent Noordeloos, do you --

23   have you ever heard of APAC?

24   A.   Yes, sir, I have.

25   Q.   From your understanding, what is it?

Noordeloos - direct

440

1   A.   It is the American-Israeli Political Action Committee.

2   Q.   Defendant said if you're going to tell him that he's

3   wrong, then you are a traitor.  Did you ever tell the

4   defendant that he was wrong?

5   A.   At no time, sir.

6   Q.   Did you ever tell him he's right?

7   A.   At no time.

8   Q.   Why not?

9   A.   I was there to investigate his threatening communications,

10  not discuss his beliefs.

11       (Government Exhibit 117 played in open court.)

12  BY MR. JONAS:

13  Q.   Agent Noordeloos, you had said earlier on in this clip to

14  the defendant, he can believe what you want.  Do you recall

15  stating that?

16  A.   Yes, sir, I do.

17  Q.   What did you mean by that?

18  A.   He's entitled to have whatever beliefs he wishes, chooses

19  to have, sir.

20  Q.   Did you ever tell him he cannot have those beliefs?

21  A.   At no time.

22  Q.   Did you ever tell him he cannot post those beliefs on the

23  internet?

24  A.   At no time.

25  Q.   Did you ever attempt to infringe his First Amendment

Noordeloos - direct

441

1  rights?

2  A.  Never.

3  Q.  You said that you treated him with respect.  Is that

4  something you said to him multiple times throughout the

5  interview?

6  A.  I did.

7  Q.  Why did you say that?

8  A.  I was hoping to remind him that he was being treated with

9  respect and hopefully that him being reminded of that would

10  deescalate the contact.

11        MR. JONAS:  Your Honor, if I can play Government's

12  Exhibit 118, and the corresponding transcript is Government's

13  Exhibit 243.

14        THE COURT:  Go ahead.

15     (Government Exhibit 118 played in open court.)

16        MR. JONAS:  Your Honor, if I can play Government's

17  Exhibit 119 with a corresponding transcript of 244.

18        THE COURT:  Go ahead.

19     (Government Exhibit 119 played in open court.)

20  BY MR. JONAS:

21  Q.  Agent Noordeloos, the defendant says, "That's ISIS."  Can

22  you tell us what's going on here?

23  A.  He was showing me something on his phone, sir.

24  Q.  Was it ISIS, the terrorist organization that he was

25  showing you?

Noordeloos - direct

442

1   A.  He was claiming that a photo was somehow affiliated with

2   the Islamic state.

3        (Government Exhibit 119 played in open court.)

4   BY MR. JONAS:

5   Q.  Agent Noordeloos, you asked the defendant what would he do

6   if he saw Nikki Haley in Ottawa, Illinois, and he said he

7   would scream, "Muslim traitor" and watch Ottawa pummel her.

8   What was your understanding of what he meant by that?

9   A.  My understanding of Mr. Haas' statements is that he was

10  hoping to incite others to pummel her into the blank ground.

11  Q.  And how did that make you feel as someone investigating

12  threats?

13  A.  It -- I remained concerned.

14       MR. JONAS:  Judge, if I can play Government's Exhibit

15  120, and the corresponding transcript is Government's Exhibit

16  245.

17       THE COURT:  You may.

18       (Government Exhibit 120 played in open court.)

19  BY MR. JONAS:

20  Q.  Why did you ask him how he was feeling?

21  A.  A lot of times in these threat investigations, it's

22  important both to have our observations of the individual who

23  sent the threats and also the input information from the

24  person themselves as to how they're feeling so we can better

25  understand them.

Noordeloos - direct

443

1    Q.  And I just want to make sure.  Do you have a background in

2    psychology or psychiatry?

3    A.  I do not.

4    Q.  So is it your understanding in asking these questions

5    based upon your years as a law enforcement agent?

6    A.  Yes, and my training and experience, yes, sir.

7            MR. JONAS:  Your Honor, I'd like to play Government's

8    Exhibit 1 with a corresponding transcript of Government's

9    Exhibit 201.

10           THE COURT:  All right.  Go ahead -- actually, one

11   moment.

12           MR. JONAS:  Sorry, Judge.

13           THE COURT:  Let's get a sidebar.

14       (Proceedings heard at sidebar:)

15           THE COURT:  All right.  I might have missed it.  I

16   don't think you had moved to admit 201 through, is it, 204.

17           MR. JONAS:  I'm sorry, your Honor.  The transcripts?

18           THE COURT:  Yes.

19           MR. JONAS:  I apologize.  I think you may be right.

20           THE COURT:  So 201 corresponds with 1; is that

21   correct?

22           MR. JONAS:  That's correct.

23           THE COURT:  And then 202 with interview clip 2; is

24   that right?

25           MR. JONAS:  Yes, right.

1           THE COURT:  Okay.  And then are you planning on

2    introducing 203 and 204?

3           MR. JONAS:  Yes, your Honor, when we get to the

4    January 26th transcripts.

5           THE COURT:  Okay.  So you have to lay a separate

6    foundation for those for 3, 4, 203, and 204.  All right.  But

7    you're moving 201 and 202?

8           MR. JONAS:  Yes, your Honor.

9           THE COURT:  Okay.  Mr. Haas, any objections other

10   than the previous ones?

11          THE DEFENDANT:  No, sir.

12          THE COURT:  All right.  So 201 and 202 are allowed.

13          MR. JONAS:  Sorry about that, your Honor.

14      (Proceedings heard in open court:)

15          THE COURT:  All right.  201 and 202 are in.

16      (Government Exhibits 201 and 202 received in evidence.)

17          MR. JONAS:  Judge, may I play 201?

18          THE COURT:  You may.

19      (Government Exhibit 201 played in open court.)

20   BY MR. JONAS:

21   Q.  Agent Noordeloos, when he said that last line, "anyone who

22   wants to make that a crime should be followed home and stabbed

23   to death," did that concern you?

24   A.  Very much so, sir.

25   Q.  Why?

Noordeloos - direct

445

1    A.   In threat investigations, in protective intelligence

2    investigations where we're protecting government officials,

3    one of the things that concerns us the most is when somebody

4    either states an intent or there is an actual approach on one

5    of our protected persons or a facility.

6            Mr. Haas, speaking of following somebody home, i.e.,

7    conducting surveillance on that person and following them,

8    definitely concerned me.

9    Q.   Now, he doesn't say necessarily like he's the one that's

10   going to do it.

11   A.   He did not.

12   Q.   Does that make any difference to you?

13   A.   No, sir, it does not.

14   Q.   Why not?

15   A.   Because as he stated earlier, his intent was to get other

16   people to do the acts for him.

17           MR. JONAS:  Okay.  Back to the recording.

18        (Government Exhibit 201 played in open court.)

19   BY MR. JONAS:

20   Q.   Agent Noordeloos, what did you mean when you said,

21   "freedom of speech up to hate speech," and then "freedom of

22   speech up to fighting words"?

23   A.   In those comments I made, I was really trying to explain

24   to Mr. Haas and hopefully increase his understanding of, I

25   guess, a conceptual line in the sand of what is

1    constitutionally protected free speech, what is hate speech,

2    what's fighting words, and what are threats.

3          THE COURT:  All right.  And a reminder to the jury, I

4    will give you instructions of law that's going to incorporate

5    the First Amendment protections.

6    BY MR. JONAS:

7    Q.  Agent Noordeloos, why were you trying to do that?

8    A.  Our goal is to mitigate the threat that Mr. Haas would

9    present to any of our protected persons at the U.S. Department

10   of State.  And for him to better understand the thresholds of

11   what he's allowed to say and post, that helps us mitigate

12   those potential threats.

13   Q.  Is that in the hopes that he would follow the

14   understanding of the mitigation that you're trying to convey

15   to him?

16   A.  That he would stop the threatening comments, yes, sir.

17   Q.  Were you trying to get him to stop saying his beliefs

18   online?

19   A.  Never.

20         MR. JONAS:  Okay.  Let's go back to the audio.

21      (Government Exhibit 201 played in open court.)

22   BY MR. JONAS:

23   Q.  Agent Noordeloos, is the defendant, in the line where he

24   says, "If you're going to come charge me for an F'ing internet

25   threat," what was your understanding of what he meant by that?

Noordeloos - direct

447

1    A.   It was my understanding that he was saying if I was there

2    to arrest him and charge him for making threatening internet

3    comments.

4    Q.   Were you there to arrest him and charge him?

5    A.   I was not.  I was there to interview him, sir.

6              MR. JONAS:  I'll keep going.

7         (Government Exhibit 201 played in open court.)

8    BY MR. JONAS:

9    Q.   He said, "I might go F'ing visit them because they pushed

10   me to that point."  That's after he's saying he'll do his two

11   weeks and then he'll go F'ing visit them.  Was that a concern?

12   A.   Very much so.  Again, it gets to the conceptual of an

13   approach and following somebody.

14   Q.   He said, "Because they pushed me to that F'ing point."

15   What was your understanding of what he meant by that?

16   A.   Mr. Haas was stating that other persons pushed him to take

17   such action.

18   Q.   Were you pushing him to take any action?

19   A.   No, sir, I was not.

20        (Government Exhibit 201 played in open court.)

21   BY MR. JONAS:

22   Q.   Agent Noordeloos, the defendant talked to you about

23   getting buttons pushed.  Do you recall that?

24   A.   Yes, sir, I do.

25   Q.   And that it's dangerous to push people's buttons, correct?

Noordeloos - direct

1   A.  Yes.

2   Q.  In fact, he said that if he pushes your buttons, you may,

3   I think you put it as break leather and shoot him?

4   A.  Yes, sir.

5   Q.  Did you argue with him on social media?

6   A.  Never.

7   Q.  Did you argue with him at all during this meeting about

8   his beliefs?

9   A.  I did not.

10   Q.  Did you argue with him at all at any time about anything?

11   A.  I did not.

12   Q.  Do you know, if you know, did any other State Department

13   employee argue with him on social media?

14   A.  No, sir, I'm not aware of any other.

15   Q.  Or argue with him about his beliefs?

16   A.  No, sir.

17   Q.  Did he acknowledge posting threats online against people

18   or groups prior to ever meeting with you?

19   A.  Can you restate your question, sir?

20   Q.  I tripped over the question.  Prior to -- did he

21   acknowledge during your interview with him that prior to

22   meeting with him on that day that he, in fact, had posted

23   threats online against people who pushed his buttons?

24   A.  Yes, sir, he did.

25   Q.  Did you ever encourage him to send threats online?

1   A.   At no time, sir.

2   Q.   Did you instruct him to do so?

3   A.   No.

4   Q.   Did you do the opposite?

5   A.   I was encouraging him to stay within the constitutionally

6   protected freedom of speech, yes, sir.

7   Q.   Have you ever heard of something called VK or vk.com?

8   A.   I have, sir.

9   Q.   And did you hear of it prior to your meeting with

10  defendant?

11  A.   Yes, sir.

12  Q.   What's your understanding of what that is?

13  A.   It's my understanding that VK is a Russian-based social

14  media platform similar to Facebook or Instagram.

15  Q.   Did you have -- during this January 25th meeting or any of

16  your meetings with the defendant, did you have discussions

17  with him about vk.com?

18  A.   No, sir, I did not.

19  Q.   Did he ever tell you he was posting things on VK?

20  A.   No, sir.

21  Q.   Were you aware when you met with him that he had an

22  account on VK?

23  A.   I was not.

24  Q.   He says at the very end, quote, "You're protecting

25  scumbags by coming to my fucking house right now."

Noordeloos - direct

450

1   A.   That's Line 36 and 37, sir?

2   Q.   Correct.  Page 4 of that Government Exhibit --

3   A.   Yes, sir.

4   Q.   -- 201.

5   A.   That's what he stated.

6           THE COURT:  Mr. Jonas, if you could slow your pace a

7   little bit.

8           MR. JONAS:  I'm sorry, Judge.

9   BY MR. JONAS:

10  Q.   Did you make it clear to him that you were there because

11  of the threats against Nikki Haley?

12  A.   Yes, sir, I did.

13  Q.   Were you there to bother him about his freedom of speech?

14  A.   No, sir.

15  Q.   Did you ever disrespect him?

16  A.   No, sir.

17  Q.   Did you tell him multiple times that you were, in fact,

18  respecting him?

19  A.   I did, multiple times.

20  Q.   At this point in this clip, you mentioned to him that

21  you're State Department.

22  A.   I did.

23  Q.   Why at this point did you tell him that?

24  A.   Sir, at this point I identified myself as a fed in the

25  vernacular.  I wanted to -- a lot of times as a diplomatic

Noordeloos - direct

451

1   security service special agent, a lot of the general public

2   has not heard of us.  So I wanted to start that I was a fed

3   and then explain later that I was with Diplomatic Security

4   Service of the State Department.

5        MR. JONAS:  Your Honor, at this time I'd like to play

6   Government's Exhibit 121 with a corresponding transcript of

7   246.

8        THE COURT:  All right.  Go ahead.

9      (Government Exhibit 121 played in open court.)

10  BY MR. JONAS:

11  Q.  Did you offer him help?

12  A.  I did.

13        MR. JONAS:  Your Honor, if we can play Government's

14  Exhibit 122 with the transcript of Government's Exhibit 247.

15        THE COURT:  All right.  Go ahead.

16      (Government Exhibit 122 played in open court.)

17  BY MR. JONAS:

18  Q.  When you said, "Are you willing to talk to somebody," what

19  did you mean?

20  A.  It was my offer to Mr. Haas to get him connected with a

21  therapist regarding his anger issues.

22        MR. JONAS:  Your Honor, if I can play Government's

23  Exhibit 123 with a corresponding transcript of Exhibit 248.

24        THE COURT:  You may.

25      (Government Exhibit 123 played in open court.)

Noordeloos - direct

452

BY MR. JONAS:

Q. So Agent Noordeloos, when you said to the defendant, "I want you to be able to say your piece," what did you mean?

A. I wanted him to still have the right to express his beliefs, his freedom of speech.

Q. And you said, "On a volume, if you could instead of being like volume on a scale, on a zero to ten scale around 11.5," did you mean that he was at 11.5 before or you want him to tone it down to 11.5?

A. I was clarifying that on that scale that I mentioned, the zero to ten volume scale to conceptualize it, that he was currently off the scale at 11.5.

Q. And did he acknowledge that he would try to tone it down?

A. He said, "I'll try to be calmer about it."

    MR. JONAS: Judge, if I can play Government's Exhibit 2 with corresponding transcript of 202.

    THE COURT: Go ahead.

    (Government Exhibit 2 played in open court.)

    MR. JONAS: Sorry, Judge.

BY MR. JONAS:

Q. So Agent Noordeloos, you said to him essentially, "meet halfway." What did you mean by "meet halfway"?

A. In interviews and contacts like this in protective intelligence cases, it's oftentimes a negotiation. I'm speaking to the person. My goal is to get them to not make

Noordeloos - direct

453

1  further interstate threatening communications.  So meeting

2  halfway was in -- I was articulating it that way so he knew he

3  could still express his beliefs but do so without making

4  threatening communications.

5  Q.  The very last line you said, "I think you're crossing a

6  line on fighting words."  What were you trying to convey to

7  him?

8  A.  I was attempting to convey to him that the comments in the

9  lines before there on the recording and on the transcript were

10  indeed outside of protected First Amendment speech and were

11  threatening communications.

12         MR. JONAS:  Judge, if I can play Government's Exhibit

13  124 with a transcript of 249.

14         THE COURT:  Go ahead.

15         MR. JONAS:  And, Judge, I think I accidentally

16  switched the sides of the recording and the transcript.

17         THE COURT:  All right.

18      (Government Exhibit 124 played in open court.)

19  BY MR. JONAS:

20  Q.  Agent Noordeloos, he says, "but did you see what they

21  say?"  Did you understand what he was talking about or who he

22  was talking about?

23  A.  It was my understanding, sir, that he was referencing some

24  of the communications he displayed on his phone that we had

25  discussed earlier.

Noordeloos - direct

454

1    Q.  And again, when you said to him "dialing it down," you

2    were talking about no threats?

3    A.  Correct, no threats.

4         MR. JONAS:  Judge, if I can play Government's Exhibit

5    125 with a corresponding transcript of 250.

6         THE COURT:  Go ahead.

7      (Government Exhibit 125 played in open court.)

8    BY MR. JONAS:

9    Q.  Agent Noordeloos, what's going on?

10   A.  At that point we are exiting his apartment and walking

11   down the stairs to sidewalk level to go back to our car.

12   Q.  He accused you in this clip of harassing him.  Do you

13   remember that?

14   A.  Can you go back to the previous page, sir?

15   Q.  I can try.

16         Do you see on Line 12?

17   A.  I do.

18   Q.  Were you harassing him?

19   A.  I was not.

20         MR. JONAS:  I'll go back to the audio.

21      (Government Exhibit 125 played in open court.)

22   BY MR. JONAS:

23   Q.  Did you put a stop on his travel?

24   A.  I did not.

25         MR. JONAS:  Your Honor, I'm going to be moving to the

1    next interview.  I don't know if you want to break for lunch

2    or should I keep going.

3              THE COURT:  It probably makes sense to break for

4    lunch.  All right.  Ladies and gentlemen, we'll reconvene at

5    1:15.  Because again, I'm not going to see you for an entire

6    hour, I'm going to remind you to do no research into the case,

7    not the facts, law, or the parties.  Don't communicate about

8    the case, not with anyone, even amongst yourselves.  I'll see

9    you at 1:15.

10        (Proceedings heard in open court.  Jury out.)

11             THE COURT:  All right.  Please be seated.

12             If you could put your mask back on -- oh, you've got

13   it already.

14             Anything for the record before we break?

15             MR. JONAS:  No, your Honor, not from the government.

16             THE COURT:  Mr. Haas, anything?

17             THE DEFENDANT:  No, your Honor.

18             THE COURT:  Okay.  I'll see you at 1:15.

19        (Recess from 12:07 p.m. to 1:15 p.m.)

20

21

22

23

24

25

<pre>
 1                  IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4              Plaintiff,            )
                                      )
 5              v.                    )  No. 19 CR 00486
                                      )
 6   ROBERT ANTHONY HAAS,             )  Chicago, Illinois
                                      )  August 5, 2020
 7              Defendant.            )  1:15 p.m.

 8                            VOLUME 3

 9                     TRANSCRIPT OF PROCEEDINGS

10        BEFORE THE HONORABLE EDMOND E. CHANG, and a Jury

11   APPEARANCES:

12   For the Plaintiff:        HON. JOHN R. LAUSCH, JR.
                               United States Attorney
13                             BY:  MS. ERIN E. KELLY
                                    MR. BARRY JONAS
14                             Assistant United States Attorneys
                               219 South Dearborn Street, Suite 500
15                             Chicago, Illinois 60604
                               (312) 353-5300
16
     For the Defendant:        MR. ROBERT ANTHONY HAAS,
17                             Pro se;

18   For the Defendant as      BEDI & SINGER, LLP
     standby counsel:          BY:  MS. DENA M. SINGER
19                             53 West Jackson Boulevard
                               Suite 1505
20                             Chicago, Illinois 60604
                               (312) 525-2017
21

22   Court Reporter:          Judith A. Walsh, CSR, RDR, F/CRR
                              Official Court Reporter
23                            219 South Dearborn Street, Room 2118
                              Chicago, Illinois 60604
24                            (312) 702-8865
                              judith_walsh@ilnd.uscourts.gov
25
</pre>

1    (Proceedings heard in open court.  Jury in.)

2         THE COURT:  All right.  Please be seated.

3         Welcome back from lunch, ladies and gentlemen.  I do

4    want to apologize, by the way, for what is the frigid

5    temperature in this courtroom.  As you can tell, for health

6    reasons we're really cranking the air system in here.  So I've

7    driven most of you into jackets, it looks like.  So please

8    keep bringing the layers every day.

9         Okay.  We're ready to resume with the questioning of

10   Mr. Noordeloos.  Do you understand you're still under an oath

11   to tell the truth?

12        THE WITNESS:  Yes, sir, I do.

13        THE COURT:  All right.  And you can keep the mask off

14   at this point.

15        All right.  Mr. Jonas?

16        MR. JONAS:  Thank you, Judge.

17     DAVID NOORDELOOS, GOVERNMENT'S REBUTTAL, PREVIOUSLY SWORN

18              DIRECT EXAMINATION (Resumed)

19   BY MR. JONAS:

20   Q.  Agent Noordeloos, when we broke for lunch, we had just

21   finished discussing your interview on January 25th, 2018, of

22   the defendant, correct?

23   A.  Yes, sir, we did.

24   Q.  Did you meet the defendant again?

25   A.  Yes, sir, the following day.

Noordeloos - direct

458

1   Q.   January 26th?

2   A.   January 26th, yes, sir.

3   Q.   And where was that meeting?

4   A.   That was at the Ottawa, Illinois, police department, sir.

5   Q.   Did you force him to go to the Ottawa, Illinois, police

6   department to meet you?  Did you compel him to do that?  Let

7   me rephrase the question.

8         Did you as the State Department agent force him to go

9   to the Ottawa Police Department to meet with you?

10  A.   No, sir, I did not.

11  Q.   Okay.

12       THE WITNESS:  Judge, my screen froze.

13       MR. JONAS:  Yes.  Our screen just locked out.  If I

14  could have a moment to log back in.

15       THE COURT:  Yes.  Go ahead.

16    (Pause.)

17  BY MR. JONAS:

18  Q.   Why did you meet with him again?

19  A.   For a subsequent interview, sir.

20  Q.   Why?

21  A.   A lot of times in these type of investigations, multiple

22  interviews with the subject to see if the person's demeanor

23  has changed, to see if potentially levels of anger, levels of

24  contentment had changed to get a better understanding of the

25  person who had previously sent threats against a protectee.

1    Q.  And did his attitude or demeanor change that second day?

2    A.  No, sir.  It was similar to the day prior.

3    Q.  Was this meeting recorded?

4    A.  Yes, it was.

5    Q.  Was this audio and video?

6    A.  Yes, sir, it was.

7    Q.  And have you reviewed the audio and video recording?

8    A.  I have.

9    Q.  Does it fairly and accurately represent the conversation

10   you had with him in January 26, 2018?

11   A.  Yes, sir, it does.

12   Q.  And approximately how long was your interview with him?

13   A.  Right around an hour.

14   Q.  And are we playing the whole hour for the jury today?

15   A.  No, sir.

16   Q.  Have you reviewed clips of that January 26th meeting?

17   A.  I have.

18   Q.  And do those clips fairly and accurately represent the

19   interview, at least the portions of the interview that are on

20   the clip that you had with the defendant on that day?

21   A.  Yes, sir, they do.

22           MR. JONAS:  Your Honor, at this time I would offer

23   into evidence Government's Exhibits 3, 4, 126, 127, and 128.

24           THE COURT:  All right.  Any objection other than

25   previous ones?

Noordeloos - direct

460

1          THE DEFENDANT:  No, your Honor.

2          THE COURT:  All right.  They're in.

3          MR. JONAS:  Thank you, Judge.

4      (Government Exhibits 3, 4, 126, 127, and 128 received in

5       evidence.)

6  BY MR. JONAS:

7  Q.  Agent Noordeloos, did you assist in preparing transcripts

8  of the clips that we're going to play for the jury?

9  A.  Yes, sir, I did.

10 Q.  And you reviewed the transcript and made any corrections

11 that you saw needed to be made?

12 A.  Yes, sir.

13 Q.  And do those transcripts after your last review fairly and

14 accurately represent the clips of that January 26th meeting?

15 A.  Yes, sir, they do.

16         MR. JONAS:  Your Honor, at this time I would offer

17 into evidence the transcripts, Government's Exhibits 203, 204,

18 251, 252, and 253.

19         THE COURT:  All right.  Any objection other than

20 previous ones, Mr. Haas?

21         THE DEFENDANT:  No, your Honor.

22         THE COURT:  All right.  Those are allowed as

23 well.

24     (Government Exhibits 203, 204, 251, 252, and 253 received

25      in evidence.)

 1            MR. JONAS:  Your Honor, may I play for the jury and

 2    publish Government's Exhibit 3 with a corresponding transcript

 3    of 203?

 4            THE COURT:  You may.

 5        (Government Exhibit 3 played in open court.)

 6    BY MR. JONAS:

 7    Q.   Agent Noordeloos, the clip cut off about a word earlier

 8    than the transcript.  Do you recall the last word he said

 9    before the clip cut off -- or the word he said after the clip

10    cut off?

11    A.   I believe it was "citizen."

12    Q.   He said, "I don't see you as an American citizen"?

13    A.   Correct.

14    Q.   And just so we're clear, are you an American citizen?

15    A.   Yes, sir, I am.

16            MR. JONAS:  Judge, if I can play Government's Exhibit

17    4 with a corresponding transcript of 204.

18            THE COURT:  Go ahead.

19            MR. JONAS:  I'm sorry, Judge.  One second.

20        (Government Exhibit 4 played in open court.)

21    BY MR. JONAS:

22    Q.   Agent Noordeloos, do you profit from war?

23    A.   No, sir, I do not.

24    Q.   Do you consider yourself a terrorist?

25    A.   No, sir.  I am not a terrorist.

Noordeloos - direct

462

1         MR. JONAS:  Judge, if I can play Government's Exhibit

2    126 with the corresponding transcript of 251.

3         THE COURT:  Go ahead.

4      (Government Exhibit 126 played in open court.)

5    BY MR. JONAS:

6    Q.  Agent Noordeloos, what did you mean when you said to him,

7    "You're not afraid to put hands on people"?

8    A.  Based on his history, his statements that he had made via

9    social media, he was not afraid to assault people.  He even

10   said in previous contacts about his intent to assault somebody

11   if he sees them on the street.

12   Q.  And you asked him about making changes.  What did you mean

13   by that?

14   A.  Perhaps addressing his self-admitted anger management

15   issues, keeping his social media comments to protected speech

16   only and not threats, fighting words, or intimidation.

17        MR. JONAS:  Your Honor, I'd like to play Government's

18   Exhibit 127 with a corresponding transcript of 252.

19        THE COURT:  All right.  Go ahead.

20     (Government Exhibit 127 played in open court.)

21   BY MR. JONAS:

22   Q.  Who is -- Agent Noordeloos, who is speaking?

23   A.  That is Detective Sergeant Cheatham of Ottawa PD.

24     (Government Exhibit 127 played in open court.)

25   BY MR. JONAS:

1  Q.  Agent Noordeloos, you said to the defendant something

2  about catching a collar.

3  A.  Yes, sir.

4  Q.  What did you mean?

5  A.  I was articulating for him that future threats will likely

6  result in him being arrested and prosecuted.

7  Q.  Did he challenge that?

8  A.  Could I review the previous page there, sir?

9      MR. JONAS:  And for the record, your Honor, I put the

10 previous page on the screen.

11     THE COURT:  All right.

12     THE WITNESS:  I'm trying to find it, sir.  "You're

13 going to catch a collar."  Mr. Haas responded that, "Nikki

14 Haley is a terrorist, and she should hang for her crimes, is

15 not illegal.  If I say I'm going to come and do it, if I say

16 I'm going to come and do it or something like that or when

17 humanity is going to do it."

18 BY MR. JONAS:

19 Q.  You talked about the difference between 7.5 and 7.6, I

20 believe is what you used --

21 A.  Yes.

22 Q.  -- the term you used?

23     Can you explain what you meant by that?

24 A.  Again, just trying to set an articulable line in the sand,

25 if you will, for what is free speech and what could result in

Noordeloos - direct

464

1    being arrested and prosecuted for threats.

2            MR. JONAS:  Your Honor, if we can play Government's

3    Exhibit 128 with a corresponding transcript of 253.

4            THE COURT:  Go ahead.

5        (Government Exhibit 128 played in open court.)

6    BY MR. JONAS:

7    Q.  Agent Noordeloos, what were you trying to accomplish in

8    that last clip?

9    A.  I was trying to encourage Mr. Haas to obtain therapy for

10   his self-admitted anger management issues.

11   Q.  With what goal did you have in mind with that?

12   A.  With a goal of further mitigating his potential harm to a

13   Department of State protectee.

14   Q.  Did you meet with him again after this January 26th

15   meeting?

16   A.  Yes, sir, I did.

17   Q.  And when was that?

18   A.  The following day, Saturday, January 27, 2018.

19   Q.  Why?  Why did you meet with him?

20   A.  I was informed by assistant DSS Chicago, Assistant Special

21   Agent in Charge Robert Rochowiak that he had been receiving

22   intimidating text messages on his work cell phone from

23   Mr. Haas.

24   Q.  And what did -- why did you talk to the defendant about

25   that?

Noordeloos - direct

465

1    A.   We were interested in discovering how Mr. Haas had

2    obtained Mr. Rochowiak's work cell phone number.

3    Q.   And how did that happen?

4    A.   From speaking to Mr. Haas on the 27th, Mr. Haas said that

5    he found a business card of Mr. Rochowiak on the floor in his

6    apartment after we had left.

7    Q.   That would have been from the January 25th meeting two

8    days prior?

9    A.   Yes, sir, the January 25th meeting.

10   Q.   Did you discuss anything else with him on January 27th?

11   A.   No, sir, I did not.

12   Q.   Did you have any other meetings with him after January

13   27th, 2018?

14   A.   No, sir, I did not.

15   Q.   Did you have any other contact with him after that date?

16   A.   No, sir.

17   Q.   Did you try to arrest the defendant on any of those three

18   days?

19   A.   No, sir.

20   Q.   Why not?

21   A.   The original threatening communication had been deleted by

22   the recipient, Ambassador Haley, and we opted to continue the

23   investigation.

24   Q.   Without having the posts?

25   A.   Due to the fact we did not have the documented post, yes,

1    sir.

2              MR. JONAS:  Your Honor, I have no further questions.

3              THE COURT:  All right.  Cross-examination?

4              THE DEFENDANT:  Thank you, your Honor.

5                         CROSS-EXAMINATION

6    BY THE DEFENDANT:

7    Q.  You say I made threatening communications or threats of

8    violence but I wasn't arrested.  So obviously, they were First

9    Amendment protected speech.  Why were you harassing me at that

10   juncture?

11   A.  Can you restate the question, sir, or repeat the question?

12   Q.  You claim I made threat -- made threatening

13   communications.  Obviously, they were First Amendment

14   protected speech because you did not arrest me.  Why were you

15   there harassing me?

16             MR. JONAS:  Your Honor, I'm going to object to the

17   form of the question.

18             THE COURT:  Sustained.

19             THE DEFENDANT:  One second, your Honor.

20   BY THE DEFENDANT:

21   Q.  You said there was four DSS officers and two Ottawa at

22   least.  How many FBI were present at that time also?

23   A.  Sir, on which date are you referring to?

24   Q.  In front of my building when you guys pulled out your

25   guns.

Noordeloos - cross

467

1    A.   Just to articulate, sir, you're referring to January 25?

2    Q.   There was only one experience in front of my building.

3    A.   So we're referring to January 25, sir?  I guess I'm trying

4    to --

5    Q.   I'm not exactly sure what date you did it.  I'm asking you

6    how many FBI officers were in front of my building with you.

7    A.   I was --

8             THE WITNESS:  Your Honor, with all due respect, I was

9    in front of the building multiple dates.  I'm just trying to

10   articulate --

11            THE COURT:  So on the date, on January 25, 2018.

12            THE WITNESS:  Okay.

13            THE COURT:  I believe the question Mr. Haas is asking

14   first is, were there any FBI agents at that time.

15   BY THE WITNESS:

16   A.   On January 25, 2018, in front of your apartment on Main

17   Street in Ottawa, Illinois, and in your apartment, there were

18   no FBI agents.

19   BY THE DEFENDANT:

20   Q.   I'm just -- one of my neighbors told me that the FBI was

21   in their building and stated that they were FBI and that they

22   were wondering if I was available at that time right before I

23   walked out my door and you guys pointed your guns at me.

24            MR. JONAS:  Objection --

25            THE COURT:  Mr. Haas, you are testifying rather than

1    posing a question, so please do pose a question.

2    BY THE DEFENDANT:

3    Q.  You said this was an unplanned interview, it's better to

4    not plan an interview with a suspect.  So you like to surprise

5    people with your gun out and point it in their face, is that

6    correct, to get a reaction so you can arrest them possibly?

7    A.  That was -- can I break that question up into --

8    Q.  Absolutely.  Go ahead.

9    A.  Oh, to answer.  So the first part of your question was

10   what, sir?

11   Q.  You said it's better not to plan an interview, you like to

12   surprise people.

13   A.  I don't believe I said I like to surprise people, sir.

14   Q.  Well, that's what it -- that's what you basically said.

15            MR. JONAS:  Objection, your Honor.  That's not a

16   question.

17            THE COURT:  Sustained.

18   BY THE DEFENDANT:

19   Q.  Carry on.

20            MR. JONAS:  Your Honor, I think that there was a

21   compound --

22            THE COURT:  Why don't you just pose another question.

23   You can keep on this line of questioning.  Just pose another

24   one.

25   BY THE DEFENDANT:

1  Q.  Okay.  You are a diplomat security service.  Do you

2  understand the definition of terrorism?

3  A.  I am a special agent with the Diplomatic Security Service

4  of the U.S. Department of State, sir, and, yes, I understand

5  the definition of terrorism.

6  Q.  It's using the threat of violence to intimidate or cause

7  panic especially as a means of achieving a political end.

8          MR. JONAS:  Objection.

9          THE COURT:  Sustained as to relevance.

10 BY THE DEFENDANT:

11 Q.  Did you come to my house to intimidate me for political

12 end?

13 A.  At no time, sir.

14 Q.  So you weren't supporting a United Nations protectee or

15 who you're securing?

16 A.  Sir --

17 Q.  A United Nations employee?

18 A.  I'm a special agent with the U.S. Department of State

19 Diplomatic Security Service.  Ambassador --

20 Q.  But you came because I exercised my freedom of speech on

21 an employee of the United Nations.  You came and jumped out

22 and pointed guns at me to startle me and terrorize me.  Is

23 that true?

24          MR. JONAS:  Objection.

25          THE COURT:  Go ahead and answer.

Noordeloos - cross

470

1            THE WITNESS:  Sir, can I get the question one more

2      time, please, with respect?

3      BY THE DEFENDANT:

4      Q.  You came with the political goal of intimidating me -- did

5      you not come with a political goal to intimidate and startle

6      me, jump out and surprise me?

7            THE COURT:  Okay.  Just end it there.

8            Go ahead and answer.

9      BY THE WITNESS:

10     A.  Sir, at no time did I appear at your residence to

11     intimidate or startle you.

12           THE COURT:  Okay.  Then you can keep questioning.

13     BY THE DEFENDANT:

14     Q.  Did you or did you not exit your vehicle with your gun in

15     your hand?

16     A.  I exited the vehicle.  When you reached for your pocket

17     and turned is when I unholstered my sidearm and pointed it at

18     you, identified myself as a police officer, and ordered you to

19     get on the ground.

20     Q.  In your comment, you said, "I thought you were going to

21     run," not, "I thought you had a gun."  Now, why would you pull

22     out your gun if you thought I was going to run away if I

23     wasn't under arrest?  If I wasn't being illegally detained,

24     why are you pulling out a gun and telling me to get on the

25     ground?

Noordeloos - cross

471

1          If I turn to walk away, you at that point made an

2     illegal seizure.  You seized me with no probable cause, no

3     warrant, and no charges.

4          MR. JONAS:  Objection.

5          THE COURT:  Sustained as to the form.  It was

6     compound.

7          You can break this up, Mr. Haas.  Just you can take

8     the first part of that question, stop, and get an answer and

9     then keep going.

10          THE DEFENDANT:  Okay.

11          THE COURT:  So take a look at your question, all

12     right, and try to reformulate it and pose it again.

13     BY THE DEFENDANT:

14     Q.  I turned to walk away and supposedly then you pulled out

15     your gun.  What entitled you to pull out your gun because I

16     was leaving the scene?

17     A.  Sir, as you were turning, you also patted your right front

18     pocket, a furtive movement, which made me fear for my safety

19     and believe that you possibly had a weapon.

20     Q.  I was fearing for my safety, sir.

21     A.  That's --

22     Q.  That's why --

23          THE COURT:  Mr. Haas, that -- please.  I'll instruct

24     the jury to disregard that remark.

25          All right.  Please pose a question.

1  BY THE DEFENDANT:

2  Q.  I was explaining Israeli lobbying to you.  How would you

3  feel about Russian lobbying or Iranian lobbying or ISIS

4  lobbyists in our country?

5           MR. JONAS:  Objection.  Relevance.

6           THE COURT:  Sustained as irrelevant.

7  BY THE DEFENDANT:

8  Q.  You said that -- I said, "That's ISIS."  Is that correct?

9  A.  Yes, sir.

10 Q.  And was I talking about the Oded Yinon Plan to create

11 Sunni and Shiite opposing Muslim sects, the Israeli plan?

12 A.  I do not --

13 Q.  You do not recall that conveniently?

14 A.  I do not recall the specifics of what you were referring

15 to --

16 Q.  Okay.

17 A.  -- when you said, "That's ISIS."

18 Q.  And when I said, "She's not white, Israel is an apartheid

19 state but white people have no business in that desert," is

20 that or is that not what I said about your boss --

21 A.  I'm sorry.  I don't --

22 Q.  -- Nikki Haley?

23 A.  I don't understand your question, sir.

24          THE COURT:  Are you referring to a transcript,

25 Mr. Haas, or not?

Noordeloos - cross

473

1       THE DEFENDANT:  I'm referring to what was said in

2  general in that conversation.  The transcript skipped large

3  portions of our conversation.

4       THE COURT:  Okay.  Then you're going to have to

5  pose -- go ahead and try to pose the question again.

6  BY THE DEFENDANT:

7  Q.  Okay.  In our meeting, did I or did I not say Israel is an

8  apartheid state?

9  A.  I don't recall you using the word "apartheid," but I'd be

10  happy to review the transcripts, sir.

11  Q.  What is free speech and what is hate speech?  You

12  mentioned that multiple times.  What is free speech and what

13  is hate speech?  Are you the person who makes that decision,

14  or is the Congress the people that make that decision?  Who

15  decides that?

16       MR. JONAS:  Objection.

17       THE COURT:  Sustained.  And I'll just remind the jury

18  as I have before that I will give you the law that governs the

19  case.  And I also reminded you during Mr. Noordeloos'

20  testimony that whenever he referred to, for example, threats,

21  that's from his perspective and not a legal definition.

22       Okay.  Go ahead, Mr. Haas.

23       THE DEFENDANT:  Yes, your Honor.

24  BY THE DEFENDANT:

25  Q.  In the video I said, "Before I realized you're really

1    cops."  Why would I turn and run -- let me rephrase that.  I

2    said, "Before I realized you're really cops."  When I saw you,

3    I turned and walked away.  What would make me turn and walk

4    away other than a gun in your hand when you exited the

5    vehicle?

6                  MR. JONAS:  Objection.

7                  THE COURT:  Sustained.  It calls for speculation.

8    BY THE DEFENDANT:

9    Q.   Okay.  Do you think a normal person would see a door open

10   of a car and turn and try to flee because a door opened on a

11   car?

12                 MR. JONAS:  Objection.

13                 THE DEFENDANT:  Is that normal?

14                 MR. JONAS:  Objection.

15                 THE COURT:  Okay.  Overruled.  You can go ahead and

16   answer.

17                 THE WITNESS:  Can you repeat your question, sir?

18   BY THE DEFENDANT:

19   Q.   I walked out my door and I turned to the left, and I saw a

20   car door open, and I turned around to go back into my house.

21   Is that normal to see a car door open from anyone?  A car door

22   opens, you turn and run away, is that typical, or is there

23   usually you see something that startles you that makes you

24   want to run away?

25                 MR. JONAS:  Objection to the form.

Noordeloos - cross

475

1          THE COURT:  Okay.  Just try to answer that question

2    based on your training, experience, and how people react to

3    you.

4    BY THE WITNESS:

5    A.  Just to make sure I'm understanding you correctly, sir,

6    you're asking me if it's normal for somebody to see a car door

7    open as they're walking down the street and then run away?  Is

8    that what you're asking me, sir?  I just want --

9    BY THE DEFENDANT:

10   Q.  Yes.

11   A.  -- to --

12   Q.  Yes, sir.  Let me just simplify it.  I live on a busy

13   street.  Do you think I turn and run every time a car door

14   opens on my block on Main Street?

15          MR. JONAS:  Objection.  Speculation.

16          THE COURT:  Sustained.  You had the question,

17   Mr. Haas.  So if you return to it, maybe you'll get an answer

18   on it.

19   BY THE DEFENDANT:

20   Q.  Can you think of any reason that I would turn and run from

21   somebody exiting a vehicle other than seeing a gun?

22          MR. JONAS:  Objection.

23   BY THE DEFENDANT:

24   Q.  When you said, "Get on the ground," I stopped immediately.

25          THE COURT:  Sustained as to the first question that

1   had been asked --

2           THE DEFENDANT:  Okay.

3           THE COURT:  -- before the objection.

4           THE DEFENDANT:  I'll skip to something else.

5           THE COURT:  You can pose the second question that you

6   had just asked if you want.

7   BY THE DEFENDANT:

8   Q.  You mentioned anger issues.  Is having an anger issue a

9   crime?

10  A.  No, sir, it is not.

11  Q.  You said "11.5."  Is that your anger scale?

12  A.  That's a scale that I was using to help you understand.

13  Q.  Oh, is an 11.5 a crime?

14          MR. JONAS:  Objection.

15          THE COURT:  Sustained.

16  BY THE DEFENDANT:

17  Q.  You said "dial it down."  What did I say?

18  A.  I would have to review the transcript to see exactly what

19  you said, sir.

20  Q.  When you were walking away, at the very end it said, "Call

21  me."  I told you, "Call me."

22          Do you recall me saying, I said, "Call me like a man,

23  not jump out with a gun like a terrorist"?  Do you recall me

24  saying that?

25  A.  I do not recall you saying that, nor do I recall seeing

Noordeloos - cross

477

1   that in the transcripts or in the audio recording, sir.

2   Q.  Of course.

3         THE COURT:  Mr. Haas, if you want the government to

4   display a particular transcript, just ask me, and I will

5   direct the government to do that.

6         THE DEFENDANT:  Thank you, your Honor.

7   BY THE DEFENDANT:

8   Q.  The government asked you, did you force me to go to the

9   Ottawa Police Department to speak to you.  Was I or was I not

10  already at the Ottawa Police Department against my will for

11  something separate?

12  A.  You were already at the Ottawa Police Department.

13  Q.  You said what I'm doing is moving towards a conspiracy,

14  conspiring.  Obviously, you know what a conspiracy is?

15  A.  I do.

16  Q.  Do you know what racketeering is?

17         MR. JONAS:  Objection.

18         THE COURT:  Sustained as to relevance.

19  BY THE DEFENDANT:

20  Q.  Do you support the terrorist Zionist Israeli protection

21  racket controlling the United States?

22         MR. JONAS:  Objection.

23         THE COURT:  Sustained as to relevance.

24  BY THE DEFENDANT:

25  Q.  You said you threatened me with prosecution.  Why would

Noordeloos - cross

478

1   you -- why would you warn me about prosecution when I have

2   done nothing besides protected speech?  You were attempting --

3   were you attempting to chill my protected speech, my First

4   Amendment protected speech?  Is that what you were attempting

5   to do?

6   A.  Can you repeat the question, sir?  I missed one word.

7            THE COURT:  Just answer the last question that he

8   asked instead of the other two.

9   BY THE DEFENDANT:

10  Q.  Were you attempting to chill my First Amendment protected

11  speech?

12  A.  You're asking me if I intended to chill, c-h-i-l-l.

13  Q.  Yes.

14  A.  No, at no time.

15  Q.  So what was your point in visiting me if you weren't

16  trying --

17  A.  To encourage you --

18  Q.  You -- I'm sorry.  Go ahead.

19  A.  To encourage you to no longer make interstate threatening

20  communications in violation of federal law.

21  Q.  If I had really made threatening communications in

22  violation of federal law, interstate commerce, wouldn't I have

23  been arrested right then?

24  A.  If the threatening communication that you had directed

25  against Ambassador Haley had not been deleted, I would have

1    sought an arrest warrant for your arrest.

2    Q.   I don't believe there was a comment.  I'll move on.

3         You said, trying to set a line in the sand, what is a

4    threat and what can be prosecuted.  You make that line in the

5    sand?

6    A.   No, sir.  I was intending to help you understand what

7    could reach an arrest and prosecution of interstate

8    threatening communications.

9    Q.   So three days in a row, you came to do what?

10   A.   Like I just said, sir, encourage you to no longer direct

11   interstate threatening communications against Department of

12   State protected persons.

13   Q.   Do you not see how an average person exercising their

14   First Amendment protected speech would find that as invading

15   their privacy and attempting to violate their First Amendment?

16        MR. JONAS:  Objection.

17        THE COURT:  Sustained as to the form.

18        THE DEFENDANT:  I'm finished, your Honor.  No further

19   questions.

20        THE COURT:  All right.  Is there any redirect?

21        MR. JONAS:  No, your Honor.

22        THE COURT:  All right.  Mr. Noordeloos, you are

23   excused.  First, let me ask you to put your mask back on.

24        THE WITNESS:  Yes, sir.

25        THE COURT:  And then second, what we've been asking

1    the witnesses to do is put on a pair of latex gloves, please.

2    And then I'm going to ask you after you've got your gloves on

3    to take a disinfecting wipe and just wipe down the table

4    surface in front of you --

5              THE WITNESS:  Yes, sir.

6              THE COURT:  -- as well as the chair and the armrests.

7              THE WITNESS:  Yes, sir.

8              May I stand up, sir?

9              THE COURT:  Yes, you can now.  Then you can take the

10   mike cover and the wipe and the gloves and you can throw them

11   all in that wastebasket that should be right there.

12             THE WITNESS:  May I step down, your Honor?

13             THE COURT:  Yes.  You can step down.

14        (Witness excused.)

15             THE COURT:  All right.  Can you announce your next

16   witness?

17             MR. JONAS:  Yes, Judge.  The government calls Matt

18   Najdanovich to the stand.

19             THE COURT:  All right.  If you could come on up, and

20   then as you pass that table with the white squares, pick one

21   of them up.  That's a microphone cover.  You can step up to

22   the witness stand.  And I'll ask you to slip the cover over

23   the tip of the microphone.

24             All right.  And then you can have a seat.  And you

25   may remove your mask.  All right.  Great.  And turn towards

Najdanovich - direct

481

1    me, please.  You can stay seated.  Please raise your right

2    hand.

3        (Witness sworn.)

4            THE WITNESS:  I do.

5            THE COURT:  All right.  Mr. Jonas?

6            MR. JONAS:  Thank you, Judge.

7      MATTHEW NAJDANOVICH, GOVERNMENT'S REBUTTAL WITNESS, SWORN

8                    DIRECT EXAMINATION

9    BY MR. JONAS:

10   Q.  Can you state and spell your name?

11   A.  Matthew Najdanovich.  It's N-a-j-d-a-n-o-v-i-c-h.

12   Q.  What do you do for a living?

13   A.  I'm a detective with the Ottawa Police Department.

14   Q.  And how long have you been with the Ottawa Police

15   Department?

16   A.  Just shy of seven years.

17   Q.  Can you just orientate, where is Ottawa, Illinois?  Like

18   what's a big landmark people would know?

19   A.  So Starved Rock State Park is the most commonly known in

20   proximity to Ottawa.  We're just a little bit to the east of

21   there.

22   Q.  Did there come a time when you were asked to accompany

23   State Department agents along for an interview with the

24   defendant, Robert Haas?

25   A.  Yes.

Najdanovich - direct

482

1   Q.  Do you remember approximately when that was?

2   A.  January, I want to say, maybe 2018.

3   Q.  And what was your role?  Why were you asked to go?

4   A.  My role and what I did was, we were just asked to assist

5   them because they came to Ottawa.  They asked for, you know,

6   representatives from the Ottawa Police Department to accompany

7   them.  My role on that first time there was I was just in a

8   vehicle near Mr. Haas' residence waiting for the member of the

9   State Department to speak with him.

10  Q.  And were you able to see the area where everyone was --

11  where the other agents were waiting?

12  A.  Yup.

13  Q.  Do you remember the names of the agents who you were

14  accompanying?

15  A.  I'm sorry.  I do not.

16  Q.  Did you see on that day a State Department agent draw his

17  weapon?

18  A.  Yes.

19  Q.  Was that, he drew his weapon on the defendant?

20  A.  Correct.

21  Q.  Where were you when that happened?

22  A.  So I would have been -- so that occurred on the north side

23  of Main Street in Ottawa.  I was on the south side of Main

24  Street about half a block to the east.

25  Q.  Did you have a view of the defendant at that time?

Najdanovich - direct

1    A.   Yes.

2    Q.   Did you see the defendant make any moves that would have

3    caused the agent to draw his gun?

4    A.   I couldn't see exactly where he reached.  There was a car

5    in between of us, but he reached down towards his like waist

6    area.

7    Q.   In your experience as a law enforcement officer, did you

8    think that was a maneuver that justified a gun being drawn by

9    another agent?

10   A.   Yes.

11   Q.   Did you hear any of the State Department agents threaten

12   to kill defendant on that day?

13   A.   No, I did not.

14   Q.   Is that something that would have stuck out in your mind

15   if someone said that?

16   A.   Yes.

17   Q.   Did things calm down after a few minutes?

18   A.   Yes.  Almost immediately after the agent drew his weapon,

19   the situation became calm very quickly after that.

20   Q.   Did you go up with the State Department agents and the

21   defendant into his apartment?

22   A.   No, I did not.

23   Q.   What did you do after?

24   A.   So after the situation calmed down to a degree, the agents

25   and Mr. Haas went up to his apartment.  I left the area.

Najdanovich - direct

484

1  Q.  Was there another occasion where FBI agents asked you to

2  accompany them to interview the defendant?

3  A.  Yes.

4  Q.  Would that have been about May of 2019?

5  A.  That sounds correct.

6  Q.  Why were you asked to go?

7  A.  Again, when they come to Ottawa, they ask for

8  representatives of the police department to accompany them.

9  Q.  Do you remember the names of the agents who asked you to

10  accompany them in May of 2019?

11  A.  I remember the FBI agent's first name was Joe.  That's

12  all.

13  Q.  Did you go with him to interview the defendant?

14  A.  Yes.

15  Q.  Do you remember where that location was?

16  A.  Yup.  We went to west Washington Street in Ottawa.  I

17  don't remember the exact hundred block, but it was on the west

18  side of town.

19  Q.  Was it defendant -- is that where he lived?

20  A.  No.  He was doing some work to a residence over there.  I

21  believe he was putting in a French drain.

22  Q.  Did the agents draw their gun on him that day?

23  A.  No.

24  Q.  Did any of the agents say that they were going to kill the

25  defendant?

Najdanovich - cross

485

1    A.   No.

2    Q.   What happened?

3    A.   So they came to town to speak with Mr. Haas.  The agents,

4    they spoke with him in the front yard of that property where

5    he was working.  And they just had a discussion with him

6    there.  Myself and my supervisor were present.  We just kind

7    of stood back and allowed them to conduct their investigation.

8    Q.   What was the defendant's attitude towards them?

9    A.   Very hostile.

10   Q.   Was their attitude hostile in return?

11   A.   No.  Their behavior was calm.

12        MR. JONAS:  No further questions, Judge.

13        THE COURT:  All right.  Cross-examination?

14                    CROSS-EXAMINATION

15   BY THE DEFENDANT:

16   Q.   Do you know anything about Officer Noordeloos visiting

17   with my landlord inside your police station, in the Ottawa

18   police station?

19   A.   I know that a conversation took place between officers or

20   agents with the landlord, but I don't have any information to

21   what that pertained to.

22   Q.   In the Ottawa police station, is it standard to harass

23   someone's landlord because you suspect them of a crime?

24        MR. JONAS:  Objection.

25        THE COURT:  Sustained.  It assumes facts not in

Najdanovich - cross

486

1    evidence.

2              THE WITNESS:  No.

3              THE COURT:  When I sustain an objection, no need to

4    answer.

5              THE WITNESS:  Okay.  Sorry.

6    BY THE DEFENDANT:

7    Q.  You had said the situation calmed down --

8    A.  Yes.

9    Q.  -- in front of my apartment.  When was it not calm?

10   A.  So --

11   Q.  Did I do something that made it not calm?

12   A.  When agents exited the vehicle and made contact with you

13   originally, based on your furtive movements, Agent Noordeloos

14   drew his weapon.  I would classify that as elevated from calm.

15   Q.  So you're saying Agent Noordeloos elevated the situation

16   from not calm with his weapon?

17   A.  I'd say he responded to your behavior.

18   Q.  You said at the job site in Ottawa, I was hostile towards

19   the FBI agents.

20   A.  Correct.

21   Q.  Is that typical behavior from someone who agrees to a

22   meeting with the police --

23             MR. JONAS:  Objection.

24             THE DEFENDANT:  -- to be hostile?

25             THE COURT:  Sustained.

1          THE DEFENDANT:  No further questions, your Honor.

2          THE COURT:  Any redirect?

3          MR. JONAS:  No, your Honor.

4          THE COURT:  All right.  Mr. Najdanovich, so you are

5     excused.  However, first please put your mask back on.  Now

6     I'm going to ask you to put on a pair of latex gloves.  Once

7     you've done that, then please take out a disinfecting wipe

8     from that bottle right there and just wipe down the table

9     surface, and then you can stand and wipe down your chair and

10    the armrests.

11         And then when you're done with that, if you could

12    grab the mike cover also, and then you can throw that and the

13    gloves into that wastebasket.  And then you are excused.

14         THE WITNESS:  Thank you.

15      (Witness excused.)

16         THE COURT:  All right.  Anything else in the

17    government's rebuttal case?

18         MR. JONAS:  Your Honor, can we have a quick sidebar?

19         THE COURT:  All right.

20      (Proceedings heard at sidebar:)

21         THE COURT:  Okay.  Go ahead.

22         MS. KELLY:  Your Honor, I wanted to follow up on

23    something before we close the case.

24         THE COURT:  If you can bring the mike a little closer

25    to you.

1     MS. KELLY:  Your Honor, I wanted to follow up on some

2  testimony from yesterday.  And listening to the testimony

3  today about the admission of the transcripts, I may have,

4  during the testimony of Officer Mullen, moved to publish the

5  transcripts but not asked for their admission into evidence.

6  I can't recall specifically.  But that may have been the word

7  choice I used.  And I wanted to see if at this point there

8  would be any problem with moving their admission.

9     THE COURT:  Right.  Do you have any other objections

10  other than the prior ones, Mr. Haas?

11     THE DEFENDANT:  No, your Honor.

12     THE COURT:  Okay.  They're allowed in.  I think I

13  heard you say that and my response, I believe, was to allow

14  them into evidence.

15     MS. KELLY:  I see.

16     THE COURT:  So they're allowed.

17     MS. KELLY:  Thank you.

18     THE COURT:  All right.  Anything else?

19     MS. KELLY:  No, your Honor.

20     MR. JONAS:  No, your Honor.

21     THE COURT:  So the government rests its rebuttal

22  case, correct?

23     MR. JONAS:  Yes, your Honor.

24     THE COURT:  All right.  Okay.  Mr. Haas, well, first,

25  do you want to make another Rule 29 motion?  Ms. Singer is

1    motioning for you to just take a look at the screen there.

2         (Pause.)

3              THE DEFENDANT:  No, your Honor.

4              THE COURT:  And do you have anything, any other

5    evidence to offer?

6              THE DEFENDANT:  I do not.

7              THE COURT:  Okay.  I'm going to have the -- I'll have

8    the government rest its rebuttal case and then I'll just --

9    I'll turn to Mr. Haas, ask him in front of the jury if he has

10   anything else, and he'll say no.  And then I'll let them go so

11   that we can have our instructions conference, and then we can

12   close tomorrow morning.  Does that make sense to the

13   government?

14             MR. JONAS:  Yes, your Honor.

15             THE COURT:  And Mr. Haas?

16             THE DEFENDANT:  Yes, your Honor.

17             THE COURT:  All right.

18        (Proceedings heard in open court:)

19             THE COURT:  Okay.  Any further rebuttal case from the

20   government?

21             MR. JONAS:  No, your Honor.  The government rests its

22   rebuttal case.

23             THE COURT:  All right.  And Mr. Haas, do you have

24   anything more to offer?

25             THE DEFENDANT:  No, your Honor.

1          THE COURT:  All right.  Ladies and gentlemen, we have

2     then come to the conclusion of evidence.  Now, what the

3     lawyers and Mr. Haas and I are going to do is spend the rest

4     of the afternoon working on jury instructions and otherwise

5     getting ready for closing arguments.  So I'm going to let you

6     go early.  It's like getting out of school a little bit early.

7     And I'll ask you to return tomorrow at the usual time, between

8     8:00 and 8:30.

9          It is still very important for you to do no research

10    into the case, not the facts, not the parties, not the law.

11    Even though evidence has closed, you have not heard the

12    instructions.  You haven't heard the arguments of the lawyers

13    or Mr. Haas.  So you still must not discuss the case even

14    amongst yourselves and, of course, with no one else and let no

15    one ask you or discuss the case with you.  Continue to take

16    that north bank of elevators.

17         So please have a good evening.  Stay safe.  And I'll

18    see you tomorrow.

19         (Recess from 2:06 p.m. to 2:31 p.m.)

20         (Proceedings heard in open court.  Jury out.)

21         THE COURT:  Court resumes in session.  We're still in

22    19 CR 486, U.S. versus Haas.

23         All right.  For our instructions conference, let me

24    first ask before I forget, I propose to read the jury

25    instructions to the jury except the final two before closing

1    arguments.  And that way they'll have heard the instructions

2    one time before.  And I think it does help the jury kind of

3    process the closings if they've heard all of the other

4    instructions before closings.

5         Is there any objection to that from the government?

6         MR. JONAS:  No, your Honor.

7         THE COURT:  Mr. Haas?

8         THE DEFENDANT:  No, your Honor.

9         THE COURT:  All right.  Okay.  On the instructions

10   conference itself, so Mr. Haas, I provided another copy of the

11   filing that I posted.  Let's see.  Docket entry 231 posted on

12   August 2nd.  And we'll just go through these one by one.

13   There was also an order that accompanied this that was docket

14   entry 232.  And this was also delivered to the MCC.  That, I'm

15   not sure -- I'm not sure I printed out an extra copy of that

16   for you, Mr. Haas, but just let me know if you have any

17   questions.

18        So in docket entry 231-1, Page 2 is functions of the

19   Court and the jury.  Is there any objection from the

20   government on that one?

21        MR. JONAS:  No, your Honor.

22        THE COURT:  Mr. Haas?

23        THE DEFENDANT:  No, your Honor.

24        THE COURT:  Page 3 is a description of the charges.

25   Any objection from the government?

 1          MR. JONAS:  No, your Honor.

 2          THE COURT:  Mr. Haas?

 3          THE DEFENDANT:  No, your Honor.

 4          THE COURT:  And I'll just say that everyone's prior

 5   proposed instructions, you preserved those objections.  So I'm

 6   just asking for anything new.

 7          Anything new on Page 4 which deals with

 8   self-representation from the government?

 9          MR. JONAS:  No, your Honor.

10          THE COURT:  Mr. Haas?

11          THE DEFENDANT:  No, your Honor.

12          THE COURT:  Page 5 is presumption of innocence and

13   burden of proof.  It's from the pattern instruction, of

14   course.  Any objection from the government?

15          MR. JONAS:  No, your Honor.

16          THE COURT:  From Mr. Haas?

17          THE DEFENDANT:  No, your Honor.

18          THE COURT:  All right.  Again, pattern instruction,

19   Page 6, the evidence.  Any objection from the government?

20          MR. JONAS:  No, your Honor.

21          THE COURT:  Mr. Haas?

22          THE DEFENDANT:  No, your Honor.

23          THE COURT:  All right.  No. 7, the same thing.  It's

24   considering the evidence, another pattern instruction.  Any

25   objection from the government?

1          MR. JONAS:  No, your Honor.

2          THE COURT:  From the defendant?

3          THE DEFENDANT:  No, your Honor.

4          THE COURT:  Okay.  And maybe we can group a few of

5    these just because they are pattern instructions -- well, I

6    can only do the next two.  So Pages 8 and 9, direct and

7    circumstantial evidence and then number of witnesses, is there

8    any objection from the government?

9          MR. JONAS:  No, your Honor.

10         THE COURT:  From Mr. Haas?

11         THE DEFENDANT:  No, your Honor.

12         THE COURT:  All right.  We do need to remove Page 10.

13         Okay.  Next, let me see if I can group a few -- well,

14    no, I can't.  So Page 11, credibility of witnesses from the

15    pattern.  Let's see.  I think there's a bracket around

16    "consistent."  Arguably -- let's see.  I think Mr. Haas might

17    have gotten a consistent statement in regarding the

18    confrontation outside his apartment, just that a gun was

19    pointed at him.  So I propose to remove that bracket.

20         And then is there any objection from the government?

21         MR. JONAS:  No, your Honor.

22         MS. KELLY:  Your Honor, there's one more bracket at

23    the top, "including that of the defendant."

24         THE COURT:  Right.  So we'll remove that because we

25    do have to include that phrase.

1          Okay.  Mr. Haas, any objection after those edits are

2     made?

3          THE DEFENDANT:  No, your Honor.

4          THE COURT:  All right.  Okay.  Page 12, those have to

5     be adjusted as well.  This first paragraph was about uncharged

6     statements.  And Mr. Haas had declined to have this

7     instruction be read.  Is that still your position, Mr. Haas?

8          THE DEFENDANT:  You can go ahead and read it, I

9     guess.  I mean, it doesn't matter.

10          THE COURT:  All right.  What's the government's

11     position?

12          MR. JONAS:  We're fine with you reading it, your

13     Honor.  So no objection.

14          THE COURT:  I'll leave that in.

15          Paragraph 2 was given in trial as well but it should

16     be given again at the end.  Any objection from the government?

17          MR. JONAS:  No, your Honor.

18          THE COURT:  Mr. Haas?

19          THE DEFENDANT:  No, your Honor.

20          THE COURT:  All right.  Let's see if I can group

21     again.  Well, no.  We should just take it one by one.  Any

22     objection to Page 13?  This is also a pattern instruction.

23     From the government?

24          MR. JONAS:  No, your Honor.

25          THE COURT:  Mr. Haas?

1          THE DEFENDANT:  No, your Honor.

2          THE COURT:  All right.  Page 14, testimony about

3   statements.  Let me just make sure everyone on this list did

4   testify.

5          Okay.  There's an extra "and" before "Joseph

6   Kostuchowski."  I'll take that out.  The Oxford comma has got

7   to get in there after "Kostuchowski" as a fervent believer of

8   the Oxford comma.  Okay.  So with those typographical changes,

9   is there any objection from the government?

10          MR. JONAS:  No, your Honor.

11          THE COURT:  Mr. Haas?

12          THE DEFENDANT:  No, your Honor.

13          THE COURT:  Okay.  Now, the identification, I think

14   we got a stipulation each time.  It's probably not necessary.

15   So any objection to removing this one on Page 15 from the

16   government?

17          MR. JONAS:  No, your Honor.

18          THE COURT:  Mr. Haas?

19          THE DEFENDANT:  No, your Honor.

20          THE COURT:  All right.  We'll take -- delete that.

21          Okay.  Page 16 also should be deleted because this

22   witness did not testify.  I'll just confirm, the government

23   has no objection to that?

24          MR. JONAS:  No objection.

25          THE COURT:  And Mr. Haas, no objection, right?

1          THE DEFENDANT:  No, your Honor.

2          THE COURT:  Okay.  Next, Page 17 is audio and video

3  recording evidence.  And this also comes from the pattern

4  instruction.  All right.  Any objection from the government?

5          MR. JONAS:  No objection.

6          THE COURT:  Mr. Haas?

7          THE DEFENDANT:  No, your Honor.

8          THE COURT:  Well, hold on.  Let me see if -- yes.  I

9  anticipated since the transcripts were put into evidence

10  sending those back in the first instance.  So the last

11  paragraph would be deleted.  And the jury's instructed that

12  the transcripts are not evidence but it's a guide.

13          All right.  Is there any objection to removing that

14  last sentence --

15          MR. JONAS:  No, your Honor.

16          THE COURT:  -- and putting the transcripts back in

17  deliberations?

18          Mr. Haas, any objections to that?

19          THE DEFENDANT:  No, your Honor.  But I just have a

20  question.  Just as the jurors were nervous about me seeing

21  their names and identities and stuff like that on their

22  information charts -- I'm not sure what you would call

23  those -- are the jurors allowed to take their notes home?

24          THE COURT:  No.

25          THE DEFENDANT:  No?

1          THE COURT:  They will not be taking their notes home.

2     They have to leave it there, and then we just shred them.

3          All right.  We'll delete that last paragraph.  I'll

4     send the transcripts back.

5          And I believe there was one juror who had expressed

6     just a question, does the defendant review the forms.  So it

7     was one, not multiple.

8          Okay.  Note taking which is on Page 18 of Court set

9     1, again, this is from the pattern.  I just want to make sure

10    it jibes with -- yes.  Okay.  So is there any objection from

11    the government to this one?

12         MR. JONAS:  No, your Honor.

13         THE COURT:  Mr. Haas?

14         THE DEFENDANT:  No, your Honor.

15         THE COURT:  All right.  Page 19 is also from the

16    pattern.  Any objection from the government?

17         MR. JONAS:  No, your Honor.

18         THE COURT:  Mr. Haas?

19         THE DEFENDANT:  No, your Honor.

20         THE COURT:  We can group a few of these.  Let's see.

21    Just two, Pages 20 and 21, separate consideration of charges,

22    punishment not relevant.  Is there any objection from the

23    government?

24         MR. JONAS:  No, your Honor.

25         THE COURT:  Mr. Haas?

1          THE DEFENDANT:  No, your Honor.

2          THE COURT:  All right.  The elements of threatening a

3     federal law enforcement officer, Page 22, any objection from

4     the government?

5          MR. JONAS:  Yes.  Yes, your Honor, we do.

6          THE COURT:  All right.

7          MR. JONAS:  Your Honor, you injected the *Alaniz*

8     intent requirement into this instruction.  And I think that's

9     number --

10          THE COURT:  2.

11          MR. JONAS:  -- 2, element 2.

12          THE COURT:  Yes.

13          MR. JONAS:  And it's the government's position that

14     in *Alaniz*, the Court in discussing 875(c), if I remember

15     correctly, said there was no intent element in that statute

16     and read in the intent element.  And there are cases, not many

17     admittedly, but there are cases that talk about -- I think 115

18     cases where *Alaniz* doesn't apply because 115 has its own

19     intent element and, therefore, it's not necessary to add the

20     additional intent element.  And I can cite these cases for

21     your Honor if that would help.

22          THE COURT:  Yes.  All right.  One second.

23          All right.  Go ahead with the citations.

24          MR. JONAS:  The first one, *United States versus*

25     *Ivers*, I-v-e-r-s.  It's 2020 Westlaw 421, 216.1 at 8.  It's an

1    Eighth Circuit case that's July 23rd, 2020.

2           THE COURT:  So is it -- is that published, or is it

3    unpublished, or is it just too recent that it doesn't have

4    a --

5           MR. JONAS:  I think it's too recent, your Honor.

6           THE COURT:  Okay.  Hold on.  I can just pull it up.

7           Yes, I thought of this concern, but there are reasons

8    to think -- obviously, if there's a Seventh Circuit case of

9    the contrary or persuasive other case -- that there are two

10   different forms of intent that are at play.  One has to do

11   with the intent that it be taken as a true threat, and the

12   other one is, okay, even if that's happened, then why did you

13   do it.  And you had this additional intent to impede,

14   intimidate, and interfere or to retaliate.

15          So they're not necessarily inconsistent, but I'll

16   certainly take a look at the case.

17          MR. JONAS:  We recognize that they're not

18   inconsistent, Judge, but we think it's unnecessary to add that

19   second intent element.

20          And I think there's also two other cases if I can

21   give the citation.  And I'm sorry, Judge.  I don't have it in

22   front of me.  They're both Westlaw citations.  One is *United*

23   *States versus Segui*, S-e-g-u-i.  That's 219 WL 858, 729.1 at

24   Page 12.  And that's an Eastern District of New York case from

25   2019.

1          And the last one is United States -- let me know if

2    you're ready for me.

3          THE COURT:  All right.  One second.

4          Okay.

5          MR. JONAS:  *United States versus Nicholas*,

6    N-i-c-h-o-l-a-s, 219 WL 377, 4622 at Page 2.  And that's

7    Western District of Virginia from August of 2019.

8          THE COURT:  Okay.  I'll take a look at those and let

9    you know what I think.

10         MR. JONAS:  Thank you, Judge.  In terms of the rest

11   of the instruction No -- - Page 22, we have no objection.

12         THE COURT:  Okay.  Mr. Haas, do you have a position

13   on this elements instruction, any objection to it or any

14   response to what the government just said?

15         THE DEFENDANT:  I -- no.  I mean, you're going to do

16   what precedent says, so no.

17         THE COURT:  Okay.  All right.  I'll take a look at

18   that tonight, and I'll post something on the docket so you

19   know.  I'm going to post a revised set, obviously.  And just

20   for your information, you can display the instructions once

21   they've been finalized.  So if you want to incorporate them

22   into the closing argument, you can do that.

23         Okay.  Page 23, definition of true threat.  Any

24   objection from the government?

25         MR. JONAS:  We have a requested modification or an

 1    additional line to add.  We have no objection to the way it's

 2    written, but we'd like to add an additional line.

 3              THE COURT:  All right.  Go ahead.

 4              MR. JONAS:  So I haven't written it out, Judge, so I

 5    don't have the exact wording but what it is, is we'd like to

 6    put in there that the threat did not -- a threat can be

 7    conditional.  And certainly you can balance it out by saying,

 8    you know, and that's a factor the Court -- the jury can

 9    consider in whether or not it's a true threat.

10              And so in other words, to use an example taken from

11    the case I'm about to cite, "Your money or your life," that's

12    viewed as a threat but it's a conditional threat:  "If you

13    don't give me your money, then you're going to give up your

14    life."

15              The case, *United States versus Schneider,* is one of

16    the cases.  I think this one is most directly on point.

17    S-c-h-n-e-i-d-e-r.  It's 910 F. 2nd 1569.  The Supp. cite is

18    1570.  It's 1990 Seventh Circuit case.  And there are other

19    cases on this, but this case states, "Most threats are

20    conditional.  They are designed to accomplish something.  The

21    threatener hopes that they will accomplish it so that they

22    won't have to carry out the threats.  They are threats

23    nonetheless."

24              So many of the threats that the government has

25    presented in the indictment states, you know, "If you do

1    something, then I will kill you" because I'm paraphrasing.  So

2    we want the jury to understand that that "if" doesn't make it

3    any less of a threat because it's conditional.

4           THE COURT:  Okay.  That was the state trial court

5    judge, and the letter was the Illinois Supreme Court saying

6    that if he doesn't straighten out, then he will be executed.

7           MR. JONAS:  I believe that's the --

8           THE COURT:  So I see your point.

9           Mr. Haas, what's your response to that?

10          THE DEFENDANT:  The United States Supreme Court has

11   declined to establish any bright line test for distinguishing

12   a true threat from protected speech.  I believe that should be

13   told to the jury, and they should decide.

14          THE COURT:  Okay.  It's generally true that there is

15   no bright line, nor is the government asking for one.  I would

16   not --

17          THE DEFENDANT:  Well, we put a bunch of them on here.

18   I would like this to be stipulated on there.

19          THE COURT:  All right.  Just one moment.  I think the

20   idea is to give the jury as I try to do as neutrally as

21   possible in the definition of true threat, and I explain this

22   in the order as well that accompanied this first court set,

23   that there are circumstances that might point way or the other

24   but is not an absolute necessity to prove in every case.

25          And this, I think, may be one of them.  I'll mull it

1    over some but the --

2         THE DEFENDANT:  This also -- I'm sorry.

3         THE COURT:  Just to finish up, on the bright line

4    standard, that language you just read, I don't think that's

5    helpful for the jury to hear that as opposed to just getting

6    the standard which is not a bright line standard.  And so I

7    don't think we need to express that to them further.

8         So just to be clear, I'm not -- it's not like I'm

9    going to give an instruction saying that a conditional

10   statement equals a threat.  In fact, it's kind of the

11   opposite.  And I would add a sentence that it can be

12   considered in -- by the jury in deciding whether a

13   communication is a true threat.

14        THE DEFENDANT:  Can we add that the federal circuits

15   have failed to reach a consensus on what constitutes a true

16   threat?

17        THE COURT:  That is rejected.  We do have case law

18   from the Seventh Circuit and the United States Supreme Court

19   that I have incorporated into this instruction.  And so I

20   think that's not an accurate statement of the law as far as

21   what should be delivered to the jury.

22        Let me just think about this for a second because I

23   do want to get your reaction to the potential language.

24        (Pause.)

25        THE COURT:  All right.  So the trick is to explain to

1     the jury in plain language the concept of conditional without

2     just leaving it as "conditional."

3          MR. JONAS:  Your Honor, maybe something -- if I could

4     make a suggestion.

5          THE COURT:  Go ahead.

6          MR. JONAS:  So I'm looking at the paragraph that says

7     a threat does not need to be communicated directly.  Maybe a

8     line in that paragraph that says, "a threat can be

9     conditional; however," you know, "you can consider a

10    conditional statement in determining whether a communication

11    is a true threat."

12         THE COURT:  Yes, so that is a paragraph that is

13    explaining what a threat need not -- not necessarily be

14    communicated directly to its intended victim or say that the

15    defendant himself would be the one to commit a violent act or

16    specify.  So it's a bunch of "not's."  This is a little

17    different because it's trying to explain to the jury that a

18    threat may be conditional.

19         Okay.  Let me try this out:  "A threat may be

20    conditional, that is, may threaten violence if some condition

21    is not fulfilled.  Once again, however, the fact that a

22    communication is conditional can be relevant in deciding

23    whether a communication is a true threat."

24         Any objection from the government?

25         MR. JONAS:  No, Judge.  We're fine with that.

1          THE COURT:  Okay.  Mr. Haas?

2          THE DEFENDANT:  No, your Honor.

3          THE COURT:  Okay.  That's the new paragraph 4.

4          Moving on to Page 24, this just comes out of the

5    statute.  Is there any objection from the government?

6          MR. JONAS:  No, your Honor.

7          THE COURT:  Mr. Haas?

8          THE DEFENDANT:  No, your Honor.

9          THE COURT:  Okay.  Page 25, so Mr. Haas, just to

10   explain to you, there's in Count 5 as you have seen in the

11   second superseding indictment, it alleges multiple

12   communications that the government alleges qualify as a

13   threat.  What this instruction is telling the jury is that

14   they do have to be unanimous if they're going to rely on a

15   particular communication to find you guilty on Count 5.

16         They have to be unanimous on that, on one particular

17   statement at the least.  In other words, six of them -- there

18   should be no conviction if six of them say, "Yeah, that first

19   statement is a threat and then" --

20         THE DEFENDANT:  I understand, your Honor.

21         THE COURT:  So obviously, this is protective of you.

22   Do you have any objection to that?

23         THE DEFENDANT:  No, I don't.

24         THE COURT:  So 25 -- I think you proposed it.  The

25   government proposed it.  So is there any objection to it?

1          MR. JONAS:  No, your Honor.  No objection.

2          THE COURT:  26 is elements of transmitting a threat

3     in interstate commerce.  This is for the 875 counts.  Any

4     objection from the government?

5          MR. JONAS:  No, your Honor.

6          THE COURT:  Mr. Haas?

7          THE DEFENDANT:  No, your Honor.

8          THE COURT:  Okay.  And then the next page is the

9     definition of "knowingly."  This comes from the pattern, and

10    we need it for the 875 because it uses the word "knowingly."

11    Any objection from the government?

12         MR. JONAS:  No, your Honor.

13         THE COURT:  Mr. Haas?

14         THE DEFENDANT:  No, your Honor.

15         THE COURT:  Okay.  Page 28, I'm just referring them

16    back to the definition of true threat that applied before.

17    Any objection from the government?

18         MR. JONAS:  No, your Honor.

19         THE COURT:  From Mr. Haas?

20         THE DEFENDANT:  No, your Honor.

21         THE COURT:  Okay.  Definition of "interstate

22    commerce," is there any objection from the government?  This

23    is Page 29.

24         MR. JONAS:  No, your Honor.  I guess the only -- I'm

25    hesitating for one reason.  And I know I think we proposed

1      this.

2                  THE COURT:  You did.

3                  MR. JONAS:  The only question I raise, and this cuts

4      against what we proposed, in the -- it doesn't apply to this

5      case, but I want to be perfectly clear.  In the rare

6      circumstance if someone is in the state of Illinois and then

7      sends a message to someone in the state of Illinois and it

8      doesn't go through Google or G-Mail or something, if it's all

9      an internal server, arguably it's not interstate commerce.

10                 So, of course, we don't have that here.  We have

11     Ottawa, Illinois, to Russia so it's not a problem.  But I just

12     want to make sure that the Court recognizes that there are

13     some rare circumstances that could come up where that may not

14     apply, that instruction may not apply.

15                 THE COURT:  Well, yes.  You proposed this.  This is

16     a -- this is a broad definition.

17                 MR. JONAS:  Yes.

18                 THE COURT:  I held ultimately that it was correct,

19     but it's certainly arguable.  If you want to change it so that

20     it incorporates the idea that the transmission -- or that the

21     communication had to cross state lines, then I will include

22     that.  I have no problem, you know, being more protective than

23     what the case law, I think, demands.  So I'm perfectly happy

24     to do that.

25                 MR. JONAS:  I'm -- I know it's better for us, for the

1 government, if it remains as-is.  So I'm happy leaving it as

2 is --

3    THE COURT:  Well --

4    MR. JONAS:  -- but I'm just putting it out there in

5 case the defendant wants to raise it.  I'm just trying to make

6 sure he's aware.

7    THE COURT:  You propose a particular legal principle,

8 and I took a look at the cases.  They were not necessarily on

9 point directly because of the "in or affecting commerce," that

10 we don't have in or affecting.  We do have transmitted in

11 interstate commerce, and by analogy, I think it does then

12 satisfy if it's transmitted over the internet.

13    Now, if you are saying that you believe it actually

14 does require the communication to cross state lines, then we

15 should incorporate that in here.  And when you say "better for

16 government," just if that legal principle that's on this page

17 right now is incorrect, then there may be an issue on appeal.

18    MR. JONAS:  And that's why I'm raising it, Judge,

19 because I want to make sure if this goes up on appeal that the

20 Seventh Circuit doesn't focus on this issue.

21    THE COURT:  Yes.  And, of course, you know, the -- I

22 have two interests.  One is to make sure I get the legal

23 principle correct.  And I think it's correct.  However, the

24 other interest I have is if you don't need to push it that

25 far, then we should be more protective and more cautious.  So

1   we could add, "this requirement is satisfied when the

2   communication was transmitted or received over the internet

3   and the communication crosses state lines or" --

4           MR. JONAS:  State line or national line or

5   international line -- forget about the second part.  "State

6   line," I think is fine.

7           THE COURT:  "Was transmitted or received over the

8   internet and crossed from" -- how about this, just to mimic

9   the first sentence of the first paragraph -- "from inside a

10  state to outside a state."

11          MR. JONAS:  That's fine, your Honor.  Factually, I

12  think there's no question that's what happened here, so I'm

13  not concerned about it.  I just want to make sure, like we

14  said, the Seventh Circuit doesn't come back and have an issue

15  with it.  So I think your proposed language is fine.  And I

16  apologize for not raising this when we submitted these.

17          THE COURT:  Okay.  And then I need to make that

18  language in the next sentence:  "It is for you to decide,

19  however, if the communication was transmitted or received over

20  the internet and crossed from inside a state to outside a

21  state."

22          Okay.  Any objection to that, Mr. Haas?

23          THE DEFENDANT:  No, your Honor.

24          THE COURT:  This is the more protective version for

25  you.

1          Page 30, this is what I've been telling the jury all

2    along, that the First Amendment protections have been

3    incorporated into the legal instructions that I will give

4    them.  All right.  So is there any objection to this from the

5    government?

6          MR. JONAS:  No, your Honor.

7          THE COURT:  Mr. Haas?

8          THE DEFENDANT:  What are the legal instructions that

9    you're going to give them?

10         THE COURT:  All the things, all the instructions that

11   we've been talking about so far including those elements

12   instructions and the definition of true threat, those are the

13   instructions I'm referring to.

14         THE DEFENDANT:  Okay, your Honor.

15         THE COURT:  All right.  Anything else to propose on

16   this, Mr. Haas?

17         THE DEFENDANT:  No, your Honor.

18         THE COURT:  Okay.  Next is the elements of

19   entrapment.  I understand the government objects obviously to

20   the proffering of that defense, but do you have any objections

21   to the instruction itself?

22         MR. JONAS:  We have no objection to the instruction

23   but, as you said, Judge, we don't think he met -- he provided

24   any evidence that even comes close to the threshold that he

25   must pass, as low as that threshold is.

1    THE COURT:  Okay.  Mr. Haas, any response?

2    THE DEFENDANT:  I'm sorry.  I was reading this.  I

3    missed what he said.

4    THE COURT:  Mr. Jonas is proposing to preclude you

5    from arguing entrapment, that you were induced into committing

6    the offense and that you lacked predisposition to commit it.

7    THE DEFENDANT:  I was definitely predisposed to a few

8    comments -- or not predisposed, induced because I would never

9    have said it if he didn't say, "You're all talk.  You're a

10   keyboard warrior.  You'll never do anything."  I would have

11   never said that to him.  If he didn't have the attitude he

12   had, I would have never done it.

13   Predisposed, making a threat, I'd like to know what

14   actual threats that I've been charged with before that that

15   I've been convicted of that prove that I've made a threat.  I

16   have no convictions for a threat.  So you are inventing this

17   predisposition by -- I don't know where you're coming up with

18   it.

19   THE COURT:  All right.  You're going to win on this

20   point.  I think given the minimal level of burden that the

21   defense has to offer in order to get this in front of the

22   jury, I'll keep it in.  Do you have any objection, Mr. Haas,

23   to the wording on Page 31, the elements of entrapment?

24   THE DEFENDANT:  No, your Honor.

25   MR. JONAS:  Your Honor, before we walk away from it.

1          THE COURT.  Yes.

2          MR. JONAS:  So what the defendant just proffered

3   pertains to Counts 1 through 5.  There's been nothing at all

4   to show any entrapment at all with regard to Counts 6 through

5   13.

6          THE COURT:  He -- count 6 is December 2018.  He

7   described the January 25, 2018, encounter and, you know, with

8   the different version of what the agent said.  So you can

9   certainly argue that that time gap makes the inducement --

10  well, obviously, you're going to argue there was no

11  inducement, but that time gap completely undermines it.  You

12  can argue that to the jury, but I will not take it away from

13  the jury.

14         MR. JONAS:  Okay.

15         THE DEFENDANT:  Thank you, your Honor.

16         THE COURT:  All right.  Page 32, on the wording

17  again, I understand the government's objection, but on the

18  wording of definition of induce.

19         MR. JONAS:  No, your Honor.  No objection to the

20  definition.

21         THE COURT:  All right.  Mr. Haas?

22         THE DEFENDANT:  No objections.

23         THE COURT:  All right.  I think we do need to remove

24  the bracketed language.  On Page 33, definition of predispose,

25  there was not -- there were some references to arrests and so

1   on but nothing of detail in criminal history, so I think we

2   need to remove that. And with that removed, any other

3   comments on the wording? From the government?

4           MR. JONAS: No, your Honor.

5           THE COURT: Mr. Haas?

6           THE DEFENDANT: No, your Honor.

7           THE COURT: Okay. One second. Let me just take a

8   note.

9           Okay. Page 34, obviously that's a pattern

10   instruction. I'll review the verdict form with them. Any

11   objection from the government?

12           MR. JONAS: No, your Honor.

13           THE COURT: Mr. Haas?

14           THE DEFENDANT: No, your Honor.

15           THE COURT: I'm sorry. Let me just take a note. I

16   just realized I can't hand out the verdict form. I usually

17   hand it out and review it with the jury. I'll just display it

18   on their screens. So I just need to take a note on that.

19   I'll try to be a little bit more careful about what's shown on

20   the screen.

21           All right. Next is, so these last two, Page 35 is

22   jury deliberations from the pattern. Page 36, unanimity,

23   slash, disagreement among jurors from the pattern. That's the

24   *Silvern* instruction. So these are the two I won't read until

25   after everyone's closed and made their closing arguments.

514

1              Are there any objections to 3 -- Pages 35 and 36 on

2    this docket entry?

3              MR. JONAS:  No, your Honor.

4              THE COURT:  Mr. Haas?

5              THE DEFENDANT:  No, your Honor.

6              THE COURT:  Okay.  Any other proposed instructions

7    from the government?

8              MR. JONAS:  No, your Honor.

9              THE COURT:  Mr. Haas, anything else?

10             THE DEFENDANT:  No, your Honor.

11             THE COURT:  All right.  Now, you should also have the

12   verdict form.  It's very simple.  I'm not -- is that in the

13   papers I gave to you just now, Mr. Haas, a verdict form?

14             THE DEFENDANT:  Yes.

15             THE COURT:  Okay.  So it's just one page obviously --

16   well, it's actually two pages.  The signatures --

17             THE DEFENDANT:  The signatures on the --

18             THE COURT:  Yes, there's a second page.  So any

19   objection from the government to how it's formatted?

20             MR. JONAS:  No, your Honor.

21             THE COURT:  And Mr. Haas?

22             THE DEFENDANT:  No.

23             THE COURT:  Okay.  All right.  And just to make sure

24   before we go through the exhibits -- okay.  Mr. Haas, you

25   probably -- there was a modified lockdown yesterday

1   apparently.  And so the staff at the MCC should have still let

2   you go to the discovery computer.  So I have talked to the

3   attorney or emailed back and forth the attorney advisor.

4   They're going to tell the staff today that you, if you want --

5   I don't know if you're going to want it, but you do have

6   access to the discovery computer.  All right?

7           THE DEFENDANT:  Yes, your Honor.

8           THE COURT:  Now, for the closings -- all right.

9   Mr. Haas, in order to display exhibits, if you want to display

10  exhibits during closing, you've got to have the exact correct

11  exhibit number.  And if it's -- whether it's a page number or

12  part of a clip of something, you have to have at least a

13  general timestamp to get you there unless you want to play the

14  whole clip, which is also okay.  And I will direct the

15  government to display it during the closing.  All right?

16          THE DEFENDANT:  If I was to ask them to play

17  anything, it would be stuff that we've already used, your

18  Honor.

19          THE COURT:  Yes.  It has to be.  There's no doubt

20  about that, right, because only allowed evidence can be --

21          THE DEFENDANT:  What's already admitted, yes.

22          THE COURT:  -- can be discussed in closing.

23          But I'm saying that you need to have the number,

24  government exhibit whatever it is or defense exhibit whatever

25  it is --

1      THE DEFENDANT:  I have the list.  Yes.

2      THE COURT:  Okay.  I just want you to be prepared for

3  that because it will not be sufficient, for example, to say,

4  "Oh, yeah, you know that transcript when we said X, and please

5  put that up."  So they're just -- again, at my request,

6  they're just going to display based on what you exactly say.

7  All right?

8      THE DEFENDANT:  Yes, your Honor.

9      THE COURT:  Okay.  Let's go through the exhibits and

10  just make sure we're all on the same page as to what's been

11  allowed and not allowed.  Have you been keeping track,

12  Mr. Haas, more or less or not?

13      THE DEFENDANT:  Well, there's only been one added

14  that wasn't allowed, and that was No. 7.

15      THE COURT:  Right.  I just -- in trial, sometimes not

16  every exhibit has been allowed previously and it was actually

17  offered, and then sometimes something goes wrong whether it's

18  foundation or otherwise and an exhibit gets excluded at trial

19  that otherwise was going to be in.  So we'll just do a

20  double-check and make sure that we're all on the same page.

21  All right?

22      THE DEFENDANT:  From my understanding, it would be

23  just whatever had already been allowed to show the jury, not

24  things where I would need the witness, right?  Correct?  That

25  would have been during my cross-examination.

1          THE COURT:  So each time an exhibit has been offered,

2     I've either said "allowed" or not.  And so those are the

3     exhibits that you can refer to in closing.  And we're just

4     going to double-check that now.

5          So on my list here as allowed evidence -- okay.  And

6     then you tell me if I skip a number and just stop me at that

7     point.  What I have is in is:  Government 1, 2, 3, 4, 5, 7, 8,

8     9, 10 through 17; Government 20, 21, 22; 25 through 35;

9     Government 43, 48, 50, 51, 53, 54; 57 through 60; Government

10    61, 62; 64 through 66; Government 68, 70; 73 through 87; 96,

11    97, 98, 102, 111; 112 through 128; then Government 201, 202,

12    203, 204; 207 through 228.

13         All right.  That's what I've got for the government.

14    Does that square with the government's list?

15         MR. JONAS:  No, your Honor.

16         THE COURT:  All right.  So what have you got?

17         MR. JONAS:  So 218, 219, we did not admit.

18         THE COURT:  Oh, you're right.  Okay.  You're right.

19    Okay.

20         MR. JONAS:  223 and 224 were not admitted.

21         THE COURT:  That is correct.

22         MR. JONAS:  And then 237 through 254, I believe.

23    Yes, through 254 I believe were the transcripts admitted

24    today.

25         THE COURT:  Okay.  I think it might be 253.

1        MR. JONAS:  Your Honor, if I can just check one

2   second.  Let me just check one second, your Honor.

3        THE COURT:  All right.

4        MR. JONAS:  253.  You're right.

5        THE COURT:  Yes.  I missed those last set.  So 237

6   through 253.

7        MR. JONAS:  Correct.

8        THE COURT:  All right.  Any comments on the list,

9   Mr. Haas?

10       THE DEFENDANT:  No, your Honor.

11       THE COURT:  Okay.  For defense exhibits, the

12  following were allowed:  1, 5, 6, 7, 8, 19.  Does that square

13  with the government's list?

14       MR. JONAS:  Yes, Judge.  I was keeping track.  I

15  can't find my list.  That sounds right from what I recall.

16       THE COURT:  Do you want to just write down what I

17  just said, or do you have that?

18       MS. KELLY:  I wrote it down.  I can check it, Judge.

19  I remember.

20       MR. JONAS:  It sounds right.

21       MS. KELLY:  I'll just look through.

22       MR. JONAS:  I apologize, Judge.  I was keeping good

23  notes.

24       THE COURT:  As you're looking, I'll ask Mr. Haas,

25  does that sound right?

1           THE DEFENDANT:  That's the same with my list, yes.

2           THE COURT:  All right.

3           MS. KELLY:  7 were the new photos, correct?

4           THE COURT:  That's correct.

5           MS. KELLY:  Yes.

6           THE COURT:  All right.  Okay.  Anything else for the

7 government?

8           MS. KELLY:  One point, your Honor.  We've had a

9 little trouble with some of the audio clips.  And I didn't

10 know when the exhibits go back to the jury, is there a way to

11 provide a set of speakers to be plugged into the laptop if

12 needed?  I didn't know what the sound system was going to be

13 like in the jury room.

14           THE COURT:  Yes.  That's a good question.  I'm going

15 to test it at 4:00 o'clock.  I've got a meeting with Systems

16 in there and I'm going to -- we're going to publish the

17 exhibits.  Obviously, we'll then take them down and they won't

18 know how to turn it on anyway, and I'm going to try to listen

19 to the things like 17, for example, which I think was the

20 lowest volume one and see how it turns out.

21           MS. KELLY:  Okay.  Thank you.

22           THE COURT:  And if I think there needs to be some

23 other mechanism, then I'll talk to Systems about it.

24           MS. KELLY:  Thank you.

25           THE COURT:  All right.  Mr. Haas, anything else?

1          THE DEFENDANT:  No, your Honor.

2          THE COURT:  All right.  Just remember, you do have

3    one hour for closing argument.  And I think we are set.

4          All right.  I'll see you tomorrow.  Thanks.

5          MR. JONAS:  Judge, 9:00 o'clock?

6          THE COURT:  Yes.  If you -- just get here at 8:45.

7    It's helpful in case we need to test anything out.

8          MR. JONAS:  Thank you, Judge.

9          THE COURT:  All right.  Thank you, Ms. Singer.

10         (Proceedings adjourned from 3:17 p.m. to August 6, 2020,

11         at 8:45 a.m.)

12                         *  *  *  *  *  *  *

13                    C E R T I F I C A T E

14         I, Judith A. Walsh, do hereby certify that the

15   foregoing is a complete, true, and accurate transcript of the

16   proceedings had in the above-entitled case before the

17   Honorable EDMOND E. CHANG, one of the judges of said court, at

18   Chicago, Illinois, on August 5, 2020.

19

20   /s/ Judith A. Walsh, CSR, RDR, F/CRR_____  September 11, 2020

21   Official Court Reporter

22   United States District Court

23   Northern District of Illinois

24   Eastern Division

25